Case 1:01-cv-00148   Document 25   Filed in TXSD on 09/11/2002   Page 1 of 13

'25

United States District Court
Southern District of Texas
FILED

SEP 1 1 2002

Michael N. Milby
Clerk of Court

700.0078/1794

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| EXEL BOBBINS AND PLASTIC COMPONENTS, INC. | § § | |
| Plaintiff | § § | |
| VS. | § § | CIVIL ACTION NO. B-01-148 JURY |
| | § | |
| JSW PLASTICS MACHINERY, INC. Defendant | § § § | |

**PLAINTIFF'S FIRST AMENDED ORIGINAL COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, EXEL BOBBINS AND PLASTIC COMPONENTS, INC., Plaintiff and files this its First Amended Complaint against JSW PLASTICS MACHINERY, INC. and JAPAN STEEL WORKS AMERICA, INC., Defendants, and would show the Court as follows:

**I.**

1.  EXEL BOBBINS AND PLASTIC COMPONENTS, INC., ("EXEL") is a Texas Corporation with its principal place of business in Brownsville, Cameron County, Texas.

2.  JSW PLASTICS MACHINERY, INC., ("JSW") is a Delaware corporation with its principal place of business in Anaheim, California. "JSW" has made an appearance and no service is requested at this time.

3.  JAPAN STEEL WORKS AMERICA, INC., ("JSWA") is a New York Corporation with its principal place of business in New York. "JSWA" may be served with process by serving its registered agent, C.T. Corporation System, 350 N. St. Paul, Dallas, Texas 75201.

*Motion To Appear As Lead Counsel - Page 1*

## JURISDICTION

4. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §1332(a) in that there exists complete diversity of citizenship between EXEL and "JSW" and "JSWA." In addition, the amount in controversy exceeds the amount of $75,000.00.

## VENUE

5. Venue is proper in the Brownsville Division of this Court pursuant to 28 U.S.C. §1391(b)(2) in that a substantial part of the events or omissions giving rise to EXEL's claims occurred in Brownsville, Cameron County, Texas.

## FACTUAL BACKGROUND

6. Beginning in 1999, EXEL inquired of JSW whether JSW would sell to EXEL certain JSW plastic molding machines. EXEL sought to purchase JSW molding machines in order to provide plastic molding services to its customer, including, but not limited to, Sunbeam-Oster. Further, EXEL inquired whether JSW would extend a line of credit to EXEL specifically for EXEL's purchase of certain JSW machines from JSW. Thereafter, on or about February 2000, JSW confirmed, in writing to EXEL, that JSW would provide and sell the molding machines needed by EXEL to provide services to its customers. (See attached Exhibit "1").

7. In that connection, JSW knew that the JSW machines which EXEL sought to purchase and finance were being purchased by EXEL in order that EXEL would provide services to its customers. Further, JSW had knowledge of specific customers of EXEL for which EXEL would provide services by means of the JSW machines. For example, JSW knew that EXEL sought to purchase and finance certain JSW machines in order to provide services specifically to Sunbeam-Oster. In that regard, JSW had knowledge of EXEL's ongoing business relationship with Sunbeam-Oster. More significantly, JSW had knowledge of EXEL's prospective business

and contractual relationship with Sunbeam-Oster. Accordingly, JSW represented to EXEL, Sunbeam-Oster and other EXEL customers, in writing, that an inventory of JSW machines would remain available to meet EXEL's needs and that JSW would provide to EXEL "full support on an on-going basis." JSW further represented that JSW had "extended a credit line of $1,500,000.00 to EXEL for the purchase of JSW's products and services ...". EXEL relied upon these representations and further acted in reliance upon the same. As a result, EXEL incurred expenses, costs and other liabilities including, but not limited to, other contractual obligations.

8. Thereafter, on or about January 2001, EXEL and JSW entered a written agreement ("contract") setting forth, among other things, that JSW would sell certain JSW machines to EXEL, would extend a credit line to support the purchase of said machines and that the JSW machines would be delivered to EXEL pursuant to the contract. (See attached Exhibit "2"). The contract was delivered to EXEL by JSW's Vice President of Operations, Jerry Johnson on behalf of JSW. On or about April 2001, EXEL paid the amount of $4,788.92 pursuant to the contract as the initial down payment. Nevertheless, on or about May 10, 2001, JSW advised EXEL that it would not perform its obligations set forth in the contract. Consequently, EXEL has been caused to suffer injury and damages beyond the minimum jurisdictional limits of this Court.

## BREACH OF CONTRACT

9. At all times relevant, there exists an enforceable contract between EXEL and JSW. There was a valid offer and valid acceptance of said offer. Further, EXEL and JSW mutually assented to the contract. In addition, JSW executed the contract and delivered the same with the intent that such contract be mutual and binding. There exist mutual obligations of the parties which support such contract. Further, EXEL performed or tendered performance of its

obligations set forth in the contract. Nevertheless, JSW has breached the contract and said breach has caused EXEL injury and damages.

10.     Specifically, JSW has breached the contract by failing, without legal justification, to perform one or more of the terms of the contract. That is, JSW breached the contract by failing and refusing to deliver the JSW machines to EXEL as set forth in the contract. Further, JSW has breached the contract by failing and refusing to provide EXEL the line of credit as set forth in the contract. In short, JSW has refused to perform the contractual obligations set forth in the contract.

11.     JSW has further breached the contract by, without legal justification, taking actions inconsistent with the existence of such contract. That is, JSW failed and refused to deliver JSW machines to EXEL and to extend the credit line to EXEL as set forth in the contract, thereby acting inconsistent with the existence of the contract and the obligations set forth therein. Further, JSW received, accepted and retained EXEL's performance and tender of down payment made pursuant to the contract and thereafter failed and refused to perform JSW's obligations in the contract inconsistent with th existence of the contract.

12.     JSW has further breached the contract by failing, without legal justification, to recognize the existence of such contract. That is, JSW by its actions has expressed its refusal to recognize the existence of the contract and its obligations to EXEL set forth therein.

13.     JSW has further breached the contract by, without legal justification, expressing its fixed intent to abandon and renounce the contract and by refusing to perform pursuant to the terms of the contract.

14.     As a result of JSW's breaches of the contract, EXEL has been caused to suffer injury and damages including, but not limited to, nominal damages and actual damages.

## FRAUD AND FRAUDULENT INDUCEMENT

15. During the negotiations with Plaintiffs and at the time the contract was entered into, representatives materially misrepresented JSW's intentions and ability to perform the contract.

16. The misrepresentations were made with knowledge of their falsity or recklessly without any knowledge of the truth and as a positive assertion, with the intention that they would be relied upon. EXEL relied on the misrepresentations to its substantial detriment.

17. If EXEL had known the truth, it never would have signed the contract with JSW. As a result of signing this contract, EXEL lost other business opportunities and has been damaged by its reliance on Defendant's misrepresentations. Therefore, JSW is liable for fraud and fraudulent inducement.

18. To the extent that JSWA is a parent company to JSW, JSWA is also liable to EXEL for these fraudulent statements.

19. During the negotiations with EXEL, JSW representatives concealed or failed to disclose material facts, including but not limited to JSW's intentions and ability to perform the contract.

20. JSW knew that EXEL was ignorant about such facts, and concealed the fact in order to induce EXEL to sign the contract.

21. As a result of this concealment, EXEL suffered injury and lost other business opportunities. Therefore, JSW is liable for fraudulent concealment and fraudulent inducement based on that concealment.

22. To the extent that JSWA is a parent company to JSW, JSWA is also liable to EXEL for this fraudulent concealment and inducement.

## NEGLIGENT MISREPRESENTATION

23. During the negotiations with EXEL, JSW representatives supplied false and misleading information to EXEL, directly through its agent, about JSW's intention and ability to perform the contract.

24. JSW made these misrepresentations in the course of its business and in a transaction in which it had a pecuniary interest.

25. JSW did not exercise reasonable care or competence in communicating its true intentions and abilities to EXEL, acted in reckless disregard of the truth, and knew or should have known that the communications were false.

26. As a result of these negligent misrepresentations, EXEL suffered damages. Threfore, JSW is liable for negligent misrepresentation.

27. To the extent that JSWA is a parent company to JSW, JSWA is also liable to EXEL for these negligent misrepresentations.

## CONVERSION OF DOWN PAYMENT

28. JSW deliberately and maliciously kept the down payment paid by EXEL to JSW and failed to pay these proceeds back to EXEL in accordance with the contract.

29. JSW's wrongful withholding of the proceeds constitutes conversion. EXEL had a superior right to the proceeds as provided in the contract, and JSW had no right or justification for exercising wrongful dominion over the proceeds.

30. JSW's wrongful withholding of the proceeds violates the Texas Theft Liability Act, Tex. Civ. Prac. & Rem Code §134.001, et seq. JSW unlawfully appropriated EXEL's property without EXEL's effective consent. Tex. Penal Code §31.03.

31. EXEL seeks to recover its proceeds wrongfully being withheld by JSW under the

common law doctrine of money had and received.

## TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACT

32.	At all times relevant, there was a reasonable probability that EXEL would have entered into a business relationship and/or contractual relationship with Sunbeam-Oster, one of EXEL's customers. Further, JSW had knowledge of EXEL's business relationship with Sunbeam-Oster. In addition, JSW was aware of the reasonable probability of such business relationship and/or the continuing business relationship between EXEL and Sunbeam-Oster. Nevertheless, JSW intentionally interfered with such business relationship. That is, JSW desired to bring about the interference and/or knew that JSW's interference was certain or substantially certain to occur as a result of its conduct. Further, JSW's conduct was independently tortious or unlawful. In addition, JSW's interference was the proximate cause of the injury suffered by EXEL and EXEL has suffered actual damages and losses as a result.

33.	To the extent that JSWA is a parent company to JSW, JSWA is also liable to EXEL for these tortious interference with prospective contract.

## ATTORNEY'S FEES

34.	In addition to recovery of nominal and actual damages, EXEL seeks reasonable attorney's fees for JSW's breach of contract pursuant to Texas Civil Practice and Remedies Code, §38.001(8).

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff EXEL prays that Defendant JSW be cited to answer and appear herein and that upon a trial on the merits, judgment be entered against Defendant JSW, and that Plaintiff EXEL be awarded nominal damages, actual damages, exemplary damages, attorney's fees, pre-judgment interest, post-judgement interest, and for such other and further relief to which Plaintiff EXEL may show itself justly entitled to receive.

Respectfully submitted,

**GRIFFITH, HILL & OCHOA, L.L.P.**
One Park Place
100 Savannah, Suite 500
McAllen, Texas 78503
(956) 971-9446
(956) 971-9451 - facsimile

By: _/s/ John R. Griffith_ *w/ permission by V.G.*
John R. Griffith
Federal I.D. No. 12186
State Bar No. 08480750
Viola G. Garza
State Bar No. 00787518

Moises M. Salas, Jr.
**Law Office of Moises M. Salas, Jr.**
847 E. Harrison
Brownsville, TX 78520
State Bar No. 00786217
Federal I.D. No. 17506

**ATTORNEYS FOR PLAINTIFF
EXEL BOBBINS AND PLASTIC
COMPONENTS, INC.**

## CERTIFICATE OF SERVICE

I, do hereby certify that a true copy of the above and foregoing instrument was forwarded to all counsel of record, to wit:

David C. Garza
**Garza & Garza, L.L.P.**
680 E. St. Charles, Suite 300
Brownsville, TX 78522-2025
(956) 541-4914
(956) 542-7403 (fax)
*Attorney-in-charge for JSW Plastics Machinery, Inc.*

James J. Regan
Lorne Lilienthal
**Regan & Braun Law Offices**
2533 Artesia Blvd, Suite 200
Redondo, CA 90278
(310) 372-1988
(310) 318-5894 (fax)
*Attorneys for JSW Plastics Machinery, Inc.*

on this  11th  day of September, 2002.

_____
Viola G. Garza

David C. Garza
**Garza & Garza, L.L.P.**
680 E. St. Charles, Suite 300
Brownsville, TX 78522-2025

James J. Regan
Lorne Lilienthal
**Regan & Braun Law Offices**
2533 Artesia Blvd, Suite 200
Redondo, CA 90278

# EXHIBIT "1"

# JSW PLASTICS MACHINERY INC.

**HEAD OFFICE: LOS ANGELES**
3726 EAST MIRALOMA AVENUE • ANAHEIM, CALIFORNIA 92806-2107 • PHONE (714) 630-5651 • FAX (714) 630-1886

| CHICAGO TECHNICAL CENTER | EAST COAST OFFICE | DETROIT OFFICE | ATLANTA OFFICE |
|---|---|---|---|
| 1300 LANDMEIER ROAD | P.O. BOX 498 | 44712 HELM STREET | 1700 CUMBERLAND POINT DR., STE#17 |
| ELK GROVE VILLAGE, IL 60007 | DAYVILLE, CT 06241-0498 | PLYMOUTH, MICHIGAN 48170 | MARIETTA, GEORGIA 30067 |
| PHONE: (847) 427-1100 | PHONE: (860) 774-2613 | PHONE: (734) 455-9003 | PHONE: (770) 952-0269 |
| FAX: (847) 427-1131 | FAX: (860) 774-3297 | FAX: (734) 455-9058 | FAX: (770) 956-9058 |

February 29, 2000

To Whom It May Concern:

JSW Plastics Machinery Inc., will support the growth and expansion of Exel Bobbins and Plastic Components Inc., by providing any model of JSW PMI Plastic Injection Molding Machine, which they will require for future projects with Sunbeam-Oster. This also includes maintaining a new machine inventory for quick delivery, based on the demands by Exel Customers, as well as providing full support on an on-going bases. We will assist Exel in any way possible to accommodate the needs of Sunbeam-Oster in all of their molding needs.

As of this date, JSW PMI has extended a credit line of $1,500,000.00 to Exel for the purchase of JSW's products and services, and agrees to a payment term of 5% down payment and balance net 180 days, at 0% interest. In addition, JSW PMI guarantees Exel a stock inventory of Injection Molding Machines at our Anaheim, CA. facility with delivery requirements of fourteen (14) days or less.

Once again, it has been and will be a pleasure doing business with Exel Plastics Inc., and sincerely appreciate our relationship of being a team supplier member of Exel Plastics.

Sincerely,

Jerry Johnson
Vice President

# EXHIBIT "2"




**JSW PLASTICS MACHINERY INC.**

January 30, 2001

Mr. Steve Becker
EXEL BOBBINS Inc.
3301 NAFTA Parkway – Unit C
Brownsville, TX  78521

Dear Steve,

As you will remember, JSW Plastics Machinery, Inc., extended a Line of Credit to your company, EXEL BOBBINS Inc., and now that we are getting close to shipping machines into your facility in Brownsville, TX., we must have an agreement as to the re-payment of this Line of Credit. Therefore, please accept the following proposal. We will be shipping the following Machines, per your Purchase Order #'s 15 and 5.

    1 – JSW Model J500EII Injection Molding Machine      $~~206,500.00~~  202,500.00 per 3/3/2000 Quote +
    1 – JSW Model J110EII Injection Molding Machine      $  84,835.00    our conversation today 3/21/01
            TOTAL INVOICE AMOUNT    $4789.92  ~~$291,335.00~~
                                              $ 287,335.00

A 5% Down Payment of the total order amount is normally required prior to shipment, however we will make a special consideration to EXEL BOBBINS of 3 Equal Monthly Payments of $~~4,855.59~~, with the first payment due prior to shipment of machines, and the next Down Payment Installment is due Thirty (30) days after shipment, and the last Down Payment Installment Sixty (60) days after shipment.

$ 217,768.23

After the last Down Payment Installment is made, there will not be any payments due for a period of Six (6) Months. Then, starting on the Seventh (7) Month, EXEL BOBBINS will make Eleven (11) Monthly payments of $5,000.00 until the Twelfth (12) Month, at which time EXEL BOBBINS agrees to make a balloon payment of the balance owed (~~$ 221,768.23~~) to JSW Plastics Machinery. No interest will be charged during this special financing period, however it is agreed that JSW Plastics Machinery will still remain the owner and have recovery rights of this equipment until final payment has been made by EXEL BOBBINS or it's Financial Partner. JSW Plastics Machinery has the right to cancel or withdraw from this agreement after given written notice to EXEL BOBBINS on a Thirty (30) days notice.

Steve, if you are interested in pursuing this agreement, please sign below and return to my attention, a.s.a.p. as we are ready to ship these machines to you. Should you have any questions about this agreement, or require additional information, please feel free to contact Dennis Pochatek at the Chicago Technical Center.

Sincerely,

Jerry Johnson
Vice President Operations

Accepted By: _____
                       Signature
              President
              _____
                       Title
Date:  2/26/01

CORPORATE OFFICE  3726 EAST MIRALOMA                    HONE: 714-630-5651  FAX 714-630-1886
CHICAGO TECHNICAL CENTER  1300 LANDMEI                  PHONE: 847-427-1100  FAX 847-427-1131
ATLANTA REGIONAL OFFICE  1700 CUMBERL                   30067  PHONE 770-952-0269  FAX: 770-956-9058
DETROIT REGIONAL OFFICE  24404 CATHERI                  48375  PHONE 248-449-5422  FAX: 248-449-6018