IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

FEB 0 7 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| EXEL BOBBINS AND PLASTIC COMPONENTS, INC., | § § § § | CIVIL ACTION No. B-01-148 |
| | § § | [Assigned to the Hon. Hilda G. Tagle Stipulated to Magistrate Felix Recio] |
| Plaintiff, | § § | |
| vs. | § § | Date:  February 27, 2003 |
| JSW PLASTICS MACHINERY, INC., | § § | Time: 2:00 p.m. |
| Defendant. | § § § | |
| | § | |

---

**DEFENDANT JSW PLASTICS MACHINERY, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION OF ISSUES; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; PROPOSED ORDER**
**(Appendix to Motion For Summary Judgment with Supporting Affidavits of Hatsumi Akeda and James J. Regan with Exhibits filed concurrently herewith)**

---

To Plaintiff Exel Bobbins and Plastic Components, Inc., and Plaintiff's attorney of record:

**PLEASE TAKE NOTICE** that on February 27, 2003, at 2:00 p.m. in the Courtroom of Magistrate Felix Recio, located at 600 East Harrison Street, Room 306, Brownsville, Texas 78520, Defendant JSW PLASTICS MACHINERY, INC. ("JSW-PMI") will move, and hereby

---

does move pursuant to Federal Rules of Civil Procedure, Rule 56(c), for summary judgment or, in the alternative, for summary adjudication of issues.

This Motion is made on the basis that there are no genuine issues of material fact in this case and that JSW-PMI is entitled to judgment on the Complaint as a matter of law. Specifically, the undisputed facts refute the Plaintiff's contentions that (a) JSW-PMI breached the contract, (b) JSW-PMI is liable to Plaintiff in torts arising out of the alleged contract breach, (c) JSW-PMI converted Plaintiff's funds for its own or any improper use; (d) Plaintiff is entitled to recover lost profits damages, and (e) Plaintiff may recover exemplary damages.

This Motion will be based on this Notice, the accompanying Memorandum of Points and Authorities, the supporting Declarations of Hatsumi Akeda and James J. Regan and exhibits filed therewith, all matters of which the Court may take judicial notice, the pleadings and papers on file in this action and any other matters brought to the attention of this Court at the time of hearing on this matter.

DATED: February 7, 2003                    GARZA & GARZA, L.L.P.


By: _____

DAVID C. GARZA
Attorneys for Defendant
Japan Steel Works America, Inc.

# TABLE OF CONTENTS

Table of Authorities ................................................................ ii.

I.    Statement Of The Nature And Stage Of The Proceedings ...................... 3

II.   Statement Of Issues To Be Rules Upon By The Court .......................... 3

III.  Summary Of The Argument ........................................................ 4

IV.   Statement Of Facts ................................................................ 5

V.    Argument ...... ................................................................ 8

      A.   Plaintiff Failed To Satisfy All Conditions Precedent To
           JSW-PMI's Performance  Under The Contract ......................... 8

      B.   Each Of Plaintiff's Tort Claims Arises Out Of, And Is Dependent
           Upon, the Same Facts Alleged With Respect To Plaintiff's Breach Of
           Contract Claim And In The Absence Of Any Breach,
           The Tort Claims Must Fail ................................................. 9

      C.   There Has Been No Conversion Of Plaintiff's Down Payment ....... 10

           1.   Plaintiff Has Not Alleged or Offered Evidence It Demanded
                Return of its Deposit or That Any Such Demand Was Refused
                By JSW-PMI .................................................... 10

           2.   JSW-PMI's Retention of the Down Payment Was Not
                Inconsistent With Plaintiff's Rights and Was Reasonable
                Under The Circumstance ........................................ 12

      D.   Plaintiff's Claim For Lost Profits Damages  Is Speculative And
           Such Damages May Not Be Recovered By Plaintiff As A
           Matter Of Law .............................................................. 13

      E.   There Is No Evidence To Support A Claim For Exemplary Damages
                .......................................................................... 19

VI.   Conclusion ........................................................................ 21

# TABLE OF AUTHORITIES

## Cases

Associated Indem. Corp v. CAT Contracting, Inc., 964 S.W.2d 276 (Tex. 1998) ....     9

Atomic Fuel Extraction Corporation v. Slick's Estate, 386 S.W.2d 180 (Tex. 1965)     14

C&D Robotics, Inc. v. Mann, 47 S.W.2d 194 (Tex.App-Texarkana 2001) ...........     19

City of Austin v. Teague, 570 S.W.2d 389, 395 (Tex. 1978) ...........................     14

City of El Paso v. State Line, Inc., 570 S.W.2d 409 (1978) writ ref. n.r.e. ............     13

Corp v. CAT Contracting, Inc., 964 S.W.2d 276, 283 (Tex. 1998) .....................     9

Corrigan Dispatch Co., v. Casa Guzman, S.A., 696 F.2d 359 (5th Cir. Tex. – 1983) .     9

Earthman's Inc. v. Earthman, 526 S.W.2d 192, 204 (Tex Civ App Houston 1975) .     11

Edmunds v. Sanders, 2 S.W.3d 697 (Tex App – El Paso 1999) ........................     12

Edwards v. Ward Associates, Inc., 367 S.W.2d 390 (1963), writ ref. n.r.e. ...........     13, 18

Ganda, Inc. v. All Plastics Molding, Inc., 521 S.W.2d, 940 (1975) ....................     14, 17

General Inv. & Development Co. v. Guardian Sav. And Loan Ass'n,
862 F.Supp. 153 (S.D. Tex. 1994) ........................................................     9

Harper Building Systems v. Upjohn Co., 564 S.W.2d 123 (Tex. 1978) ...............     18

Henderson v. Norfolk Southern Corp., 55 F.3d 1066 (5th Cir.-Tex. 1995) ............     19

Huffmeyer v. Mann, 49 S.W.3d 554 (Tex. App. – Corpus Christi 2001) .............     11

Intern. Bank v. Intern. Energy Dev. Corp., 981 S.W.2d 38 (Tex.App. 1998) ........     14

Judson Building v. First National Bank of Longview, 587 F.Supp. 852 (E.D. Tex. 1984)     11

Matter of Gober, 100 F.3d 1195 (5th Cir.-Tex. 1996) ...................................     19

Measday v. Kwik-Kopy Corp., 713 F.2d 118 (5th Cir. Tex.- 1983) ....................     9

Mesa Argo v. R.C. Dove & Sons, 584 S.W.2d 506 (1979), writ ref. n.r.e. ............ 13, 18

Pierson v. GFH Financial Services, 829 S.W.2d 311 (Tex Civ App – Austin 1992) 12

Redman v. Whitney, 541 S.W.2d 889 (Tex.Civ.App.-Austin 1976), ref. n.r.e....... 9

Rescar, Inc. v. Ward, 60 S.W.3d 169 (Tex.App.-Houston 2001) ...................... 20

Seideneck v. Cal Bayreuther Associates, 451 S.W.2d 752 (Tex. 1970) .............. 19

Southwest Bank & T. Co. v. Executive Sportsman Ass'n, 477 S.W.2d 920 (Tex. 1972) 13

Streber v. Hunt, 221 F.3d 701, 731, reh. denied 223 F.3d 576 (5th Cir. - Tex. 2000) ... 19

Texas Instruments, Inc. v. Teletron Energy Management, Inc., 877 S.W.2d 276
(Tex. 1994) ................................................................................ 13

Universal Commodities, Inc. v. Weed, 449 S.W.2d 106 (Tex. 1970) ................. 13, 16, 17, 18

Villareal v. Moreno, 650 S.W.2d 191 (Tex. Civ. App. 1983) .......................... 10

Whitaker v. Bank of El Paso, 850 S.W.2d 757 (Tex. Civ. App. – El Paso 1993) .... 11

W.T. Rawleigh Co. v. Izard, 113 S.W.2d 620 (Tex.Civ.App.-Eastland 1938) ....... 9

## Statutes

28 U.S.C. §1332(a) ........................................................................ 3

Texas Civil Practice and Remedies Code, §41.003 ...................................... 19

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

This is an action for breach of contract and related claims for fraud, negligent

misrepresentation, conversion and tortious interference with prospective contract. JSW-PMI is a

named defendant in all causes of action.  Plaintiff Exel Bobbins and Plastic Components, Inc.

("Plaintiff" or "Exel"), a Texas corporation which manufactures and sells plastic components,

claims that JSW-PMI, a Delaware corporation whose principal place of business is in Los

Angeles County, California, breached a contract between JSW-PMI and Plaintiff pursuant to

which JSW-PMI was to (a) sell to Plaintiff certain plastic molding machines and (b) extend a

line of credit to the Plaintiff for the purchase of such machines. Among other remedies, Plaintiff

seeks actual and punitive damages.  Jurisdiction is conferred on this Court by 28 U.S.C.

§1332(a) in that there exists diversity of citizenship among each of the parties to this action.  All

discovery in the action has been completed.  The parties are currently negotiating an extension of

the discovery period to permit the taking of expert witness depositions and the further deposition

of percipient witness Steve Becker with respect only to those matters pertaining to the additional

causes of action added by the Plaintiff's 1st Amended Complaint.  Trial in this matter is currently

set for April 9, 2003.

### II.

## STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT

Issue No. 1:    Whether there are genuine issues of material fact sufficient for Plaintiff to

meet its burden of proving that Plaintiff performed all conditions precedent to JSW-PMI's performance under the contract.

    <u>Issue No. 2</u>:    Whether there are genuine issues of material fact sufficient for Plaintiff to establish tort liability in the absence of a breach of the contract.

    <u>Issue No. 3</u>:    Whether there are genuine issues of material fact sufficient for Plaintiff to be able to establish the condition to recovery for conversion that it demanded a return of the funds allegedly converted by JSW-PMI which demand JSW-PMI refused.

    <u>Issue No. 4</u>:    Whether there are genuine issues of material fact sufficient for Plaintiff to be able to establish that JSW-PMI's retention of Plaintiff's down payment was unreasonable or inconsistent with Plaintiff's rights.

    <u>Issue No. 5</u>:    Whether there are genuine issues of material fact sufficient for Plaintiff to be able to establish that its claim for lost profits for a start-up company is not so speculative that recovery is barred as a matter of law.

    <u>Issue No. 6</u>:    Whether there are genuine issues of material fact sufficient for Plaintiff to be able to establish by clear and convincing evidence that JSW-PMI acted fraudulently, maliciously or wilfully or was grossly negligent and is therefore liable for exemplary damages.

**III.**

**<u>SUMMARY OF THE ARGUMENT</u>**

    Defendant JSW-PMI is entitled to summary judgment on the following grounds:

(1) Plaintiff failed to perform conditions precedent to JSW-PMI's obligations on the contract and therefore may not recover on the contract as a matter of law; (2) JSW-PMI's performance of the contract having been excused, each of Plaintiff's tort claims, which arise out of the same facts as

the alleged breach of contract, are without any basis in fact and must be dismissed as a matter of

law; (3) JSW-PMI's retention of Plaintiff's down payment did not constitute a conversion as a

matter of laws because (a) Plaintiff failed to allege and produce evidence that it demanded return

of its down payment or that JSW-PMI refused any such demand and (b) JSW-PMI's retention of

the down payment was reasonable and consistent with Plaintiff's rights; (4) Plaintiff, a start-up

company with no history of profits at the time of the alleged breach, may not recover lost profit

damages as a matter of law as such damages are too uncertain and speculative; and (5) In the

absence of clear and convincing evidence that JSW-PMI acted wilfully, with malice or fraud or

was grossly negligent, Plaintiff may not recover exemplary damages as a matter of law.


## IV.

## STATEMENT OF FACTS

Defendant JSW-PMI, a Delaware corporation with its principal place of business in

Corona, California, is engaged in the business of manufacturing and selling plastic injection

molding machines.  Plaintiff Exel, a Texas corporation, is engaged in the business of

manufacturing and selling plastic components.  Exel was incorporated in 1999 and started

operations in late 2000.  As of the time of the alleged breach of contract and related torts by

JSW-PMI , Exel had not made any profit from its operations and in fact had operated at a loss, as

shown by the Exel Tax Returns for 2000 and 2001. (Exhibit J, Regan Affd't.)  In 1999, Plaintiff

contacted JSW-PMI and inquired whether JSW-PMI would sell it certain plastic injection

molding machines and extend a line of credit to Exel for the purpose of purchasing these

machines from JSW-PMI. (Plaintiff's First Amended Original Complaint ("1st Amend.

Complaint") ¶¶ 1, 6.)  On February 29, 2000, JSW-PMI issued a letter ("Contract") to Plaintiff

addressed "To Whom It May Concern" by which JSW-PMI stated it would provide its plastic

injection molding machines to Plaintiff and that JSW-PMI had as of that date extended Plaintiff

a $1.5 million line of credit to Plaintiff for the purchase of JSW-PMI's machines on the

following terms: five percent (5%) down payment toward each machine purchased with payment

of the net balance within 180 days. (1st Amend. Complaint, Exhibit 1.)   The line of credit and

the credit terms were offered to Plaintiff because JSW-PMI was aware that Plaintiff was having

difficulty obtaining financing, that a cash discount would not help because Plaintiff did not have

the cash, because Plaintiff had asked for JSW-PMI's help in this regard and because JSW-PMI

wanted to support its customer. [Deposition of Gerald Johnson ("Johnson") taken October 11,

2002 ("Johnson Depo"), 82/1-21; 83/7-84/20; Exhibit I to Regan Affd't.]  In an effort to assist

Plaintiff with obtaining financing, JSW-PMI referred Plaintiff to Wells Fargo Bank and U.S.

Bancorp. (Johnson Depo., 97/1-4; 98/24-99/5.)

Thereafter, pursuant to the Contract, Plaintiff submitted purchase orders to JSW-PMI for

three machines as follows: (1) purchase order #98-1811 dated September 5, 2000 for machine

Model J385, purchase price $140,000 (Exhibit B, Regan Affd't); (2) purchase order #9 dated

November 7, 2000 for machine Model J500, purchase price $202,500 (Exhibit C, Regan Affd't);

(3) purchase order #15 dated January 23, 2001 for machine Model J110, purchase price $84,835.

(Exhibit D, Regan Affd't)  JSW PMI delivered the J380 machine after its receipt from Plaintiff

of a down payment in the sum of $7,000.  On April 23, 2001, Plaintiff, by its own admission,

failed to pay the balance due on the J385 machine, leaving an outstanding balance due on the

J385 of $133,000.  [Deposition of Steve Becker taken April 4, 2002 ("Becker Depo."), 192/3-17,

193/2-5; Exhibit G to Regan Affd't.)  On May 4, 2001, Steven Becker ("Becker"), Plaintiff's

president, called Jerry Johnson, JSW-PMI's Vice President.  Becker acknowledged that Plaintiff

was behind in its payment for the J385 machine and was attempting to obtain bank financing in order to resume payments. Becker requested that JSW-PMI immediately deliver the J500 and J100 machines. Johnson denied this request on the basis that Plaintiff was in default of its obligations with respect to the J385 machine and had failed to submit a commitment letter from Sunbeam-Oster. [Johnson Depo., 119/16-121/8.] Johnson offered to deliver the two remaining machines upon Plaintiff becoming current on its payment obligations with respect to the J380 machine.

Although Plaintiff had issued purchase orders for the two remaining machines in November 2000 and January 2001, the required 5% down payment was not made by Plaintiff. By letter agreement dated January 30, 2001 between Plaintiff and JSW-PMI, it was agreed that Plaintiff would pay JSW-PMI a total of $287,355 for both machines, that in lieu of the 5% down payment Plaintiff would make three equal monthly payments of $4,788.92, the first installment being due prior to shipment of the machines. (1st Amended Complaint, Exhibit 2.) JSW-PMI requested that Becker and Annoreno execute UCC-1 financing statements to secure JSW-PMI's interest in the J100E2 and J500E2 machines but Annoreno never executed either financing statement. (Johnson Depo., 191/16-193/13.) Plaintiff, on May 8, 2001, sent JSW-PMI a check in the amount of $4,855.59. JSW-PMI responded by letter to Plaintiff dated May 10, 2001, stating that it had received Plaintiff's check but would not deliver the J500 or J110 machines until Plaintiff became current on its payments for the J385 machine. JSW-PMI advised Plaintiff it would grant Plaintiff an extension until May 11, 2001, in order to obtain financing for the payments due on the J385 machine, but in the event payment was not received within the extension period, JSW-PMI would exercise its right to recover the machine from Plaintiff's facility, would cancel all outstanding machine orders from Plaintiff and would apply the

$4,855.59 payment to Plaintiff's outstanding obligation on the J385 machine. JSW-PMI further advised the Plaintiff that it was withdrawing Plaintiff's line of credit as a result of Plaintiff's default in payments. (Exhibit F, Regan Affd't.)

Plaintiff having failed to cure its default by the May 11, 2001 extension date, JSW-PMI, by letter from JSW-PMI's attorney to Plaintiff dated June 13, 2001, demanded immediate payment of the sum of $134,931.32, constituting the outstanding balance and accrued interest on the J385 machine. (Exhibit J, Regan Affd't.) Plaintiff thereafter made no further payments to JSW-PMI.

## V.

## ARGUMENT

### A.   PLAINTIFF FAILED TO SATISFY ALL CONDITIONS PRECEDENT TO JSW-PMI'S PERFORMANCE UNDER THE CONTRACT

Any obligations by JSW-PMI to sell equipment to Plaintiff and to extend Plaintiff a line of credit to finance such purchases were excused by Plaintiff's own conduct in violation of the terms and conditions of the contract. As the facts clearly indicate: (a) Plaintiff failed to make timely down payments for ordered equipment; (b) Plaintiff failed to issue purchase orders in a timely fashion; (c) UCC financing statements for equipment purchased or to be purchased were not executed by Plaintiff as required; and (d) JSW-PMI never received a written commitment or copy of a purchase order from Sunbeam-Oster to acquire plastic components from Plaintiff, a commitment which Plaintiff knew was required by JSW-PMI. (Annoreno Depo., 92/3-5.) Sunbeam-Oster had in fact announced that they were filing for bankruptcy. (Annoreno Depo., 91/12-14.)

Plaintiff, as the party seeking to recover on the contract, has the burden of establishing substantial performance. *Measday v. Kwik-Kopy Corp.,* 713 F.2d 118, 125 (5th Cir. Tex.- 1983). Texas law also requires a party to show the ability to perform under the contract at the time of the other party's alleged breach to recover damages. *General Inv. & Development Co. v. Guardian Sav. And Loan Ass'n,* 862 F.Supp. 153, 158 (S.D. Tex. 1994). The performance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurence is excused. *Corrigan Dispatch Co., v. Casa Guzman, S.A.,* 696 F.2d 359, 363 (5th Cir. Tex. – 1983). If a promise is made subject to the happening of a condition no liability can arise on the part of the promisor and there can be no breach of the contract by him, until the condition occurs or is performed. *Redman v. Whitney,* 541 S.W.2d 889, 892 (Tex.Civ.App.-Austin 1976), ref. n.r.e. Plaintiff has the burden of proving that all conditions precedent have been satisfied. *Associated Indem. Corp v. CAT Contracting, Inc.,* 964 S.W.2d 276, 283 (Tex. 1998). Conditions to a contract which are either expressed or implied in fact must be exactly fulfilled or no liability can arise on the promise which such conditions qualify. *W.T. Rawleigh Co. v. Izard,* 113 S.W.2d 620, 621 (Tex.Civ.App.-Eastland 1938).

It is undisputed that Plaintiff failed to make timely down payments, failed to issue timely purchase orders, failed to sign required UCC financing statements and failed to provide a purchase order from Sunbeam-Oster. Based on the foregoing, the failure of each of these conditions precedent to performance by JSW-PMI bars recovery on the contract by Plaintiff as a matter of law.

**B.**      **EACH OF PLAINTIFF'S TORT CLAIMS ARISES OUT OF, AND IS DEPENDENT UPON, THE SAME FACTS ALLEGED WITH RESPECT**

**TO PLAINTIFF'S BREACH OF CONTRACT CLAIM AND IN THE**

**ABSENCE OF ANY BREACH, THE TORT CLAIMS MUST FAIL**

The facts alleged in support of Plaintiff's tort claims for fraud and fraudulent inducement, negligent misrepresentation, conversion and tortious interference with prospective contract are based on the same facts giving rise to the alleged breach of contract. No additional facts to support these claims are alleged in Plaintiff's complaint. (1st Amended Complaint, ¶¶ 15, 23, 28, 32.) In the absence of a genuine issue of material fact as to breach of the contract, none of Plaintiff's tort claims may be sustained and must therefore be dismissed as a matter of law.

### C.    THERE HAS BEEN NO CONVERSION OF PLAINTIFF'S DOWN PAYMENT

Plaintiff contends that JSW-PMI is liable to Plaintiff for the conversion of a $4,788.92 down payment made by Plaintiff to JSW-PMI. (1st Amended Complaint, ¶ 28, et seq.) JSW-PMI having obtained the down payment lawfully, Plaintiff is required to plead and prove that (a) Plaintiff made demand for return of the down payment and (b) JSW-PMI refused absolutely to return the down payment. As there is no pleading or proof of such a demand or refusal, JSW-PMI is entitled to summary adjudication as a matter of law on Plaintiff's conversion cause of action.

#### 1.    Plaintiff Has Not Alleged or Offered Evidence It Demanded Return of its Deposit or That Any Such Demand Was Refused By JSW-PMI

Plaintiff has the burden of proving those acts alleged to have constituted the conversion. *Villareal v. Moreno*, 650 S.W.2d 191, 192 (Tex. Civ. App. 1983). Conversion is established by proving that (1) plaintiff owned, had legal possession of, or was entitled to possession of the

---

property, (2) defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with plaintiff's rights, and (3) defendant refused plaintiff's demand for return of the property. *Huffmeyer v. Mann,* 49 S.W.3d 554, 558 (Tex. App. – Corpus Christi 2001). Demand by the plaintiff is a required element as against a person who acquired possession lawfully and without fault. "When possession of property is lawful at the outset, conversion can only occur when the possessor refuses an owner's demand for return of the property." *Judson Building v. First National Bank of Longview,* 587 F.Supp. 852, 856 (E.D. Tex. 1984). To constitute an effective refusal such as will evidence a conversion, the refusal to transfer possession of property to one entitled thereto must be absolute. *Earthman's Inc. v. Earthman,* 526 S.W.2d 192, 204 (Tex Civ App Houston 1975). In the absence of a genuine issue of material fact as to demand for return of the allegedly converted property, summary judgment is appropriate. *Whitaker v. Bank of El Paso,* 850 S.W.2d 757, 760 (Tex. Civ. App. – El Paso 1993).

By Plaintiff's own contention, the down payment which Plaintiff claims was converted by JSW-PMI was originally made as a down payment pursuant to a letter agreement between the parties. (1st Amended Complaint, ¶ 8, and letter agreement dated January 30, 2001 attached to the 1st Amended Complaint as Exhibit 2.) It is therefore undisputed that JSW-PMI lawfully acquired possession of the down payment. In order for there to be conversion under such circumstances, Plaintiff is required to allege and prove, in part, that it made a demand to JSW-PMI for return of the down payment which demand JSW-PMI refused. There is no allegation in Plaintiff's complaint that Plaintiff ever demanded a return of its down payment or that JSW-PMI refused any such demand. (1st Amended Complaint, ¶¶ 28-31) According to JSW-PMI's accounting manager, Plaintiff's deposit in the sum of $4,855.59 was received by JSW-PMI on or

about May 3, 2001, and was deposited to a specific set-aside account held by JSW-PMI to be used in connection with any orders for equipment which JSW-PMI might receive from Plaintiff. (Affidavit of Hatsumi Akeda ("Akeda Affdt"), ¶¶ 5-8, attached to Appendix.) This deposit remains in full in said account, no portion of the deposit has been applied by JSW-PMI for any other purpose and the total deposit remains available either for the purchase of equipment by Plaintiff or for return to Plaintiff upon receipt of a demand for its return from Plaintiff. (Akeda Affdt, ¶ 8.)

## 2.   JSW-PMI's Retention of the Down Payment Was Not Inconsistent With Plaintiff's Rights and Was Reasonable Under The Circumstance

Possession of legally obtained property may be considered a conversion when the use of the property departs so far from the conditions under which it was received as to amount to an assertion of right inconsistent with that of the owner. *Pierson v. GFH Financial Services,* 829 S.W.2d 311, 314 (Tex Civ App – Austin 1992). JSW-PMI's retention of a down payment required by the contract for a purpose contemplated by the contract was and is entirely proper and is not inconsistent with Plaintiff's rights. Even had JSW-PMI refused to return Plaintiff's down payment (which it has not), any such refusal would have been proper because no conversion results if such refusal is made in good faith to resolve a doubtful matter or to investigate the rights of the parties. *Edmunds v. Sanders,* 2 S.W.3d 697, 704 (Tex App – El Paso 1999).

//

**D.**  **PLAINTIFF'S CLAIM FOR LOST PROFITS DAMAGES IS
SPECULATIVE AND SUCH DAMAGES MAY NOT BE
RECOVERED BY PLAINTIFF AS A MATTER OF LAW**

Plaintiff seeks to recover damages for lost profits arising from JSW-PMI's alleged

breach of the contract. Texas courts follow the general rule that the loss of anticipated profits

from a new business is too speculative and conjectural to support a recovery of damages,

particularly where the business has no history of making profits. *Universal Commodities, Inc. v.

Weed,* 449 S.W.2d 106, 113 (Tex. 1970); *Mesa Argo v. R.C. Dove & Sons*, 584 S.W.2d 506, 512

(1979), writ ref. n.r.e. ("Our courts have consistently denied a recovery of damages where the

profits claimed are too uncertain or speculative where the business is new or uncertain."); *City of

El Paso v. State Line, Inc.*, 570 S.W.2d 409, 413 (1978) writ ref. n.r.e. ("[W]here the loss of

profits is too uncertain or speculative because the business is new or unestablished , the rule

denying recovery for loss of profits would be enforced."); *Edwards v. Ward Associates, Inc.*, 367

S.W.2d 390, 395 (1963), writ ref. n.r.e. ("It is well settled that anticipated profits from a business

that had not been established at the time of the alleged breach are necessarily so speculative and

remote that recovery thereof should not be allowed."); *Southwest Bank & T. Co. v. Executive

Sportsman Ass'n*, 477 S.W.2d 920, 929 (Tex. 1972) (Refers to the "well established rule that

prospective profits from a new enterprise which has no history of profits are too remote and

speculative to be included in compensatory damages."). "A business venture which is risky in

prospect, i.e., one whose activities are dependent on uncertain or changing market conditions,

chancy business opportunities, promotion of untested products or entry into unknown or

unviable markets, or the success of a new and unproven enterprise, cannot recover lost profits."

*Texas Instruments, Inc. v. Teletron Energy Management, Inc.*, 877 S.W.2d 276, 279 (Tex. 1994).

Even if Plaintiff were to establish that it had a successful business elsewhere, it has been recognized that "[a] business in successful operation, if changed into a different form or line of business, may become a new and unestablished venture." *Atomic Fuel Extraction Corporation v. Slick's Estate*, 386 S.W.2d 180, 189 (Tex. 1965).

In seeking to recover lost profits, "the amount of the loss must be shown by competent evidence with reasonable certainty." *Intern. Bank v. Intern. Energy Dev. Corp.*, 981 S.W.2d 38, 49 (Tex.App. 1998). "It is not enough that profits merely be anticipated or hoped for, they must be established with reasonable certainty." *City of Austin v. Teague*, 570 S.W.2d 389, 395 (Tex. 1978). Summary judgment on Plaintiff's lost profits claim is proper where undisputed facts show that the profits which might have been made from Plaintiffs new or unestablished business are not susceptible of being established by proof to that degree of certainty which the law demands. *Ganda, Inc. v. All Plastics Molding, Inc.*, 521 S.W.2d, 940, 943 (1975).

John Annoreno ("Annoreno"), owner of a 50% interest in Exel, testified that Exel was incorporated in December 1999, was a start-up company and did not have a track record. (Deposition of John Robert Annoreno taken January 9, 2003 ("Annoreno Depo."), 31/21-23; 100/8-101/1; 112/10-16; Exhibit H to Affidavit of James J. Regan ("Regan Affd't), ¶ 5.) Exel was opened in Brownsville, Texas, primarily to service an anticipated account with Sunbeam-Oster. (Annoreno Depo., 50/10-17; 70/21-71/7.) Although Sunbeam-Oster informed JSW-PMI by letter dated April 19, 2001, that it would conduct business with Exel, Sunbeam-Oster expressly stated that its letter would not represent a formal commitment with Exel or JSW-PMI until a formal contract were entered into. (Deposition of Gerald Arthur Johnson taken October 11, 2002 ("Johnson Depo"), 119/5-121/2 and Exhibit 33 thereto; Exhibit I to Regan Affd't.) Annoreno testified that there is no guarantee that a quote will become a purchase order.

(Annoreno Depo., 72/1-3) Exel has never provided any molded products for Sunbeam-Oster out of its Brownsville plant. (Annoreno Depo., 50/18-22.)

Exel was capitalized upon start-up in the sum of $70,000 in the form of a loan to Exel by Exel Plastics, an Annoreno-owned company. (Annoreno Depo., 131/1-6; 133/2-5.) Exel was unable to obtain financing for the purchase of machinery from Wells Fargo Bank and U.S. Bank because Exel was a start-up company with no proven track record. (Annoreno Depo., 111/20-112/16; 113/24-114/8.) Annoreno couldn't remember taking any other steps to obtain financing in view of having been refused financing by Wells Fargo Bank and U.S. Bank. (Annoreno Depo., 114/20-115/2.) After JSW-PMI refused to deliver additional machines to Exel and withdrew its line of credit, Exel attempted to obtain machines from other suppliers, such as Battenfield and Cincinnati Millitron and possibly others, but those companies informed Exel they would not finance a start-up company. (Annoreno Depo., 143/8-144/3.)

Steve Becker ("Becker"), Exel's president, estimated Exel's damages at a total of $4.6 million. (Deposition of Steve Becker taken April 5, 2002 ("Becker Depo"), 20/2-4; Exhibit G to Regan Aff'dt., ¶ 4.) Becker testified he arrived at that figure by taking a percentage of "my potential gains from potential customers." (Becker Depo., 5-8.) Asked what he believed Exel's damages were as a result of JSW-PMI withdrawing the line of credit, Becker testified: "Could be eight million, could be 10 million. I don't know." (Becker Depo., 21/10-32/3.) Annoreno testified that he calculated lost profits on the Sunbeam-Oster account at $20 million. Asked how this sum was calculated, Annoreno answered as follows:

> "A.    Well, you could simply take the Sunbeam for an example, multiply it by how many years, which is how they do things in selling and buying businesses called e-bits, and they would say if we did five to seven million dollars a year with them, we'd make a percentage of profit, unless you going to have a customer for a one-time customer, which this is not.

> **Q.**   Okay. Just tell me how you got to twenty million.
> **A.**   The loss of business over a period of time."

(Annoreno Depo., 197/6-21.) Annoreno's lost profit figure was based entirely on his own

estimates regarding how much business Sunbeam-Oster might have provided to Exel over time

and his estimate of Exel's profit margins had it had enough machines to fill the building, even

though Annoreno did not known Exel's current profit margins at the time of his deposition.

(Annoreno Depo., 197/22-204/10.)

The status of the Plaintiff's business at the time of the alleged breach and related torts is

no better than that of the many businesses which have been denied recovery of lost profits

damages in the reported decisions.  The facts in this case are similar to those in the case of

*Universal Commodities, Inc. v. Weed, supra.*  Weed owned two seafood processing plants and

thirty fishing boats in Ecuador.  Weed was introduced to three men, none of whom had

experience in the operation of a shrimp and fish processing plant, who formed Universal to go

into the business of processing and selling shrimp and fish from one of Weed's processing

plants. Shortly after Universal's formation it signed a contract with Weed whereby Weed leased

a processing plant to Universal for five years.  By the contract, Weed would obtain shrimp and

fish from its fishing boats and sell them to Universal.  Weed was to supply a minimum amount

of shrimp and fish to Universal, the purchases from and payments to Weed for this seafood to

constitute the rental paid by Universal to Weed, although Universal was to pay Weed a

minimum rent of $5,000, regardless of the plaint's production.  Universal quickly ran into

financial difficulty.  It had signed the contract with Weed before any financing arrangements had

been made and before it had any operating capital, hoping that the contract with Weed would

permit them to obtain financing, financing which they never obtained prior to the alleged breach

by Weed. Weed demanded payments from Universal under the contract and Universal managed to scrape together enough money to make one payment to Weed.  Universal, in an attempt to obtain customers for its output, obtained an oral agreement from a food company to purchase output from Universal but any purchase of such output was subject to certain conditions, none of which were met by Universal.  This potential customer never made any purchases or received any shipments from Universal. Weed cancelled the contract twenty days after it was executed. *Universal,* 449 S.W.2d at 109-110.  On this evidence, the appellate court held that the trial court, in rendering its judgment notwithstanding the verdict, had properly disregarded the jury verdict granting Universal $255,000 in lost profits and affirmed the trial court finding that Universal could not recover for loss of future profits based, in part, on the fact that  (1) Universal was never able to raise the necessary financing for its contemplated business and (2) Universal never produced its anticipated products and never took possession of the processing plant.  *Id. at* 113.

      *Ganda, supra,* involved a complaint for breach of  contract brought by plaintiff, a fabricator of plastic, which sold such parts to defendant, which used those parts to construct fire extinguishers. The appellate court upheld a summary judgment in favor of the plaintiff barring the defendant's recovery of special or consequential damages on defendant's cross-complaint. Finding that defendant's claim for special or consequential damages consisted of a "speculative claim for commercial loss in profits and general operating expenses for a new and unestablished business that never showed a profit," the court invoked the "rule denying recovery…where the enterprise is new or unestablished." *Ganda, supra,* 521 S.W.2d at 943.  Based, in part, on the newness and lack of established credit of the  defendant, the court found that the plaintiff had the right to insist on cash payments in advance for parts shipped to the defendant and that it would

not have shipped those parts without the written guaranty of the defendant's president and owner of the majority interest in the defendant business. *Id.*

In *Mesa Argo, supra,*, lost profits were denied on a contract to graze cattle where at the time of breach the plaintiff had been in business nine months and its costs of operation were twice what it had paid the defendants. In *Edwards, supra,* lost profits were denied a doctor in a suit against the landlord of leased premises later found to be damaged where the plaintiff leased the premises for a branch clinic and the evidence showed the clinic had been opened for 17 months, was in a new shopping center, the plaintiff had no experience operating a branch clinic, the venture was new, the plaintiff could not estimate his branch income and he knew he was taking a risk.

While lost profits will not be denied merely because a business is new, there must be "factual data available to furnish a sound basis for computation of probable losses." *Universal, supra,* 449 S.W.2d at 113. In those cases in which recovery of lost profits has been allowed there was evidence that prior to the defendant's alleged wrongdoing the plaintiff's business had signed contracts for the purchase of its products and had made an actual profit. In *Harper Building Systems v. Upjohn Co.,* 564 S.W.2d 123, 126 (Tex. 1978), it was held that plaintiff company which sold foam panels could recover lost profits from the manufacturer of defective materials used by plaintiff to manufacture its panels where plaintiff had been in business for approximately ten months at the time defendant's materials were declared to be defective and had, during that period, entered into two signed contracts and had an accepted proposal from a third for the sale of its panels and had made a profit of $5,000. (*But see* dissent by Justice Keith describing this as "the classic case of a new business entering an untested field with a new

product and founders upon a combination of bad luck, under capitalization, and lack of technical know-how. regarding the sufficiency of the evidence of lost profits." *Id. at 128.*)

Plaintiff's evidence of lost future profits is nothing more than an unsupported guess. As the court said of the evidence in *Seideneck v. Cal Bayreuther Associates*, 451 S.W.2d 752, 755 (Tex. 1970), Plaintiff's evidence of loss of future profits is so weak "as to do no more than create a mere surmise or suspicion of its existence, [and] such evidence, is in legal effect no evidence, and it will not support a verdict or judgment."

### E. THERE IS NO EVIDENCE TO SUPPORT A CLAIM FOR EXEMPLARY DAMAGES

Exemplary damages may only be awarded if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery results from fraud, malice or wilful act or omission. (Texas Civil Practice and Remedies Code ("Tex. Civ. P & R Code"), §41.003.) On Plaintiff's claim for negligent misrepresentation, the standard for imposition of exemplary damages is gross negligence, a standard considerably more stringent than the standard for ordinary negligence. *Streber v. Hunt*, 221 F.3d 701, 731, reh. denied 223 F.3d 576 (5th Cir. - Tex. 2000); *Henderson v. Norfolk Southern Corp.*, 55 F.3d 1066, 1070 (5th Cir.-Tex. 1995). In its claim for conversion, Plaintiff alleges that JSW-PMI committed a theft in violation of Texas law (a claim which JSW-PMI denies). (1st Amended Complaint, ¶ 30.) Even if proven true, the fact that an act is unlawful is not of itself grounds for an award of exemplary damages and plaintiff must prove that the act in question was of a wanton and malicious nature. *C&D Robotics, Inc. v. Mann*, 47 S.W.2d 194, 201 (Tex.App-Texarkana 2001); *Matter of Gober*, 100 F.3d 1195, 1205 (5th Cir.-Tex. 1996).

There is no genuine issue of material fact which would support a finding that JSW-PMI acted fraudulently, maliciously, wilfully or was grossly negligent by refusing to ship additional machines or in withdrawing its offer of a line of credit where the Plaintiff was unable, as required by the contract, to make payments and secure purchase orders from Plaintiff's hoped-for customers. As set forth in the prior discussion regarding breach of contract and conversion, each of JSW-PMI's actions with respect to the Plaintiff and the contract were appropriate, justified and privileged under the circumstances. JSW-PMI was neither a guarantor nor malicious inhibitor of Plaintiff's success in the injection molding business in Brownsville. To the contrary, JSW-PMI undertook affirmative steps to assist Plaintiff in its endeavors. Even were Plaintiff's tort claims found to be valid, "every tort involves conduct that the law considers wrong, but punitive damages are proper only in the most exceptional cases." *Rescar, Inc. v. Ward*, 60 S.W.3d 169, 182 (Tex.App.-Houston 2001). This case is not exceptional and is no more than a routine breach of contract dispute. On the undisputed facts, Plaintiff cannot, by clear and convincing evidence, raise a genuine issue of material fact to support the recovery of exemplary damages.

//

//

## VI.

## CONCLUSION

Based upon all of the foregoing, Defendant JSW Plastics Machinery, Inc. requests that the Court grant this motion for summary judgment and enter judgment in its favor. In the alternative, Defendant requests that this court grant this motion for summary adjudication of issues.

Dated: February 7, 2003.                    Respectfully submitted,

By: _David C. Garza by _____
        DAVID C. GARZA
        SBN 07731400
        GARZA & GARZA, L.L.P.
        680 East St. Charles, Suite 300
        P.O. Box 2025
        Brownsville, Texas 78522-2025
        Tel: (956) 541-4914
        Fax: (956) 542-7403
        Attorney-in-Charge for JSW Plastics
        Machinery, Inc.

        JAMES J. REGAN
        CAL. SBN 80576
        REGAN ◆ BRAUN LAW OFFICES
        2522 Artesia Boulevard, Suite 200
        Redondo Beach, California 90278
        Tel: (310) 372-1988
        Fax: (310) 318-5894

# CERTIFICATE OF SERVICE

I certify that a copy of the foregoing **DEFENDANT JSW PLASTICS MACHINERY, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION OF ISSUES; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; PROPOSED ORDER (Appendix to Motion For Summary Judgment with Supporting Affidavits Attached)** have been served on attorneys of records to the following addresses on this 7th day of February, 2003.

John R. Griffith                                   Via Hand Delivery
Viola G. Garza
GRIFFITH, HILL & OCHOA, LLP
One Park Place
100 Savannah Avenue, Suite 500
McAllen, Texas 78503

Moises M. Salas, Jr.                               Via Hand Delivery
LAW OFFICES OF MOISES M. SALAS JR.
847 East Harrison
Brownsville, Texas 78520

DAVID C. GARZA

---

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

|  |  |  |
|---|---|---|
| EXEL BOBBINS AND PLASTIC COMPONENTS, INC., | § § § § | CIVIL ACTION No. B-01-148 |
| Plaintiff, | § § | [Assigned to the Hon. Hilda G. Tagle Stipulated to Magistrate Felix Recio] |
| vs. | § § § | Date: February 27, 2003 |
| JSW PLASTICS MACHINERY, INC., | § § | Time: 2:00 p.m. |
| Defendant. | § § § § § | |

## APPENDIX TO
## DEFENDANT JSW PLASTICS MACHINERY, INC.'S
## MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

1.     Affidavit of Hatsumi Akeda   ………………………………….     1

2.     Affidavit of James J. Regan ……………………………………     4

Exhibit A -   Letter dated February 29, 2000 from Jerry Johnson to whom it may concern.

Exhibit B -   Purchase order No. 98-1811 dated September 5, 2000 from Exel to JSW-PMI for a J385 machine.

Exhibit C -   Purchase order No. 9 dated November 7, 2000 from Exel to JSW-PMI for a J500 machine.

Exhibit D -   Purchase order No. 15 dated January 23, 2001 from Exel to JSW-PMI for a J110 machine.

Exhibit E -   Letter agreement dated January 30, 2001, between JSW-PMI and Exel.

Exhibit F -   Letter dated May 10, 2001 from JSW-PMI (by Jerry Johnson) to Exel (by Steve Becker) re withdrawal of the line of credit.

Exhibit G -   True and correct copies of relevant pages from the transcript of the Steve Becker deposition.

Exhibit H -   True and correct copies of relevant pages from the transcript of the John Robert Annoreno deposition.

Exhibit I -   True and correct copies of relevant pages from the transcript of the Gerald Arthur Johnson deposition.

Exhibit J -   True and correct copy of a letter dated June 13, 2001 authored by James Regan Via U.S. Mail and Fax to Steve Becker, Exel Bobbins and Plastics Components, Inc.

Exhibit K -   True and correct copies of face pages of the U.S. Income Tax Return for S Corporation for the years of 2000 and 2001 which produced by Plaintiff in the course of Discovery in this action.

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

| | | |
|---|---|---|
| EXEL BOBBINS AND PLASTIC COMPONENTS, INC., | § § § § | CIVIL ACTION No. B-01-148 |
| Plaintiff, | § § | [Assigned to the Hon. Hilda G. Tagle Stipulated to Magistrate Felix Recio] |
| vs. | § § § | |
| JSW PLASTICS MACHINERY, INC., | § § | |
| Defendant. | § § § § | |

---

### AFFIDAVIT OF HATSUMI AKEDA IN SUPPORT OF DEFENDANT JSW PLASTIC MACHINERY, INC.'S MOTION FOR SUMMARY JUDGMENT

Before me, the undersigned notary public, personally appeared Hatsumi Akeda, who, after being duly sworn, declares the following under penalty of perjury under the laws of the United States:

1.     My name is Hatsumi Akeda, I am over the age of twenty-one and I submit this Affidavit in support of defendant JSW Plastic Machinery, Inc.'s Motion for Summary Judgment.

2.     I am the accounting manager for JSW Plastics Machinery, Inc. (hereafter "JSW-PMI"), one of the defendants in this action, and my office is located in JSW-PMI's offices at 555 South Promenade Avenue, Unit 104, Corona, California.

//

3.    I have personal knowledge of the facts set forth herein and if called upon to do so, I could and would competently testify to the matters set forth in this Affidavit.

4.    As the accounting manager for JSW-PMI, I am responsible for recording, depositing and tracking all monies received and expended by JSW-PMI in connection with all machinery sales to third parties by JSW-PMI.

5.    On or about May 3, 2001, JSW-PMI received a deposit check from Exel Bobbins and Plactic Components, Inc. (hereafter "Exel") in the sum of Four Thousand Eight Hundred and Fifty Five Dollars and 59 Cents ($4,855.59) (hereafter "Deposit").

6.    I logged in the receipt of Exel's Deposit and ordered that the Deposit be placed in a specific account for Exel ("Exel Account").

7.    The Deposit has remained in the Exel Account in full from the time of its receipt until the present time.

8.    The Deposit has at all times, from the date of its receipt until the present time, been available to be applied to any orders for machinery received by JSW-PMI from Exel or to be returned to Exel upon the receipt by me of a written request from Exel for the return of all or any portion of the Deposit.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _4TH_ day of February, 2003, at Corona, California.

_____
Hatsumi Akeda
Accounting Manager, JSW Plastics Machinery, Inc.

//

## NOTARY ACKNOWLEDGMENT

State of California          )     ss.
County of _Riverside_    )

On February ___4th___, 2003, before me _Raquel Villarreal_ [name of

notary] personally, appeared HATSUMI AKEDA personally known to me (or proved to me on

the basis of satisfactory evidence) to be the person whose name is subscribed to the within

instrument and acknowledged to me that she/he executed the same in her/his authorized

capacity, and that by her/his signature on the instrument the person, or the entity upon behalf of

which the person acted, executed this instrument.


WITNESS my hand and official seal.


Signature _Raquel Villarreal_

(SEAL)

> RAQUEL VILLARREAL
> COMM. #1290080
> NOTARY PUBLIC-CALIFORNIA
> RIVERSIDE COUNTY
> My Comm. Expires Feb. 6, 2005
> BCT 6

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

| | | |
|---|---|---|
| EXEL BOBBINS AND PLASTIC COMPONENTS, INC., | §<br>§<br>§<br>§ | CIVIL ACTION No. B-01-148 |
| Plaintiff, | §<br>§ | [Assigned to the Hon. Hilda G. Tagle<br>Stipulated to Magistrate Felix Recio] |
| vs. | §<br>§<br>§ | |
| JSW PLASTICS MACHINERY, INC., | §<br>§ | |
| Defendant. | §<br>§<br>§ | |

---

## AFFIDAVIT OF JAMES J. REGAN IN SUPPORT OF DEFENDANT JSW PLASTICS MACHINERY, INC.'S MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION OF ISSUES

---

Before me, the undersigned notary public, personally appeared James J. Regan, who, after being duly sworn, declares the following under penalty of perjury under the laws of the United States:

1.    My name is James J. Regan, I am over the age of twenty-one and I submit this Affidavit in support of defendant JSW Plastics Machinery, Inc.'s ("JSW-PMI") Motion for Summary Judgment or, in the alternative, Summary Adjudication of Issues.

2.    I am an attorney duly licensed to practice law in all courts of the State of

California and in the United States District Court, Central District of California. I am one of the attorneys primarily responsible for representing the Defendant Japan Steel Works America, Inc. in the above-captioned action and am familiar with the action. I have personal knowledge of the facts set forth herein and if called upon to do so, I could and would competently testify to the matters set forth in this Affidavit.

3.      Attached hereto as exhibits are true and correct copies of the following documents received by me from plaintiff Exel Bobbins and Plastic Components, Inc. ("Plaintiff" or "Exel") in response to discovery propounded to Plaintiff on behalf of JSW-PMI and/or received by me in depositions taken in this action:

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| A. | Letter dated February 29, 2000 from Jerry Johnson to whom it may concern. |
| B. | Purchase order No. 98-1811 dated September 5, 2000 from Exel to JSW-PMI for a J385 machine. |
| C. | Purchase order No. 9 dated November 7, 2000 from Exel to JSW-PMI for a J500 machine. |
| D. | Purchase order No. 15 dated January 23, 2001 from Exel to JSW-PMI for a J110 machine. |
| E. | Letter agreement dated January 30, 2001, between JSW-PMI and Exel. |
| F. | Letter dated May 10, 2001 from JSW-PMI (by Jerry Johnson) to Exel (by Steve Becker) re withdrawal of the line of credit. |

4.      I attended the deposition of Steve Becker taken in this action on April 4, 2002 Attached hereto as EXHIBIT G are true and correct copies of relevant pages from the transcript of the Becker deposition.

5.      I attended the deposition of John Robert Annoreno taken in this action on January 9, 2003.  Attached hereto as EXHIBIT H are true and correct copies of relevant pages from the transcript of the Annoreno deposition.

6.      I attended the deposition of Gerald Arthur Johnson taken in this action on October 11, 2002  Attached hereto as EXHIBIT I are true and correct copies of relevant pages from the transcript of the Johnson deposition.I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

7.      Attached hereto as Exhibit J is a true and correct copy of a letter dated June 13, 2001 authored by James Regan Via U.S. Mail and Fax to Steve Becker, Exel Bobbins and Plastics Components, Inc.

8.      Attached hereto as Exhibit K is a true and correct copies of face pages of the U.S. Income Tax Return for S Corporation for the years of 2000 and 2001 which produced by Plaintiff in the course of Discovery in this action.

Executed this _6_ day of February, 2003, at Redondo Beach, California.

James J. Regan

//

PAGE 04          LAW OFFICES J REGAN          310-318-5894          08:36  02/07/2003

## NOTARY ACKNOWLEDGMENT

State of California       )     ss.
County of Los Angeles      )

On February ____6____, 2003, before me _Michael Anne Cahill_, [name of notary] personally, appeared JAMES J. REGAN personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that she/he executed the same in her/his authorized capacity, and that by her/his signature on the instrument the person, or the entity upon behalf of which the person acted, executed this instrument.

WITNESS my hand and official seal.

Signature _Michaelanne Cahill_

(SEAL)

> MICHAELANNE CAHILL
> Commission # 1312256
> Notary Public - California
> Los Angeles County
> My Comm. Expires Jul 5, 2005

**EXHIBIT "A"**

# JSW PLASTICS MACHINERY INC.

HEAD OFFICE: LOS ANGELES
3726 EAST MIRALOMA AVENUE • ANAHEIM, CALIFORNIA 92806-2107 • PHONE (714) 630-5651 • FAX (714) 630-1886

| CHICAGO TECHNICAL CENTER | EAST COAST OFFICE | DETROIT OFFICE | ATLANTA OFFICE |
|---|---|---|---|
| 1300 LANDMEIER ROAD | P.O. BOX 498 | 44712 HELM STREET | 1700 CUMBERLAND POINT DR., STE#17 |
| ELK GROVE VILLAGE, IL 60007 | DAYVILLE, CT 06241-0498 | PLYMOUTH, MICHIGAN 48170 | MARIETTA, GEORGIA 30067 |
| PHONE. (847) 427-1100 | PHONE: (860) 774-2613 | PHONE: (734) 455-9003 | PHONE: (770) 952-0269 |
| FAX: (847) 427-1131 | FAX: (860) 774-3297 | FAX: (734) 455-9058 | FAX. (770) 956-9058 |

February 29, 2000

To Whom It May Concern:

JSW Plastics Machinery Inc., will support the growth and expansion of Exel Bobbins and Plastic Components Inc., by providing any model of JSW PMI Plastic Injection Molding Machine, which they will require for future projects with Sunbeam-Oster. This also includes maintaining a new machine inventory for quick delivery, based on the demands by Exel Customers, as well as providing full support on an on-going bases. We will assist Exel in any way possible to accommodate the needs of Sunbeam-Oster in all of their molding needs.

As of this date, JSW PMI has extended a credit line of $1,500,000.00 to Exel for the purchase of JSW's products and services, and agrees to a payment term of 5% down payment and balance net 180 days, at 0% interest. In addition, JSW PMI guarantees Exel a stock inventory of Injection Molding Machines at our Anaheim, CA. facility with delivery requirements of fourteen (14) days or less.

Once again, it has been and will be a pleasure doing business with Exel Plastics Inc., and sincerely appreciate our relationship of being a team supplier member of Exel Plastics.

Sincerely,

Jerry Johnson
Vice President

**EXHIBIT "B"**

08/23/00  09:50 FAX 714 630 1888      JSW PMI LA                    ☑003
08/22/2000 16:28 FAX 847 427 1131      JSW TECH CENTER      → PMI LOS ANGELES  ☑001

OM : EXEL PLASTICS INC.            FAX NO. : 630 372 5879

| Purchase Order # | Page |
|------------------|------|
| 96-1811          | 1    |

# EXEL BOBBINS AND PLASTIC COMPONENTS, INC.

3301 NAFTA PARKWAY UNIT C
BROWNSVILLE, TX 78521
Phone (956) 832-0807
Fax (956) 830-0811

SHIP TO
EXEL BOBBINS

## Purchase Order

VENDOR

JSW Plastics Machinery Inc .
**1300 Landmeier Rd**
Elk Grove Village, IL 60007 . U.S.A
(847) 427-1100 fax (847) 427-1151

BILL TO
**EXEL BOBBINS AND
PLASTIC COMPONENTS, INC.
3301 NAFTA PARKWAY UNIT C
BROWNSVILLE , TX 78521**

| REQUESTER | | | | DELIVER TO | |
|-----------|--|--|--|------------|--|
| EXEL BOBBINS AND PLASTIC COMPONENTS,INC. | | | | SAME | |
| ORDER DATE | VENDOR CODE | | BUYER JOHN | TERMS | SHIP VIA |
| 8/22/00 | | | OR STEVE | 5% down balance 6 months | OUR TRUCK |
| F.O.B. | FREIGHT | TAXABLE | P.O. TYPE | ACCOUNT NUMBER | CONFIRM TO | RESALE NUMBER |
| | | | | | John | |

| LINE | PART NUMBER / DESCRIPTION | INSP. | DELIV. DATE | QTY. | UOM | UNIT PRICE | EXT. | TAX |
|------|--------------------------|-------|-------------|------|-----|------------|------|-----|
| 1 | 385 ton molding machine J385EII-P with " B " barrel computer and electronics to be in compliance with Y2K | | | 1 | | $140,000.00 | | |
| | CREDIT MOLD SAMPLE AT AGS,INC | | | | | $1,500.00 | | |
| | | | TOTAL | | | $138,500.00 | | |

**EXHIBIT "C"**

Excel Bobbins & Plastic Compo.     Inc.                    # Purchase Order

3301 NAFTA Parkway
Unit C
Brownsville, TX 78521

| DATE | P.O. NO. |
|------|----------|
| 11/7/2000 | 9 |

**Vendor**

JSW Plastics Machinery Inc
3726 E. Miraloma Avenue
Anaheim, CA 92806
Fax: 847-427-1111

**SHIP TO**

Exel Bobbins & Plastic Components Inc.
3301 NAFTA Parkway
Unit C
Brownsville, TX 78521
Ph. 956-832-0807  Fax 832-0811

| ITEM | DESCRIPTION | QTY | RATE | AMOUNT |
|------|-------------|-----|------|--------|
| IT2 | 500 Ton Injection Molding Machine; B-Barrel | 1 | 202,500.00 | 202,500.00 |
|  | NOTE. Ship to above address. Bill to Exel Plastics 302 toma Jean Pkwy. Streamwood, IL 60107 | | | |
|  | Per Quote dated March 03, 2000; Per Jerry Johnson | | | |
|  | REVISION PER CONVERSATION WITH JERRY AND DENIS ON 3/21/01 | | | |

Per special terms Jerry Johnson

| | **Total** | **$202,500.00** |

**EXHIBIT "D"**

Exel Bobbins & Plastic Components Inc.

3301 NAFTA Parkway
Unit C
Brownsville, TX 78521

# Purchase Orde

| DATE | P.O. NO. |
|------|----------|
| 1/23/2001 | 15 |

| Vendor | SHIP TO |
|--------|---------|
| JSW Plastics Machinery Inc<br>3726 E. Miraloma Avenue<br>Anaheim, CA 92806<br>Fax: 847-427-1131 | Exel Bobbins & Plastic Components Inc.<br>3301 NAFTA Parkway<br>Unit C<br>Brownsville, TX 78521<br>Ph. 956-832-0807  Fax 832-0811 |

| ITEM | DESCRIPTION | QTY | RATE | AMOUNT |
|------|-------------|-----|------|--------|
| J110 EII | J110EII with a 7.2 oz "B" barrel, wired for 460/3/60 voltage. | 1 | 84,835.00 | 84,835.00 |

Special Discounted Price.  Machine is in stock, subject to prior sale.

| | Total |
|---|-------|
| | $84,835.00 |

**EXHIBIT "E"**

**JSW**

**J S W  P L A S T I C S  M A C H I N E R Y  I N C.**

January 30, 2001

Mr. Steve Becker
EXEL BOBBINS Inc.
3301 NAFTA Parkway – Unit C
Brownsville, TX  78521

Dear Steve,

As you will remember, JSW Plastics Machinery, Inc., extended a Line of Credit to your company, EXEL BOBBINS Inc., and now that we are getting close to shipping machines into your facility in Brownsville, TX., we must have an agreement as to the re-payment of this Line of Credit. Therefore, please accept the following proposal. We will be shipping the following Machines, per your Purchase Order #'s 15 and 5.

| | | |
|---|---|---|
| 1 – JSW Model J500EII Injection Molding Machine | ~~$ 206,500.00~~ | *202,500.00 per 3/3/2000 Quote &* |
| 1 – JSW Model J110EII Injection Molding Machine | $ 84,835.00 | *OuR Conversation today 3/21/01* |
| TOTAL INVOICE AMOUNT | ~~$ 291,335.00~~ | *$4788.22*  *$ 287,335.00* |

A 5% Down Payment of the total order amount is normally required prior to shipment, however we will make a special consideration to EXEL BOBBINS of 3 Equal Monthly Payments of $ ~~4,835.59~~, with the first payment due prior to shipment of machines, and the next Down Payment Installment is due Thirty (30) days after shipment, and the last Down Payment Installment Sixty (60) days after shipment.  *$ 217,768.23*

After the last Down Payment Installment is made, there will not be any payments due for a period of Six (6) Months. Then, starting on the Seventh (7) Month, EXEL BOBBINS will make Eleven (11) Monthly payments of $5,000.00 until the Twelfth (12) Month, at which time EXEL BOBBINS agrees to make a balloon payment of the balance owed (~~$ 221,768.23~~) to JSW Plastics Machinery. No interest will be charged during this special financing period, however it is agreed that JSW Plastics Machinery will still remain the owner and have recovery rights of this equipment until final payment has been made by EXEL BOBBINS or it's Financial Partner. JSW Plastics Machinery has the right to cancel or withdraw from this agreement after given written notice to EXEL BOBBINS on a Thirty (30) days notice.

Steve, if you are interested in pursuing this agreement, please sign below and return to my attention, a.s.a.p. as we are ready to ship these machines to you. Should you have any questions about this agreement, or require additional information, please feel free to contact Dennis Pochatek at the Chicago Technical Center.

Sincerely,

Jerry Johnson
Vice President Operations

Accepted By: _____
Signature

*President*
Title

Date: ___2/26/01___

CORPORATE OFFICE  3726 EAST MIRALOMA AVENUE, ANAHEIM, CA 92806-2107  PHONE: 714-630-5651  FAX. 714-630-1886
CHICAGO TECHNICAL CENTER  1300 LANDMEIER ROAD, ELK GROVE VILLAGE, IL 60007  PHONE. 847-427-1100  FAX: 147-427-1131
ATLANTA REGIONAL OFFICE  1700 CUMBERLAND POINT DR., SUITE 17, MARIETTA, GA 30067  PHONE. 770-952-0269  FAX. 770-956-9058
DETROIT REGIONAL OFFICE  24404 CATHERINE INDUSTRIAL DR., SUITE 310  NOVI, MI 48375

**EXHIBIT "F"**



**JSW**
JSW PLASTICS MACHINERY INC.

May 10, 2001

Mr. Steve Becker
EXEL BOBBINS Inc.
3301 NAFTA Parkway – Unit C
Brownsville, TX 78521

Sent by Fax and Certified Letter

Dear Steve,

I am in receipt of your fax dated May 8, 2001.

Please understand that your check of $4,855.59 (which represents a 1/3 of the 5% down payment) has been received by JSW Plastics Machinery, and is being applied to our model JSW J-500EII Hydraulic Injection Molding Machine located in our L.A., California facility, and our model J-110EII Hydraulic Injection Molding Machine located in our Chicago facility, which is currently on a hold bases, until we receive full payment on the delinquent past due payment of the model J-385EII machine at your facility in Brownsville, TX facility, which was due on April 23, 2001.

Steve, as you know, we (JSW) have extended special payment terms to Exel Bobbins and Plastics Components, with the full understanding and agreement, that Exel Bobbins and Plastics Components would adhere to the payment terms extended to you, however we (JSW) have not been paid for the first shipment of our model J-385EII machine.

Therefore, we must withdraw our initial offer to Exel Bobbins and Plastics Components, the Credit Line of $1,500,000.00, due to non-payment of the original sales agreement.

Per our telephone conversation of May 7, 2001, JSW is extending to you, an extension of payment to May 11, 2001, allowing you to obtain financing for the original payment. Should you not be able to obtain financing, unfortunately, JSW will need to exercise it's right to recover this machine from you facility and cancel all other existing and remaining orders that you have placed with JSW, and applying all other funds from Exel Bobbins and Plastics Components received, toward the recovery and remarketing of the model J385EII machine.

Steve, after reviewing this letter, should you have any questions, or require additional information, please feel free to contact me at the JSW Chicago Technical Center.

Sincerely,

Jerry Johnson
Vice President

**EXHIBIT "G"**

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                   BROWNSVILLE DIVISION

 3   EXCEL BOBBINS AND PLASTIC      )
     COMPONENTS, INC.,              )
 4            PLAINTIFF,            )
                                    )
 5   VS.                            )   CIVIL ACTION NO. B-01-148
                                    )
 6   JSW PLASTICS MACHINERY, INC.,  )
              DEFENDANT             )

 7

 8

 9

10   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

11                      ORAL DEPOSITION OF

12                        STEVE BECKER

13                        APRIL 4, 2002

14                       VOLUME 1 OF 2

15   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

16

17

18                                      CERTIFIED

19                                      COPY

20

21          ORAL DEPOSITION of STEVE BECKER, produced as a

22   witness at the instance of the Defendant, and duly sworn,

23   was taken in the above-styled and numbered cause on the

24   4th day of April 2002, from 10:39 a.m. to 6:29 p.m.,

25   before CATHY MATA STURROCK, CSR in and for the State of
```



```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3   EXCEL BOBBINS AND PLASTIC      )
     COMPONENTS, INC.,              )
 4            PLAINTIFF,            )
                                    )
 5   VS.                            )   CIVIL ACTION NO. B-01-148
                                    )
 6   JSW PLASTICS MACHINERY, INC.,)
              DEFENDANT             )

 7

 8

 9

10      *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

11                    ORAL DEPOSITION OF

12                      STEVE BECKER

13   '                  APRIL 5, 2002

14                      VOLUME 2 OF 2

15      *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

16

17                                    CERTIFIED

18

19                                    COPY

20

21          ORAL DEPOSITION of STEVE BECKER, produced as a

22   witness at the instance of the Defendant, and duly sworn,

23   was taken in the above-styled and numbered cause on the

24   5th day of April 2002, from 1:14 p.m. to 5:49 p.m.,

25   before CATHY MATA STURROCK, CSR in and for the State of
```

**181**

1 years and they just didn't deliver it for one-and-a-half
2 years, or did they deliver it --
3     A. Oh, no. We -- we weren't going to take -- we
4 were building a mold, and the mold wasn't done. In fact,
5 the 385 -- to clarify the 385 -- we did a mold trial,
6 which you got documentation there in one of their
7 customer's -- JSW's customer's facility on -- in the 385
8 to make sure that the 385 that I have in my facility
9 today would work for the Sears Die mold -- the Sears
10 Diehard mold. That was the purpose and reason of buying
11 that machine.
12     Q. Okay. So just trying to establish a time line.
13 It's your contention that the first interference by JSW
14 PMI with Exel Bobbins and its customers occurred sometime
15 in April of 2001?
16     A. When Sunbeam first required me to bring in
17 machines. They actually wanted me to bring in three
18 machines. And according to our contract and agreement,
19 there was two machines that were going to be released at
20 a time.
21     Q. Okay.
22     A. And building our relationship with our customer
23 that was agreeable with my customer that we build our
24 business slow. So the release of the 13 or 17 or 15
25 machines that we had purchased -- or not given a purchase

**182**

1 order on, but got quotes on from JSW were based on
2 releases over a period of time building a relationship
3 with Sunbeam Oster as we are trying to do today.
4     Q. All right. So you make a five percent deposit
5 and request two machines to come from JSW in April
6 of -- of 2001. What does JSW respond which you find
7 offensive?
8     A. "We're not shipping your machines."
9     Q. And why not?
10     A. Because we didn't have prior financing that we
11 were trying to get on the 385. Our applications -- we
12 were busy trying to start the business. We've never had
13 a problem before on starting and getting these type of
14 loans on machines. And being a new business, there was
15 no company out there that was going to give
16 us -- give us this credit.
17     Q. Okay. So in April of 2001, you were trying to
18 get a loan on the JSW supply 385-ton machine, correct?
19     A. Yes.
20     Q. Were you able to get a loan on a 385-ton
21 machine?
22     A. No. Through JSW, yes.
23     Q. Okay. But you were not able to get a
24 third-party loan, correct?
25     A. That's correct.

**183**

1     Q. And earlier when we were talking, you made
2 reference to various banks that you contacted, U.S. Bank
3 Wells Fargo, Heller Financial?
4     A. Yes.
5     Q. Were these banks contacted to try to get a loan
6 for the 385-ton press?
7     A. Were they contacted?
8     Q. Yes.
9     A. Yes.
10     Q. All right. So you were trying to get specific
11 financing on the 385-ton press when you contacted these
12 banks?
13     A. Yes.
14     Q. Okay. Now, did you have an agreement with JSW
15 that you would pay within 30 days, after having the 385
16 shipped to you, the -- another installment on the down
17 payment?
18     A. I don't understand the question.
19     Q. That's fair enough. I'll try to repeat it --
20     A. Okay.
21     Q. -- and make it... JSW in April of 2001 said,
22 "We're not going to ship you two machines because you
23 haven't made payment on the 385"?
24     A. We haven't closed out the loan. We
25 haven't -- what happens -- you know what happens in this

**184**

1 business. The machines are financed. The finance
2 company pays off the machine company. Well, prior
3 talking to you and Jerry and JSW, I guess we came to an
4 agreement and -- and that was the agreement we came to
5 was the one you know of.
6     Q. Okay. The one we're talking about is that in
7 April JSW contended that you owed them money on the 385,
8 correct? Is that correct?
9     A. That is -- that is correct.
10     Q. Did you believe that you owed JSW money in April
11 of 2001 for the 385?
12     A. For the 385, yes.
13     Q. Okay. And that is the reason you were going to
14 the banks to try to get money to pay off the 385?
15     A. Yes, because it wasn't included in -- in a line
16 of credit that was projected toward Sunbeam Oster to
17 fulfill their package and needs.
18     Q. Okay. So it was a separate purchase?
19     A. Separate purchase. We were -- we were
20 responsible to get that thing -- to get it financed. We
21 ran into some brick walls. And I think, more or less, it
22 had to do with early squirming with trying to get the
23 financing, having too many people -- too many hands --
24 too many people's hand in the pot having to each other
25 without our knowledge. JSW was talking to these machine

**189**

1. or potential contractual relationships?
2. A. Yeah. I felt I was lied to.
3. Q. Okay.
4. A. And deceived.
5. Q. Now, are there any other reasons in April of
6. 2001 why you felt that JSW was interfering with Exel
7. Bobbins' business relations with its customers?
8. A. No. Only the suspect feeling that I was getting
9. from -- from employees of JSW and how things transpired
10. with conversations, where things were going, how
11. impatient they were and not understanding on how a
12. customer is the judge on when and how we ship machines.
13. Q. Okay.
14. A. Not me.
15. Q. Let's try to quantify that term you used,
16. "suspect feeling." I'm -- I want some -- if I may, some
17. evidence to support whatever that is that leads you to
18. conclude that JSW was interfering with Exel Bobbins'
19. relationship with third-party customers?
20. A. Coming up with the other part of the
21. contract -- the line of credit.
22. Q. Okay. That -- in April that was -- was that an
23. issue?
24. A. Not in April.
25. Q. Okay. That was in May?

**190**

1. A. That was -- that was December of 2000. The end
2. of December in 2000. That's when we became suspect when
3. we're asking, "Hey, guys" --
4. Q. Okay.
5. A. -- "where's the rest of -- where -- what are we
6. going to do here?" They wanted to ship me machines, and
7. I said no.
8. Q. So that suspect feeling that John Annereno and
9. you have that you've testified to was never assuaged, was
10. never mollified during the January, February, March and
11. early April activities by JSW? In other words, February
12. 2nd, 2001, Jerry Johnson assists you in a phone call with
13. Sunbeam Oster. That didn't remove that suspect feeling
14. that you had, correct?
15. A. It did remove a lot of my -- with the -- with
16. the second part of the line of credit, which were the
17. terms on those two machines, I was -- yes. I was -- I
18. was actually relieved.
19. Q. Okay.
20. A. If you could -- if you would say.
21. Q. Now, do you agree that you lived up to the terms
22. of the contract of January 30th, 2001?
23. A. January 30th, 2001? Yes. Absolutely.
24. Q. Okay. You made payments when they were due,
25. particularly on the 385?

**191**

1. A. There was no payments due at that time.
2. Q. Well, in -- later in the year there were
3. payments due?
4. A. Yes.
5. Q. Did you make the payment in a timely manner?
6. A. I sure did.
7. Q. You made all payments that were due?
8. A. I have made the pay -- every payment on time
9. since the day we made our agreement.
10. Q. Well, in April of 2001 you've already testified
11. that JSW told you that they would not ship the two
12. machines because you had missed a payment on a 385,
13. correct?
14. A. And I -- we explained to them, the 385 has
15. nothing to do with the line of credit or the other machines.
16. That is a separate issue. And we gave them evidence, and
17. we gave them the companies that we were working with.
18. Q. Okay. But you acknowledged JSW's argument that
19. they wouldn't ship because they felt you owed the money
20. on the 385, correct? I mean that was the reason they
21. gave you?
22. A. That was the reason they gave me.
23. Q. Okay.
24. A. And we weren't buying it.
25. Q. Now, did you owe the money on the 385 in April

**192**

1. of 2001?
2. A. Did we owe it? No, we did not.
3. Q. Did you owe them money on the 385 in May 2001?
4. A. April 23rd, 2001.
5. Q. That's when you owed the money?
6. A. Payment was due on the machine, which -- indeed,
7. we'd been late on a 300-ton press on final payment over
8. two months and never even got a whistle, not even a phone
9. call on a prior machine by them.
10. Q. Was the payment on the 385 due JSW on or about
11. August -- April 23, 2001?
12. A. Yes, it was due.
13. Q. Did you make the payment?
14. A. No, I did not.
15. Q. Okay. Did you make the payment by May 11th,
16. 2001 for the 385?
17. A. I don't believe that's -- that either, no.
18. Q. Okay. Did you make the payment at any time,
19. that was due on the 385, prior to July of 2001?
20. A. That would be two months later, and I think
21. that's when we came up with our -- our agreement, yes.
22. Q. The agreement was sometime in or about July
23. 19th?
24. A. Which was an additional $10,000 down and a
25. payment -- the first payment, which was $2800 as agreed

193

16:39:40 1  upon.

16:39:42 2      Q.  Right.  And can you agree that from the due date

16:39:44 3  of April 23 through late July 2001 that you made no

16:39:54 4  payment on the 385?

16:39:58 5      A.  Yes, I agree.

16:39:58 6      Q.  Okay.  All right.  Now, we've talked -- well,

16:40:20 7  let me see.  All right.  You have an agreement with GBIC,

16:40:36 8  correct?

16:40:36 9      A.  That's correct.

16:40:38 10     Q.  Go ahead and tell me, "GBIC" stands for?

16:40:42 11     A.  No.  The Greater Brownsville -- Greater

16:40:48 12 Brownsville Economic Council.

16:40:52 13     Q.  Okay.

16:40:54 14     A.  BEDC.

16:40:56 15     Q.  Okay.  Do they refer to it as "BEDC," the

16:41:00 16 Brownsville Economic Development Council?

16:41:04 17     A.  Yes, something like that.

16:41:04 18     Q.  Okay.  And did the -- I'm going to refer to the

16:41:12 19 Brownsville Economic Development Council as "BEDC," and

16:41:16 20 I'm going to abbreviate.  You'll understand what I'm

16:41:18 21 referring to?

16:41:20 22     A.  Yes.

16:41:20 23     Q.  Okay.  Do you have a contract with BEDC?

16:41:26 24     A.  Yes.

16:41:26 25     Q.  And what is the value of that contract?

194

16:41:32 1      A.  The value of the contract?

16:41:32 2      Q.  Right.  The monetary value.

16:41:36 3      A.  $271,000.

16:41:36 4      Q.  Okay.  And have you received all that money?

16:41:44 5      A.  No.

16:41:46 6      Q.  How much have you received?

16:41:46 7      A.  $55,000 that I'm going to have to pay back.

16:41:52 8      Q.  When you say you'll have to pay back, would

16:41:54 9  you -- is that part of the contract?

16:41:58 10     A.  Yes.  If I don't fulfill my requirements, they

16:42:00 11 have a claw back where I have to pay them back.

16:42:04 12     Q.  And what are your requirements under of the

16:42:08 13 contract?

16:42:08 14     A.  I lose the -- I lose all my credit incentives

16:42:12 15 for job creation.

16:42:14 16     Q.  Let's go back for a second.  What are your

16:42:16 17 requirements under the contract?

16:42:18 18     A.  Job creation.

16:42:20 19     Q.  Okay.

16:42:20 20     A.  55 employees in the first two years.

16:42:24 21     Q.  Have the two years passed?

16:42:26 22     A.  Yes.  As showed in the that news article that

16:42:30 23 you -- you have in your files.

16:42:30 24     Q.  Well, news is not necessarily authority.

16:42:36 25 Contract would be something we could look at.  All right.

195

16:42:38 1  You have to hire 55 employees within two years.  And

16:42:42 2  within the first two years -- strike that.  When did the

16:42:46 3  two years start?

16:42:48 4      A.  December of 2001 -- I'm sorry.  December --

16:42:54 5  January of 2000.

16:42:56 6      Q.  January of 2000?

16:42:58 7      A.  They didn't count the two month -- the month and

16:43:02 8  a couple of days that we began, no, because they went by

16:43:06 9  fiscal year.  January 2001.

16:43:10 10     Q.  Okay.  Well, that's less than two years.

16:43:14 11     A.  What's that?

16:43:16 12     Q.  If I understand what you're saying, you're

16:43:18 13 saying that the contract went into effect January of

16:43:22 14 2001; is that correct?

16:43:26 15     A.  The contract actually states what we were

16:43:38 16 granted, an extension to start 2001, January 1.

16:43:36 17     Q.  Okay.  Two years from January 1 would be January

16:43:38 18 2003?

16:43:40 19     A.  Yes.

16:43:40 20     Q.  So you are not in breach of the contract as yet,

16:43:46 21 are you?

16:43:46 22     A.  My first year is 35 employees.  My second year

16:43:50 23 is -- is 20 employees.  I'm already in breach.

16:43:58 24     Q.  Okay.  I had first understood that already the

16:44:00 25 two years had passed, but...

196

16:44:02 1      A.  Oh, no, no.  Without machines there's no people.

16:44:06 2  Without people there's no job creation.  Without the job

16:44:08 3  creation, there's no money.

16:44:10 4      Q.  Okay.  Has -- okay.  So the terms are to hire 35

16:44:18 5  employees in the first year, and 20 in the second year.

16:44:22 6  And you are -- receive a grant for how much per employee?

16:44:28 7      A.  $5,000 approximately.  It's $4,835 to be exact,

16:44:36 8  I believe.

16:44:36 9      Q.  Okay.

16:44:36 10     A.  That's exact -- I think that's their exact

16:44:40 11 count -- dollar amount.

16:44:42 12     Q.  Okay.  Now, in June of 2000 you went and

16:44:52 13 obtained three additional machines, correct?

16:44:56 14     A.  Correct.

16:45:00 15     Q.  Those three machines, have those run five days a

16:45:04 16 week, 24 hours a day?

16:45:08 17     A.  Like I said before, they break down on me every

16:45:10 18 other week, so, no, they haven't.

16:45:12 19     Q.  What is your best estimate of the amount of

16:45:20 20 downtime that you've incurred with those three machines,

16:45:20 21 be it on a weekly or monthly basis?

16:45:24 22     A.  Over $150,000 worth of lost downtime.

16:45:26 23     Q.  How does that translate into hours per week,

16:45:32 24 your best estimate?

16:45:34 25     A.  Could be -- I usually do about 100 and -- 110

**EXHIBIT "H"**

```
 1               IN THE UNITED STATES DISTRICT COURT

 2                  SOUTHERN DISTRICT OF TEXAS

 3                     BROWNSVILLE DIVISION

 4   EXEL BOBBINS and PLASTIC        )

 5   COMPONENTS, INC.,               )

 6              Plaintiffs,          )  Civil Action

 7              -vs-                 )  No. B-01-148

 8   JSW PLASTICS MACHINERY, INC.,   )

 9   et al.,                         )

10              Defendants.          )

11              The deposition of JOHN ROBERT ANNORENO,

12   called for examination pursuant to Notice and the

13   Rules of Civil Procedure for the United States

14   District Courts pertaining to the taking of

15   depositions, taken before Janet M. Stanton, a

16   notary public within and for the County of DuPage

17   and State of Illinois, at Doubletree Club, 920 East

18   Northwest Highway, Palatine, Illinois, on the 9th

19   day of January, 2003, at the hour of 9:09 o'clock

20   a.m.

21

22   Reported by:  Janet M. Stanton, CSR

23   License No.:  084-001905

24
```

1

```
 1        APPEARANCES:

 2            GRIFFITH, HILL & OCHOA, L.L.P.

 3            BY:  MR. JOHN GRIFFITH

 4            One Park Place

 5            100 South Savannah, Suite 500

 6            McAllen, TX  78503

 7            (956) 971-9446

 8            MR. MOISES M. SALAS, JR.

 9            847 East Harrison

10            Brownsville, TX  78520

11            (956) 982-0600

12                Representing the Plaintiffs;

13            REGAN, BRAUN LAW OFFICES

14            BY:  MR. JAMES J. REGAN

15            2522 Artesia Boulevard

16            Redondo Beach, CA   90278

17            (310) 372-1988

18                Representing the Defendants.

19        ALSO PRESENT:

20            MR. DAVID M. FRANKLIN

21            Legal Video Specialist

22            McCorkle Court Reporters

23

24
```

2

1    equipment?

2        A.    Written procedures?

3        Q.    Yes.

4        A.    No.

5        Q.    Do you have any unwritten procedures for

6    purchase of equipment, or informal procedures?

7        A.    I do the purchasing, so there's no real

8    procedure as far as that goes.

9            I mean, the changes depends on what I'm

10   purchasing, depends on who -- how I'm negotiating,

11   if it's auxiliary equipment, what it is.

12           I mean, when you say "purchase," you

13   purchase a lot of purchase.

14       Q.    And what about for machines, injection

15   molding machines; do you do the purchasing?

16       A.    Yes.

17       Q.    You don't delegate that to anyone at your

18   office, do you?

19       A.    No.  I'm the only one who does that for

20   that part.

21       Q.    Do you recall when Exel Bobbins and

22   Plastics Components, Inc. was started?

23       A.    December of 1999, incorporated.

24       Q.    If I refer to them as Exel Bobbins, you'll

31

1    area, what business prospects are you talking about

2    that you're personally aware of?

3        A.    Injection molding.

4        Q.    What injection molding prospects?

5        A.    Well, we already had some existing

6    customers here that we were molding for, and we

7    were able to receive quotes here for molding there,

8    and the biggest one being, at that time,

9    Sunbeam-Oster.

10       Q.    Was the purpose of opening the Exel

11   Bobbins business in Brownsville, Texas, was it to

12   service the Sunbeam-Oster account?

13       A.    Well, yes, it was to service them, yeah,

14   sure.

15       Q.    Okay.  When --

16       A.    And anybody else that would want us to,

17   and the existing customers, and so forth and so on.

18       Q.    Does Exel Plastics provide any custom

19   molded product for Sunbeam-Oster out of your plant?

20       A.    No.

21       Q.    Have you ever?

22       A.    No.

23             Not directly.  I -- it was the plan,

24   but --

50

1    A.    That wasn't -- that has nothing to do with

2  us not being able to obtain those machines?

3    Q.    Right.

4    A.    No, not with the stuff that was going on

5  there already, no.

6          I don't know.  I wasn't there.

7    Q.    Now in June of 2000, Exel Bobbins had two

8  presses; is that correct?

9    A.    In June of 2000?

10   Q.    Strike that.

11         In November of 2000.

12   A.    Yes.

13   Q.    They had two presses.

14         What sizes were those?

15   A.    310, 385.

16   Q.    Okay.  And those were JSW presses?

17   A.    Yes.

18   Q.    In November of 2000, Exel Bobbins had

19  Schumacher and Magnitech as the primary clients?

20   A.    Primarily, already doing business with.

21   Q.    Okay.  In November of 2000, Exel Bobbins

22  was not doing business with Sunbeam-Oster, correct?

23   A.    Working with, doing business for, I

24  mean --

70

1     Q.   So there's no guarantee that a quote will

2  turn into a purchase order, is there?

3     A.   No guarantee.

4     Q.   No guarantee.

5        Of the quotes that -- for example, right

6  now you're quoting business.

7        Of the quotes that you're issuing,

8  approximately what percentage of those quotes turn

9  into a purchase order or business?

10    A.   Well, when?  Then or now?

11    Q.   Now.

12    A.   Now.

13       It's a much smaller number now.  As far as

14  my situation that I'm quoting.

15    Q.   Yeah, right.

16    A.   Because I'm here in the Midwest, where

17  there's a lot of competition and there's a lot of

18  molders, and since things slowed up up here, it

19  would be less.

20    Q.   What is that percentage, approximately?

21    A.   I don't -- I don't know.

22    Q.   Your best estimate, if you have one?

23       10 percent?

24    A.   20 percent.

72

1    A.   Well, I guess it was Exel, and Exel

2 Bobbins, Exel Plastics and Bobbins.

3         It was a combination, because it was all

4 happening at the same time, so --

5    Q.   Okay.

6    A.    I mean, that's why I say it was -- it's

7 kind of hard to pinpoint that.

8    Q.   Well, can you tell me everything that was

9 said in this conversation with Jerry Johnson

10 regarding a guarantee?

11    A.   Well, this -- this is when I'm planning to

12 put together the facility in Texas, really, and it

13 had to do with the line of credit for Exel Bobbins,

14 really, 'cause I already had the one with Exel

15 Plastics.

16         So I said "Listen, I -- you know, it's a

17 start-up company.  I need -- you know, I'm going to

18 -- when it comes time to finance this, you are --

19 you're giving me this letter of credit for

20 financing, and also, that -- the assistance with

21 the complete financing with the banks, or anybody,

22 if need be, would you take position and make sure

23 that this gets done and financed through --"

24 whether it be a bank or someone they had or -- or

100

1    Steve handled?

2         A.    At that time, yeah.

3         Q.    Yeah, and you were --

4         A.    I mean, it went to that.

5         Q.    All right.  Now this is after the machine

6    is shipped by JSW PMI to Exel Bobbins, correct?

7         A.    Correct.

8         Q.    And it's your understanding that Steve

9    Becker is working on the financing to pay off the

10   385-ton press, correct?

11        A.    Correct.

12        Q.    And Steve Becker is handling the

13   negotiations and doing all the work to try to raise

14   the money for the financing, correct?

15        A.    Yeah.

16        Q.    Is it accurate that you are basically out

17   of the loop; that this is something that Steve

18   Becker is handling?

19        A.    At the time he was handling it, yes.

20        Q.    Okay.  Now at some point in time did Steve

21   Becker come to you and say "Look, I cannot get the

22   financing for the 385-ton press"?

23        A.    Yes.  He said they were having -- he was

24   having a problem.

111

1      Q.    Okay.  Did he tell you what he had done to

2    try to get the financing?

3      A.    Yes.  He spoke with various number of

4    financial institutions.

5      Q.    Well, was Wells Fargo one?

6      A.    That sounds like -- yeah, Wells Fargo,

7    U.S. Bank Corp., if I recall.

8      Q.    Heller Financial?

9      A.    I don't think so.

10     Q.    Okay.  Now did Steve Becker tell you why

11   Wells Fargo and U.S. Bank Corp. did not want to

12   lend money?

13     A.    We were a start-up company.

14     Q.    In other words, Exel Bobbins did not have

15   a proven track record?

16     A.    Correct.

17     Q.    Did Wells Fargo and U.S. Bank ask for

18   personal financial statements?

19     A.    I don't know.  They may have.

20     Q.    Did you provide any personal financial

21   statement to either Wells Fargo or U.S. Bank

22   Corp.?

23     A.    I don't think so.

24     Q.    What else, if anything, did Steve Becker

112

1    tell you he did to attempt to locate financing for

2    purchase of the JSW PMI 385-ton press?

3         A.    Made a lot of phone calls to people

4    around, to the bank, I think Texas State Bank that

5    we work with.  They don't handle that, they don't

6    do that.

7              From -- just tried to find someone.

8         Q.    Okay.  Do you -- or can you give us your

9    best estimate of the number of banking

10   institutions, leasing agencies, different entities

11   that Steve Becker contacted in order to secure

12   financing for the 385-ton press?

13        A.    I guess -- no, I couldn't.  I just know

14   that he talked with a couple, few, maybe more, I

15   don't know.

16        Q.    Well, more than ten?

17        A.    No, I don't think so.

18        Q.    More than five?

19        A.    I know he spoke with Wells Fargo, I know

20   he spoke with U.S. Bank Corp., I know he spoke with

21   Texas State Bank.

22              This is things that I know that I can

23   answer to.

24        Q.    Okay.  And he told you that -- strike

                                                    113

1    Sunbeam-Oster business?

2        A.    Along with others.

3        Q.    But primarily Sunbeam-Oster, correct?

4        A.    Primarily, yes, that with the customers we

5    already had.

6        Q.    Now my question is:

7              Did you do any analysis, what we might

8    call a business analysis, in terms of projecting

9    profit and loss, actually prepare a projected

10   Profit and Loss Statement for Exel Bobbins?

11       A.    No.

12       Q.    All right.  At the time of start-up, did

13   you prepare a cash flow analysis for monies needed

14   for Exel Bobbins' operation?

15       A.    Prepare, no.

16       Q.    Well, how much money did you think was

17   needed to start up Exel Bobbins?

18       A.    How much was needed to start.

19             I don't have those figures of --

20       Q.    Well, how much money did you put into Exel

21   Bobbins; you, personally?

22       A.    Well, not me, personally, but --

23       Q.    Did you put any money in personally?

24       A.    I mean, yeah, Exel Plastics did.

                                                        131

1    Q.    All right.  How much money did Exel

2    Plastics put into Exel Bobbins to start up?

3    A.    I don't -- it's on the tax return as to

4    what I think it was.

5    Q.    Well, what is your best estimate?

6    A.    It may have been seventy thousand.

7    Q.    I recall, and I -- Steve Becker testifying

8    that each of you put in $500 to start the

9    corporation?

10    A.    Well, that's different.  That's just to

11    establish the corporation.

12    Q.    That was to establish the corporation; is

13    that accurate?

14    A.    Yeah.

15    Q.    Now following the five hundred dollars

16    from each, did you put, specifically, dollars into

17    -- in other words, money, and then we'll get to

18    equipment.

19         Did you put any money into Exel Bobbins?

20    A.    Yes.

21    Q.    How much?

22    A.    I don't know offhand.

23    Q.    Do you keep a ledger card on how much

24    money you put into Exel Bobbins?

132

1    A.    The accountant had something for that.

2    Q.    All right.  Now is this money that you put

3    into Exel Bobbins, is that on the basis that those

4    monies are a loan?

5    A.    Yes.

6    Q.    And is it your understanding that you have

7    loaned -- by "you," I mean either you or Exel

8    Plastics, have loaned Exel Bobbins seventy thousand

9    dollars?

10    A.    I believe that to be the number, around

11    about.

12    Q.    Okay.  But that number --

13    A.    Yes.

14    Q.    -- whatever that number is, it is a loan

15    to Exel Bobbins; is that correct?

16    A.    Yeah.

17    Q.    And what are the terms of that loan?

18    A.    Well, I'm -- I'm Exel Bobbins, so when I

19    can pay it back, I would.  There was no set terms.

20    Q.    All right.  So it's just a loan to a

21    shareholder?

22    A.    I don't know how you would classify that,

23    just that I, at one day, would take the money back

24    or use it as a deduction of some sort if -- I don't

133

1    Q.    What else?

2    A.    I don't remember what else.

3          I mean, just --

4    Q.    What prevented you from going with another

5    machine manufacturer?

6    A.    The -- it just never came about that any

7    of them would supply machines, I guess.

8    Q.    So at this point you don't know why the

9    other machine manufacturers didn't supply Exel

10   Bobbins a machine, do you?

11   A.    No, I don't know why they didn't.

12   Q.    Well, wouldn't that be an important

13   question to -- to know?

14         Or is this something that Steve is just

15   handling?

16   A.    Well, we -- I mean, why, because we were a

17   start-up company.  There is the real answer, I

18   guess you could say.

19   Q.    All right.

20   A.    And we did not --

21   Q.    So you discussed the situation of Exel

22   Bobbins with Battenfeld and Cincinnati Millitron

23   and perhaps other machine manufacturers, and when

24   they learned that Exel Bobbins was a start-up

143

1    company, they said "We cannot finance a start-up

2    company"; is that correct?

3        A.    After some work with them, yes.

4        Q.    And why -- did they tell you why they

5    can't finance or provide financing for a start-up

6    company?

7        A.    No.

8        Q.    Well, you're in the custom molding

9    business, correct?

10        A.    Um-hum.

11        Q.    And that's a tough business, isn't it?

12            I mean, it's a business full of

13    competition?

14        A.    It wasn't tough.

15        Q.    Well, is it tough now?

16        A.    Tougher.

17        Q.    Okay.  Well, in your experience, have you

18    seen and observed any custom molders go out of

19    business?

20        A.    Yes.

21        Q.    Many, or one or two?

22        A.    Many.

23        Q.    Okay.  Now those custom molders that go

24    out of business, have you any opinion as to why

                                                        144

1    to -- it needs a professional, and my -- my amount

2    would be extremely high, twenty million, if you

3    want to know my amount, my calculations.

4        Q.   Okay.  You've done calculations?

5        A.   Somewhat.

6        Q.   All right.  Would you tell us the basis of

7    your calculations?

8             Just tell us what you did to calculate

9    twenty million?

10       A.   Well, you could simply take the Sunbeam

11   for an example, multiply it by how many years,

12   which is how they do things in selling and buying

13   businesses called e-bits, and they would say if we

14   did five to seven million dollars in sales a year

15   with them, we'd make a percentage of profit, unless

16   you're going to have a customer for a one-time

17   customer, which this is not.

18       Q.   Okay.  Just tell me how you got to twenty

19   million?

20       A.   The loss of business over a period of

21   time.

22       Q.   If you could share with us the

23   calculations that you worked on to get to the

24   twenty million?

197

1      A.    Well, if -- if they gave us work for the

2    first section of stuff that we were supposed to

3    receive, was the approximate five million dollars,

4    if you made 15, 20 percent, times five to seven

5    years, five usually is the number they use, and

6    that's also the same number they'll use in the net

7    worth of your business for sale, so there's two

8    things, and after that five years your machines are

9    paid for also.

10      MR. REGAN:  Okay.  We'll go off for a minute.

11      THE VIDEO TECHNICIAN:  We're now going off the

12    record to change video tapes.

13            This is the end of tape number two.  The

14    time is 1:55.

15            (Discussion off the record.)

16      THE VIDEO TECHNICIAN:  We are now back on the

17    record.  This is the continuation of the deposition

18    of John Annoreno.  This is the beginning of video

19    tape number three.  The time is 1:57.

20    BY MR. REGAN:

21      Q.    Okay.  When we went off, we were talking

22    about how you calculated damages of twenty million

23    dollars, and you mentioned that you used some kind

24    of what appears to be rules of thumb.

198

1          I would like the know what, specifically,

2    you used, if you can identify, in reaching the

3    number of twenty million dollars, what calculation?

4        A.    Well, just -- the first quote was for

5    approximately five million dollars.

6        Q.    Okay.  So the first quotation was five

7    million dollars, and is that the first quotation

8    provided by Exel Bobbins to Sunbeam?

9        A.    It was -- it was a quote to Sunbeam, and

10   it was later -- it was -- you know, it was a number

11   that -- and, of course, I'm -- as you said, I'm

12   estimating it because that number could have went

13   to ten -- would have probably went to ten-plus

14   million a year based on what I know.

15          So if it was five million, just -- usually

16   that's a pretty standard company that would -- you

17   would continue to do business with.

18          When I say "standard company," I mean,

19   you're not just going to -- it's not a one-time

20   thing.  Ongoing products.

21          Products get renewed, changed.  They

22   wanted to give us mixers and shavers and -- and all

23   kinds of stuff.  There was not just coffee makers.

24       Q.    Now with regard to the five-million-dollar

199

1  quote, you have made an assumption that all the

2  business that you quote, you would get.  Is that

3  accurate?

4      A.    I'm going based on what they wanted to

5  give to us, first of all, and that was that they

6  could -- I think -- you know, not think; they gave

7  a letter saying they were plan-- this is what their

8  plans were.

9      Q.    But all I'm trying to do is understand the

10  manner in which you calculated.

11          Is it accurate that you made the

12  assumption that you, Exel Bobbins, would receive a

13  purchase order for all of the business that you

14  quoted to Sunbeam-Oster?

15     A.    It was only two -- that was only

16  represented in, like, a few coffee makers that they

17  -- in a portion of it, and they said, committed to

18  us, they even did a letter saying that this is what

19  they were -- and, of course, they said they were

20  going to give it to us, which was -- that was what

21  they wanted to do.

22     Q.    Okay.  So it's accurate you made an

23  assumption that everything that you -- Exel Bobbins

24  quoted, Exel Bobbins would actually receive from

200

1    Sunbeam; isn't that correct?

2        A.    I made the assumption that they said they

3    were going to give us this work.

4        Q.    Okay.

5        A.    Based on them telling me that.

6        Q.    So the quote was for five million dollars,

7    so you made the assumption Exel Bobbins would

8    receive a purchase order for five million dollars,

9    correct?

10       A.    Annually, that's an annual.

11       Q.    Okay.  Annually.

12       A.    Just for that project.

13       Q.    Right.

14            Now you've also made an assumption that

15   Exel Bobbins would operate at a profit margin of

16   approximately 15 to 20 percent, correct?

17       A.    Correct.

18       Q.    Now at the time that -- well, strike that.

19            To your knowledge, has Exel Bobbins

20   operated at a profit margin of 15 to 20 percent for

21   the work that Exel Bobbins has done for Sunbeam?

22       A.    I -- I don't want to guess at anything.  I

23   just --

24       Q.    Well, you either know or you don't know.

201

1    It's not a guess.

2         Do you know?

3    A.    No, not at this point.

4         I know the overall of the scope of doing

5    business that those percentages, based on when you

6    run the machines and you get X amount of dollars

7    for them, and it seems to work out to that.

8         But that's my -- well, you -- you ask

9    about a business plan and things like that,

10   forecasting.   That's my forecast.

11   Q.    All right.   The 15 to 20 percent is

12   industry standards, as you understand it; would

13   that be accurate?

14   A.    I don't know about industry.   I am just

15   going by personal knowledge in talking with, you

16   know, other molders, I guess.

17   Q.    Is it your understanding that Exel Bobbins

18   operates at a 15 to 20 percent profit margin?

19   A.    It most certainly would if it had the

20   machines to fill the building that we have there

21   and the space that we are acquiring to do that,

22   yes.

23   Q.    To your knowledge, does it currently

24   operate at a 15 to 20 percent profit margin?

202

1    A.    I don't know.

2    Q.    Okay.  Now you stated as a further

3    component of your assumptions that the business

4    would last five to seven years?

5    A.    Not that it would last.  That's what

6    people use as a factor.

7    Q.    Okay.  So that's another assumption, isn't

8    it?

9    A.    No, that's what business people use that

10   go to buy and purchase and sell businesses.

11   Q.    Okay.  Now when you came up with the

12   twenty million -- and please understand I'm not

13   arguing with your number, I'm just trying to

14   understand your calculation methodology, okay?

15         Now when you came up with the number of

16   twenty million and you said "Well, I'm looking at

17   five million times 15 to 20 percent times five to

18   seven years," is that basically how you know those

19   are the numbers, kind of, plus or minus, that you

20   used to come up with the twenty million?

21   A.    That is, 15 to 20 percent at five years,

22   would be approximately ten-plus, seven to ten

23   million dollars, or based on if it was five million

24   or more, plus the fact at the end of five years

203

1    your equipment is paid for, your business is worth

2    the same or more because now that your equipment is

3    paid for, your profit then will probably go up to

4    35 percent, 30 percent, 20 percent.

5              But I didn't base it on that.  I just

6    based it on the 15 to 20.

7              But, technically, if you really think

8    about it, and your equipment is paid for after five

9    years, your profit margin is going to go up, and

10   I'm not an expert on that, expert.

11        Q.   Okay.  Any other damages you can think of

12   other than this twenty million related to

13   Sunbeam-Oster?

14        A.   You know, I mean, I've had personal

15   issues.

16        Q.   What personal issues?

17        A.   Just, you know, stress and so forth.

18        Q.   What stress?

19        A.   What stress?

20              Stress that causes ulcers and low --

21   what's called irritable bowel syndrome and hyper--

22   kind of hypertension, high blood pressure, things

23   like that.

24        Q.   When did you first notice that?

204

**EXHIBIT "I"**

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF TEXAS

3                  BROWNSVILLE DIVISION          ORIGINAL

4

5    EXCEL BOBBINS AND PLASTIC            )

6    COMPONENTS, INC.,                    )

7                   Plaintiff,            )

8    vs.                                  )   No. B-01-148

9    JSW PLASTICS MACHINERY, INC.,        )

10                  Defendants.           )

11

12

13          The videotaped discovery deposition of

14   GERALD ARTHUR JOHNSON called for examination

15   pursuant to Notice and the Rules of Civil Procedure

16   for the United States District Courts pertaining to

17   the taking of depositions, taken before Judy

18   Carlson, a notary public within and for the County

19   of McHenry and State of Illinois, at 1300 Landmeier

20   Road, Chicago, Illinois, on the 11th day of

21   October, 2002.

22

23   Reported by:  Judy Carlson, CSR

24   License No.:  084-003347

Excel Bobbins and Plastic Components, Inc.    v.                Gerald Arthur Johnson
JSW Plastics Machinery, Inc.                                    October 11, 2002

---

**Page 81**

[1]   **Q:** And I guess maybe an easier way to ask
[2] this is did Dennis type this letter up and just
[3] hand it to you for your signature or were you the
[4] one that drafted this letter?
[5]   **A:** I drafted that letter.
[6]   **Q:** Did you draft it based upon what you were
[7] told by Dennis or did you draft it based upon what
[8] you discussed with Mr. Becker?
[9]   **A:** This is a very hard question to answer
[10] because prior to Dennis Pochatek coming on board
[11] with JSW, I handled the Excel Plastics account with
[12] Bob Fehrenbach.
[13]     Sometime after Dennis came on board, it
[14] was his responsibility to negotiate the deals. So,
[15] therefore, I can't say who actually negotiated.
[16] But I certainly will attest that it was put into
[17] this letter by me.
[18]   **Q:** Okay.
[19] And you said this is an offer of sale.
[20] So, this is basically JSW Plastics' offer to Excel
[21] Bobbins as to what you would agree to — what JSW
[22] Plastics would agree to, correct?
[23]   **A:** For these two specific machines. Yes.
[24]   **Q:** Okay.

---

**Page 82**

[1] Why is it that you offered six months no
[2] payment, and then payments over 12 months with a
[3] balloon at the end of the total 18 months? Why is
[4] it that you offered that to Excel Bobbins?
[5]   **A:** Well, it was — it became very apparent
[6] that Excel Bobbins was having difficulty obtaining
[7] financing. And even though we are not a finance
[8] company, we tend to try to support our customers in
[9] any way we can.
[10]     So, in being able to sell these two
[11] machines, we offered a special sales concession, if
[12] you will, to Excel Bobbins. That — when I talk
[13] about sales concession, it can be — that meaning
[14] could either be cash discounts or payments over
[15] time without any type of interest or several
[16] different items.
[17]     So, what we try to do is support each and
[18] every customer in the way that they — they need at
[19] that time of purchase. You made reference to the
[20] five percent down payment in 180 days. I'm sorry.
[21] Okay. Should I continue or —
[22]   **Q:** Let me go ahead and ask a question.
[23] The reason I smiled is because yesterday
[24] Dennis called it special terms, and you're calling

---

**Page 83**

[1] it special sales concessions.
[2]   **A:** Same thing.
[3]   **Q:** Right.
[4]   **A:** And our definition is the same thing.
[5]   **Q:** Working with the customer, correct?
[6]   **A:** That is correct.
[7]   **Q:** Now, you said that — well, for example,
[8] you knew that with Mr. Becker, a cash discount
[9] wouldn't work because he didn't have the cash to
[10] pay, correct?
[11]   **A:** That is correct.
[12]   **Q:** Okay.
[13] So, what you gave him was six months no
[14] pay, and then 12 months payout with a balloon, is
[15] that right?
[16]   **A:** That is correct.
[17]   **Q:** Okay.
[18] Now, as long as we are discussing it, you
[19] had, about a year earlier, given Excel Bobbins a
[20] line of credit of 1.5 million with the terms being
[21] at that time five percent down and balance net 180
[22] days, do you remember that?
[23]   **A:** I remember the letter. Yes.
[24]   **Q:** Okay.

---

**Page 84**

[1] Is there any reason why that's — that
[2] letter is incorrect? In other words, is it —
[3] would it be your testimony that you, yes, did agree
[4] to a 1.5 million line of credit under the terms —
[5] repayment terms of five percent down and net
[6] balance 180 days?
[7]   **A:** That is correct.
[8]   **Q:** Okay.
[9] So, this wasn't just done and nobody —
[10] nobody thought it was going to be enforceable or
[11] that you were — JSW Plastics was going to stand
[12] behind it. I mean, this was — you agreed to do
[13] this?
[14]   **A:** I agreed to do it based on a request by
[15] Steve Becker to help him solidify business.
[16]   **Q:** Well, let me ask you this, at the time you
[17] wrote it, was it merely just to help him solidify
[18] business or were you intending to stand behind the
[19] 1.5 million line of credit under those terms?
[20]   **A:** Under those terms, yes.
[21]   **Q:** Okay.
[22] Now, was that line of credit set up for
[23] Sunbeam Oster?
[24]   **A:** No.

---

**Page 97**

[1] Q: Was it, in fact, your company's reference
[2] to Steve to go to Wells Fargo and US Bancorp to get
[3] financing?
[4] A: Yes.
[5] Q: Okay.
[6] Was it giving — in giving that reference
[7] to Steve, was that when you first started hearing
[8] about the problems he was having getting financing?
[9] A: Maybe — may have been around that time.
[10] Yes.
[11] Q: Okay.
[12] So, if we wanted to try to date about when
[13] you — when JSW flakes first started becoming aware
[14] that Steve was having difficulty getting financing,
[15] it would be around the date that JSW Plastics
[16] referred Steve over to Wells Fargo and US Bancorp,
[17] correct?
[18] A: Correct.
[19] Q: And then, that was, in fact, confirmed —
[20] the difficulty was, in fact, confirmed when you
[21] received a copy of a FAX from Wells Fargo dated
[22] January 22, correct?
[23] A: Correct.
[24] Q: And in fact, I think it was your testimony

**Page 98**

[1] earlier that one of the reasons that the terms in
[2] the January 30 letter were written as they were was
[3] because you knew that Steve was having trouble
[4] getting financing for the 385?
[5] A: Correct.
[6] Q: Okay.
[7] What else was done, if anything, to assist
[8] Steve in getting financing for the 385 other than
[9] the reference to Wells Fargo and to US Bancorp?
[10] A: Well, and including this January 30 letter
[11] or offer for sale?
[12] Q: More specifically, though, I want to know
[13] what was done with regard to the 385. Would you
[14] not agree that the January 30, 2001 agreement does
[15] not reference the 385 at all?
[16] A: I would agree.
[17] Q: I mean, the 385 is not anywhere in there,
[18] correct? Go ahead and read it.
[19] A: No. That's correct.
[20] Q: So, then, yes, I guess it would be other
[21] than Exhibit 5. I'm just curious if JSW Plastics
[22] did anything else to assist Steve with financing
[23] the 385?
[24] A: No. I believe we contacted Wells Fargo

**Page 99**

[1] and US Bancorp to have them contact Steve Becker to
[2] see if they would be able to finance that machine.
[3] Q: And then you heard back from them that
[4] they were not going to be able to do that, correct?
[5] A: That is correct.
[6] Q: Okay.
[7] Now, in July of 2001, you were — or JSW
[8] Plastics was able to come, I guess, to Excel
[9] Bobbins' aid by providing them a payout on the 385,
[10] correct?
[11] A: I don't understand that question.
[12] Q: Let me hand you what's been marked as
[13] Exhibit 31, and you can review it.
[14] A: Okay. I'm sorry. The question was?
[15] Q: Does that refresh your memory that JSW
[16] Plastics did agree to allow Excel Bobbins to make
[17] another five percent down payment and then monthly
[18] payments of $2,800 on the 385?
[19] MR. REGAN: Objection. Calls for a legal
[20] conclusion. Misstates the evidence presented or
[21] offered.
[22] THE WITNESS: No comment.
[23]             BY MR. GRIFFITH:
[24] Q: I guess I'm a little confused because I

**Page 100**

[1] thought that was pretty straightforward. Okay.
[2] This is a letter from —
[3] MR. REGAN: You're — I'm sorry, counsel. I
[4] don't mean to interrupt. It was your question.
[5] MR. GRIFFITH: Okay. Maybe so because I'm —
[6] this isn't tricky or at least I'm not trying to be.
[7] MR. REGAN: I know it. And I think it was your
[8] question that you asked regarding an agreement.
[9] There was no agreement there. I think that's what
[10] the problem was. There was later an agreement but
[11] not at that point.
[12] MR. GRIFFITH: Thanks.
[13] MR. REGAN: I'm sorry. I'm just trying to not
[14] be difficult.
[15] MR. GRIFFITH: No. I don't want to spend 30
[16] minutes on something I hope is fairly obvious.
[17]             BY MR. GRIFFITH:
[18] Q: Okay.
[19] Exhibit — Plaintiff's Exhibit 31 shows
[20] that on July 11 —
[21] MR. REGAN: Of 2001.
[22]             BY MR. GRIFFITH:
[23] Q: Or July 10 2001, that Mr. Becker, on
[24] behalf of Excel Bobbins, offered to make a five

Gerald Arthur Johnson
October 11, 2002

Excel Bobbins and Plastic Components, Inc. v.
JSW Plastics Machinery, Inc.

**Page 109**

[1] were not going to be shipped, is that right, or is
[2] that incorrect?
[3]    **A:** I'm sorry. Say again.
[4]    **Q:** At some point, JSW Plastics informed Steve
[5] Becker and Excel Bobbins that these two machines
[6] were not going to be shipped to him, were not going
[7] to be sold to him, is that right?
[8]    **A:** Correct.
[9]    **Q:** Okay.
[10] What was it that precipitated that
[11] decision?
[12]    **A:** Well, there were basically four things
[13] that didn't happen.
[14]    **Q:** Okay.
[15]    **A:** JSW didn't receive final payment on the
[16] J385P machine.
[17]    **Q:** Okay.
[18]    **A:** We sent UCC papers to John Annoreno, but
[19] he refused to sign them. And that's part of our
[20] policy before shipping out the machines, that we
[21] register with the state that it's going to that we
[22] still hold ownership of the machine until it's been
[23] paid in full.
[24]    The — at that time, the five percent was

**Page 110**

[1] not received, five percent down payment or a
[2] portion of it, I'm sorry.
[3]    And lastly, there was some type of
[4] acknowledgment required from Sunbeam showing that
[5] they were actually going to place business with
[6] Excel Bobbins.
[7]    **Q:** Were there any other conditions that had
[8] to be met before JSW Plastics would honor
[9] Exhibit 5 — the agreement embodied in Exhibit 5
[10] other than the four you mentioned?
[11]    **A:** To the best of my knowledge, no.
[12]    **Q:** Okay.
[13] And let's go through those four because
[14] those coincidentally are the same ones that Dennis
[15] gave me yesterday.
[16]    The first was the payment of the — the
[17] final payment for the J385, correct?
[18]    **A:** Correct.
[19]    **Q:** Where in Exhibit 5 is there a requirement
[20] that the J385 has to be paid off before this
[21] agreement will be honored?
[22]    **A:** On this document, I don't see any
[23] reference to it.
[24]    **Q:** Now, with regard to the signed UCC papers,

**Page 111**

[1] which was the second requirement, is it your
[2] understanding that you received signed UCC papers
[3] from Steve who was a co-owner of Excel Bobbins?
[4]    **A:** Yes, we did.
[5]    **Q:** It was a company requirement that any
[6] other owners also had to sign those UCC papers, is
[7] that correct?
[8]    **A:** Yes, it is.
[9]    **Q:** Where did that directive come from?
[10]    **A:** It's been part of our order entry and
[11] shipping policy since I came to JSW in 1997.
[12]    **Q:** If a company is owned by shareholders, do
[13] you have all the shareholders sign the UCC or can
[14] the president of the sign in that situation?
[15]    **A:** Officers of the company must sign.
[16]    **Q:** Okay. How many officers?
[17]    **A:** I don't know.
[18]    **Q:** If a company is owned by five partners, is
[19] it JSW Plastics' requirement that all five partners
[20] sign the UCC?
[21]    **A:** I don't know that we have a regimented
[22] policy set up to handle that type of situation.
[23]    **Q:** So, that would not be the policy of JSW
[24] Plastics, then, if there were five partners, that

**Page 112**

[1] all five partners would have to sign?
[2]    **A:** No.
[3]    **Q:** Okay.
[4] At what point — at what number of
[5] partners does the requirement start that all
[6] partners have to sign? Is it if there is three or
[7] four or two, where does that requirement start with
[8] JSW Plastics?
[9]    **MR. REGAN:** Objection. Calls for speculation.
[10] Lack of foundation.
[11]       **BY MR. GRIFFITH:**
[12]    **Q:** As far as you know?
[13]    **A:** I don't know that we have a set rule that
[14] makes that decision. I think it's on a per basis.
[15]    **Q:** Okay.
[16] So, sometimes if a company is owned by
[17] shareholders, you will take the signature of the
[18] president of the company, right?
[19]    **A:** Yes.
[20]    **Q:** And other times, when there is a number of
[21] partners, you may take just one of the partner's
[22] signature, correct?
[23]    **A:** Yes.
[24]    **Q:** But in this case, you wanted to get both

Case 1:01-cv-00148   Document 34   Filed in TXSD on 02/07/2003   Page 82 of 109

Excel Bobbins and Plastic Components, Inc.   v.
JSW Plastics Machinery, Inc.

Gerald Arthur Johnson
October 11, 2002

[1] Steve and John to sign the UCC papers, right?

[2] A: Yes.

[3] Q: Is there anywhere in Exhibit 5 a mention

[4] of a requirement that both Steve and John have to

[5] sign the UCC papers?

[6] A: No.

[7] Q: And in fact, is there any document that

[8] you have ever seen involved in this case, where

[9] there is a requirement that both Steve and John

[10] sign the UCC papers?

[11] A: Yes.

[12] Q: And that would be the letter where you're

[13] requesting that, correct?

[14] A: I'm not sure if it's my letter or a letter

[15] from our company, JSW Plastic Machinery.

[16] Q: Okay.

[17] Is this Plaintiff's Exhibit 14, the letter

[18] you're discussing?

[19] A: Yes.

[20] Q: Are there any other letters that refer to

[21] the requirement that both Steve and John signed the

[22] UCC papers other than that letter?

[23] A: Not to my knowledge.

[24] Q: Okay.

Page 113

[1] Now, the UCC papers you're discussing,

[2] were those papers for the 500 and the 110 that are

[3] referenced in Exhibit 5 or were they for the 385?

[4] A: Well, Exhibit 14 is for the 385.

[5] Q: Is there a similar exhibit — a document

[6] similar to Exhibit 14 that applies to the 500 and

[7] the 110?

[8] A: I believe so.

[9] Q: And when would that have been sent to

[10] Steve and John?

[11] A: I don't know.

[12] Q: Would you typically send a UCC financing

[13] statement to someone who has not been delivered a

[14] machine?

[15] A: Oh, yes.

[16] Q: So, you think, as part of your files, you

[17] will be able to produce to me a letter that you

[18] sent to Steve and to John requesting that they sign

[19] a UCC for the 500 and the 110?

[20] A: To the best of my ability to recall, I do

[21] claim to have seen that document.

[22] Q: Now —

[23] A: And —

[24] Q: Go ahead.

Page 114

[1] A: Two separate UCC filings. One for the 500

[2] and one for the 110.

[3] Q: So, when we go through the five — the

[4] four things that were not done that caused

[5] Exhibit 5 to go unfulfilled by JSW Plastics, the

[6] second one being that the UCC was not signed by

[7] both Steve and John, the UCC you are saying —

[8] you're discussing in that situation is the UCC for

[9] the 500 and the 110, correct?

[10] A: That is correct.

[11] Q: It's not the UCC for the 385?

[12] A: No.

[13] Q: And that was not part of the reason that

[14] Exhibit 5 was not complied with?

[15] A: No.

[16] Q: Okay.

[17] So, even though this is Exhibit 14 to this

[18] deposition, this has nothing to do with any of the

[19] UCC filing problems that you have discussed or

[20] Dennis has discussed, correct?

[21] A: Correct.

[22] MR. REGAN: Well, objection as to Dennis.

[23] BY MR. GRIFFITH:

[24] Q: Okay. That you have discussed?

Page 115

[1] A: Yes.

[2] Q: Now, the third one was the check for

[3] one-third of five percent down, correct?

[4] A: Um-hum.

[5] Q: Is that "yes"?

[6] A: Yes.

[7] Q: You've got to say yes so she can type it.

[8] A: I'm sorry.

[9] Q: Now, we have agreed that that was done,

[10] correct, that payment was received?

[11] A: At a later date, yes.

[12] Q: Okay.

[13] So, out of the four things, the one thing

[14] that was done was the check for five percent down

[15] but at a later date?

[16] A: It wasn't for the total five percent, I

[17] believe.

[18] Q: It was one-third of five percent down?

[19] A: Yes, sir.

[20] Q: And that was agreed to, was it not?

[21] A: Yes, sir.

[22] Q: So, that complied with the requirements of

[23] agreement 5 — I mean, of the agreement in

[24] Exhibit 5?

Page 116

Case 1:01-cv-00148    Document 34    Filed in TXSD on 02/07/2003    Page 83 of 109

Gerald Arthur Johnson
October 11, 2002

Excel Bobbins and Plastic Components, Inc.    v.
JSW Plastics Machinery, Inc.

[1] A: Within a couple of dollars because you'll
[2] notice on Exhibit 5, it's been modified by someone.
[3] I think it's Steve Becker. But it's been modified
[4] to from the original content.
[5] Q: Okay.
[6] Is this the one-third of five percent down
[7] that was received by JSW Plastics, Exhibit 12?
[8] A: Seems to be a copy of that check. Yes.
[9] Q: And in fact, that number was the original
[10] typed in number under the agreement on January 30,
[11] correct?
[12] A: Yes.
[13] Q: So, even though it's your testimony that
[14] the handwritten in numbers were not agreed to by
[15] JSW Plastics, nevertheless, the amount typed in was
[16] the amount that was paid?
[17] A: Seems to be that. Yes.
[18] Q: Not the handwritten amount, correct?
[19] A: Correct.
[20] Q: So, on April 30th of 2001, the check
[21] referred to in Exhibit 5 was delivered to JSW
[22] Plastics, correct?
[23] A: I can't attest to that because that —
[24] that is the date of the check. I'm not sure when

Page 117

[1] we actually received it.
[2] Q: I will represent to you yesterday, Dennis
[3] stated that this was his handwriting, okay?
[4] A: Yes.
[5] Q: And if you note, the date of this memo is
[6] the same date as the check. Would that help you
[7] attest to the fact that this check was, in fact,
[8] received on that date?
[9] A: Yes, it would.
[10] Q: Okay.
[11] Now, finally, the fourth item was a letter
[12] from Sunbeam Oster, right, confirming that they
[13] were going to purchase, is that correct?
[14] A: Repeat the question.
[15] Q: Okay.
[16] The fourth item that had to be done before
[17] JSW Plastics was going to comply with the agreement
[18] embodied in Exhibit 5 was that they needed a letter
[19] from Sunbeam Oster confirming that they were going
[20] to purchase molded plastic from Excel Bobbins,
[21] correct?
[22] A: Yes.
[23] Q: Okay.
[24] Now, let ask you this, is that requirement

Page 118

[1] listed anywhere in Exhibit 5, that there must be a
[2] letter from Sunbeam Oster confirming that they will
[3] purchase molded plastic from Excel Bobbins?
[4] A: No.
[5] Q: Now, let me ask you this, do you remember
[6] if you ever received any letters from Sunbeam
[7] Oster?
[8] A: I can't say that I have received them
[9] personally because I don't remember. But I do
[10] remember seeing a letter.
[11] Q: Okay.
[12] So, you have seen a letter from Sunbeam
[13] Oster discussing purchases from Excel Bobbins,
[14] correct?
[15] A: Yes.
[16] (Whereupon, Plaintiff's
[17] Deposition Exhibit No. 33 was
[18] marked for identification.)
[19] BY MR. GRIFFITH:
[20] Q: I think I received a copy of it yesterday.
[21] Let me hand you what I have marked as
[22] Plaintiff's Exhibit 33 and ask you is this the
[23] letter that you received from — it appears Excel
[24] Bobbins, but that was written by Sunbeam Oster?

Page 119

[1] A: Yes. I remember seeing this letter.
[2] Q: What does it appear — what date does it
[3] appear it was sent to — if you can tell, to JSW
[4] Plastics?
[5] A: I don't know that it shows what date it
[6] was received by us. But the date of the letter is
[7] April 19, 2001.
[8] Q: Okay.
[9] Do you have any independent recollection
[10] of when you would have received that letter?
[11] A: No, I don't.
[12] Q: In that letter, does Sunbeam state that
[13] they will purchase product from Excel Bobbins?
[14] A: Somewhat confusing because it states that
[15] they will conduct business with Excel Bobbins, but
[16] at the same time, it says this is not a
[17] confirmation.
[18] Q: Did you ever communicate to Steve Becker
[19] that this letter wasn't sufficient to comply with
[20] your fourth requirement for fulfilling the
[21] obligations under Exhibit 5?
[22] A: I believe I did.
[23] Q: What did you tell Steve?
[24] A: That I mentioned I noticed in the body of

Page 120

Excel Bobbins and Plastic Components, Inc. v.
JSW Plastics Machinery, Inc.

Filed in TXSD on 02/07/2003    Page 84 of 109

Gerald Arthur Johnson
October 11, 2002

[1] the letter that this doesn't represent a formal
[2] commitment with JSW or Excel Plastics.
[3]    **Q:** Okay.
[4] And so, it's your statement that what you
[5] needed was not just an assurance, but you wanted a
[6] formal commitment is what you needed in writing,
[7] correct?
[8]    **A:** That's correct.
[9]    **Q:** And you told that to Steve orally,
[10] correct?
[11]    **A:** That is correct.
[12]    **Q:** Okay.
[13] But it's not a requirement that's included
[14] in Exhibit 5, is it?
[15]    **A:** No.
[16]    **Q:** And in fact, is it anywhere in any
[17] documentation that you have or that you know of
[18] that there is a requirement for a formal commitment
[19] from Sunbeam Oster in writing?
[20]    **A:** I'm not sure about that.
[21]    **Q:** Can you think of anyplace where that would
[22] be in writing?
[23]    **MR. REGAN:** Well, objection. Over broad. I
[24] mean, there is a lot of documents in this case.

Page 121

[1]    **MR. GRIFFITH:** I just want to know what he
[2] knows about.
[3]    **THE WITNESS:** I can't answer that.
[4]             **BY MR. GRIFFITH:**
[5]    **Q:** You don't know of any — I mean, you can't
[6] think of any offhand at this moment?
[7]    **A:** Not at this moment. No.
[8]    **Q:** But you think there may be somewhere in
[9] writing a requirement that a formal commitment be
[10] made by Sunbeam to Excel Bobbins and provided to
[11] JSW Plastics?
[12]    **A:** I'm thinking that there may be a document
[13] of that such. Yes.
[14]    **Q:** Do you know who would have written that
[15] type of document? Is that something you would have
[16] or written or Dennis would have written?
[17]    **A:** I would have written it.
[18]    **Q:** Do you specifically as you sit here today
[19] remember writing that document, drafting it?
[20]    **A:** I'm not 100 percent sure.
[21]    **Q:** Other than the four requirements we
[22] discussed, were there any other requirements that
[23] JSW Plastics had before they would comply with the
[24] terms and conditions outlined in Exhibit 5?

Page 122

[1]    **A:** To pay for the J385, to sign the UCC
[2] papers or John Annoreno sign them.
[3]    **Q:** On the 500 and the 110?
[4]    **A:** Yeah.
[5]    **Q:** Okay.
[6]    **A:** To get a better confirmation that Sunbeam
[7] was going to do business with Excel Bobbins.
[8]    **Q:** Okay.
[9]    **A:** And the fourth one was —
[10]    **Q:** The check for five — one-third of five
[11] percent down.
[12]    **A:** Yes. Thank you.
[13]    **Q:** Okay. I wrote them down.
[14] Now, when you say a better confirmation —
[15] so, you'd agree that Exhibit 33 is a confirmation
[16] that Sunbeam is going to be working with Excel
[17] Bobbins, it just isn't good enough for what JSW
[18] Plastics wanted, would that be correct?
[19]    **A:** I don't know if I could answer that
[20] specific question.
[21]    **Q:** Okay.
[22] Well, the first sentence says this letter
[23] is a confirmation that Sunbeam Oster is and will
[24] conduct business with Excel Bobbins.

Page 123

[1] So, I mean, given that sentence, isn't
[2] that clear enough that this is a confirmation that
[3] Sunbeam will be conducting business with Excel
[4] Bobbins?
[5]    **A:** Yes. It's a very general statement.
[6]    **Q:** It's just that JSW Plastics wanted
[7] something that was more specific and more formal,
[8] correct?
[9]    **A:** A better commitment. Yes.
[10]    **Q:** Now, because those four things were not
[11] done, what ended up happening?
[12]    **A:** I sent a letter that withdrew any offer of
[13] support in the future, including supplying machines
[14] to Excel Bobbins and Plastic Components.
[15]    **Q:** Is that what is marked as Exhibit —
[16] Plaintiff's Exhibit 27?
[17]    **A:** Yes.
[18]    **Q:** Is this a draft or was this basically the
[19] final — the final version that would have gone
[20] out?
[21]    **A:** I believe that's the final version that
[22] would have gone out.
[23]    **Q:** I'm just asking because it doesn't have a
[24] signature on it, and it would have normally gone

Page 124

Gerald Arthur Johnson
October 11, 2002

Case 1:01-cv-00148    Document 34    Filed in TXSD on 02/07/2003    Page 85 of 109

Excel Bobbins and Plastic Components, Inc. v.
JSW Plastics Machinery, Inc.

[1] out on letterhead, too, correct?

[2]    A: That is correct.

[3]    Q: But as far as you can remember, Exhibit 27
[4] is the final letter that had gone out?

[5]    A: That is correct.

[6]    Q: Okay.
[7] And that letter is withdrawing any further
[8] support for Excel Bobbins from JSW Plastics,
[9] correct? I think I'm just stating back what you
[10] testified to a moment ago.

[11]    A: Could you repeat it?

[12]    Q: Okay.
[13] I think what you said was — is that as a
[14] result of these four things not being complied
[15] with, that you wrote a letter, and that letter
[16] withdraw any further support to Excel Bobbins from
[17] JSW Plastics?

[18]    A: Yes.

[19]    Q: Now — so this letter did not just
[20] withdraw the or did not just — I don't know what
[21] the word you want to use — tell Excel Bobbins that
[22] JSW Plastics was not going to comply with
[23] Exhibit 5, but it went further than that, correct?

[24]    A: Yes.

Page 125

[1]    Q: Okay.
[2] It said both we are not going to comply
[3] with Exhibit 5, and we are withdrawing any further
[4] support of Excel Bobbins under the 1.5 million line
[5] of credit, correct?

[6]    A: Yes.

[7]    Q: Now, under the 1.5 million line of credit,
[8] what was it that JSW Plastics was going to do
[9] before they withdrew?

[10]    A: Well, the agreement was to support Excel
[11] Bobbins in such a way that they could go out and
[12] solicit business and bring that business back in
[13] and deliver that business to their customer in a
[14] step-by-step plan growth — excuse me, growth plan
[15] which meant that we were willing to supply up to
[16] two machines under the standard agreement of five
[17] percent down, 180 days until the next two machines
[18] could be released for shipment.

[19]    Q: Okay.
[20] So, you would — and I'm trying to find a
[21] letter because Dennis had a letter basically to
[22] that effect which is that JSW Plastic was going to
[23] provide two machines and then later provide two
[24] more machines and then later provide two more

Page 126

[1] machines, and that sort of was the plan at the
[2] time, correct?

[3]    A: As long as their payment history was up to
[4] date, yes.

[5]    Q: Okay.

[6]    Now — so, if these original two machines
[7] had been supplied, the 500 and the 110, and the
[8] payments required in Exhibit 5 would have been made
[9] up to date, then it was JSW Plastics' commitment to
[10] go ahead and supply two more machines and then
[11] after that, two more machines until they worked
[12] their way up to the 1.5 million commitment,
[13] correct?

[14]    A: Say that one more time. I'm sorry.

[15]    Q: My questions are kind of long.
[16] It was JSW Plastics' agreement that — or
[17] the arrangement that so long as Excel Bobbins was
[18] making the payments required under Exhibit 5, that
[19] JSW Plastics at some negotiated point would deliver
[20] two more machines, as long as the payments were
[21] being made under Exhibit 5. And then at some point
[22] after that, those payments were being made on the
[23] two additional machines, they would deliver another
[24] two machines, on a step process, correct?

Page 127

[1]    A: That is correct.

[2]    Q: Okay.
[3] So, there weren't any other requirements
[4] on Excel Bobbins other than to make the payments
[5] required in Exhibit 5 to allow them to get the
[6] additional machines under the line of credit,
[7] correct?

[8]    A: Yes. Yes. If they didn't violate the
[9] terms. Yes.

[10]    Q: Okay.
[11] As long as they didn't violate the terms,
[12] they were going to get additional machines?

[13]    A: Yes.

[14]    Q: Now, those additional machines I think you
[15] said would have followed along the terms of the
[16] line of credit of five percent down, 180 days net,
[17] correct?

[18]    A: That is correct.

[19]    Q: They may not have been under the same
[20] advantageous terms that were being offered in
[21] Exhibit 5?

[22]    A: That is correct.

[23]    Q: Is it also true that JSW Plastics would
[24] have perhaps considered doing these same sort of

Page 128

[1] payments later as long as the payments under
[2] Exhibit 5 were being made?
[3]    A: No.
[4]    Q: This was sort of a one-time thing?
[5]    A: Well, it was in lieu of Excel Bobbins not
[6] being able to obtain financing that we made this
[7] special concession.
[8]    Q: That was for these two machines only?
[9]    A: Yes.
[10]    Q: But then it's your statement as long as
[11] the payments were made under these special terms,
[12] and I think you have already said this, that future
[13] machines would be delivered but the terms there
[14] would be five percent down, 180 days —
[15]    A: That is correct.
[16]    Q: — correct? Okay.
[17] In fact, Exhibit 10, the letter from
[18] Dennis discusses that step arrangement, deliver two
[19] machines in a time, other deliveries during the
[20] duration of the agreement are subject to the terms
[21] as being agreed on on a machine-by-machine basis,
[22] do you see that sentence?
[23]    A: Well —
[24]    Q: Is that a different arrangement that's

[1] being discussed there?
[2]    A: Yeah. I don't agree to that. There needs
[3] to be clarification on extended terms.
[4]    Our standard terms of sale are normally 10
[5] percent down, net 30 days. So, when you refer to
[6] the terms that we extended to Excel Bobbins of five
[7] percent down, 180 days, those are the extended
[8] terms. Not to be confused with the offer on
[9] Exhibit 5.
[10]    Q: Okay. So —
[11]    A: Those are two separate things.
[12]    Q: Right.
[13] But it would still be your testimony that
[14] future machines, while not necessarily being
[15] given — or while not being given this advantageous
[16] terms would still be given the five percent down,
[17] 180 days?
[18]    A: As long as the payment history was up to
[19] date, yes.
[20]    Q: Okay.
[21] And that would be in — that would be in
[22] compliance with the line of credit letter that we
[23] discussed earlier that was —
[24]    MR. REGAN: Exhibit 7.

[1]
[2]    Q: Thank you. Which was Exhibit 7, correct?
[3]    A: Yes. Five percent down, balance 180 days.
[4]    Q: And in fact, weren't there two phone calls
[5] between yourself and Mr. Becker and individuals at
[6] Sunbeam where JSW Plastics through you confirmed
[7] that very arrangement, that those machines would be
[8] available to Excel Bobbins to support Sunbeam work?
[9]    A: Well, I can only recall one telephone
[10] call.
[11]    Q: Okay.
[12] And I think it was Bob Fehrenbach
[13] yesterday that said that there were two that he
[14] remembered. Let me ask you about the one that you
[15] remember.
[16]    Was it, in fact, a conference call between
[17] yourself and one or more principals of Sunbeam and
[18] Mr. Becker, do you remember that being the parties
[19] involved?
[20]    A: The call that I remember was Steve Becker
[21] was present at the Sunbeam facilities.
[22]    Q: Okay.
[23]    A: He put me on speaker phone with Hector
[24] Lu —

[1]    Q: Hector Lucio, I think.
[2]    A: Oh, Lucio, yes, of Sunbeam.
[3]    Q: Okay.
[4]    A: And I was in my office here alone at the
[5] Chicago Tech Center.
[6]    Q: So, Dennis was not with you nor was Bob at
[7] that time?
[8]    A: No. They were not.
[9]    Q: But — and what you remember as far as on
[10] the other side it was Mr. Becker and Hector Lucio
[11] at the Sunbeam plant?
[12]    A: That is correct.
[13]    Q: And in that conversation, did you confirm
[14] to Hector Lucio that you would support Excel
[15] Bobbins by providing machinery to Excel Bobbins?
[16]    A: Yes, I did.
[17]    Q: And did you confirm with Hector Lucio that
[18] you, in fact, would provide that machinery along
[19] the lines that we just discussed, that you would
[20] provide the machines over time or did you just say
[21] we will support it?
[22]    A: There were no details confirmed in that
[23] conversation except for the commitment of
[24] supporting Excel Bobbins to becoming a successful

Case 1:01-cv-00148    Document 34    Filed in TXSD on 02/07/2002    Page 87 of 109

Gerald Arthur Johnson
October 11, 2002

Excel Bobbins and Plastic Components, Inc.    v.
JSW Plastics Machinery, Inc.

[1] recognize that styled of handwriting. I would like
[2] to have you go ahead and tell me who it was that
[3] you think wrote it?

[4]    A: I don't recognize it.

[5]    Q: Okay. Do you recognize the numbers?

[6]    A: Could you be more specific? I mean —

[7]    Q: Well, do those numbers happen to be the
[8] amounts that were referred to in Exhibit 5?

[9]    A: Yes.

[10]    Q: Okay.

[11] And it refers to check number 3021 which
[12] would be the check shown on Exhibit 12, correct?

[13]    A: Yes.

[14]    Q: And in the amount of $4,855.59, correct?

[15]    A: Yes.

[16]    Q: And then, it also shows a calculation with
[17] a final result being $4,788.92, do you see that?

[18]    A: Yes.

[19]    Q: And that number is, in fact, on Exhibit 5,
[20] correct?

[21]    A: Yes.

[22]    Q: So, would it be correct to say that the
[23] numbers being referenced on this letter appear to
[24] be a comparison between the check amount and the

Page 141

[1] amount that was calculated as being owed under
[2] Exhibit 5?

[3]    A: It appears that way. Yes.

[4]    Q: Now, going back to the E-mail, which I may
[5] have buried for you. First let me ask you on the
[6] letter that you wrote on May 10, it states that JSW
[7] Plastics is withdrawing the initial offer of the
[8] credit line of 1.5 million.

[9]    Was there ever any money extended under
[10] the 1.5 million?

[11]    A: Money?

[12]    Q: Terms. I mean, in other words, was this
[13] 1.5 million line of credit ever triggered or was it
[14] withdrawn before it was ever triggered?

[15]    A: I don't know that I can answer the
[16] question that way.

[17]    Q: Would there be any sort of formal
[18] accounting where a 1.5 million line of credit would
[19] normally be set up if there was one?

[20]    A: No. It —

[21]    Q: In other words, earlier you testified that
[22] the 1.5 million line of credit was something you
[23] wrote in the letter but you didn't ever formally
[24] set one up, correct?

Page 142

[1]    A: That is correct.

[2]    Q: Okay.

[3] If you were to formally set up a 1.5
[4] million line of credit, would there be an
[5] accounting entry somewhere to that effect?

[6]    A: No.

[7]    Q: Would there be a document somewhere to
[8] that effect?

[9]    A: No.

[10]    Q: So, it just — I mean, this formally
[11] setting it up versus not is merely in your head?

[12]    A: No. I say no because this letter would be
[13] proof that it was extended to them, but it would be
[14] the actual machine order entry that would trigger
[15] that, okay, they went ahead and we shipped them, if
[16] we shipped them, we shipped them two machines,
[17] there you go, it's triggered, it's started.

[18]    Q: Okay.

[19] So, this line of credit, the 1.5 million
[20] line of credit would be triggered by the shipment
[21] of the original — the original machines?

[22]    A: Yes.

[23]    Q: Now, given that fact, is it your testimony
[24] that this 1.5 million line of credit was never

Page 143

[1] formally triggered?

[2]    A: That's correct.

[3]    Q: So, there were never any machines shipped
[4] under this 1.5 million line of credit?

[5]    A: That is correct.

[6]    Q: Now, the 1.5 million line of credit, it
[7] was — I think we discussed earlier was basically
[8] for Sunbeam Oster, correct?

[9]    A: No. It was to support Excel Bobbins and
[10] Plastic Components.

[11]    Q: In whatever they did?

[12]    A: (No audible response.)

[13]    Q: Okay.

[14] So, it wasn't limited to Sunbeam Oster?

[15]    A: No.

[16]    Q: But it's your testimony that the 1.5
[17] million line of credit was never formally
[18] triggered, correct?

[19]    A: That's correct.

[20]    Q: Okay.

[21] And that's because no machines were
[22] purchased under that 1.5 million line of credit?

[23]    A: Correct. Because it was withdrawn prior
[24] to any shipments.

Page 144

Gerald Arthur Johnson
October 11, 2002

Case 1:01-cv-00148    Document 34    Filed in TXSD on 02/07/2002    Page 88 of 109

Excel Bobbins and Plastic Components, Inc.  v.
JSW Plastics Machinery, Inc.

[1] **Q:** That sentence, they refused to ship those
[2] machines under overdue situation. Now, it's your
[3] testimony that the refusal wasn't on May 10, it was
[4] actually prior to May 10, correct? But —
[5] according to a letter that we don't have in front
[6] of us, but that you remember being sent, correct?
[7] **MR. REGAN:** Objection. Misstates the witness.
[8] **THE WITNESS:** Mr. Becker was in a hurry to
[9] receive these machines. So, I know that there were
[10] different dates that he wanted them to be shipped
[11] out.
[2] The documents that we have in front of us,
[3] as your exhibits, are dated material that documents
[4] what was said. But there was a lot of verbal
[5] communications done prior to any of these letters
[6] written.
[7] **BY MR. GRIFFITH:**
[8] **Q:** Okay.
[9] And so, you think that Steve was told
[10] prior to May 4 that JSW Plastics was not going to
[11] ship the machines under an overdue situation,
[2] correct?
[3] **MR. REGAN:** Objection. Calls for speculation.
[4] **THE WITNESS:** Steve Becker knew that because he

Page 149

[1] did not fulfill his obligation on the 385 and could
[2] not obtain financing on the next two machines, that
[3] he was in jeopardy of not receiving those two
[4] machines from JSW.
[5] **BY MR. GRIFFITH:**
[3] **Q:** How did he know that?
[4] **A:** Through verbal conversations by telephone
[5] from both myself and Dennis Pochatek.
[6] **Q:** Okay.
[7] Is there anywhere else that he could have
[8] gotten that information from?
[9] **A:** Officially, no. I don't believe so.
[10] **Q:** In other words, you don't have a letter or
[11] a document that can refer me to where that's being
[12] told to Mr. Becker?
[13] **A:** I believe that there is one that exists.
[14] I don't have it here today.
[15] **Q:** And that's the one we were discussing
[16] earlier?
[17] **A:** That is correct.
[18] **Q:** Okay.
[19] And that if — and that because of that
[20] non-payment on the 385, he was at risk of not
[21] getting the machines?

Page 150

[1] **A:** That is correct.
[2] **Q:** Okay.
[3] Now, finishing out this sentence, they
[4] refused to ship those machines under overdue
[5] situation. The overdue situation you are referring
[6] to is the 385, correct?
[7] **MR. REGAN:** Objection. Calls for speculation.
[8] **THE WITNESS:** Yes.
[9] **BY MR. GRIFFITH:**
[10] **Q:** Okay.
[11] And when I say you're referring to, I
[12] mean, this is Mr. Hirayama talking about
[13] discussions that you had with Steve. And so I
[14] guess in those discussions you had with Steve, the
[15] overdue situation you would have been referencing
[16] is the 385?
[17] **A:** That is correct.
[18] **Q:** Are you aware of any other overdue
[19] situation that possibly could be coming into play
[20] in this transaction at this time?
[21] **A:** I'm not sure of the dates, but there is an
[22] issue outstanding with Excel Plastics on a 310
[23] machine.
[24] **Q:** Okay. And that's —

Page 151

[1] **A:** But —
[2] **Q:** Other than the 310 and the 385, is there
[3] any other overdue situations that come into play in
[4] this situation in the spring of 2001?
[5] **A:** Not that I am aware of.
[6] **Q:** Now, is it your testimony that payment on
[7] the 310 was — should be a fifth item? Remember
[8] under the four items we discussed, the 385, the
[9] UCC, the five percent down, the Sunbeam letter.
[10] Should there be a fifth item payment of the 310?
[11] **A:** I don't know because it's — now, it
[12] becomes — it's a separate company. It's a
[13] separate transaction, you know. That was a demo
[14] machine that we sold at a discounted price and
[15] separate situation.
[16] So, I would not say that that must be
[17] added to these four stipulations. I think that
[18] would be unfair.
[19] **Q:** Okay.
[20] So, that you weren't going to add the
[21] payment on the 310 as one of the requirements to
[22] fulfill the agreement embodied in Exhibit 5?
[23] **A:** It was not my intention. No.
[24] **Q:** Okay.

Page 152

Gerald Arthur Johnson
October 11, 2002

Excel Bobbins and Plastic Components, Inc. v.
JSW Plastics Machinery, Inc.

Case 3:01-cv-00148    Document 34    Filed in TXSD on 02/07/2003    Page 89 of 109

[1] Q: Right.

[2] A: And support and the — I guess opportunity

[3] to sell 12 to 16 machines.

[4] Q: As you found out these things about Steve,

[5] both the professional concerns you had as a

[6] supplier and then also about the concerns with the

[7] business sense and the ability to get financing,

[8] did that concern you?

[9] A: Yes.

[10] Q: If you had known those things before

[11] February of 2000, would you have written the letter

[12] that you wrote, the one —

[13] MR. REGAN: Exhibit 7.

[14] BY MR. GRIFFITH:

[15] Q: Number helps a little bit, but it doesn't

[16] help as much as finding it. I got it. Okay.

[17] If you would have known the problems with

[18] Steve's lack of business sense, the issues — the

[19] things you found out about the business through the

[20] financing people and the professional concerns that

[21] you had from just dealing with him over the, I

[22] guess, year and a half after writing that letter,

[23] would you have ever written Exhibit 7?

[24] A: No.

Page 173

[1] Q: Would you agree with me that that's one of

[2] the reasons or part of the reasons that you wrote

[3] Exhibit 27 with drawing the line of credit where

[4] the things that you found out about Steve in 2000

[5] and 2001 that we just discussed?

[6] A: No.

[7] Q: It didn't have anything to do with why you

[8] wrote Exhibit 27?

[9] A: Maybe two percent.

[10] Q: Okay.

[11] So, I mean, it was — it was something

[12] that you thought about when you went ahead and went

[13] so far as to withdraw the 1.5 million line of

[14] credit, would that be correct to say?

[15] A: A very small portion of it. Yes.

[16] Q: What would be the bigger portions of it?

[17] A: That he violated our contract, our

[18] agreement. That's why.

[19] Q: Which agreement is that?

[20] A: I think it's Exhibit No. 5. It is Exhibit

[21] No. 5.

[22] Q: How did he violate Exhibit No. 5?

[23] MR. REGAN: Objection. Asked and answered. I

[24] thought we have already gone through that.

Page 174

[1] MR. GRIFFITH: We have and he — none of the

[2] things that are listed as the reasons for not

[3] complying in Exhibit 5 are in there. So now, I'm

[4] confused because you're saying he violated Exhibit

[5] No. 5 and I don't —

[6] BY MR. GRIFFITH:

[7] Q: What in Exhibit 5 did he violate?

[8] MR. REGAN: Objection. Argumentative.

[9] BY MR. GRIFFITH:

[10] Q: You can go ahead and answer.

[11] A: It took several phone calls and about four

[12] months to get the down payment. It took — well,

[13] we still don't have the signed UCC papers.

[14] Q: Where is that in Exhibit 5?

[15] A: Right here, as far as the down payment.

[16] Q: No. The UCC?

[17] A: Well, that — that was part of our order

[18] process.

[19] Q: Okay.

[20] What I want to know is what in Exhibit 5

[21] did — since you're basing — you're withdrawing

[22] the 1.5 million line of credit on his violation of

[23] Exhibit 5, I want to know what in Exhibit 5 did he

[24] violate?

Page 175

[1] A: Okay. One being the down payment.

[2] Q: Okay.

[3] A: By this date — this date, he did not send

[4] the down payment to us.

[5] Q: Okay.

[6] A: This is January 30, 2001. I think you

[7] established on that exhibit over there that we

[8] received it April 30, '01. That's four months.

[9] Q: Okay. What else?

[10] A: The second thing is that in our normal

[11] procedure of processing order — an order, the UCC

[12] has to be signed. We sent those UCCs and never

[13] received signed copies back.

[14] Q: If you had not sent those UCCs to him,

[15] would you still be pointing at that as a violation

[16] of this agreement? In other words, if you never

[17] sent them to him, then he had nothing to sign,

[18] correct?

[19] A: Right.

[20] Q: And was it his obligation to provide those

[21] UCCs himself or was he just supposed to sign what

[22] you sent him?

[23] A: Sign what we sent him.

[24] Q: Okay.

Page 176

Excel Bobbins and Plastic Components, Inc. 34
JSW Plastics Machinery, Inc.

Filed in TXSD on 02/07/2003

Gerald Arthur Johnson
October 11, 2002

**Page 177**

[1] So, if the evidence shows that you never
[2] sent him an UCC for the 110 or the 500, then you
[3] couldn't say that he violated that part of this
[4] agreement, correct?
[5]   A: That is correct.
[6]   Q: Then, what else do you —
[7]   A: But on the other hand, if we did prove to
[8] you that we sent it to him —
[9]   Q: Which is your testimony.
[10]   A: Yes. Okay.
[11]   Q: And that he wouldn't violated. I
[12] understand.
[13]   I guess my question what else — how else
[14] did he violate this contract or this agreement?
[15]   A: Well, give me a second here. Well, I
[16] think those are the only two items on this contract
[17] or this offer —
[18]   Q: Okay.
[19]   A: — that he violated.
[20]   Q: And it was a violation of this agreement
[21] that caused you to withdraw the 1.5 million line of
[22] credit, correct?
[23]   A: Yes.
[24]   Q: Or at least that was 98 percent of it.

**Page 178**

[1] The other two percent was what we just talked
[2] about?
[3]   A: Yeah. But I can't judge people on how
[4] they run their business. I have got to judge on
[5] the financial risk on the JSW side.
[6]   Q: Right.
[7] You said that was only two percent.
[8]   A: The — right.
[9]   Q: The problems he had financing and the —
[10] and the lack of business savvy and your dealings
[11] with him on a professional basis, that was only two
[12] percent, correct?
[13]   A: Yes.
[14]   Q: And the other full 98 percent was the
[15] violation of this agreement which is Exhibit 5?
[16]   A: Yes.
[17]   Q: Okay.
[18] Anything else that we should add to that
[19] as to why you withdraw the line of credit?
[20]   A: Well, he signed this agreeing to it.
[21]   Q: Right.
[22]   A: And in my statement here, I have to bring
[23] it closer. Sorry. It says JSW Plastic Machinery
[24] has the right to cancel or withdraw from this

**Page 179**

[1] agreement after given written notice to Excel
[2] Bobbins on a 30-day notice.
[3]   Q: Okay.
[4]   A: And he agreed to that.
[5] So, he agreed that we had the right to
[6] withdraw the credit line.
[7]   Q: Is your understanding that that 30-day
[8] written notice applies to the 1.5 million credit
[9] line or does it apply to this agreement?
[10]   A: Well, I think they are both tied in.
[11]   Q: Okay.
[12]   A: I'm not a lawyer, and I don't — maybe I
[13] shouldn't.
[14]   Q: Did you draft this letter?
[15]   A: Yes, I did.
[16]   Q: Is it your understanding that at any time
[17] when Steve had been making payments on this machine
[18] had been operating with this machine on his
[19] property for six months or twelve months, that you
[20] could then come in and cancel this agreement and
[21] demand all the money right away under that clause,
[22] is that your understanding of that clause?
[23]   A: I guess I don't understand.
[24]   Q: You're saying that this can be canceled

**Page 180**

[1] with 30 days notice, right, this agreement?
[2]   A: If there is any violation to it, yes.
[3]   Q: So, if there is not a violation, then, it
[4] can't be canceled?
[5]   A: Well, I guess it still could be cancelled.
[6]   Q: Okay.
[7] And then I guess my question is it did
[8] your understanding what you wrote here that if
[9] Steve had taken possession of these two machines,
[10] gone through the six months no pay, started making
[11] payments, that even twelve months into this
[12] agreement, that you could still give him 30 days
[13] notice, I'm canceling agreement, deliver the
[14] machine back to me or I want all my money right
[15] now, is that —
[16]   MR. REGAN: Objection.
[17]       BY MR. GRIFFITH:
[18]   Q: Is that what you wrote when you wrote this
[19] agreement?
[20]   MR. REGAN: Objection. Calls for speculation.
[21] Calls for a legal conclusion.
[22]
[23]       BY MR. GRIFFITH:
[24]   Q: You can still answer.

Case 1:01-cv-00148   Document 34   Filed in TXSD on 02/07/2002   Page 91 of 109

Gerald Arthur Johnson
October 11, 2002

Excel Bobbins and Plastic Components, Inc. v.
JSW Plastics Machinery, Inc.

[1]    A: I have no comment.

[2]    MR. GRIFFITH: First of all, it doesn't call

[3] for speculation if I'm asking what he wrote and

[4] what he intended when he wrote it. Second, it

[5] doesn't call for a legal conclusion if I ask for

[6] what he wrote and what he intended when he wrote

[7] it. He is the author of this. And your objection

[8] is causing him to say no comment.

[9]    MR. REGAN: No. You're asking him to speculate

[10] if these machines were shipped and that's what I'm

[11] saying.

[12]    MR. GRIFFITH: I want to know what his

[13] intent —

[14]    MR. REGAN: That's what the speculation was.

[15]    MR. GRIFFITH: I want to know what his intent

[16] was.

[17]        BY MR. GRIFFITH:

[18]    Q: Was that 30-day notice requirement that

[19] you wrote in there applicable at any time during

[20] the time period of this agreement being applicable?

[21]    MR. REGAN: Let me further object on the basis

[22] that the document speaks for itself as far as the

[23] right to cancel or withdraw on that particular

[24] sentence, it just says that. It is what it is.

Page 181

[1]    MR. GRIFFITH: I want to know what his

[2] intention was when he wrote that.

[3]    MR. REGAN: Go ahead. Preserving the

[4] objections, go ahead.

[5]    MR. GRIFFITH: That's fine.

[6]    THE WITNESS: If all of the conditions of this

[7] contract was met, probably not, we wouldn't enforce

[8] that.

[9]    However, that was our safeguard that if

[10] something happened during the life of this

[11] agreement, that we could cancel this contract and

[12] bring back the machines.

[13]        BY MR. GRIFFITH:

[14]    Q: At any time during the life of that

[15] agreement?

[16]    A: Yes.

[17]    MR. GRIFFITH: Go ahead and change.

[18]    THE VIDEOGRAPHER: We are now going off the

[19] record to change videotapes. This is the end of

[20] videotape No. 2. The time is 2:56

[21] (Discussion off the record.)

[22]    THE VIDEOGRAPHER: We are now back on the

[23] record. This the continuation of the deposition of

[24] Jerry Johnson. This is the beginning of tape

Page 182

[1] No. 3. The time is 4:18 — 3:18. I'm, again,

[2] looking at the seconds. I'm sorry. Again, looking

[3] at the wrong — 3:04.

[4]        BY MR. GRIFFITH:

[5]    Q: Let me hand you what's been marked as

[6] Deposition Exhibit 26. Do you recognize those

[7] E-mails?

[8]    A: I don't recognize them, and I don't

[9] remember them, no. So, I'm sorry, but this goes

[10] back, what, three years, two years. Two years.

[11] No, one year. I'm sorry.

[12]    I'm not saying I didn't write them, but

[13] I — I don't recognize it, and —

[14]    Q: Well, and really, it's the — this is a

[15] response. So, you didn't write that one, the first

[16] one on Exhibit 26. But the second one looks like

[17] on May 25, you provided at least one leasing

[18] company with Mr. Steve Becker's name and address to

[19] see whether Steve could get financing for the three

[20] machines through that leasing company?

[21]    A: Oh, I believe that this Corona Company is

[22] a finance company that specializes in hard to do

[23] deals.

[24]    Q: So —

Page 183

[1]    A: Yeah.

[2]    Q: After you wrote the May 2 letter

[3] withdrawing the line of credit, then, at that

[4] point, rather than extending credit or terms on the

[5] machines that were discussed in Exhibit 5, you sent

[6] Steve's information to a leasing company so that he

[7] could buy those machines just outright from JSW

[8] Plastics, correct?

[9]    A: That was my intent. Yes.

[10]    Q: Because at this point, after the May

[11] letter, you were no longer giving Steve terms or

[12] any sort of credit under the 1.5 million line of

[13] credit?

[14]    A: That is correct.

[15]    Q: Or really, terms or credit of any sort,

[16] not just under the 1.5, you were no longer going to

[17] be extending terms to Steve Becker and Excel

[18] Bobbins, correct?

[19]    A: That is correct.

[20]    Q: And you were expecting him to pay cash or

[21] to finance through some other means so that you

[22] received cash for all the machines that he wanted?

[23]    A: Yes.

[24]    Q: Now, yesterday we took Bob Fehrenbach's

Page 184

Excel Bobbins and Plastic Components, Inc.    v    Gerald Arthur Johnson
JSW Plastics Machinery, Inc.                       Filed in TXSD on 02/07/2003    Page 210 of 112
October 11, 2002

[1] deposition, and he stated that there was a company,
[2] and I think we decided when we were off the record
[3] that it was Advanced Molding that needed a screw
[4] and a barrel on a new injection molding machine,
[5] and that you wanted them to pay cash for the part
[6] up front. And that he then had to guarantee
[7] payment on that part. And that later, it turned
[8] out that that was a warranty item, anyway.
[9]     And I just wanted to hear, I guess, your
[10] version of that situation if you remember what
[11] situation he was discussing?
[12]   **A:** Yes. I do remember it.
[13]   **Q:** Okay.
[14]   **A:** However, it wasn't a cash payment that I
[15] was requesting. It was a c.o.d. And the problem
[16] is that the customer was on credit hold with JSW
[17] for not returning warrantied parts. So, in other
[18] words, a part breaks, it's under warranty, we will
[19] send them out a new part, but we want the
[20] replacement part back.
[21]     And there were a couple other issues that
[22] went on. Now, this situation comes about where
[23] they actually damaged a barrel. The barrels on our
[24] machines are made out of bimetallic metal. They

Page 185

[1] are tough. They — they are anti-corrosive and
[2] anti-wear.
[3]     So, when a customer claims that their
[4] barrel is broken, and I believe this company
[5] claimed that the barrel was cracked, something
[6] weird had to happen to it. A screw, absolutely. A
[7] screw will break, either they have gone too far
[8] forward with it or what have you. But a barrel
[9] just doesn't happen.
[10]     So, what I — what I offered to the
[11] customer was buy the barrel, send the old one back
[12] to us, and if we find after inspecting it that it
[13] was a defect in workmanship, we will credit your
[14] account back with the price of that barrel.
[15]   **Q:** And what ended up happening in that
[16] situation?
[17]   **A:** Well, of course, when a barrel or a screw
[18] is broken, that shuts down the machine completely.
[19] That means that the owner of that machine is not
[20] making any money on it.
[21]     So, replacement time is of the essence.
[22] Very important. And they did not want to agree to
[23] except that shipment on a c.o.d. basis. So, I
[24] talked to Bob Fehrenbach about it, and Bob is very

Page 186

[1] close friends on a personal side with this guy. He
[2] plays tennis with him, and so, I'm sure that it was
[3] somewhat embarrassing for Bob Fehrenbach. But
[4] policy is policy.
[5]     And being that they were on credit hold,
[6] for not running warrant — replacement warranty
[7] parts, there is no way I could authorize that. So,
[8] Bob put up such a big stink about it, that I
[9] offered to him that I would use part of his
[10] commissions as a guarantee until we received the
[11] parts back or if we found that it wasn't under
[12] warranty or some type of conclusion made.
[13]   **Q:** Okay.
[14] And what was the conclusion on the whole
[15] deal?
[16]   **A:** I'm embarrassed to report, I don't
[17] remember what it was. I know it was a cracked
[18] barrel. I doubt very much that we sent it back to
[19] Japan to be analyzed because it's just a waste, and
[20] I just — without doing any research in the file, I
[21] can't report to you right now what happened to
[22] that.
[23]   **Q:** So, you don't no whether it was covered
[24] under warranty or not?

Page 187

[1]   **A:** No.
[2]   **MR. GRIFFITH:** I'll pass the witness.
[3]           **CROSS-EXAMINATION**
[4]           **BY MR. REGAN:**
[5]   **Q:** If you would turn to Exhibit 5. Now,
[6] during the course of your examination by
[7] Mr. Griffith, he asked whether or not you had done
[8] anything further pursuant to this contract, do you
[9] recall that line of questioning?
[10]   **A:** Yes, I do.
[11]   **Q:** Okay.
[12] And if you would just read the last
[13] sentence which has the later opinion discussed in
[14] this deposition?
[15]   **A:** JSW Plastic Machinery, Incorporated, has
[16] the right to cancel or withdraw from this agreement
[17] after given written notice to Excel Bobbins on a
[18] 30-day notice.
[19]   **Q:** Now, at the time of the question by
[20] Mr. Griffith, did you not refer to that as JSW
[21] taking any action. But in fact, did JSW PMI take
[22] action pursuant to that —
[23]   **MR. GRIFFITH:** Objection. Leading.
[24]

Page 188

Gerald Arthur Johnson
October 11, 2002

Excel Bobbins and Plastic Components, Inc. v.
JSW Plastics Machinery, Inc.

BY MR. REGAN:

[2] Q: — paragraph?

[3] MR. GRIFFITH: Objection. Leading.

[4]           BY MR. REGAN:

[5] Q: Go ahead.

[6] A: Yes.

[7] Q: And what is the action that was taken?

[8] A: On May 10. a letter which is now

[9] Exhibit 27. was sent out to Mr. Becker informing

[10] him that we he are withdrawing our initial offer to

[11] Excel Bobbins and Plastic Components, the credit

[12] line of 1.5 million due to non-payment of the

[13] original sales agreement.

[14] Q: Now, I want to direct your attention to

[15] February 29, 2000, Exhibit 7 letter.

[16] A: Um-hum.

[17] Q: "Yes"?

[18] A: Yes.

[19] Q: Okay.

[20] This is a form of a letter you had

[21] previously written at Steve Becker's request, isn't

[22] it?

[23] A: That is correct.

[24] Q: And did Mr. Becker send you a sample of a

Page 189

[1] letter that he had previously requested you to

[2] write?

[3] MR. GRIFFITH: Objection. Leading.

[4] THE WITNESS: Yes, he did.

[5] MR. REGAN: I'm going to show you what we will

[6] mark as next in order.

[7] MR. GRIFFITH: There you go. 34.

[8] MR. REGAN: Exhibit 34.

[9]    (Whereupon, Plaintiff's

[10] Deposition Exhibit No. 34 was

[11] marked for identification.)

[12]           BY MR. REGAN:

[13] Q: And ask you to take a look at this letter.

[14] And Exhibit 34, have you ever seen that?

[15] A: Yes, I have.

[16] Q: And is this a proposed letter that

[17] Mr. Becker wrote to you or asked you to write on

[18] behalf of JSW?

[19] MR. GRIFFITH: Objection. Leading.

[20] THE WITNESS: Yes, it is.

[21]           BY MR. REGAN:

[22] Q: Did you use that letter in composing the

[23] contents of Exhibit 7?

[24] MR. GRIFFITH: Objection. Leading.

Page 190

[1] THE WITNESS: Yes, I did.

[2]           BY MR. REGAN:

[3] Q: Did you prepare Exhibit 7 at the request

[4] of Mr. Becker?

[5] A: Yes, I did.

[6] Q: At the time that you prepared the

[7] Exhibit 7 letter to whom it may concern on

[8] February 29. 2000. had you determined the financial

[9] status or credit worthiness of Excel Bobbins?

[10] A: No.

[11] Q: And what were you basing any credit

[12] worthiness on?

[13] A: Our past relationship with Excel Plastics

[14] and John Annoreno.

[15] MR. REGAN: All right.

[16] I'm going to show you what we will mark as

[17] Exhibit 35.

[18]    (Whereupon, Plaintiff's

[19] Deposition Exhibit No. 35 was

[20] marked for identification.)

[21]           BY MR. REGAN:

[22] Q: A UCC statement for a 110 — J110 machine.

[23] A: Um-hum.

[24] Q: Do you recognize that document?

Page 191

[1] A: Yes, I do.

[2] Q: And is that a document that was

[3] received — a copy of which was received from

[4] Mr. Becker?

[5] A: Yes, it is.

[6] Q: And that is for which machine?

[7] A: This is for a model J110E2, serial number

[8] 2, dash, 99701112.

[9] Q: Okay.

[10] And do you recall when that was received

[11] back?

[12] A: No. But the — no. I do not.

[13] Q: Okay.

[14] And to your knowledge, was John Annoreno's

[15] signature ever obtained on this UCC statement,

[16] Exhibit 35?

[17] A: No. It was not.

[18]    (Whereupon, Plaintiff's

[19] Deposition Exhibit No. 36 was

[20] marked for identification.)

[21]           BY MR. REGAN:

[22] Q: Let me show you what we have marked as

[23] Exhibit 36 which is a UCC statement for a 500. Do

[24] you recognize that document?

Page 192

[1]  A: Yes. I do.

[2]  Q: And is that an UCC financing statement for

[3] the J500?

[4]  A: Yes, it is.

[5]  Q: And do you recognize the signature?

[6]  A: Yes, I do.

[7]  Q: And whose signature is on it?

[8]  A: Steve Becker's.

[9]  Q: And the date?

[10]  A: April 2, 2001.

[11]  Q: To your knowledge, were you able to obtain

[12] John Annoreno's signature?

[13]  A: No.

[14]  Q: Now, directing your attention to

[15] Exhibit 36. I'm sorry. Exhibit 33, you were

[16] referring to, when questioned by Mr. Griffith, the

[17] fact that you wanted a better commitment. What do

[18] you mean by a better commitment?

[19]  A: Well, in reading —

[20]  Q: I'm referring to the letter from Mr. Lucio

[21] to Dear Sirs and directed to JSW Plastics

[22] Machinery, Inc., dated April 19, 2001.

[23]  A: In reading through the letter, it points

[24] out that this letter does not represent a formal

Page 193

[1] commitment with JSW or Excel Plastics until we sign

[2] a formal contract, but according to the Sunbeam

[3] Corporation requirements.

[4]  Q: Okay.

[5] So, at the time of this letter, did you

[6] know whether or not a formal contract had been

[7] signed?

[8]  A: No.

[9]  Q: Did you receive a purchase order?

[10]  A: No.

[11]  Q: Did you receive from either Excel Bobbins

[12] or Sunbeam an advice or written document stating

[13] what purchase order the purchase order number that

[14] had been issued as of this date?

[15]  A: No.

[16]  Q: Did you need that information in order to

[17] complete your determination on the Sunbeam

[18] situation?

[19]  A: Yes.

[20]  MR. REGAN: I don't have any further questions.

[21]          REDIRECT EXAMINATION

[22]          BY MR. GRIFFITH:

[23]  Q: Mr. Johnson, let me ask you with regard to

[24] deposition Exhibit — Exhibits 35 and 36, do you

Page 194

[1] have a cover letter in your possession that would

[2] have been transmitted with those UCCs?

[3]  A: Normally, we would do that. So, I'm

[4] saying, yes, it probably exists.

[5]  Q: Okay.

[6] And do you know whether that cover letter

[7] would have requested that both John and Steve

[8] signed the UCC?

[9]  A: I'm not sure.

[10]  MR. REGAN: Counsel, if I might, and I'm sorry

[11] to interrupt you. There may have been a mix up,

[12] and I'm just posing this.

[13]      Yesterday, in Dennis' deposition, I had

[14] thought that the letter of March 23 which is an

[15] Exhibit 16, I believe, was referring to these two

[16] forms as opposed to just the 385 which only has one

[17] form attached to it.

[18]      But I'm posing that because I believe that

[19] that is the situation. I'm not sure because I

[20] noticed when we went through the whole file, there

[21] was a stack of stuff and it was sort of all mixed

[22] up.

[23]  MR. GRIFFITH: Counsel, I think — do you have

[24] the FedEx package that was pulled out when we

Page 195

[1] pulled the two UCC statements yesterday?

[2]  MR. REGAN: I believe that we do. If I can —

[3]  MR. GRIFFITH: Why don't we go off the record,

[4] then for a moment?

[5]  THE VIDEOGRAPHER: We are now going off the

[6] record. The time is 3:22.

[7]      (Discussion off the record.)

[8]  THE VIDEOGRAPHER: We are now back on the

[9] record. The time is 3:24.

[10]  MR. GRIFFITH: If it's okay with counsel, I'm

[11] going to take the Exhibit 14, which is the letter

[12] discussing getting signature on the UCC forms and

[13] go ahead and attach that to Exhibits 36 and 35

[14] since that letter is the one that accompanied those

[15] two UCCs. Would that be correct?

[16]  MR. REGAN: That's correct.

[17]  MR. GRIFFITH: Okay.

[18]      And then, I'm going to also mark an

[19] additional exhibit, which is the — which are the

[20] documents that were attached to Exhibit 14

[21] originally, and this is now going to be Exhibit 37

[22] which is the UCC on the 385, is that correct?

[23]  MR. REGAN: That's correct.

[24]

Page 196

JSW TECH CENTER
EXEL BOBBINS &          ...          PAGE  01



**JSW PLASTICS MACHINERY INC.**

January 30, 2001

Mr. Steve Becker
EXEL BOBBINS Inc.
3301 NAFTA Parkway – Unit C
Brownsville, TX  78521

Dear Steve

As you will remember, JSW Plastics Machinery, Inc., extended a Line of Credit to your company, EXEL BOBBINS Inc., and now that we are getting close to shipping machines into your facility in Brownsville, TX., we must have an agreement as to the re-payment of this Line of Credit. Therefore, please accept the following proposal. We will be shipping the following Machines, per your Purchase Order #'s 15 and 5

    1 - JSW Model J500EII Injection Molding Machine          $~~200,500.00~~     202,500.00  per 3/3/2000
    1 - JSW Model J110EII Injection Molding Machine          $  84,835.00                        Quote &
                                          TOTAL INVOICE AMOUNT     $84799.22   ~~285,335.00~~       our conversation
                                                                                                today  3/31/01
                                                                              1 = 87,335.20

A 5% Down Payment of the total order amount is normally required prior to shipment, however we will make a special consideration to EXEL BOBBINS of 3 Equal Monthly Payments of $ ~~4,333.67~~, with the first payment due prior to shipment of machines, and the next Down Payment Installment is due Thirty (30) days after shipment, and the last Down Payment Installment Sixty (60) days after shipment.
$ 2,917.767.67

After the last Down Payment Installment is made, there will not be any payments due for a period of Six (6) Months. Then, starting on the Seventh (7) Month, EXEL BOBBINS will make Eleven (11) Monthly payments of $5,000.00 until the Twelfth (12) Month, at which time EXEL BOBBINS agrees to make a balloon payment of the balance owed [$ ~~127,768.24~~] to JSW Plastics Machinery. No interest will be charged during this special financing period, however it is agreed that JSW Plastics Machinery will still remain the owner and have recovery rights of this equipment until final payment has been made by EXEL BOBBINS or its Financial Partner. JSW Plastics Machinery has the right to cancel or withdraw from this agreement after given written notice to EXEL BOBBINS on a Thirty (30) days notice.

Steve, if you are interested in pursuing this agreement, please sign below and return to my attention, a.s.a.p. as we are ready to ship these machines to you. Should you have any questions about this agreement, or require additional information, please feel free to contact Dennis Pochatek at the Chicago Technical Center

Sincerely,

Jeff Jeanson
Vice President Operations

**EXHIBIT**
No. 5

Accepted By _____
                              Signature
                      President
                              Title
Date: ___5/26/01___

CORPORATE OFFICE   1120 EAST MIRALOMA AVENUE  ANAHEIM, CA 92806-2107   PHONE 714-520-9888   FAX 714-520-9889
CHICAGO TECHNICAL CENTER   700 LANDMEIER ROAD  ELK GROVE VILLAGE, IL 60007   PHONE 847-427-8888   FAX 847-427-8889
ATLANTA REGIONAL OFFICE   700 CUMBERLAND POINT DR  SUITE 17  MARIETTA GA 30067   PHONE 770-933-9233   FAX 770-955-6288
DETROIT REGIONAL OFFICE   34575 DYNAMIC INDUSTRIAL DR  SUITE 2ND  NOVI MI 48375   PHONE 248-449-5422   FAX 248-449-5473

# JSW PLASTICS MACHINERY INC.

HEAD OFFICE: LOS ANGELES
3726 EAST MIRALOMA AVENUE • ANAHEIM, CALIFORNIA 92806-2107 • PHONE (714) 630-5651 • FAX (714) 630-1886

| | | | |
|---|---|---|---|
| CHICAGO TECHNICAL CENTER<br>1100 LANDMEIER ROAD<br>ELK GROVE VILLAGE, IL 60007<br>PHONE: (847) 427-1100<br>FAX: (847) 427-1131 | EAST COAST OFFICE<br>P.O. BOX 498<br>DAYVILLE, CT 06241-0498<br>PHONE: (860) 774-2613<br>FAX: (860) 774-3297 | DETROIT OFFICE<br>44712 HELM STREET<br>PLYMOUTH, MICHIGAN 48170<br>PHONE: (734) 455-9003<br>FAX: (734) 455-9058 | ATLANTA OFFICE<br>1700 CUMBERLAND POINT DR., STE#17<br>MARIETTA, GEORGIA 30067<br>PHONE: (770) 952-0269<br>FAX: (770) 956-9058 |

February 29, 2000

To Whom It May Concern:

JSW Plastics Machinery Inc., will support the growth and expansion of Exel Bobbins and Plastic Components Inc., by providing any model of JSW PMI Plastic Injection Molding Machine, which they will require for future projects with Sunbeam-Oster. This also includes maintaining a new machine inventory for quick delivery, based on the demands by Exel Customers, as well as providing full support on an on-going bases. We will assist Exel in any way possible to accommodate the needs of Sunbeam-Oster in all of their molding needs.

As of this date, JSW PMI has extended a credit line of $1,500,000.00 to Exel for the purchase of JSW's products and services, and agrees to a payment term of 5% down payment and balance net 180 days, at 0% interest. In addition, JSW PMI guarantees Exel a stock inventory of Injection Molding Machines at our Anaheim, CA. facility with delivery requirements of fourteen (14) days or less.

Once again, it has been and will be a pleasure doing business with Exel Plastics Inc., and sincerely appreciate our relationship of being a team supplier member of Exel Plastics.

Sincerely,

Jerry Johnson
Vice President

---

**EXHIBIT**

_fl-5_ 7



April 19, 2001

JSW Plastics Machinery Inc.

Dear Sirs:

This letter is a confirmation that Sunbeam-Oster is and will conduct business with Exel Bobbins and Plastic Components Inc. and will book machine time with the said company with production on all machines. we need for the use of running Sunbeam products. This letter doesn't represent a formal commitment with JSW or Exel Plastics until we sign a formal contract, but according the Sunbeam Corp. requirements. Exel comply with all our expectations in price, storage, deliveries, q.c. systems, etc. We appreciate all your cooperation on this project and will expect your full support in all future machine orders pertaining to Exel. Sunbeam will continue to support Exel in future projects and a long lasting relationship

Sincerely,

Lic. Hector Lucio
Purchasing Mgr.



EXHIBIT



# EXEL Plastics
**Injection Mold Sampling • Production Molding**

Exhibit "B"

Attn: Jerry Johnson

Don, Overdahl

*please forward ASAP! *

Even fax

TO: Steve Becker

JSV will support the growth & expantion of EXEL Plastics INC., with any plastic Injection molding machinery equiptment they will require for future projects with Trendler Components. We will assist in any way possible to accomidate to the needs of Trendler Component to run all of Trendler products. plastic products.

Also it is a pleasure doing business with Exel Plastics Inc., and sincerely appreciate our relationship of being a team supplier member of Exel Plastics Inc.

Add anything else you see Nesessary

thank, Steve Becker.

EXHIBIT
34

302 Roma Jean Parkway. Streamwood, IL 60107 • Telephone (530) 372-5878 • Fax (630) 372-5879



**JSW**

JSW PLASTICS MACHINERY INC.

March 23,2001

Steve:

Jerry and I were trying to see John today to get his signature on the UCC forms, but he was tied up. He suggested that we send them to you first. You sign and return them to us and we will get John's signature. Leave all the papers intact when you sign and we will give John the proper copy. Do not send these to California like their letter states. Send them to Chicago.

Thank you,

Dennis Pochatek

EXHIBIT

Plaintiff 14

CORPORATE OFFICE  3726 EAST MIRALOMA AVENUE, ANAHEIM. CA 92806-2127  PHONE  714-630-5651  FAX· 714-630-1886
CHICAGO TECHNICAL CENTER  1333 LANDMEIER ROAD  ELK GROVE VILLAGE, IL 60007  PHONE: 847-427-1100  FAX. 847-427-1131
ATLANTA REGIONAL OFFICE  1700 CUMBERLAND POINT DR . SUITE 17, MARIETTA, GA 30067  PHONE. 770-952-0269  FAX 770-956-9058
DETROIT REGIONAL OFFICE  24404 CATHERINE INDUSTRIAL DR  SUITE 310  NO.  MI 48375  PHONE  248-449-5422  FAX 248-449-6018

2. Remove Secured Party and Debtor copies and send other 3 copies with interleaved carbon paper to the filing officer. Enclose filing fee.

(612) 421-1773

07960

3. If the space provided for any item(s) on the form is inadequate the item(s) should be continued on additional sheets, preferably 5" x 8" or 8" x 10". Only one copy of such additional sheets need be presented to the filing officer with a set of three copies of the financing statement. Long schedules of collateral, indentures, etc., may be on any size paper that is convenient for the secured party. Indicate the number of additional sheets attached.

4. If collateral is crops or goods which are or are to become fixtures, describe generally the real estate and give name of record owner.

5. When a copy of the security agreement is used as a financing statement, it is requested that it be accompanied by a completed but unsigned set of these forms, without extra fee.

6. At the time of original filing, filing officer should return third copy as an acknowledgement. At a later time, secured party may date and sign Termination Legend and use third copy as a Termination Statement.

| This FINANCING STATEMENT is presented to a filing officer for filing pursuant to the Uniform Commercial Code: | | 3. Maturity date (if any): |
|---|---|---|
| 1. Debtor(s) (Last Name First) and address(es)<br><br>EXEL Bobbins & Plastic<br>          Comp.<br>3301 NAFTA Parkway Unit C<br>Brownsville, TX 78521<br>Tax ID/Social Security No. | 2. Secured Party(ies) and address(es)<br><br>JSW PLASTICS MACHINERY INC<br>3726 E. Miraloma ave.<br>Anaheim, CA 92806<br>Tax ID/Social Security No. | For Filing Officer (Date, Time, Number, and Filing Office) |

This financing statement covers the following types (or items) of property:

ONE INJECTION MOLDING MACHINE WITH
ACCESORIES AND PARTS.
MODEL: J110E2
  S/N: 2-99701112

5. Assignee(s) of Secured Party and Address(es)

This statement is filed without the debtor's signature to perfect a security interest in collateral (check [ ] if so)

[ ] already subject to a security interest in another jurisdiction when it was brought into this state.

[ ] which is proceeds of the original collateral described above in which a security interest was perfected:

Check ☒ if covered: [ ] Proceeds of Collateral are also covered [ ] Products of Collateral are also covered. No. of additional Sheets presented:

Filed with:

By: _____ 4/2/01
    Signature(s) of Debtor(s)

By: _____
    Signature(s) of Secured Party(ies)

(1) Filing Officer Copy - Alphabetical     **STANDARD FORM - FORM UCC-1.**



EXHIBIT

07958

(512) 321-1713

1. Remove Secured Party and Debtor copies and send other 3 copies with interleaved carbon paper to the filing officer. Enclose filing fee
3. If the space provided for any item(s) on the form is inadequate the item(s) should be continued on additional sheets, preferably 5″ x 8″ or 8″ x 12″. Only one copy of such additional sheets need be presented to the filing officer with a set of three copies of the financing statement. Long schedules of collateral, indentures, etc. may be on any size paper that is convenient for the secured party. Indicate the number of additional sheets attached
4. If collateral is crops or goods which are or are to become fixtures, describe generally the real estate and give name of record owner.
5. When a copy of the security agreement is used as a financing statement, it is requested that it be accompanied by a completed but unsigned set of these forms, without extra fee.
6. At the time of original filing, filing officer should return third copy as an acknowledgement. At a later time, secured party may date and sign Termination Legend and use third copy as a Termination Statement

This FINANCING STATEMENT is presented to a filing officer for filing pursuant to the Uniform Commercial Code:

| 1. Debtor(s) (Last Name First) and address(es) | 2. Secured Party(ies) and address(es) | For Filing Officer (Date, Time, Number, and Filing Office) |
|---|---|---|
| el Bobbins & Plastic Comp. | JSW Plastics Machinery Inc. | 3. Maturity date (if any): |
| 01 NAFTA Parkway Unit C | 3726 E. Miraloma Ave. | |
| ownsville, TX 78521 | Anaheim, CA 92806 | |
| Tax ID/Social Security No. | Tax ID/Social Security No. | |

This financing statement covers the following types (or items) of property:

E INJECTION MOLDING MACHINE WITH
CESORIES AND PARTS.
DEL: J500E2
S/N: 2-00712005481

5. Assignee(s) of Secured Party and Address(es)

This statement is filed without the debtor's signature to perfect a security interest in collateral (check ☒ if so)    Filed with:

☐ already subject to a security interest in another jurisdiction when it was brought into this state.
☐ which is proceeds of the original collateral described above in which a security interest was perfected.

Check ☒ if covered: ☐ Proceeds of Collateral are also covered. ☐ Products of Collateral are also covered. No. of additional Sheets presented:

By: _____  4/2/01      By: _____
    Signature(s) of Debtor(s)                Signature(s) of Secured Party(ies)

(1) Filing Officer Copy - Alphabetical      **STANDARD FORM - FORM UCC-1.**

EXHIBIT
3

**EXHIBIT "J"**

# REGAN • BRAUN
### L A W   O F F I C E S

IAMES J. REGAN, PARTNER
MICHAEL S. BRAUN, PARTNER
ALBERT CHANG
LORNE D. LILIENTHAL
SHEILA WALSH
GENE A. WILKER

2522 ARTESIA BOULEVARD, SUITE 200
REDONDO BEACH, CALIFORNIA 90278
TEL. (310) 372-1988
FAX: (310) 318-5894
E-MAIL : jregan@reganlaw.com
www.reganlaw.com

OF COUNSEL

ARTHUR W. FRANCIS, JR
A PROFESSIONAL CORPORATION
DONALD J. PRICHARD
FRANK D. RORIE

June 13, 2001


<u>VIA FAX: (956) 832-0811/U.S. MAIL</u>

Mr. Steven Becker, President
Exel Bobbins and Plastics Components, Inc.
3301 Nafta Parkway-Unit C
Brownsville, Texas 78521

      **Re:** **$133,000 Owed JSW Plastics Machinery, Inc.**
             **Purchase Order #98-1811**

Dear Mr. Becker:

    Please be advised that JSW Plastics Machinery, Inc. has retained this law firm to represent them with regard to monies owed by Excel Bobbins and Plastics Components to JSW Plastics Machinery, Inc. Please coordinate all further communications directly with this office. Please do not contact my clients as this matter is being handled by this office.

    It is my understanding that you purchased a 385P ton injection molding press from JSW Plastics Machinery, Inc. That press was delivered and payment was due, as extended, on or about April 20, 2001. The payment balance of $133,000 has not been paid since that date. Interest on that sum is increasing on a daily basis at the rate of $36.44 and through today's date, June 13, 2001, an additional sum of $1931.32 is owed.

    DEMAND IS HEREBY MADE that you immediately pay the sum of $134,931.32 owed as of June 13, 2001 with $36.44 per day to be added through the date that you actually make payment. You have fifteen (15) days, or to and including June 29, 2001 in which to make payment. Please make the check payable to JSW Plastics Machinery, Inc. and have same delivered to JSW Plastics Machinery, Inc.'s home office located at 3726 E. Miraloma Avenue Anaheim, California 92806.

    If you do not make a timely payment, please advise this office, no later than June 21, 2001, so that arrangements can be made for the immediate removal of the injection molding press.

Mr. Steven Becker, President
June 13, 2001
Page Two


Should you have any questions, please do not hesitate to contact me.

Sincerely,

JAMES J. REGAN

JJR:cm

c:    Mr. Fumio Hirayama (via fax)
       Mr. Jerry Johnson (via fax)

# *FAX COVER SHEET*

**Regan ♦ Braun Law Offices**
**2522 Artesia Boulevard**
**Suite 200**
**Redondo Beach, California 90278**

**(310) 372-1988 ○ Fax: (310) 318-5894**

This message is intended only for the person or firm to whom it is addressed. It is confidential and may contain privileged information. Any dissemination or copying of this message and/or attachments by others is prohibited by law. If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, please notify us immediately by telephone, and destroy this message and any attachments.

TO:        Mr. Steven Becker

FAX NO.:   (956) 832-0811

FROM:      James J. Regan, Esq.

DATE:      June 13, 2001

RE:        JSW-PMI / Purchase Order No. 98-1811

This transmission is _3_ pages, including this cover sheet. If you do not receive entire transmission, please contact our office at (310) 372-1988.

*Please call   Carmen    if there is any problem with the transmission.*

**Form 1120S**

Department of the Treasury
Internal Revenue Service

## U.S. Income Tax Return for an S Corporation

► Do not file this form unless the corporation has timely filed
Form 2553 to elect to be an S corporation.
► See separate instructions.

OMB No 1545-0130

**2001**

For calendar year 2001 or tax year beginning _____ , 2001, and ending _____ , 20 ___

| | |
|---|---|
| A Effective date of election as S corp **01/01/2000** | |
| B Business code no (see instructions) **326100** | |

Use IRS label. Other wise print type

Number, street, room/suite no    City/town, state, & ZIP code
**BOBBINS AND PLASTIC COMPONENTS**
**. NAFTA PARKWAY UNIT C**
**.NSVILLE TX 78521**

C Employer Identification no.
**74-2940319**

D Date incorporated
**12/06/1999**

E Total assets (see instructions)
$ **86,786.**

F Check applicable boxes      . return   (2) ☐ Final return  (3) ☐ Name change  (4) ☐ Address change  (5) ☐ Amended return

G Enter number of shareholders ................................................ ►

Caution. Include only trade ... income and expenses on lines 1a through 21. See the instructions for more information

| | | | |
|---|---|---|---|
| I N C O M E | 1a Gross receipts or ... | 1a | |
| | b Less returns and allowances | | Bal ► 1c **1,007,758** |
| | 2 Cost of goods sold ... ine 8) | 2 | **410,024.** |
| | 3 Gross profit Subtrac ... line 1c | 3 | **597,734.** |
| | 4 Net gain (loss) from ... r ... line 18 (attach Form 4797) | 4 | |
| | 5 Other income (loss) ... le) | 5 | |
| | 6 Total income (loss) ... lines 3 through 5 ► | 6 | **597,734.** |
| D E D U C T I O N S | 7 Compensation of offic ... | 7 | |
| | 8 Salaries and wages ... credits) | 8 | **159,436.** |
| | 9 Repairs and mainten ... | 9 | **10,502.** |
| | 10 Bad debts | 10 | |
| | 11 Rents | 11 | **63,900.** |
| | 12 Taxes and licenses | 12 | **18,377.** |
| | 13 Interest | 13 | |
| | 14a Depreciation (if requ ... m 4562) | 14a | |
| | b Depreciation claimed ... and elsewhere on return | 14b | |
| | c Subtract line 14b fro ... | 14c | |
| | 15 Depletion (Do not de ... r gas depletion ) | 15 | |
| | 16 Advertising | 16 | |
| | 17 Pension profit shari ... | 17 | |
| | 18 Employee benefit pro ... | 18 | **348.** |
| | 19 Other deductions (atte ... | 19 | **290,052.** |
| | 20 Total deductions ... shown in the far right column for lines 7 through 19 ► | 20 | **542,515.** |
| | 21 Ordinary income (loss) ... business activities Subtract line 20 from line 6 | 21 | **55,119.** |
| T A X A N D P A Y M E N T S | 22 Tax a Excess net ... | 22a | |
| | b Tax from Schedule D ... ax (attach schedule). | 22b | |
| | c Add lines 22a and 22 ... ctions for additional taxes) | 22c | |
| | 23 Payments a 2001 es ... ts & amount applied from 2000 rtn | 23a | |
| | b Tax deposited with Fo ... | 23b | |
| | c Credit for Federal tax ... attach Form 4136) | 23c | |
| | d Add lines 23a through ... | 23d | |
| | 24 Estimated tax penalty ... 2220 is attached ► | 24 | |
| | 25 Tax due If the total of ... line 24 is larger than line 23d enter amount owed  See the instructions for deposit ... t payment ► | 25 | |
| | 26 Overpayment If line ... than the total of lines 22c and 24 enter amount overpaid ► | 26 | |
| | 27 Enter amount of line 26 ... Credited to 2002 est tax ►     Refunded ► | 27 | |

Under penalties of per ... belief it is true ... ... ave examined this return, including accompanying schedules and statements, and to the best of my knowledge and ... ration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge)

**Sign Here** ►

Signature of officer      Date      Title

May the IRS discuss this return with the preparer shown below See inst ? ☒ Yes ☐ No

**Paid Preparer's Use Only**

Preparer's signature ►  _[signature]_   Date **07/31/2002**   Check if self-employed ☐

Firm's name (or yours if self employed) address and ZIP

... ZBERT YOUNKER COMPANY PC
.70 GOVERNORS HWY STE 308
.YMPIA FIELDS IL 60461-1067

Preparer's SSN or PTIN **P00040226**

EIN **36-2925106**

Phone no **708-747-0258**

For Paperwork Reduction Act N ... he separate instructions.

CAA    1  1120S12

CLIENT'S COPY

... 2001 Greatland/Nelco .. Forms Software Only    Form **1120S** (2001)

ANSMISSION VERIFICATION REPORT

TIME : 06/13/2001 16:50

| | |
|---|---|
| DATE,TIME | 06/13 16:49 |
| FAX NO./NAME | 919568320811 |
| DURATION | 00:01:17 |
| PAGE(S) | 03 |
| RESULT | OK |
| MODE | STANDARD |

**EXHIBIT "K"**

**Form 1120S**

**U.S. Income Tax Return for an S Corporation**

OMB No. 1545-0130

**2000**

Department of the Treasury
Internal Revenue Service

▶ Do not file this form unless the corporation has timely filed
Form 2553 to elect to be an S corporation.
▶ See separate Instructions.

For calendar year 2000, or tax year beginning _____ , 2000, & ending _____ , 20 _____

| | | |
|---|---|---|
| **A** Effective date of election as S corp<br>01/01/2000 | Use<br>IRS<br>label.<br>Other-<br>wise,<br>print or<br>type. | **Name**  Number, street, room/suite no    City/town, state, & ZIP code<br>EXEL BOBBINS AND PLASTIC COMPONENTS<br><br>3301 NAFTA PARKWAY UNIT C<br>BROWNSVILLE TX 78521- |
| **B** Business code no.<br>(see instructions)<br>326100 | | |

**C** Employer identification no.
74-2940319

**D** Date incorporated
12/06/1999

**E** Total assets (see instructions)
$ 20,669.

**F** Check applicable boxes: (1) ☐ Initial return  (2) ☐ Final return  (3) ☒ Change in address  (4) ☐ Amended return

**G** Enter number of shareholders in the corporation at the end of the tax year ............................................ ▶ 2

Caution: Include only trade or business income and expenses on lines 1a through 21. See the instructions for more information.

Nov +
Dec
Only
Started
in 1

| | | | |
|---|---|---|---|
| **I N C O M E** | **1a** Gross receipts or sales | 124,384. | **b** Less returns and allowances | C Bal ▶ | **1c** | 124,384. |

| | | |
|---|---|---|
| **2** Cost of goods sold (Schedule A, line 8) | **2** | 85,838. |
| **3** Gross profit. Subtract line 2 from line 1c | **3** | 38,546. |
| **4** Net gain (loss) from Form 4797, Part II, line 18 (attach Form 4797) | **4** | |
| **5** Other income (loss) (attach schedule) | **5** | |
| **6** Total income (loss). Combine lines 3 through 5 ▶ | **6** | 38,546. |

**DEDUCTIONS (SEE INSTRUCTIONS) FOR LIMITATIONS**

| | | |
|---|---|---|
| **7** Compensation of officers | **7** | |
| **8** Salaries and wages (less employment credits) | **8** | |
| **9** Repairs and maintenance | **9** | 5,128. |
| **10** Bad debts | **10** | |
| **11** Rents | **11** | 8,259. |
| **12** Taxes and licenses | **12** | |
| **13** Interest | **13** | |
| **14a** Depreciation (if required, attach Form 4562) | **14a** | |
| **b** Depreciation claimed on Schedule A and elsewhere on return | **14b** | |
| **c** Subtract line 14b from line 14a | **14c** | |
| **15** Depletion (Do not deduct oil and gas depletion.) | **15** | |
| **16** Advertising | **16** | |
| **17** Pension, profit-sharing, etc., plans | **17** | |
| **18** Employee benefit programs | **18** | |
| **19** Other deductions (attach schedule) | **19** | 98,288. |
| **20** Total deductions. Add the amounts shown in the far right column for lines 7 through 19 ▶ | **20** | 111,675. |
| **21** Ordinary income (loss) from trade or business activities. Subtract line 20 from line 6 | **21** | (73,129.) |

**TAX AND PAYMENTS**

| | | |
|---|---|---|
| **22** Tax: **a** Excess net passive income tax (attach schedule) | **22a** | |
| **b** Tax from Schedule D (Form 1120S) | **22b** | |
| **c** Add lines 22a and 22b (see the instructions for additional taxes) | **22c** | |
| **23** Payments: **a** 2000 est. tax payments & amount applied from 1999 rtn. | **23a** | |
| **b** Tax deposited with Form 7004 | **23b** | |
| **c** Credit for Federal tax paid on fuels (attach Form 4136) | **23c** | |
| **d** Add lines 23a through 23c | **23d** | |
| **24** Estimated tax penalty. Check if Form 2220 is attached ▶ ☐ | **24** | |
| **25** Tax due. If the total of lines 22c and 24 is larger than line 23d, enter amount owed. See the<br>instructions for depository method of payment ▶ | **25** | |
| **26** Overpayment. If line 23d is larger than the total of lines 22c and 24, enter amount overpaid ▶ | **26** | |
| **27** Enter amount of line 26 you want **Credited to 2001 est. tax** ▶ _____ **Refunded** ▶ | **27** | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge

X _____    X 5/7/01    X PRES.
Signature of officer    Date    Title

**Paid Preparer's Use Only**

| | | |
|---|---|---|
| Preparer's<br>signature | *Gary Younker* | Date<br>04/02/2001 | Check if self-<br>employed ☐ | Preparer's SSN or PTIN<br>P00040226 |
| Firm's name (or<br>yours if self-employed),<br>address, and ZIP code | COLBERT YOUNKER & COMPANY<br>20180 GOVERNORS HWY STE 308<br>OLYMPIA FIELDS IL 60461-1067 | EIN  36-2925106<br>Phone no.  708-747-0258 |

For Paperwork Reduction Act Notice, see the separate instructions.

Form **1120S** (2000)

CAA    0  1120S12    NTF 32567    Copyright 2000 Greatland/Nelco LP - Forms Software Only