IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

MAR 2 6 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| EXEL BOBBINS AND PLASTIC COMPONENTS, INC., | § § § | CIVIL ACTION No. B-01-148 |
| Plaintiff, | § § § | [Assigned to the Hon. Hilda G. Tagle Stipulated to Magistrate Felix Recio] |
| vs. | § § | |
| JSW PLASTICS MACHINERY, INC., | § § | |
| Defendant. | § § § § | |

---

### DEFENDANT'S MOTION *IN LIMINE* NO. 1
**TO EXCLUDE PROPOSED EXPERT TESTIMONY OF WILLIAM B. ABINGTON REGARDING LOST PROFITS DAMAGES UNLESS AND UNTIL THE RELIABILITY OF THE DATA AND METHODOLOGY USED TO REACH HIS CONCLUSIONS HAS FIRST BEEN ESTABLISHED BY PLAINTIFF; MEMORANDUM OF POINTS AND AUTHORITIES; AFFIDAVIT OF DAVID C. GARZA**

---

## I. INTRODUCTION

Defendant JSW Plastics Machinery, Inc. ("Defendant" or "JSW-PMI") hereby moves this

Court for an order *in limine* excluding the testimony of William B. Abington, C.P.A.

("Abington"), the expert accounting witness designated by Plaintiff Exel Bobbins and Plastic

Machinery, Inc.'s ("Plaintiff" or "Exel Bobbins") on the grounds that unless and until the data

and  methodology utilized by Abington to reach his conclusions has first been established by

1
**Defendant's Motion *in Limine* No. 1**

C:\dcg\cfJSW\Motion-in-Limine1

Plaintiff as a valid and accepted methodology in the field of accounting and the data utilized by Abington is shown to have been reliable, such testimony is irrelevant and unreliable and should be excluded. This motion is brought pursuant to the provisions of Rules 702 and 703, Federal Rules of Evidence. Defendant requests that the Court hold a pre-trial evidentiary hearing to determine the admissibility of Abington's expert testimony. (*Goebel v. Denver & Rio Grande Western R.R.*, 215 F.3d 1083, 1087 (10th Cir. 2000) ("[t]he most common method for fulfilling this function [of gatekeeper] is a *Daubert* hearing"); *Pride v. BIC Corp.*, 218 F.3d 566, 569-574 (6th Cir. 2000) (trial court properly excluded expert testimony after pretrial evidentiary hearing).

## II.  MEMORANDUM OF POINTS AND AUTHORITIES

### 1.  Factual Background

Exel Bobbins commenced operation of a custom plastic molding enterprise in Brownsville, Texas, in October 2000. Exel Bobbins alleges JSW-PMI, which sells plastic injection molding machines of the type used in an enterprise such as that begun by Exel Bobbins, breached an agreement to provided Exel Bobbins with a line of credit by withdrawing the line of credit in March 2001. As a result of the withdrawal of the line of credit, Exel Bobbins alleges that it could not acquire plastic injection molding machines from JSW-PMI in sufficient numbers to satisfy customer orders and thereby suffered damages, among them lost profits damages an amount which Exel Bobbins contends exceed $8 million.

Exel Bobbins has designated Abington as their expert to analyze lost profits. Abington's deposition was taken by JSW-PMI on March 4,2003 ("Abington Depo.") and at his deposition Abington produced his report dated March 4,2003 entitled "Preliminary Expert Report of

William B. Abington.". (Abington Depo.), 54/24 - 55/3)[1] (*See* excerpts from the Abington Depo, Exhibit "A" to Affidavit of David C. Garza attached hereto.)    Although Exel Bobbins was an admitted start-up company with almost no cash (Abington Depo., 126/6-10; 127/13-22) and with no history of profits as of the time of the alleged breach, Abington testified that as a result of the alleged breach by JSW-PMI, Exel Bobbins has and will suffer a  net loss of revenue in the sum of $33,565,257 and net lost profits of $10,653,098 (discounted to $8,712,521), over a five year period. (Abington Depo., 15/9-13; 89/24 - 90/8.)  JSW-PMI contends that, to the contrary, the evidence shows that during its start-up period, Exel had no profits, instead  generating revenues of $508,814.59 and a negative net profit of $29,188.37, resulting in a loss.

Abington's general credentials as an expert in accounting are not in question in this motion.  What is in question are his lack of experience in the custom plastic injection molding business, the reliability of the factual data utilized by Abington and the validity of the computerized model used by him to analyze this data.   The following summarizes the questionable basis for Abington's expert testimony in this case:

A.  <u>Lack of experience in the relevant industry</u>

1.    Abington has never done a financial analysis of a custom molder and doesn't know if anyone on his staff has either. (Abington Depo., 55/13-19; 150/4-8)

2.    Abington only spoke with Steve Becker (one of the owners of Plaintiff Exel Bobbins) and Dr. Wayne Wells, another Plaintiff expert, about the custom molding industry, and Abington doesn't know if anyone on his staff spoke to anyone other than Becker and Dr. Wells about this industry and he did not see any memos or e-mails from his staff

---

[1]  References are to page/line of the relevant deposition.

regarding any communications they may have had with anyone other than Becker and Dr. Wells regarding the custom molding industry. (Abington Depo., 66/7-21)

**B.  Data**

2.    Abington utilized requests for quotations ("RFQ") from Sunbeam-Oster to "drive our model" regarding lost profits, not actual purchase orders issued by Sunbeam-Oster to Exel, as a basis for estimating lost sales and Abington assumed that it was "likely" that Sunbeam would have granted to Exel *all* of the business for which it requested RFQs from Exel and that Exel would have continued to have been granted such business by Sunbeam-Oster into the future in the same quantities stated in the RFQs, even though Abington (a) assumes bidding was highly competitive, (b) acknowledges that Sunbeam may have granted its business to producers other than Exel, (c) thinks that entities other then Exel in fact do manufacture products for Sunbeam-Oster, (d) concedes that there was no long term contract between Exel and Sunbeam (which Abington states would have been highly unusual), (e) admits that he doesn't know how Sunbeam does all of their business, and (f) never had any communications with Sunbeam-Oster. (Abington Depo., 91/7-18; 93/3-17; 94/21-95/15; 96/2-12; 139/12 - 140/23; 141/11-15; 143/11-15; 156/11-13)

3.    Abington has not read the deposition of Steve Becker in its entirety, does not know how many pages of the deposition he did read and could not recall if he read a summary of the deposition prepared by a member of his staff.. (Abington Depo., 135-15; 51/14-18)

4

**Defendant's Motion *in Limine* No. 1**

4.    The electric utility cost of $716 per machine per month utilized by Abington to calculate Exel's costs is (a) a fixed utility expense for the entire Exel facility, not the actual per machine cost, Abington not having "burst out" the actual per machine cost, and (b) is based on Exel's reports of its utility costs and not the utility bills themselves, which Abington  admitted would be the best way to confirm such costs. (Abington Depo., 71/17-21; 72/25 - 74/21)

5.    Abington did not investigate or account for a potential increase in electric utility costs. (Abington Depo., 75/23 - 76/17)

6.    The Exel financial statements on which Abington relied for his analysis are unaudited statements and Abington only checked their accuracy by talking with Becker and Dr. Wells, examining the RFQs and using the Brownsville report regarding labor costs (Abington Depo, 74/22 - 75/10; 131/9-16; 132/2 - 133/7)

7.    Abington did not include in his data the costs of insurance for machines, freight costs associated with material costs, ad valorem taxes on the machines, the rejection rate of Exel-produced products, an examination of Exel's raw materials suppliers. (Abington Depo., 119/1-19; 155/14-21)

8.    Abington did not specifically analyze the general economic conditions or the economic conditions regarding the plastic injection molding business in Brownsville or Texas during the relevant time period. (Abington Depo., 150/9-19)

9.    Abington assumed Exel experienced increased operating costs and down time from using machines other than ones supplied by JSW-PMI, although he admits

**Defendant's Motion *in Limine* No. 1**

C:\dcg\c\JSW\Motion-in-Limine1

he has no documentation to support these conclusions and cannot quantify any such losses. (Abington Depo., 161/25 - 163/25)

C.    **Model used to analyze the data**

1.    The model used to calculate lost profits damages was built by Abington and his staff in-house specifically for this litigation. (Abington Depo., 23/15-25; 24/5-16; 37/25 - 38/5)

2.    The model was developed in a "piecemeal" fashion to accommodate data as it was accumulated. (Abington Depo., 20/4-18)

3.    The discount rate of 18% utilized for the model is not precise and is not an agreed upon rate for purposes of such an analysis. (Abington Depo., 116/1 - 117/3)

2.    **The Facts And Data Relied Upon By Abington Are Unsubstantiated Assumptions**

The case law under Rule 703 makes it clear that experts may not rely on unsubstantiated facts, data or assumptions. (4 Weinstein's Federal Evidence (2d Ed.), §703.04[4]; *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 51-52 (trial court erred in admitting expert testimony based on unsubstantiated assumptions regarding increases in decedent's income); *Guillory v. Domtar Indus., Inc.*, 95 F.2d 1320, 1331 (5th Cir. 1996)(Rule 703 does not require a court to admits expert opinion based on facts that are indisputably wrong); *United States v. City of Miami, Fla.*, 115 F.3d 870, 873 (11th Cir. 1997)(opinions derived from erroneous data are appropriately excluded.).

As summarized above, Abington's lost profits calculation is predicated entirely on the data contained in RFQs.  Abington testified as follows:

Q.            "Okay.  Does your lost profits opinion here assume that Exel would have gotten all the business from Sunbeam that's reflected on the RFQ's?

6

**Defendant's Motion *in Limine* No. 1**

A.          It assumes for these particular products that are listed that *they would have gotten this business from Sunbeam.*

Q.          Does your Binder C reflect whether that's a hundred percent of that business into the future or 90 percent or 80 percent?

A.          Yes.

Q.          Do you recall what it — does it project different amounts for different products?

A.          No. *It assumes that the amounts that are contained on the RFQ would actually be produced by Exel Bobbins.*

Q.          So all the RFQ's that are there, you are projecting that they would have gotten all of that business?

A.          For these particular products for the quantities that are listed on the RFQ's.

Q.          And extrapolating that into the future, they would have gotten each year that same quantity or whatever for a certain period of time?

A.          Yes."

(Abington Depo., 139/12 – 140/7) (Emphasis added)

RFQ's are merely solicitations for price quotations from a supplier and do not constitute orders, commitments for orders or even promises of orders. Abington's assumption that Exel Bobbins would have acquired all of the business from Sunbeam-Oster for which RFQs were requested is nothing more than mere speculation regarding such business. More egregiously, Abington's assumption is entirely inconsistent with what actually happened. Plaintiff's own Steve Becker, an owner of Exel Bobbins, testified that in actual practice, only three out of seven Sunbeam-Oster RFQs issued to Exel Bobbins actually materialized into purchase orders. (Deposition of Steve Becker taken April 4, 2002, 206/7-9, Exhibit "B" to Garza Affidavit.)

In *National Corp. v. National Semiconductor Corp.,* 833 F.2d 491 (3rd Cir. 1987), the Court vacated an award for loss of profits based on the theory that one of the plaintiff's customers would have purchased certain products from plaintiff, stating: "[D]amages sought must be a proximate consequence of the breach, not merely remote or possible...An award of lost profits required speculation by the jury on the likelihood that, absent [defendant's] breaches, [a

third party] would have proceeded with the product and on the likelihood that the [the third party] would have chosen [plaintiff] as a supplier." (*Id.*, at 496, 498.) In *Advent Systems Limited v. Unisys Corporation*, 925 F.2d 670, 681-82 (3rd Cir. 1991)[2], the court, in considering the testimony of the plaintiff's expert witness on the issue of lost profits, remanded the breach of contract claim so that a hearing under Rule 703 could be conducted to evaluate the reliability of the expert's testimony where the appellate court found that the expert's testimony regarding the plaintiff's efforts to sell "new products in which [plaintiff] had high hopes, but little, if any, share" may have been based on predicted sales extrapolated from false assumptions, "rosy predictions" and speculation rather than available data based on actual performance.

Abington's assumption that Exel Bobbins would have acquired all of the Sunbeam-Oster work set forth in the RFQs, not only in the past but into the future on the same terms, is just that, an assumption, based, as the court in *Advent* put it, on "rosy predictions." This is not the stuff of which expert testimony should be made or permitted and Defendant respectfully requests that Abington's testimony, to the extent it is based on such assumptions, be excluded.

3.    **The Data On Which Abington Relied Was Informal And Is Unreliable**

Abington testified that many of facts on which he relied were relayed to him informally by his staff and without any memorialization of those communications. For example, Abington said his staff, including Victor Stai, a manager at PricewaterhouseCooper, visited the Exel Bobbins plant, not Abington, and that neither Stai nor any of the staff provided Abington with

---

[2] The *Advent* court considered Pennsylvania law which, like Texas law, allowed the recovery of lost profits damages in a contract action if there was evidence to establish such damages with reasonable certainty, they were the proximate consequence of the wrong and they were reasonably foreseeable. Also like the law of Texas, Pennsylvania "has been skeptical of claims fore loss of profits by a 'new and untried business.' [citations]."(925 F.2d at 680).

any photographs or written reports of their observation and that Stai only gave him a verbal report. (Abington Depo., 28/10-15; 39/25 - 40/14)  The foregoing is consistent with the team's conduct throughout its engagement, Abington having testified as follows:

> A.    "Q.    What about the team: Do you all have e-mails and letters in between each other, memos in between each other dealing with this particular assignment?Rarely do we have anything like that.  And I can't remember anything on this assignment that would fit that.
> Q.    For example, if you are communicating with Mr. Stai on matters dealing with this particular assignment, would it be your normal practice to send him an e-mail or for him to send you an e-mail and say, 'I just came back from visiting Exel Bobbins plant in Brownsville, this is what I observed'?  Would you have anything like that?
> A.    No. That would not be the normal practice. " (Abington Depo., 48/4-16)

In *Soden v. Freightliner Corporation*, 714 F.2d 498 (5th Cir. 1983), the court, in affirming the trial court's exclusion of expert testimony under Rule 703, based its decision in part on what the court characterized as the "*extremely* informal" nature of the material on which the expert relied, namely a two-page letter summary of defendant's documents  prepared by one of the defendant's employees and a follow-up telephone conversation between the employee and the expert which telephone conversation was  never memorialized other than by a notation by the expert on the letter summary. This informality was referred to by the court in *Soden* as a factor which "suggested weaknesses in the reliability of Hutton's [the expert's] statistics." (*Soden*, 714 F.2d at 503-04.)(Emphasis in original) As noted above, Abington consistently relied on third party impressions which were not memorialized in any way.

3.    **Plaintiff Must Establish That The Proposed Expert Testimony Of Abington Is Reliable and Relevant As Determined By The Court in its Role as Evidentiary "Gatekeeper"And In The Absence Of Such A Showing Abington's Testimony Should Be Excluded**

Rule 702 of the Federal Rules of Evidence provides that an expert may testify in the form of an opinion or otherwise if "(1) the testimony is based upon sufficient facts or data, (2) the testimony if the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." In evaluating the reliability and relevance of expert testimony under Rule 702, the court must act as a reliability "gatekeeper" under the principles enunciated in *Daubert vs. Merrill- Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The evidentiary gatekeeping principles established by *Daubert*, which concerned scientific testimony, have been held to be applicable to all expert testimony under Rule 702. (*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 149, 119 S.Ct. 1167, 1174, 143 L.Ed.2d 288 (1993).)

The court in *Daubert* listed several non-definitive factors bearing on a judge's gatekeeping function: (1) Whether the theory or technique that serves as the basis for the proposed expert testimony can be or has been tested; (2) Whether the theory or technique has been published and subjected to peer review; (3) The known or potential rate of error experienced in the application of the particular technique; (4) The existence of standards or controls for the application of the technique the witness has applied in arriving at his or her opinion, and whether the witness applied those standards and controls in the specific application of the technique; and, (5) whether the theory or technique is generally accepted in a definable relevant community of experts. (*Daubert*, supra, 509 U.S. at 592, 593). Other factors may be considered by the court, which "must have considerable leeway in determining in a particular case how to go about determining whether particular expert testimony is reliable. (*Kumho*, supra, 526 U.S. at 152; 119 S.Ct. 1176.)

**Defendant's Motion *in Limine* No. 1**

C:\dcg\c\JSW\Motion-in-Limine1

A.    **Abington's Computer Model, Developed Specifically For This Litigation,  Has Not Been Tested Or Subjected To Peer Review, Has Not Been Published And Has Not Otherwise Been Accepted In The Accounting Community**

Abington testified that he arrived at his opinions in this case by utilizing a modeling program created by himself and/or employees in his firm based on Excel software:

> "Q.    Is there a particular type of accounting program or computer type program that would be used to develop the type of model that you used to come up with your conclusions or opinions in this case?
> A.    We did use a program, but it's not - we built our model with a program.
> Q.    Is there a name for this program?
> A.    This model was built in Excel software.
> Q.    Is there any additional name or way to identify that particular software?
> A.    No..."
>
> * * *
>
> Q.    ...Is there a model that accountants such as you would go to, to Excel software, that says this is a model that you use to develop in coming up with an analysis for lost profits?
> A.    No.  *We built a discounted cash flow model tailored specifically for this particular matter.*
> Q.    But that's something that you developed in-house here yourself, that not a program that I could go buy, you know, Excel software, and plug in the same numbers?
> A.    You are correct. *We developed that in-house.*
>
> * * *
>
> Q.    What about the computer-type person?  Are the people who are the team the ones that input the information into the computers, the programs for Excel software, or is that somebody else handling all that?
> A.    No.  The team put the whole model together, including building the model and entering the data.
>
> * * *
>
> Q.    My question is: To get this final model that's reflected on Exhibit 11, or the figures that are there, were there other models that either were discarded or were figures changed to get to this final Exhibit Number 11?
> A.    This is the model, you know, period. *There are no other models.* As we build the model — any time you build a model such as this, *you build it in a piecemeal fashion.* By that, I mean you go ahead and you set the model up and then you insert the data that you have at that time. Then as you get more data, you insert that data. Then as you get more data that you are needing for the model, you insert

11

**Defendant's Motion *in Limine* No. 1**

that data. So that's what I mean that it is an iterative process when you prepare a
model. I never did come up with a draft model that was a final draft model and
look at it and throw that model away."
(Abington Depo., 20/4-18; 23/15-25; 24/5-16; 37/25-38/5)

The use of the referred to software modeling program was not disclosed in the Plaintiff's

expert witness disclosure nor in Abington's Preliminary Report dated March 4, 2003, a report

which was produced the day of his deposition.  Defendant has therefore not had the opportunity,

either by deposition or by examination of Abington's self-developed program by Defendant's

own expert, to explore the validity and reliability of the software model developed and used by

Abington.  In the absence of evidence regarding the underlying computer modeling program, it

cannot be established that this program is consistent with generally accepted methods used to

gather and analyze evidence in the expert's discipline. *(Daubert*, supra. 509 U.S. 579. at 594, 113

S.Ct. at 2797; *Barun v. Lorillard Inc.*, 84 F.3d 230, 235 (7th Cir. 1996).)

The economic model developed by the Abington group was built in-house specifically for

this litigation. There is no evidence that this recently developed economic model, admittedly

unique to the plaintiff's case, has had any exposure to peer review in the relevant economic

community.

A.          **The Potential Error Rate In Abington's Technique Renders The Results**
          **Unreliable**

Mr. Abington opined as to the potential of error and/or reasonable probability in the

accuracy of the model as follows:

"Q:     Are all your opinions here on the lost profits based on reasonable probability?
A:      I think they are all reasonable.
Q:      Are they based on reasonable probability?
A:      Yes.  If you ---- all of the calculations that I have made are reasonable probability,
        considering the discount rate as well.

12

**Defendant's Motion *in Limine* No. 1**

A:     Yes. If you ---- all of the calculations that I have made are reasonable probability, considering the discount rate as well.

Q:     Do you believe that all those figures that you've done there are based on a reasonable degree of certainty and exactness?

A:     Not exactness. *They are not exact.* That is the whole point about future. the reasonableness is the key. And I'm not sure if you are trying to attach reasonableness to exact or not. But if you say that they are reasonably accurate, then the answer is they are reasonable. *Are they exact? They cannot be exact.*

Q:     Are they within a reasonable degree of certainty and exactness?

A:     They are within a reasonable degree of certainty and a reasonable degree of exactness.

Q:     And what objective facts, figures or data were used by you to ascertain these figures? Everything we've been discussing so far?

A:     Everything that we've been discussing so far.

Q:     The request for quotations [3] at Sunbeam that you reviewed, correct?

A:     Yes.

Q:     And on the expenses, if I walked you through the different expenses, you've gotten information from Mr. Wells or Mr. Becker or documents on material cost, labor, electricity and so forth, right?

A:     Yes, and the financial statements as well.

Q:     And so the objective facts, figures or data that you used to ascertain your calculation of the expenses are based on your conversations with those individuals and the information that's going to appear in all these binders here?

A:     Yes.

Q:     What you have not done is made any independent audit of any of the financial numbers that have been given to you by Mr. Becker, is that correct?

A:     No. You would never do an independent audit in a situation like this."
(Abington Depo., 130/10 - 132/1)


In regard to his utilization of an 18% discount rate, Abington testified:

Q:     "So what you are telling me is that if the 18 percent, if you are looking back five, six years from now the 18 percent was accurate, then the 33 million would be the revenue that you project? I'm just truing to make sure that the 18 percent you are telling me is already calculated into the revenue or it's not the revenue?

A:     Well, the 18 percent is — the 18 percent is a discount off of net lost profits. Net lost profits is a result of revenue minus expenses. So, really, the discount rate encompasses the entire model.
(Abington Depo., 111/5-14)

---

[3] *See* Section II.2, above.

**Defendant's Motion *in Limine* No. 1**

Q:          ...Does it take into consideration — does your model, then, your 18 percent, somehow stay if there's a strike? That's somehow covered by the 18 percent discount?

A:          Well, the 18 percent discount rate — and I'm really trying to explain it to you the best way that I can.

Q:          And I'm trying to understand it the best way I can.

A:          Okay. *The 18 percent is not an exact science. That's why I said that you can get eight people, ten people and get ten different answers.* If they are experienced, eight of them are going to cluster anyway within a relevant range. I believe. And so you don't go through and, like, specifically look at every particular circumstance that could happen. The world could end. But you can't look at every particular circumstance. *That is purely hypothetical. 99 percent of which will never happen.* We all hope the world doesn't end tomorrow. So you consider all of the factors that could cause the model or the projection not to play our exactly as you have modeled it.

And so you then determine a discount rate, and some of it depends on how far out in the future you go. If you go fifteen years out in the future, perhaps the higher discount rate should be applied, because the longer out in the future that you go, the more element of risk that you are assuming that you r model will actually not come to fruition. So you can't really look at any particular one risk item, a war with Iraq may occur, prices may go down. You can't ascribe a particular amount to any one factor. So you really just look at things in total."

(Abington Depo., pg. 116/1 - 117/3) (Emphasis added)

## III.   CONCLUSION

For all of the foregoing reasons, Defendant JSW-PMI respectfully requests that the Court issue an order precluding any testimony at trial by William Abington regarding Plaintiff's lost profits until Plaintiff has first established by admissible evidence that Abington's testimony is the product of reliable data, principles and methods.

Dated: March 26, 2003.

                                        Respectfully submitted,
                                        **JSW PLASTICS MACHINERY, INC.,**
                                        Defendant

                    By:     _____
                                        DAVID C. GARZA,
                                        State Bar ID No. 0731400
                                        FEDERAL ID #3778
                                        GARZA & GARZA, L.L.P.

680 East St. Charles, Suite 300
P.O. Box 2025
Brownsville, Texas 78522-2025
Tel:  (956) 541-4914; Fax: (956) 542-7403
Attorney-in-Charge for JSW Plastics
Machinery, Inc.

JAMES J. REGAN
CAL. SBN 80576
REGAN ◆ BRAUN LAW OFFICES
2522 Artesia Boulevard, Suite 200
Redondo Beach, California 90278
Tel:  (310) 372-1988; Fax: (310) 318-5894

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

|  |  |  |
|---|---|---|
| EXEL BOBBINS AND PLASTIC COMPONENTS, INC., | § § § § | CIVIL ACTION No. B-01-148 |
| Plaintiff, | § § | [Assigned to the Hon. Hilda G. Tagle Stipulated to Magistrate Felix Recio] |
| vs. | § § | |
| JSW PLASTICS MACHINERY, INC., | § § | |
| Defendant. | § § | |

---

## AFFIDAVIT OF DAVID C. GARZA IN SUPPORT OF DEFENDANT JSW PLASTICS MACHINERY, INC.'S MOTION *IN LIMINE* NO. 1 TO EXCLUDE PROPOSED EXPERT TESTIMONY OF WILLIAM B. ABINGTON REGARDING LOST PROFITS DAMAGES UNLESS AND UNTIL THE RELIABILITY OF THE METHODOLOGY USED TO REACH HIS CONCLUSIONS HAS FIRST BEEN ESTABLISHED BY PLAINTIFF

---

| | |
|---|---|
| STATE OF TEXAS | § § |
| COUNTY OF CAMERON | § |

BEFORE ME, the undersigned authority, on this day personally appeared DAVID C. GARZA, known to me to be the person whose name is subscribed below, who, upon being duly sworn and under oath, did depose and state:

1 -    My name is *DAVID C. GARZA*.

2 -    I am over the age of twenty-one (21) years and am qualified in all respects to make this Affidavit.

AFFIDAVIT OF DAVID C. GARZA IN SUPPORT OF DEFENDANT JSW PLASTICS MACHINERY, INC.'S MOTION *IN LIMINE* NO. 1 TO EXCLUDE PROPOSED EXPERT TESTIMONY OF WILLIAM B. ABINGTON     PAGE 1

c:/dcg/cl/jsw/aff-dcg-mot-limine1

3 -     I have never been convicted of a felony or any other crime.

4 -     I am fully competent to make this affidavit.

5 -     I am the attorney in the above captioned matter representing the Defendant JSW PLASTICS MACHINERY, INC.

6 -     I hereby certify that the copies attached to this affidavit are true and correct copies of excerpts from the deposition of WILLIAM ABINGTON taken on March 4, 2003 taken in this case, and more particularly the following:

    (a)     The cover pages with appearances and index, signature page, reporter's certification page, and excerpts of the deposition of the WILLIAM ABINGTON taken on March 4, 2003.

    (b)     The excerpts are found as follows:

        (1)     pages 1 through 5;

        (2)     page 15, lines 9 through 13;

        (3)     page 20, lines 4 through 18;

        (4)     page 23, lines 15 through 25;

        (5)     page 24, lines 5 through 16;

        (6)     page 28, lines 10 through 15;

        (7)     page 37, line 25;

        (8)     page 38, lines 1 through 5;

        (9)     page 39, line 25;

        (10)    page 40, lines 1 through 14;

        (11)    page 48, lines 4 through 16;

        (12)    page 51, lines 14 through 18;

        (13)    page 54, lines 24 and 25;

(14)    page 55, lines 1 through 3; and lines 13 through 19;

(15)    page 66, lines 7 through 21;

(16)    page 71, lines 17 through 21;

(17)    page 72, line 25;

(18)    page 73, lines 1 through 25;

(19)    page 74, lines 1 through 21; and lines 22 through 25;

(20)    page 75, lines 23 through 25; and lines 1 through 10;

(21)    page 76, lines 1 through 17;

(22)    page 89, lines 24 and 25;

(23)    page 90, lines 1 through 8;

(24)    page 91, lines 7 through 18;

(25)    page 93, lines 3 through 17;

(26)    page 94, lines 21 through 25;

(27)    page 95, lines 1 through 15;

(28)    page 96, lines 2 through 12;

(29)    page 111, lines 5 through 14;

(30)    page 116, lines 1 through 25;

(31)    page 117, lines 1 through 3;

(32)    page 119, lines 1 through 19;

(33)    page 126, lines 6 through 10;

(34)    page 127, lines 13 through 22;

(35)    page 130, lines 10 through 25;

AFFIDAVIT OF DAVID C. GARZA IN SUPPORT OF DEFENDANT JSW PLASTICS MACHINERY,
INC.'S MOTION *IN LIMINE* NO. 1 TO EXCLUDE PROPOSED EXPERT TESTIMONY OF WILLIAM B. ABINGTON        PAGE 3

c:/dcg/cl/jew/aff-dcg-mot-limine1

(36)   page 131, lines 9 through 16; and 1 through 25;

(37)   page 132, lines 2 through 25; and line 1;

(38)   page 133, lines 1 through 7;

(39)   page 135, line 15;

(40)   page 139, lines 12 through 25;

(41)   page 140, lines 1 through 23;

(42)   page 141, lines 11 through 15;

(43)   page 143, lines 11 through 15;

(44)   page 150, lines 4 through 8; and lines 9 through 19;

(45)   page 155, lines 14 through 21;

(46)   page 156, lines 11 through 13;

(47)   page 161, line 25;

(48)   page 162, lines 1 through 25;

(49)   page 163, lines 1 through 25;

(50)   pages 166 through 169.

7 -    I hereby certify that the copies attached to this affidavit are true and correct copies of excerpts from the deposition of STEVE BECKER taken on April 4, 2002 taken in this case, and more particularly the following:

(a)    The cover pages with appearances and index, signature page, reporter's certification page, and excerpts of the deposition of the STEVE BECKER taken on April 4, 2002.

(b)    The excerpts are found as follows:

(1)    pages 1 through 4;

(2)    page 206, lines 7 through 9;

AFFIDAVIT OF DAVID C. GARZA IN SUPPORT OF DEFENDANT JSW PLASTICS MACHINERY, INC.'S MOTION *IN LIMINE* NO. 1 TO EXCLUDE PROPOSED EXPERT TESTIMONY OF WILLIAM B. ABINGTON          PAGE 4

c:/dcg/cl/jew/aff-dcg-mot-limine1

   (3)     pages 266 through 275.


     FURTHER AFFIANT SAYETH NOT.

                                     *DAVID C. GARZA*

     SWORN TO AND SUBSCRIBED before me by *DAVID C. GARZA* on this the 26th day of March 2003.

                                  Notary Public in and for Texas
                                  My commission expires: 11/04/06

**VERONICA RENDON**
Notary Public, State of Texas
My Commission Expires 11-04-06

AFFIDAVIT OF DAVID C. GARZA IN SUPPORT OF DEFENDANT JSW PLASTICS MACHINERY,
INC.'S MOTION *IN LIMINE* NO. 1 TO EXCLUDE PROPOSED EXPERT TESTIMONY OF WILLIAM B. ABINGTON     PAGE 5

c:/dcg/cl/jsw/aff-dcg-mot-limine1

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2                     BROWNSVILLE DIVISION

 3
     EXEL BOBBINS AND PLASTIC      )
 4   COMPONENTS, INC.,             )
          Plaintiff,               )
 5                                 )
     VS.                           ) CIVIL ACTION NO. B-01-148
 6                                 )
     JSW PLASTICS MACHINERY, INC.,)
 7        Defendant.               )

 8

 9   ********************************************************

10

11          ORAL DEPOSITION OF WILLIAM ABINGTON, C.P.A.
                        MARCH 4, 2003

12

13   ********************************************************

14

15

16          ORAL DEPOSITION OF WILLIAM ABINGTON, C.P.A., produced

17   as a witness at the instance of the Defendant, and duly sworn,

18   was taken in the above-styled and numbered cause on March 4,

19   2003, from 3:01 p.m. to 7:47 p.m., before Rebecca Hutchens,

20   CSR in and for the State of Texas, machine shorthand method,

21   at the offices of PricewaterhouseCoopers, L.L.P., 1201

22   Louisiana, 30th Floor, Houston, Texas 77002, pursuant to the

23   Federal Rules of Civil Procedure and the provisions stated on

24   the record or attached hereto.

25
```





EXHIBIT

A

CONTINENTAL COURT REPORTERS, INC.

2

1                                      APPEARANCES

2

3    COUNSEL FOR PLAINTIFF:

4        Mr. John R. Griffith
         Griffith, Hill & Ochoa, L.L.P.
5        One Park Place
         100 Savannah Avenue, Suite 500
6        McAllen, Texas 78503

7

     COUNSEL FOR DEFENDANT:
8
         Mr. David C. Garza
9        Garza & Garza, L.L.P.
         680 East St. Charles, Suite 300
10       P.O. Box 2025
         Brownsville, Texas 78522-2025
11

12   ALSO PRESENT:

13       Mr. Aaron Stai

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    EXAMINATION INDEX

2    THE WITNESS:  WILLIAM ABINGTON, C.P.A.

3                                                      Page
4    Appearances...................................    2

5        Examination:
             By Mr. Garza.........................     5
6

7    Signature and Changes.........................    165
     Reporter's Certificate........................    167
8

9                     EXHIBIT INDEX

10   NO/DESCRIPTION                                    PAGE

11       Deposition Exhibit 1.........................  5
             Notice of Deposition
12
         Deposition Exhibit 2.........................  5
13           Preliminary Report

14       Deposition Exhibit 3.........................  9
             "Engagement Administration Binder A.1"
15
         Deposition Exhibit 3A........................ 54
16           Engagement Letter

17       Deposition Exhibit 4.........................  9
             "Exel Bobbins Financial Data Binder B.1"
18
         Deposition Exhibit 5.........................  9
19           "Sunbeam RFQ Data Binder B.2"

20       Deposition Exhibit 6......................... 10
             "Documents Related to JSW Binder B.3"
21
         Deposition Exhibit 7......................... 10
22           "Documents Received from Client Binder B.4"

23       Deposition Exhibit 8......................... 10
             "Lost Profits from Lost Sunbeam Products
24            Binder C.1"

25

EXHIBIT INDEX (continued)

Deposition Exhibit 8A........................... 59
    Binder C — Memo Written by Aaron Stai
    Regarding Calls with Dr. Wayne Wells

Deposition Exhibit 8B........................... 72
    Summary Sheet Reflecting Utility Expense
    Coming from the Financial Statements of
    Exel Bobbins

Deposition Exhibit 8C........................... 82
    Broke Up the 8,712,000-dollar Calculation
    to Two Time periods

Deposition Exhibit 8D........................... 85
    Machines that would have been required from
    JSW to produce Sunbeam Products and the
    various purchase amounts associated with the
    individual specific machine

Deposition Exhibit 8E........................... 99
    Discount of 18 Percent

Deposition Exhibit 9............................ 12
    "Deposition Binder Binder D.1"-Cover Page Only

Deposition Exhibit 9A........................... 12
    Table of Contents

Deposition Exhibit 9B........................... 13
    "Deposition Summary of Hector Lucio"

Deposition Exhibit 9C........................... 13
    "Deposition Summary of Steve Becker"

Deposition Exhibit 10........................... 14
    Deposition Binders

Deposition Exhibit 11........................... 19
    Summary Page that Summarizes the Lost
    Profits Model

Deposition Exhibit 12........................... 28
    Affidavit

1        (Deposition Exhibits 1 and 2 marked)

2             WILLIAM ABINGTON, C.P.A.,

3  having been first duly sworn, testified as follows:

4                EXAMINATION

5  BY MR. GARZA:

6     Q.   Would you please state your name.

3:01P  7     A.   Sure.  It's William B. Abington.

8     Q.   Mr. Abington, my name is David Garza.  I'm an

9  attorney in Brownsville, Texas, and I represent JSW Plastics

10  Machinery, Inc., in a lawsuit that was brought by Exel Bobbins

11  and Plastic Components against my client.  Do you understand

12  that?

3:02P  13     A.   Yes, I do.

14     Q.   Have you ever given a deposition before?

15     A.   Yes, sir, I have.

16     Q.   How many depositions have you given before?

17     A.   I don't know the exact number.  I can estimate for

18  you, if you would like for me to do that.

19     Q.   That's fine.  How many?

20     A.   Okay.  I would estimate 20.

21     Q.   About 20?

22     A.   Yes, sir.

23     Q.   When is the last time you gave one, again,

24  approximately?

25     A.   Sure.  I would estimate four months ago.

15

1          Let me hand you this packet of material which was

2     given to me by Mr. Griffith, the Plaintiff's attorney, before

3     we started the deposition today.  Do you recognize what that

4     stack of documents is?

5          A.    Yes, I do.

6          Q.    What is that?

7          A.    It's the model for the calculation of lost profits

8     associated with the Sunbeam contract.

9          Q.    And on the first page, the very top righthand corner

10    says "Draft Subject to Change."  There's a lot of figures on

11    it.  At the very bottom, there's a figure that says "Lost

12    Profits After Discounting $8,712,521"; is that correct?

13         A.    That is correct.

14         Q.    And then what are all the pages that are attached?

15    The different figures that you used to come up with your

16    calculations?

17         A.    It's all the detail of this particular summary page.

18    This is a summary page that you were just referring to, and

19    everything that is behind it is a detail of the model.

20         Q.    Does this appear in any of these over here?

21         A.    Yes, it does.

22         Q.    Is it in C, the Binder C?

23         A.    Yes.

24         Q.    It is actually in here already?

25         A.    Yes, it is.

20

1   entering data into the model, we find better information or a

2   model may be incomplete.  It's an iterative process when you

3   create a model.

4       Q.   My question is:  To get to this final model that's

5   reflected on Exhibit 11, or the figures that are there, were

6   there other models that either were discarded or were figures

7   changed to get to this final Exhibit Number 11?

8       A.    This is the model, you know, period.  There are no

9   other models.  As we build the model -- any time you build

10  model such as this, you build it in a piecemeal fashion.  By

11  that, I mean you go ahead and you set the model up and then

12  you insert the data that you have at that time.  Then as you

13  get more data, you insert that data.  Then as you get more

14  data that you are needing for the model, you insert that data.

15  So that's what I mean that it is an iterative process when you

16  prepare a model.  I never did come up with a draft model that

17  was a final draft model and look at it and throw that model

18  away.

3:27P  19       Q.   Well, for example, if I'm drafting a lease, let's

20  say, for a building, or a contract, as an attorney you may

21  draft something and then you may go through different versions

22  because there's changes being made.  You know, you add

23  something else to it, you take something else out.  You end up

24  with a final lease, but there may have been different drafts

25  as I got to the final one.  And sometimes I may throw away

1    computer and made or there was a printout, you tore it up and

2    threw it away because it had the wrong -- later on you

3    determined that the information that you were using was

4    incorrect or something.  Is that a correct statement?

5         A.   I think that's a fairly accurate statement.

6         Q.   So there's nothing that I'm going to find in here

7    that shows an evolution to get to this?

8         A.   No.

9         Q.   What you are telling me is there was an evolution to

10   sort of get to this?

11        A.   There necessarily is when you build a model such as

12   this.  There are thousands of evolutions literally that come

13   to this.  You can save a model every five minutes and have an

14   evolution that occurs.

3:31P  15        Q.   Is there a particular type of accounting program or

16   computer type program that would be used to develop the type

17   of model that you used to come up with your conclusions or

18   opinions in this case?

19        A.   We did use a program, but it's not -- we built our

20   model within a program.

21        Q.   Is there a name for that program?

22        A.   This model was built in Excel software.

23        Q.   Is there any additional name or way to identify that

24   particular software?

25        A.   No.  And, for purposes of clarification, I'm not

1    talking about Exel Bobbins.  I think you know that.

2        Q.   I understood that.

3        A.   Right.  Okay.  Excel software is the software that we

4    used to build the model.

5        Q.   For example, you know, I see people advertising or

6    maybe folks on the jury see people advertising Quicken, you

7    know, to get your books in order.  That's what I'm saying:  Is

8    there a model that accountants such as you would go to, to

9    Excel software, that says this is a model that you use to

10   develop in coming up with an analysis for lost profits?

3:32P  11   A.   No.  We built a discounted cash flow model tailored

12   specifically for this particular matter.

13       Q.   But that's something that you developed in-house here

14   yourself; that's not a program that I could go buy, you know,

15   Excel software, and plug in the same numbers?

16       A.   You are correct.  We developed that in-house.

17       Q.   So when I was asking you about Number 5 about please

18   produce all written calculations that you have made in

19   preparation for rendering an opinion in this case, Number 11

20   is a compilation of your final calculations as it relates to

21   the lost profits issue?

22       A.   Well, this is our preliminary calculations, yes.

23       Q.   I understand it's still a draft.  But subject to any

24   changes you may make after today, these are the figures that

25   you are working with right now, correct?

28

1      A.    I haven't really given any consideration at this
2    point to be able to tell you what I might do.
3      Q.    But you don't have a chart or graph prepared at this
4    time?
5      A.    That's correct.
6      Q.    Do you have any photographs or videos or other forms
7    of visual expression in any of these documents that you've
8    produced and we've marked today?
9      A.    No, I don't believe so.
10      Q.    In your affidavit that you gave the other day and
11    signed on February 26th, you state that you made a tour of the
12    facilities of Exel Bobbins in Brownsville; is that correct?
3:38P  13      A.    I personally did not.  My staff did.  Yes.
14      Q.    Oh, you did not?
15      A.    That is correct.
16                MR. GRIFFITH:  I think it's in Exhibit 3.
17                MR. GARZA:  Mark this as the next exhibit, would
18    you please.
19                (Deposition Exhibit 12 marked)
20      Q.    Let me show you what's been marked as Exhibit Number
21    12.  Do you recognize this document?
3:39P  22      A.    Yes, I do.
23      Q.    What is that, sir?
24      A.    It's an affidavit.
25      Q.    An affidavit you signed?

1    Q.    And did he give you any kind of written comments on

2  the report which has been marked as Exhibit 2?

3    A.    He offered grammatical commentary and would point out

4  that perhaps one sentence was not clear to him and we should

5  consider rewording it.

6    Q.    Did you, in fact, make changes or some of the changes

7  he suggested to you?

8    A.    Yes, I did.

3:50P  9    Q.    Do you have in the documents that we've marked today,

10  these various binders, the draft of the report, which is now

11  marked as Exhibit 2, before it got changed?

12    A.    No, I do not.

13    Q.    You didn't keep a copy of what the draft was from

14  yesterday or the day before yesterday?

15    A.    No.  It wasn't finished at that point.  It would have

16  been just put together in a piecemeal form still.

17    Q.    Anybody else on the team besides, I guess, yourself,

18  Mr. Stai, Ms. Martin, Mr. Wells, Ms. Couvillion and Mr. Lemer?

19  Anybody else?

20    A.    I believe that's all.  I do not recall that there

21  were any others.  No, sir.

22    Q.    I assume there would be some clerical help or someone

23  else involved, but you are not giving me those names?

24    A.    There would have been some clerical help, yes.

25    Q.    What about computer-type persons?  Are the people who

1   are the team the ones that input the information into the

2   computers, the programs for Excel software, or is that

3   somebody else handling all that?

3:51P   4        A.    No.   The team put the whole model together, including

5   building the model and entering the data.

6        Q.    Somewhere in the documents I was looking at before

7   the deposition began, I noted where it says, I think, that you

8   were charging $245 an hour.

9              Does your Engagement Letter -- I saw that in the

10   Engagement Letter, but I don't remember seeing anything about

11   the different members of the team, how they were charged.   Are

12   they charged at the same rate?

13        A.    Except for the clerical people.   The professional

14   people were charged a flat rate on this assignment.

15        Q.    When you say "flat rate," are you talking about the

16   $245 an hour?

17        A.    Yes, I am.

18        Q.    So if Matthew Wells that's been out of school for

19   less than a year, if he did the summary, whatever time it took

20   him to do that, he would have been billed at $245 an hour just

21   like you were billed at $245 an hour?

3:52P   22        A.    That would be his bill, right.   I actually do not

23   believe that we have billed all of that time.   But that is

24   correct.   Any time that we would bill for Matthew Wells' time

25   would be at that rate, yes.

.39

1      Q.    So it's not just your time, but it's all these other

2  persons on the team.  So Mr. Lemer who visited with you

3  yesterday or sometime in the last few days on the report,

4  whatever time, if he spent two hours on it, if you haven't

5  billed for it, the intent would be to bill for his two hours

6  of time in reviewing the report and putting it in final form?

7      A.    Any time that we will bill will be billed at $245.

8      Q.    Everybody that's on the team that you've mentioned;

9  is that correct?

10      A.    Yes.   To the extent that their time is billed, that

11  is correct.

3:53P  12      Q.    And I went off on this team when I was asking you

13  about photographs and the videos and so forth.  I just assumed

14  that you had gone down to the plant in Brownsville, but now I

15  know you didn't.

16            Who went down there?

17      A.    Mr. Stai.

18      Q.    Do you know if he took any photographs while he was

19  there or do any photographs appear in the exhibits that have

20  been previously been marked?

21      A.    The answer is no to both questions.

22      Q.    No photographs were taken and there's none in the

23  documents that have been produced?

24      A.    That is correct.

25      Q.    Do you know if there is a report -- a written report

40

1   from Mr. Stai in the documents, all these binders that we are

2   going to have copied, where he reports to the team what his

3   observations were about the plant, its size, number of

4   employees, quality control, all such things like that?

5       A.   I don't believe there's a written report in the file

6   that contains that information, no.

7       Q.   Do you know if Mr. Stai gave you a verbal report

8   concerning any of those things from his visit over there?

3:54P   9       A.   He did.

10       Q.   So what you are saying is that in none of these books

11   that we are going to have copied is there a written report

12   saying specifically what was observed by the member of your

13   team while at the plant?

14       A.   I believe that's correct.

15       Q.   Do you know if he spoke with Mr. Becker while he was

16   at the plant?

17       A.   He did.

18       Q.   Do you know when this inspection or this tour took

19   place?

20       A.   There may be a date in these binders that would

21   specifically reflect when that occurred.  I do not recall, but

22   it would have been maybe six weeks ago or so.

23       Q.   I think the documents reflect somewhere the

24   engagement was, I think, around October or so of 2002.  So

25   we're talking about a short time period from the engagement to

1    existed, but I looked at the recent requests.

2        Q.    In forming your opinions, were you relying on members

3    of the team to possibly have looked at those requests for

4    quotations and made an analysis of those requests for

5    quotations?

6        A.    Well, they would have looked at the requests for

7    quotations and then showed me what they found.

8        Q.    And given you their analysis of those requests for

9    quotations?

10       A.    Well, they would have looked at the request for

11   quotations with a specific purpose, as I would have asked them

12   to, and then they would have told me what they found and

13   showed me the request for quotations.

14       Q..   Item G:  Deposition of Steve Becker.  You said

15   earlier you didn't think you read it or not all of it?

16       A.    That is correct.

17       Q.    Do you recall how many pages of it you've read?

4:11P  18     A.    No, I do not.

19       Q.    Do you know who Steve Becker is?

20       A.    Yes, I do.

21       Q.    Who is he?

22       A.    He's one of the owners of Exel.

23       Q.    Did you read the deposition of Jerry Johnson?

24       A.    I have not read Jerry Johnson's deposition.

25       Q.    None of it?

1    impact your opinion on future profits?

2        A.   I don't know.

3        Q.   And you can't say whether -- so changing conditions

4    such as that would not have any impact on the opinion that

5    you've expressed in Exhibit 11, the figures that you've come

6    up with?

4:14P  7        A.   I don't know.  It depends on what changing conditions

8    and what circumstances were around those changing conditions.

9        Q.   Well, have you taken any of that into consideration?

10       A.   Any of what into consideration?

11       Q.   Things that may occur in the future.

12       A.   Sure.

4:16P 13       Q.   Tell me what damages -- strike that.

14           MR. GRIFFITH:  Can we take a quick break?

15           MR. GARZA:  Why don't we do that.

16                    (Brief recess)

17           (Deposition Exhibit 3A marked)

18       Q.   (By Mr. Garza)  Let me show you what's been

19   previously marked as Deposition Exhibit 3, which is the

20   "Engagement Administration Binder."  I've had the court

21   reporter mark the Engagement Letter dated October 17, 2002 as

22   Exhibit 3A.  Do you see that?

:26P  23       A.   Yes, I do.

24       Q.   What was the engagement or assignment that was

25   requested of you when Pricewaterhouse was hired?

55

A.    It was to analyze any lost profits that would be associated with Exel's inability to receive the machines from JSW.

Q.    Was there any initial discussion with you about how those lost profits might be calculated?

A.    I don't believe so initially, no.

Q.    Do you recall who made the first contact with you?

A.    I believe it was Viola Garza.

Q.    Did you assemble your team before or after, I guess, the Engagement Letter was actually signed by the persons employing you?

A.    Most likely afterwards.

Q.    Had you ever dealt with a custom molder-type financial analysis before?

A.    I don't believe I'd ever dealt with a custom molder, no.

Q.    Do you know of anybody on your team that ever dealt with a custom molder financial analysis before?

A.    I don't know.

Q.    Now, you say in Exhibit 3A that your services shall include a financial analysis related to damages and lost profits and that you are going to do this in accordance with standards for consulting services established by the American Institute of Certified Public Accountants.

Did you, in fact, do your services in accordance with

1  that you've looked at it, you or somebody in your team has

2  looked at it.  But outside of that area —

3      A.    I didn't realize that you were including the whole

4  binders as our box, if you include all of the binders as our

5  box, as an example, this Brownsville Manufacturing Wage and

6  Benefit Report is in the binder.

7      Q.    But did you go speak with anybody else besides, let's

8  say, Dr. Wayne Wells or Mr. Becker concerning custom molding?

9      A.    No.

10     Q.    Did anybody on your team go talk to anybody else

11  besides Mr. Becker or Dr. Wells concerning custom molding?

12     A.    I don't know.

13     Q.    You haven't seen any memos that they did?

14     A..  No, I have not.

15     Q.    You told me earlier there's not a lot of e-mails

16  going back and forth.  There wasn't, for example, when the

17  tour was saying, "Hey, I made this tour."  So I assume there's

18  nothing saying, "I spoke to so and so from Custom Molding

19  Industries."  There's nothing like that that you've come

20  across that you've seen?

21     A.    I believe that's correct.

22     Q.    Going back to your discussions with Mr. Becker, would

23  some of those discussions have been where he was on a speaker

24  phone with the team, you said —

25     A.    Yes.

71

1    memorandum and it is consistent with what I understood

2    verbally were the results of the conversations with Dr. Wells.

4:53P  3        Q.    Let me make sure I'm clear.  You personally did not

4    take down any notes; is that correct?

5        A.    That is correct.

6        Q.    Have you read this memorandum?

7        A.    Yes, I have.

8        Q.    When did you read it?

9        A.    I would have read it after it was written.  So

10    either -- it's dated March 3rd.  I read it probably yesterday

11    and probably again today.

12        Q.    Do you have an independent recollection of having

13    read it yesterday or today?

14        A.    Yes.  Yes.

15        Q.    And did you find anything that was incorrect here?

16        A.    No, I did not.

17        Q.    It says here:  "I explained the methodology for our

18    calculating the 716-dollar electricity cost per machine per

19    month."

20             Who is "I" there?  Is that Mr. Stai saying this?

21        A.    That is Mr. Stai saying this.

22        Q.    Now, where do I go to determine what methodology

23    PricewaterhouseCoopers used to determine the electrical bills

24    and electrical consumption which appears on Exhibit 11 that

25    comes up with your net figure?

4:55P  1      A.    That amount is in the binders and the calculation is

2    in the binders.

3      Q.    What binders are those in?

4      A.    The binders that I'm talking about here.

5      Q.    Can you direct me to a specific binder?

6      A.    Yes, I think I can.

7      Q.    What binder do you think that is?

8      A.    May I see the one that's in front of you?

9      Q.    Sure.

10      A.    That might be in this one.

11      Q.    And I'm just picking out one.  For example, in the

12    Brownsville Herald I read yesterday where the CP&L -- not the

13    CP&L -- the local utility company is going to raise the

14    utility rates quite a bit in March.  And so I'm trying to see

15    what methodology you've come up with to say that the

16    electrical figures that you calculate in your Exhibit 11 have

17    any accuracy whatsoever within reasonable certainty.

4:56P  18      A.    Sure.

19            MR. GARZA:  Mark this --

20            THE COURT REPORTER:  8B.

21            (Deposition Exhibit 8B marked)

22      Q.    Let me hand you what's been marked as 8B, which

23    appears in the binder that we previously marked as 8, correct?

24      A.    That is correct.

25      Q.    And that appears behind Tab 2.  Explain to me what

73

1    that is now.

2        A.    Sure.   This is a summary sheet that reflects utility

3    expense which came from the financial statements of

4    Exel Bobbins.   We determined the monthly utility or

5    electricity expense, looked at the number of machines that

6    were actually used during that particular month to calculate a

7    utility cost per machine.

8            Now, it's important to note that part of this utility

9    expense is really a fixed utility expense.   In other words,

10   it's not necessarily directly related to the running of the

11   machine.   It may be the lighting in the warehouse or other

12   related expense.   We have not burst that out, which really one

13   should do if they wanted to calculate the incremental

14   electricity cost associated with machines.   Instead, we've

15   used at this point the entire electricity cost for a

16   particular month and calculated the utility cost on a machine

17   basis.

18           So the average utility cost on a machine basis --

19   again, the average includes really fixed utility cost as

20   well -- is about $716 for these months that we're talking

21   about.   Then we determine that in our model that we would be

22   using the machines more frequently; in other words, they would

23   be running more hours in a given day than what they ran during

24   this time period that we analyzed.

25           So we increased the 716-dollar number to $1313 per

1    machine to account for an increased number of hours used in a

2    particular day.  Again, what this –– necessarily embedded in

3    this 1313 in this methodology, it's a portion of the fixed

4    expenses for utilities, which would not really increase as you

5    added machines.  But because we did not have a means when we

6    prepared this to burst out the fixed expenses from the

7    incremental utilities expense, we went ahead and just included

8    it all for what we believed to be, you know, based on that

9    premise a conservative estimate which might allow for some

10   increase in actual utility rates.

4:59P  11    Q.    Well, let me look at this thing.  Do you have the

12   actual utility bills from Exel Bobbins supporting Exhibit 8B?

13   A.    I don't know if we have the actual utility invoice.

14   Q. . Well, if you do, they would be somewhere in these

15   binders, wouldn't they?

16   A.    They would be.

17   Q.    And you'd rather have the utility bills instead of

18   just something that appears on someone's monthly report,

19   wouldn't you?  Wouldn't that be the best evidence to have?

5:00P  20    A.    Well, if I wanted to confirm the accuracy of the

21   financial statement, then I would look at the utility invoice.

22   Q.    Let me ask you:  Did Pricewaterhouse undertake at all

23   to confirm the accuracy of the financial statements that were

24   given by Exel Bobbins to it?  Did you do any independent

25   verification of those financial statements?

75

1    A.    We've not audited those financial statements.

2    Q.    You've not checked to see if any of the financial

3    statements that were provided to you to see whether the

4    numbers there are correct or not correct?

5    A.    Well, if you are meaning did we audit the financial

6    statements, the answer to that is no.    If you are meaning did

7    we look at a particular line item in the financial statements,

8    we looked at these electricity amounts that are in the

9    financial statements.    We, I do not believe, have yet received

10   invoices.

11   Q.    You get the monthly utility bills and look at them

12   and see the canceled checks that they were, in fact, paid?

13   A.    I'm sorry.    I wasn't finished with my answer.    The

14   answer is, no, we did not receive those monthly --

15   Q.    So if you haven't received them, obviously you

16   haven't looked at them?

17   A.    I'm sorry.    I'm still trying to finish my answer here

18   and hopefully we'll answer that question.    The answer is, no,

19   we have not received those monthly invoices, and so we have

20   not yet looked at those.    What we have done with respect to

21   the electricity amount is discussed the electricity amount

22   that we have calculated with Dr. Wells at this point.

23   Q.    Was anybody in the team consult -- did anybody on the

24   team talk to anybody that provides the utility -- electrical

25   utility to Exel Bobbins to see what they are projecting for

1  future electrical rates?

2      A.   I'm sorry.  I'm not sure I understood your question.

3      Q.   Did anybody from your team contact the electrical

4  supplier for Exel Bobbins and say, "Hey, what do you-all

5  predict for the future is going to happen with electrical

6  rates?"

7      A.   No.

8      Q.   That's a variable, isn't it, that could go into the

9  calculation?

5:02P  10      A.   It is a variable.

11      Q.   And nothing was done to check with anybody into the

12  future on that variable; is that correct?

13      A.   We did not call a utility company.

14      Q.   That's what I'm asking you.

15      A.   I think that's your question.

16      Q.   You didn't call a utility company?  No?

17      A.   That's correct.

18      Q.   Let me ask you before I go on.  I remember seeing

19  something in these books I was looking at before we started a

20  2006 date, I think, or 2007 date.  I guess what I need to find

21  out is:  This Exhibit 11 where you are estimating lost

22  profits, what is the beginning time of that calculation and

23  what is the ending time of that calculation?

24      A.   The beginning time of the calculation would be

25  May of 2001, and it would be -- it would go through,

1    were making other products and doing other things with other

2    machines, they would have made more money?

3        A.    Yes, it is, assuming that they are continuing in

4    business, doing the things that they are currently doing, and

5    perhaps more.

5:35P  6        Q.    Okay.  So the net lost profits were from what would

7    have been generated by these new machines coming on line?

8        A.    For these -- yes, that's correct, specifically for

9    these products that --

10        Q.    Which are the products that you list on the

11    maintenance schedule?

12        A.    Well, what you are looking at on the maintenance

13    schedule, these are actually the machines, not the products

14    that the machines would produce.

15        Q.    I'm sorry.  The machines that you use to manufacture

16    the products that Exel was selling?

17        A.    Yes.

18        Q.    And so you are projecting that if Mr. Becker had

19    gotten these machines, he would have been able to eventually

20    have purchased these other ones and you are estimating the

21    date of acquisition and so forth?  That's what you show on

22    this Exhibit 8D?

23        A.    That is correct.

24        Q.    Okay.  And if all these had come on line and if you

25    had gotten all the orders that he -- or whatever figures you

90

1   used to calculate that, from this analysis they would have

2   made or Exel would have made $10,653,000?

5:36P   3   A.   Yes.   Mr. Griffith had, you know, initially asked

4   that we be conservative in our analysis, which I would have

5   wanted to have done anyway.  So we did not when we performed

6   our calculation assume that Exel could have acquired all these

7   machines up front.  He would have had to have acquired them

8   over time.

9   Q.   Did you put in interest payments as part of your

10   analysis?  Is there another sheet that has interest payments

11   on some of these machines calculating into the future or did

12   you have them all bought out of cash flow?

13   A.   They are being initially acquired under -- well,

14   there are really two determining factors that would determine

15   whether or not a machine could be purchased.  One is whether

16   or not there was line of credit available under the

17   one-and-a-half-million-dollar line of credit and the second

18   one is whether or not there were cash flows that were being

19   generated that would support such an acquisition.

37P   20   Q.   Isn't there a third?  I mean, he'd have to have

21   orders -- I mean, he wouldn't be buying a machine -- Exel --

22   most companies wouldn't go buy a machine if they didn't know

23   they were going to be able to have orders to fill that

24   machine, would they?

25   A.   They would expect to have orders.  They would not be

1    buying machines if they had idle machines sitting around.

2         Q.   Isn't it true that all the orders that you've seen

3    for Sunbeam -- were actually purchase orders for the

4    individual items being purchased on that order?

5              THE COURT REPORTER:  Would you repeat that for

6    me?  I'm sorry.

7         Q.   (By Mr. Garza)  Is it true that all the purchase

8    orders for Sunbeam were just for those items being on that

9    purchase order?

10        A.   I think I'm understanding your question, and that

11   would be yes.

12        Q.   You've never seen a contract with Sunbeam between

13   Sunbeam and Exel, a signed contract by both parties, saying

14   that you are our sole supplier of this particular product for

15   the next five years or ten years or into perpetuity on this

16   product, have you?

17        A.   No, I have not.  That would be highly, highly

18   unusual.

19        Q.   And the reason it would be highly unusual is because

20   what Exel Bobbins is manufacturing is a commodity, right?

21        A.   Well, that's only part of it.

22        Q.   It's not anything special; there's a lot of suppliers

23   that manufacture what Exel does, right?

24        A.   In part, I agree with that; in part, I do not agree

25   with that.

93

1    here, is a Sunbeam employee as well, but we did not contact

2    them directly, no.

5:40P    3        Q.    Did you come across a document -- and I think I saw

4    it in one of your tabs here; I could look for it -- where

5    Sunbeam talks about that they are getting these purchase

6    orders, it's highly competitive?  They are asking Exel to bid,

7    but they are pointing out to them it's highly competitive,

8    they are looking for the best price, quality, obviously?  But

9    you're aware of that, right?

10       A.    I don't remember if I read that in the document.

11   That's certainly what I would expect to be the case.

12       Q.    Because the way Sunbeam was doing business, they were

13   purchase orders and not a long-term contract; is that right?

14       A. .  I don't know how they do all of their business.

15       Q.    As it pertains to Exel, what you saw were purchase

16   orders and not a long-term contract?

17       A.    What I saw were the RFQ's.

18       Q.    And if another entity such as Exel, another start-up

19   company like Exel was to move down to the valley, have equally

20   good quality that Exel claims it has and give as good or a

21   better price, would you expect Sunbeam would take the better

22   price and go with the other entity?

5:41P  23       A.    I think there are a lot of factors that might be

24   considered.

25       Q.    That's certainly -- go ahead.  I'm sorry.

94

1    A.   I would consider them a competitor.  Now, whether or

2   not Sunbeam would move the business from Exel, there are

3   probably a variety of factors that would go into that.

4    Q.   Did you make any independent inquiry of Sunbeam about

5   whether they have any other competitors that they are

6   considering to manufacture what Exel Bobbins does?

7    A.   I didn't speak directly to Sunbeam about anything.

8    Q.   Are you aware that Sunbeam is in Chapter 11?

9    A.   Yes, I am.

10    Q.   Are you aware that Sunbeam has taken some of its

11   manufacturing operations for coffee makers to China?

12    A.   Yes, I am.

13    Q.   Was that taken into account in your calculations of

14   future revenue that you reflect on Exhibit 11?

15    A.   Yes.

16    Q.   How was that taken into account?

17    A.   That, along with a multitude -- well, all the

18   factors.  We looked at these particular products, specifically

19   not all the other products that Sunbeam, in fact, produces and

20   has produced for it and then sells through retail operations.

21   I'm only looking at those specific products for which Exel had

22   an RFQ for.

5:42P    23    Q.   Okay.  And an RFQ was a request for a quotation from

24   Sunbeam to Exel, correct?

25    A.   That's correct.

CONTINENTAL COURT REPORTERS, INC.

1      Q.    That RFQ may have gone out to several other

2   competitors, correct?

3      A.    It may have.

4      Q.    And Sunbeam may have given that RFQ or that purchase

5   order to the entity that came out with the best price or

6   whatever other factors they were considering?

7      A.    Well, I'm sure they did, but they did not give it to

8   Exel.  Exel didn't have the machines in order to be able to

9   supply that particular part.  So Exel was not an option.

10      Q.    But do you have any way of knowing if Exel had the

11   machines that it would have gotten all of those RFQ's?

12      A.    Right.  Right.

13      Q.    I guess my point is:  There was no long-term contract

14   between Exel Bobbins and Sunbeam.  We agree on that?

15      A.    As far as I know, that's correct.

16      Q.    There were purchase orders, correct?

17      A.    Correct.

18      Q.    Sunbeam says, "I need a thousand tops for the coffee

19   maker," sends out a request for bids or quotations, and maybe

20   one company responds, maybe ten companies respond.  What you

21   are saying is if everything had worked out well and Exel had

22   gotten all these quotations into the future, this is what kind

23   of revenue they would have gotten?

24      A.    Not exactly.

25      Q.    Explain to me, then, how you come to these revenue

1    figures.

2        A.    What I'm saying is that Exel could not produce the

3    products that we're talking about because they did not have

4    the machines.    They did not have an opportunity, the

5    availability of machines to produce these products.    Okay?   **So**

6    they could not produce them because they didn't have the

7    machines.    If they had the machines, it is my understanding

8    that they would have likely received the contract or the

9    purchase order to actually produce these products.    Had they

10    not produced these products, they would have had the machines

11    and the availability to produce other products in lieu of

12    these products.

5:44P   13        Q.    Where do you have that in your report?    I mean, have

14    you done a calculation that says, assuming they didn't have

15    Sunbeam, there is for sure a guarantee that they would have

16    been able to produce these other products and gotten the best

17    price and obtained this business?    Aren't you going out on a

18    pretty short limb there?    Aren't you stretching it quite a bit

19    there?

20        A.    No, I'm not saying at all there's a guarantee.    I

21    think if I said there was a guarantee, then I might be

22    stretching it, but I'm not saying that there's a guarantee for

23    that.

5:45P   24        Q.    Assuming Mr. Becker won the bid, then he would have

25    gotten all these revenues is what you are telling me?

1     revenues, to the expenses or both?

2          A.   Plus the model as a whole, really everything included

3     in the model.  You can't say the discount rate is just for a

4     particular line item in here.  It's for the model as a whole.

6:08P  5          Q.   So what you are telling me is that if the 18 percent,

6     if you are looking back five, six years from now the

7     18 percent was accurate, then the 33 million would be the

8     revenue that you project?  I'm just trying to make sure that

9     the 18 percent you are telling me is already calculated into

10    the revenue or it's not into the revenue?

11         A.   Well, the 18 percent is -- the 18 percent is a

12    discount off of net lost profits.  Net lost profits is a

13    result of revenue minus expenses.  So, really, the discount

14    rate encompasses the entire model.

15         Q.   Okay.  Now, again, I think, just to make the record

16    clear on your revenues, that information came from the request

17    for quotations from Sunbeam.  Anywhere else?

18         A.   That would be the principal document that we would

19    have looked at.  We had conversations with Mr. Becker and

20    Dr. Wells both about our revenue calculations.

21         Q.   Did Dr. Wells send you any material?  The only thing

22    I've seen of his is that memo that Mr. Stai prepared and the

23    report that he did last week.  Do you have any other materials

24    that Dr. Wells sent you personally or sent to the team?

25         A.   I don't think that we do.  If we do, it's included in

1    Q.    Does it take into consideration -- does your model,

2    then, your 18 percent, somehow stay if there's a strike?

3    That's somehow covered by the 18 percent discount?

4    A.    Well, the 18 percent discount rate -- and I'm really

5    trying to explain it to you the best way that I can.

6    Q.    And I'm trying to understand it the best way I can.

7    A.    Okay.    The 18 percent is not an exact science.

8    That's why I said that you can get eight people, ten people

9    and get ten different answers.    If they are experienced, eight

10    of them are going to cluster anyway within a relevant range, I

11    believe.    And so you don't go through and, like, specifically

12    look at every particular circumstance that could happen.    The

13    world could end.    But you can't look at every particular

14    circumstance.    That is purely hypothetical.    99 percent of

15    which will never happen.    We all hope the world doesn't end

16    tomorrow.    So you consider all of the factors that could cause

17    the model or the projection not to play out exactly as you

18    have modeled it.

19         And so you then determine a discount rate, and some

20    of it depends on how far out in the future you go.    If you go

21    fifteen years out in the future, perhaps the higher discount

22    rate should be applied, because the longer out in the future

23    that you go, the more element of risk that you are assuming

24    that your model will actually not come to fruition.    So you

25    can't really look at any particular one risk item, a war with

117

1    Iraq may occur, prices may go down.  You can't ascribe a

2    particular amount to any one factor.  So you really just look

3    at things in total.

:18P   4        Q.    What does labor burden mean?

5        A.    Labor burden is actually what we have included in

6    here as 40 percent of the labor, which is probably a very high

7    amount.  It's to allow for things such as insurance coverage,

8    vacations, paid vacations and other benefits that an employee

9    of Exel may receive that's over and above their normal rate

10   per hour.

11       Q.    Installation and "insurance" of all machines.  These

12   are the machines that we identified that had been purchased

13   and come on line?

:19P  14       A.    That's correct.

15       Q.    Electricity we talked about.  Maintenance.  This is

16   maintenance of the machines that would have all been purchased

17   over a period of time?

18       A.    That's correct.

19       Q.    Did that take into consideration whether there was a

20   limited machine shop there to do their own maintenance on

21   machines or not?  Do you know?

22       A.    Well, this is a consideration of what should be

23   expected in maintenance expense for the machines; so whether

24   it be maintenance that's performed in-house or maintenance

25   that is performed by an outside vendor.

1   Q.   And there's no calculation in your model for
2   insurance on all these machines?
3   A.   There is not.  Interestingly, that is something that
4   we have addressed with Mr. Becker at this point and do not
5   have any increased insurance.
6   Q.   And it's not in your model as an expense?
7   A.   That's right.
8   Q.   What other expenses can you conceive that are not
9   listed in your model that might be in there if you went back
10  and revised it besides ad valorem taxes and insurance on the
11  machines?
12  A.   Sure.  I think there's one other that could go in
13  here, one other item that I can think of, and that would be
14  freight associated with materials cost.
15  Q.   On your machines you have like $4 million on
16  machines.  So if the local Cameron County Tax Assessor
17  Collector found Mr. Becker with $4 million worth of machines,
18  he may have a pretty hefty ad valorem tax bill, wouldn't he?
6:22P 19  A.   I don't know what his ad valorem tax bill would be.
20  Q.   Does your Exhibit Number 11, your lost profit
21  calculation, take into consideration the -- rephrase that.
22       You personally have not visited plant.  Do you have
23  any idea of the size of the plant?
24  A.   Yes, I do.
25  Q.   Do you know if -- assuming that he had gotten all

1    Q.    Do you know how much -- strike that.

2          Is your analysis here on Exhibit 11 affected at all

3  by Exel Bobbins being a fairly new or start-up company in your

4  analysis?

5    A.    Yes, it is.

6    Q.    How is your analysis affected by that?

7    A.    A variety of ways.  For starters, they did not have

8  cash available to acquire all of these machines immediately.

9  Because they were a start-up company, they had not accumulated

10  a substantial amount of cash or hardly any no cash initially.

11  So that is certainly one factor that is included.  Their

12  ability to grow was a factor that was considered.  The

13  discount rate, again, considers the fact that they are a

14  smaller company as well.

15    Q.    That's in there also?

16    A.    Yes.

17    Q.    So would you expect the discount rate to be lower if

18  you had a company that had a lot more of a track record?

19    A.    It just depends.  If you are actually trying to do a

20  weighted average cost of capital or discount that is

21  specifically applicable to a company, then that would probably

22  be true if you had a big company that had been in existence

23  for a while.  What we were really doing here is discounting

24  the production of these products.

25    Q.    Do you know how old Mr. Becker is?

1    A.    Not exactly I do not.

2    Q.    Do you have any idea how old he is?

3    A.    I can only approximate.

4    Q.    Tell me what your approximation is.

5    A.    I'm thinking that he's in his 30s, but I might be

6    incorrect on that.  And I apologize if I'm --

7    Q.    In his deposition I think he was born in 1972, which

8    would make him about 30, 31?

9    A.    Okay.

10    Q.    Do you know when the company Exel Bobbins was formed?

11    A.    I know that it was not long ago, not many -- I don't

12    remember the exact date.  It wasn't many years ago.

13    Q.    Do you know what the initial capital was for the

14    corporation?

15    A.    Probably the minimum amount required to incorporate

16    in Texas, I believe.

17    Q.    Which is a thousand dollars?

18    A.    That would be what I would expect.

19    Q.    And if his testimony in his deposition was that his

20    initial investment was $500 and Mr. Arnold Reynolds, his

21    partner or co-owner was $500, that wouldn't surprise you then?

22    A.    No, not at all.

23    Q.    Is this discount rate that you we're talking about,

24    would another term for that be a rate, I guess, taking into

25    consideration the factors for mitigation or is that something

130

1    planned in May of 2001 through today, he's lost two million

2    four, or whatever that figure was in there?

3        A.   I think it was about two million six, yes.

4        Q.   But that figure, looking from May 1st to today, was a

5    calculation of lost profits if everything had gone as

6    Mr. Becker says it should have gone?

7        A.   No, not exactly.  If everything had gone as

8    Mr. Becker says it should have gone, the number would be a lot

9    higher than that actually.

10        Q.   Are all your opinions here on the lost profits based

11    on reasonable probability?

12        A.   I think they are all reasonable.

13        Q.   Are they based on reasonable probability?

14        A.   Yes.  If you -- all of the calculations that I have

15    made are reasonable probability, considering the discount rate

16    as well.

17        Q.   Do you believe that all those figures that you've

18    done there are based on a reasonable degree of certainty and

19    exactness?

20        A.   Not exactness.  They are not exact.  That is the

21    whole point about future.  The reasonableness is the key.  And

22    I'm not sure if you are trying to attach reasonableness to

23    exact or not.  But if you say that they are reasonably

24    accurate, then the answer is they are reasonable.  Are they

25    exact?  They cannot be exact.

1     Q.    Are they within a reasonable degree of certainty and

2   exactness?

3     A.    They are within a reasonable degree of certainty and

4   a reasonable degree of exactness.

5     Q.    And what objective facts, figures or data were used

6   by you to ascertain these figures?  Everything we've been

7   discussing so far?

8     A.    Everything that we've been discussing so far.

9     Q.    The request for quotations at Sunbeam that you

10  reviewed, correct?

11    A.    Yes.

12    Q.    And on the expenses, if I walked you through the

13  different expenses, you've gotten information from Mr. Wells

14  or Mr. Becker or documents on material cost, labor,

15  electricity and so forth, right?

16    A.    Yes, and the financial statements as well.

17    Q.    And so the objective facts, figures or data that you

18  used to ascertain your calculation of the expenses are based

19  on your conversations with those individuals and the

20  information that's going to appear in all these binders here?

21    A.    Yes.

22    Q.    What you have not done is made any independent audit

23  of any of the financial numbers that have been given to you by

24  Mr. Becker; is that correct?

25    A.    No.  You would never do an independent audit in a

132

1    situation like this.

2        Q.    You have not independently corroborated the figures

3    that he has provided to you other than possibly looking at the

4    labor statistics or labor figures?

5        A.    And the RFQ's.

6        Q.    And other than the RFQ's, on his figures for labor

7    costs, for electricity, for maintenance, have you done any

8    independent corroboration other than talking to Mr. Becker and

9    Mr. Wells and whatever documents are here?

10       A.    On labor, yes.

11       Q.    Well, on electricity, any independent corroboration

12   other than talking to Mr. Becker, seeing what documents he

13   provided you and talking to Mr. Wells?

14       A.    And other than looking at the financial statements,

15   which were contemporaneously prepared by Exel.

16       Q.    Are any of those financial statements -- strike that.

17             You would agree with me none of the financial

18   statements provided to you are audited financial statements?

19       A.    I believe that's correct.

20       Q.    They are unaudited financial statements?

21       A.    That's correct.

22       Q.    And you would agree with me, to the extent that you

23   had audited financial statements, that would make your

24   reasonableness and certainty and exactness a little bit higher

25   degree.  Wouldn't you feel like that?

133

1    A.    That might be the case.

2    Q.    So they are not audited?

3    A.    They are not audited, no.

4    Q.    And to the extent any of those figures are

5    inaccurate, that could affect your model?

6    A.    That could affect the electricity portion of the

7    model one way or the other.

8    Q.    It could affect maintenance?  It could affect a lot

9    of those things, couldn't it?  If he tells you he's paying his

10   workers $5 an hour and he's paying them $10 an hour, that

11   would affect that calculation, too, wouldn't it?

6:44P 12   A.    No, it would not.

13   Q.    Why not?

14   A.    Because I did not --

15                    (Brief interruption)

16   A.    Because I did not use the numbers that Mr. Becker

17   provided on labor.  I used the Brownsville report for labor.

18   Q.    (By Mr. Garza)  For manufacturing?

19   A.    Yes.

20   Q.    And is it for all -- is it just an average for all

21   manufacturing jobs?

22   A.    No.  There are specific wage amounts included in this

23   report.  We went and looked at the specific wage amounts and

24   used those specific wage numbers.

25   Q.    On what?

CONTINENTAL COURT REPORTERS, INC.

135

1    Q.   Did you or anybody on your team interview any of the

2    employees to inquire of them whether they were satisfied with

3    their work, whether they were seeking a greater salary,

4    whether they were being sought by somebody else, anything

5    along that line?

47P  6    A.   No, we did not.

7    Q.   Are you aware if there are other custom mold makers

8    in the Rio Grande Valley?

9    A.   I think that there are.

10    Q.   Did you make any inquiries on them what their wage

11    rates are --

12    A.   No, not directly.  No.

13    Q.   -- to make any comparison with their wage rates with

14    what Exel Bobbins pays?

15    A.   No, I did not make any inquiry directly to them.

16    Q.   The machines that are used in the particular business

17    can run a few hundred thousand dollars or six figures and

18    above, correct?

49P  19    A.   Yes, they can.

20    Q.   If, in fact, the start-up capital was a thousand

21    dollars, would you consider that an undercapitalized company

22    for a start-up company?

23    A.   That's the minimum capital that's required under the

24    State of Texas.

25    Q.   I agree.

1    talked about the claim as a whole and the allegation and the

2    machines and the consequences of not having the machines.  If

3    you consider that as part of the foreseeability, then we've

4    had some of those discussions.  But I've not done any analysis

5    at this point or I've not drawn any conclusion at this point.

6         Q.   What you've done is come up with, assuming everything

7    that the Plaintiff says is right and there was a breach, this

8    is what I calculate the damages are.  Is that fair to where

9    you are at right now?

10        A.   At this point in time, I'm certainly not nor will I

11   give any legal opinion as to a breach.

6:55P  12        Q.   Okay.  Does your lost profits opinion here assume

13   that Exel would have gotten all the business from Sunbeam

14   that's reflected on the RFQ's?

15        A.   It assumes for these particular products that are

16   listed that they would have gotten this business from Sunbeam.

17        Q.   Does your Binder C reflect whether that's a hundred

18   percent of that business into the future or 90 percent or

19   80 percent?

20        A.   Yes.

21        Q.   Do you recall what it -- does it project different

22   amounts for different products?

23        A.   No.  It assumes that the amounts that are contained

24   on the RFQ would actually be produced by Exel Bobbins.

25        Q.   So all the RFQ's that are there, you are projecting

140

1    that they would have gotten all of that business?

2         A.    For these particular products for the quantities that

3    are listed on the RFQ's.

6:56P  4         Q.    And extrapolating that into the future, they would

5    have gotten each year that same quantity or whatever for a

6    certain period of time?

7         A.    Yes.

8         Q.    So you are, in effect, assuming that Sunbeam would

9    have given them all that business for those RFQ's?

10        A.    As it's listed on those RFQ's, yes.  I'm not trying

11   to be cute with your question here.  I'm just trying to make

12   sure I answer you correctly.

13        Q.    Let me come at it a different way.  Your assumption

14   is that on all those RFQ's, which from earlier testimony

15   probably went out to more than one competitor -- there's no

16   reason to go out for quotes unless you're going to go to at

17   least more than one person.  But let's say they went out to

18   several people.  You in your assumptions have concluded that

19   Exel would have gotten all those bids because it would have

20   had the best price?  For whatever reason, they would have

21   gotten all those bids?

22        A.    My calculation employs the total quantities that are

23   on the RFQ's from Sunbeam.

:57P  24        Q.    Believe it or not, I don't have all that much more to

25   go.

141

1    A.    Okay.

2              MR. GRIFFITH:  We don't believe it.

3    Q.    (By Mr. Garza)  We were talking earlier about the

4    Sunbeam parts that Exel makes or commodities that anyone can

5    mold, and I may have cut you off and went on to another

6    subject.

7              Is there something peculiar about these products that

8    are listed on Exhibit 11 that makes them something that only

9    Exel Bobbins can make?  Did you come across anything

10   suggesting that?

11   A.    No.  I think they are being manufactured right now.

12   Q.    By other entities?

13   A.    Yes.

14   Q.    And being supplied to Sunbeam by other entities?

15   A.    Yes.

16   Q.    In your model, do you assume all the presses are

17   installed at the same time?  I guess not.  You have them

18   coming on at different times, don't you?

19   A.    Correct.  I have them coming on at different times.

20   Q.    The machines on that maintenance schedule?

21   A.    Yes.

22   Q.    And that's based more on a cash flow than when --

23   what is that based on?  Cash flow when each machine can be

24   purchased and brought on line?

25   A.    That's part of it as well as available line of

1    coming on line, there's no magic associated, so to speak, with

2    machine 1 coming on before machine 2.  It is possible that a

3    model could be prepared with similar results that would show

4    one of the machines coming on earlier than the machine that we

5    currently have coming on earlier.

6:59P  6    Q.    I may have asked you this before:  Did you ever have

7    any direct communications with Hector Lucio?

8    A.    No, I did not.

7:00P  9    Q.    Did anybody from your team talk to him directly?

10    A.    I do not believe so, no.

11    Q.    And neither you or -- you haven't had any direct

12    communications with anybody from Sunbeam Oster?

13    A.    That's correct.

14    Q..   To your knowledge, no one from your team either?

15    A.    No, I would highly doubt that.

16    Q.    Did you or anyone from your team talk to anybody at

17    the Brownsville Economic Development Council?

18    A.    I did not.  I'm not sure if anyone from the team did

19    or not.

20    Q.    Did you take into consideration at all the Exel tax

21    returns that are -- I think in some of the documents that you

22    have in these books, there was a 2000 tax return and a

23    2001 tax return.  Did any of that come into consideration in

24    your analysis?

:01P  25    A.    I looked at the tax returns.  They don't drive the

1    be a little while, if I could have maybe a five-minute break.

2          MR. GARZA:  Let's take a five-minute break.

3                (Brief recess)

4      Q.   (By Mr. Garza)  Have you personally ever analyzed a

5    plastic injection molding business before?

6      A.   No.

7      Q.   Has anybody on the team?

8      A.   I don't know.

9      Q.   Did you analyze the general economic conditions in

10   Brownsville and Texas during the relevant time period that

11   you've come up with?

12     A.   Well, I did not perform a specific analysis of the

13   economic conditions.  I certainly know that the labor market

14   has not been strong, which has a tendency to depress wage

15   rates.

16     Q.   Did you analyze any economic conditions in the

17   plastic injection molding business either in Texas or

18   Brownsville during this relevant time period?

19     A.   I have not.

20     Q.   Do you recall what year Exel first achieved a gross

21   profit from its business?

22     A.   I do not recall that, no.

23     Q.   Do you recall when it first achieved, if it has, a

24   net profit?

25     A.   I don't recall that either.

155

1      Q.   We talked briefly about the quality control aspects.

2  But the ability of Exel Bobbins to produce quality parts

3  basically came from your discussions with Becker, talking to

4  Dr. Wells and reading Lucio's deposition?

7:30P    5      A.   Yes, that's right.

6      Q.   I mean, no other independent study that you may have

7  done other than those things?

8      A.   I'm not, I don't think, one to do an independent

9  study of a quality of the plastics.  I think that's outside

10  the area of expertise of an accountant.

11      Q.   But you didn't see any kind of separate independent

12  report other than what you got from Becker, Wells or Lucio?

13      A.   Correct.

14      Q.   Have you seen any documents reflecting what their

15  rejection rate of products might be, what their error rate is

16  in the products they produce?

7:31P   17      A.   I don't think that I have.

18      Q.   Was there any analysis done of where Exel Bobbins

19  purchases its raw materials, its suppliers?

20      A.   I did not do any analysis of who they purchased the

21  raw materials from.

22      Q.   You were given some figures that -- well, the cost of

23  materials, I think you said you saw those on the RFQ's.  But

24  any independent investigation of whether those figures are

25  correct or not, you didn't do any of that?

156

1    A.    Actually, before looking at the RFQ's, we talked with

2    Mr. Becker and we asked him what raw materials he needs to

3    purchase the products that were -- I'm sorry -- to mold the

4    products that we're talking about here.

5         He described those.  He talked about some prices that

6    he's currently paying to be able to acquire those products.

7    But what we wanted to do was to actually look at a document

8    that we could point to and say here's a price and it's in line

9    with the prices that Mr. Becker has talked to us about with

10   respect to his ability to acquire the products.

:32P  11   Q.    What document was that?  The RFQ?

12   A.    The RFQ's are the documents that we used to drive our

13   model.

14   Q.  . But any independent corroboration from suppliers to .

15   Exel Bobbins, none of that was done by your team?

16   A.    No corroboration with suppliers, no.

17   Q.    Does your report or Binder 8, Exhibit 8, Binder C.1,

18   are there calculations in there having to do with the number

19   of employees at different times, for example, January 1, 2003,

20   March 1, 2003, April 1, 2006?  I know you have a total figure

21   here --

:33P  22   A.    Yes.

23   Q.    -- a gross figure on the Exhibit 11.  But is there

24   something breaking down how many employees they'll have at

25   different times throughout the five years?

161

1    A.   Well, you take the April 2006, all the profits that

2   occur out until that point in time, and you discount them back

3   to today's date, March 2003.

4    Q.   I got you.

5    A.   And I think it's -- I don't remember if we talked

6   about this or not, but I think it's appropriate to mention

7   that we have not, although I do consider it something that

8   should be included, we have not calculated any interest that

9   would have been earned on the profits that would have already

10  been realized in the past.

7:42P 11   Q.   Well, that's assuming that there was no distribution

12  made by the corporation to the shareholder, right?  I mean,

13  you're assuming that all the profits would stay in the

14  corporation?

15   A.   The profits would stay in the corporation and have an

16  ability to have interest on them.

17   Q.   That's what I'm saying.  You are assuming that?

18   A.   No, I'm not.  I'm not assuming anything because I

19  haven't calculated --

20   Q.   You didn't calculate it.  But if you had calculated

21  it, you would to have had to also assume that there would have

22  been no distributions by the corporation to its shareholders

23  during that time period?

43P 24   A.   Not sure on that.

25   Q.   On Page 7 under the paragraph that says "Increased

1  Operating Cost" --

2       A.   Yes.

3       Q.   -- do you see that?

4       A.   Yes, I do.

5       Q.   What documentation do you have for that section?

6       A.   I don't have any documentation for increased

7  operating cost because these machines -- the Lucky Gold Star

8  machines were recently acquired, and so there's not

9  documentation that evidences increased operating costs at this

10 point.  There is, of course, the time associated with

11 Exel Bobbins' personnel needing to go out and identify and

12 locate additional sources for these machines.  But that time

13 or the expense associated with that has not been quantified.

7:44P 14      Q.   Well, where you say -- I mean, you're making an

15 absolute statement:  "Exel has also experienced an increase in

16 operating costs as a result of purchasing machines other than

17 the JSW injection molding machines."  That sounds like a

18 pretty precise statement.

19           I'm saying, do you have documents that support that

20 statement or is that something that Steve Becker told you and

21 was written in there?

22      A.   No, I didn't write anything in here because

23 Steve Becker told me.  If you take that particular paragraph,

24 look at the heading that it's under, "Additional Lost Profits,

25 if you'll read the very first sentence under "Additional Lost

163

Profits," "my opinion that Exel likely has and will."  So that
one sentence really is a preface for everything that follows,
okay, which also includes increased operating costs.

    Q.    So --

    A.    So I'm not --

    Q.    So where it says "has also experienced," maybe it
should have said "probably has also experienced."

        What I'm trying to clarify is you haven't quantified
that.  You are making a statement there, but you don't have
any documents to support that right now?

    A.    No calculation, no documents.  That's why it falls
under this likely to incur or likely will incur economic
damages.

    Q.    Where it says "increased down time for the
Lucky Gold Star machines," do you have any documentation
supporting that?

    A.    I don't know if I have any documentation.  It's my
understanding that the JSW were top-of-the-line products and
machines.

        And, certainly, Mr. Becker and Dr. Wells believed
them to be a machine that is one of superior nature to the
Lucky Gold Star machine.  But I don't have any kind of
document that is going to show that these machines have
already been down more than the JSW machines would have been
down.

1    I, WILLIAM ABINGTON, C.P.A., have read the foregoing
deposition and hereby affix my signature that same is true and
2    correct, except as noted above.

3

4                    _____

WILLIAM ABINGTON, C.P.A.
5

6

7    THE STATE OF_____)
COUNTY OF_____)
8        Before me, _____, on this
day personally appeared WILLIAM ABINGTON, C.P.A., known to me
9    (or proved to me under oath or through (_____)
to be the person whose name is subscribed to the foregoing
10   instrument and acknowledged to me that they executed the same
for the purposes and consideration therein expressed.

11
     Given under my hand and seal of office the
12   _____ day of _____, _____.

13

14                    _____

NOTARY PUBLIC IN AND FOR
THE STATE OF _____
15

16

17

18

19

20

21

22

23

24

25

1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
2                           BROWNSVILLE DIVISION

3
     EXEL BOBBINS AND PLASTIC        )
4    COMPONENTS, INC.,               )
          Plaintiff,                 )
5                                    )
     VS.                             ) CIVIL ACTION NO. B-01-148
6                                    )
     JSW PLASTICS MACHINERY, INC.)
7         Defendant.                 )

8                         REPORTER'S CERTIFICATION
                ORAL DEPOSITION OF WILLIAM ABINGTON, C.P.A.
9                            MARCH 4, 2003

10        I, Rebecca Hutchens, Certified Shorthand Reporter in and
     for the State of Texas, hereby certify to the following:
11
          That the witness, WILLIAM ABINGTON, C.P.A., was duly sworn
12   by the officer and that the transcript of the oral deposition
     is a true record of the testimony given by the witness;
13
          That the deposition transcript was submitted on
14   _____to the witness or to the attorney for
     the witness for examination, signature and return to me within
15   30 days;

16        That pursuant to information given to the deposition
     officer at the time said testimony was taken, the following
17   includes counsel for all parties of record:

18   COUNSEL FOR PLAINTIFF:
          MR. JOHN R. GRIFFITH
19        GRIFFITH, HILL & OCHOA, L.L.P.
          ONE PARK PLACE
20        100 SAVANNAH AVENUE, SUITE 500
          McALLEN, TEXAS 78503
21
     COUNSEL FOR DEFENDANT:
22        MR. DAVID C. GARZA
          GARZA & GARZA, L.L.P.
23        680 EAST ST. CHARLES, SUITE 300
          P.O. BOX 2025
24        BROWNSVILLE, TEXAS 78522-2025

25

1          I further certify that I am neither counsel for,
2   related to, nor employed by any of the parties or attorneys in
    the action in which this proceeding was taken, and further
3   that I am not financially or otherwise interested in the
    outcome of the action.

4                Certified to by me this *4th* day of
    *March*                , 2003.

5

6

7

8   *Rebecca Hutchens*
    REBECCA HUTCHENS, TEXAS CSR No. 2239
9   Expiration Date: 12-31-2004
    Continental Court Reporters, Inc.
10  2777 Allen Parkway, Suite 600
    Houston, Texas 77019
11  713-522-5080; Fax 713-522-0440

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

## FURTHER CERTIFICATION

2

3      The original deposition was/was not returned to the
deposition officer on _____;

4      If returned, the attached Changes and Signature page
contains any changes and the reasons therefor;

5

6      If returned, the original deposition was delivered to
Mr. David C. Garza, Custodial Attorney;

7      That $_____ is the deposition officer's charges
to the Defendant for preparing the original deposition

8    transcript and any copies of exhibits;

9      That the deposition was delivered in accordance with Rule
30(f), and that a copy of this certificate was served on all

10   parties shown herein on and filed with the Clerk.

11     Certified to by me this _____ day of _____,
2003.

12

13

14   REBECCA HUTCHENS, CSR
     Expiration Date: December 31, 2004

15   Continental Court Reporters, Inc.
     2777 Allen Parkway, Suite 600

16   Houston, Texas 77019.
     713-522-5080; Fax 713-522-0440

17

18

19

20

21

22

23

24

25

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                   BROWNSVILLE DIVISION

 3   EXCEL BOBBINS AND PLASTIC       )
     COMPONENTS, INC.,               )
 4            PLAINTIFF,             )
                                     )
 5   VS.                             )   CIVIL ACTION NO. B-01-148
                                     )
 6   JSW PLASTICS MACHINERY, INC.,)
              DEFENDANT              )

 7

 8

 9

10      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

11                    ORAL DEPOSITION OF

12                      STEVE BECKER

13                     APRIL 4, 2002

14                     VOLUME 1 OF 2

15      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

16

17

18                 ORIGINAL

19

20

21           ORAL DEPOSITION of STEVE BECKER, produced as a

22   witness at the instance of the Defendant, and duly sworn,

23   was taken in the above-styled and numbered cause on the

24   4th day of April 2002, from 10:39 a.m. to 6:29 p.m.,

25   before CATHY MATA STURROCK, CSR in and for the State of
```

EXHIBIT
B

1  Texas, reported by machine stenography, at the offices of

2  Garza & Garza, L.L.P., 680 East St. Charles, Suite 300,

3  Brownsville, Texas 78522, pursuant to the Federal Rules

4  of Civil Procedure and the provisions stated on the

5  record or attached hereto.

6

7                              -o0o-

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    A P P E A R A N C E S

2

3

4    FOR THE PLAINTIFF:
          Mr. Moises M. Salas, Jr.
5         GRIFFITH, SAENZ & HILL, L.L.P.
          847 East Harrison Street
6         Brownsville, Texas  78520

7

8

9    FOR THE DEFENDANT:
          Mr. James J. Regan
10        REGAN & BRAUN
          2522 Artesia Boulevard
11        Redondo Beach, California  90278

12

13

14   ALSO PRESENT:
          Ms. Cathy Mata Sturrock, CSR
15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1              T A B L E   O F   C O N T E N T S

 2                                                        PAGE

 3   AGREEMENTS OF COUNSEL . . . . . . . . . . . . . . . 5

 4   EXAMINATION OF STEVE BECKER

 5        By Mr. Regan . . . . . . . . . . . . . . . . 7

 6

 7

 8

 9   REQUEST FOR PRODUCTION . . . . . . . . . . . . . 237

10   REPORTER'S CERTIFICATION . . . . . . . . . . . . 266

11   FILING CERTIFICATION . . . . . . . . . . . . . . 268

12   REQUESTED INFORMATION . . . . . . . . . . . . . 271

13   CHANGES AND SIGNATURE . . . . . . . . . . . . . 274

14   WITNESS' SIGNATURE CERTIFICATE . . . . . . . . . 275

15

16

17   OBJECTIONS

18        (None were made)

19

20   EXHIBITS

21   NO.   DESCRIPTION                        MK'D  ID'D

22   A     "PL Molded Parts 10/10/00 . . . . . . . 229   228

23

24

25
```

16:57:00  1  quoted with them a lot of money.  A lot of money.

2      Q.  How many quotes would you estimate that you've

3  provided Sunbeam Oster?

4      A.  How many?

16:57:18  5      Q.  How many?

6      A.  Let's just take a ballpark figure, 70.

7      Q.  And out of the 70, how many of those requests

8  for quotes have materialized into a purchase order?

9      A.  About 30.

16:57:44 10      Q.  So would you anticipate if you were able to run

11  the reservoir and the pitcher mold that you'd have a

12  three and seven chance of getting a purchase order?

13      A.  If I had a 720-ton press, yeah.

14      Q.  Okay.  So you didn't have a 720-ton press, so

16:58:06 15  you couldn't run these two molds, correct?

16      A.  That's correct.

17      Q.  Okay.  Now, have you received any other

18  purchase orders during the period of June 2000 through

19  March 31 -- I'm sorry -- from June 2001 through March 31,

16:58:32 20  2002 that you've had to turn down the business?

21      A.  Yeah.

22      Q.  From who else?

23      A.  Well, not necessarily turn down, but completely

24  be honest with my -- my potentials.

16:58:48 25      Q.  Well, did -- in being completely honest, did you

REPORTER'S CERTIFICATION

I, CATHY MATA STURROCK, a Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the facts stated by me in the caption hereto are true; that the foregoing deposition transcript of **STEVE BECKER**, the witness hereinbefore named, was at the time mentioned taken by me in stenograph, the said witness having been by me first duly cautioned and sworn upon his oath to tell the truth, the whole truth, and nothing but the truth, and later transcribed from stenograph.

I further certify that I am neither attorney for counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken, and further certify that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

I further certify that the above and foregoing deposition transcript as set forth in typewriting is a full, true and correct transcript of the proceedings had at the time of taking said deposition.

1   Certified to by me this the **23rd** day of **April**, 2002.

2

3

4

5   _Cathy Mata Sturrock_

6   CATHY MATA STURROCK

7   CERTIFIED SHORTHAND REPORTER
    STATE OF TEXAS
8   CERT. NO.: 6126  EXP. DATE:  12/31/03

9   POCKRUS REPORTING SERVICE
    P.O. BOX 531786
10  HARLINGEN, TEXAS  78553
    1-800-423-7713
11  1-800-423-7730 (FAX)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     BROWNSVILLE DIVISION

 3  EXCEL BOBBINS AND PLASTIC      )
    COMPONENTS, INC.,              )
 4          PLAINTIFF,             )
                                   )
 5  VS.                            )   CIVIL ACTION NO. B-01-148
                                   )
 6  JSW PLASTICS MACHINERY, INC.,)
            DEFENDANT              )
 7

 8

 9

10      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

11                    FILING CERTIFICATE

12                  ORAL DEPOSITION OF

13                     STEVE BECKER

14                     APRIL 4, 2002

15                    VOLUME 1 OF 2

16      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

17

18

19

20

21

22

23      I, Cathy Sturrock, Certified Shorthand Reporter in

24  and for the State of Texas, hereby certify to the

25  following:
```

1   That the witness, **STEVE BECKER**, was duly sworn by

2   the officer and that the transcript of the oral

3   deposition is a true record of the testimony given by the

4   witness;

5   That the deposition transcript was submitted on

6   **April 23, 2002,** to the witness or to the attorney for the

7   witness for examination, signature and return to me by

8   **May 23, 2002.**

9   That the amount of time used by each part at the

10  deposition is as follows:

11  Mr. Moises M. Salas - 00:00:00;

12  Mr. James J. Regan - 06:06:31;

13  That pursuant to information given to the deposition

14  officer at the time said testimony was taken, the

15  following includes counsel for all parties of record:

16  Mr. Moises M. Salas, Jr., GRIFFITH, SAENZ & HILL,

17  L.L.P., 847 East Harrison Street, Brownsville, Texas

18  78520, appearing for Plaintiff;

19  Mr. James J. Regan, REGAN & BRAUN, 2522 Artesia

20  Boulevard, Redondo Beach, California 90278, appearing for

21  Defendant;

22  If returned, the original deposition was delivered

23  to **Mr. James J. Regan**, Custodial Attorney;

24  That $ _1,870.75_ is the deposition officer's

25  charges to the Defendant for preparing the original

270

1    deposition transcript and any copies of exhibits;

2        I further certify that I am neither counsel for,

3    related to, nor employed by any of the parties or

4    attorneys in the action which this proceeding was taken,

5    and further that I am not financially or otherwise

6    interested in the outcome of the action.

7        Certified to me this **23rd** day of **April**, 2002.

8

9

10    _____*Cathy Mata Sturrock*_____

11        CATHY MATA STURROCK

12    CERTIFIED SHORTHAND REPORTER
      STATE OF TEXAS
13    CERT. NO.: 6126   EXP. DATE: 12/31/03

14    POCKRUS REPORTING SERVICE
      P.O. BOX 531786
15    HARLINGEN, TEXAS  78553
      1-800-423-7713
16    1-800-423-7730 (FAX)

17

18

19

20

21

22

23

24

25

# R E Q U E S T E D   I N F O R M A T I O N

*

EXCERPTS FROM TESTIMONY

Page 34, Line 7:

BY MR. REGAN:

    Q.  What is their name?

    A.  They sold out.

    Q.  To who?

    A.  Magnetic Lighting or -- it's a goofy name.  I

can't even remember.

    Q.  If we leave a space in the deposition transcript

would you, upon review of it, fill that in?

    A.  Sure.

        MR. REGAN:  Would that be agreeable?

        MR. SALAS:  Yes, sir.

11:14:48 (line 10)

11:15:00 (line 15)

**STEVE BECKER**

```
 1   Page 213, Line 1:

 2   BY MR. REGAN:

 3       Q.   Okay.   Anybody besides Sunbeam Oster you quoted

 4   business to?

 5       A.   The last six months of last -- the last six

 6   months of last year?

 7       Q.   Yes.

 8       A.   I know there is, I just can't -- I can't recall.

 9   I can't recall who.

10       Q.   Well, if you recall anybody, we'll leave a space

11   in the deposition for you to fill in --

12       A.   Okay.

13       Q.   -- the names of those people.

14       A.   Sure.

15       Q.   We'll leave five lines --

16       A.   Yeah.

17       Q.   -- for you to complete as you can -- if you can

18   recall the names of those people.   And, if you would,

19   when you recall those names of the companies, put down

20   the contact person at those companies?

21       A.   Yes.

22       Q.   I'd appreciate it.

23       A.   Yes.

24       Q.   Is that agreeable?

25       A.   Yes.
```

Line timestamps: 17:07:28 (line 5), 17:08:14 (line 10), 17:08:18 (line 15), 17:08:30 (line 20), 17:08:36 (line 25)

17:08:36

1          MR. SALAS:  Yes, sir.

2

3

4

5

6

7

8

9

10

11                      **STEVE BECKER**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

274

```
 1              CHANGES AND SIGNATURE
 2        PAGE   LINE    CHANGE          REASON
 3        253    16    8-9 machines   Some high cavity molds
 4                                    in certain product
 5                                    lines. I can use
 6                                    more than One mold
 7                                    per machine
 8                                    example (2 cav. 400/
 9                                    (8 cav. 2000/da
10                                    (16 cavity 1000/
11
12
13
14
15
16
17
18
19
20
21
22
23
24        _____
25              STEVE BECKER
```

275

1          I, **STEVE BECKER**, have read the foregoing

2   deposition and hereby affix my signature that same is

3   true and correct, except as noted above.

4

5                              _____

6                              **STEVE BECKER**

7   THE STATE OF _____)

8   COUNTY OF _____)

9

10          Before me, _____, on

11  this day personally appeared, **STEVE BECKER**, known to me

12  (or proved to me under oath or through _____)

13  (description of identity card or other document) to be

14  the person whose name is subscribed to the foregoing

15  instrument and acknowledged to me that they executed the

16  same for the purposes and consideration therein

17  expressed.

18          Given under my hand and seal of office this

19  _____ day of _____, 2002.

20

21

22

23                              _____

24                              NOTARY PUBLIC IN AND FOR

25                              STATE OF _____