63

0700.0078/1794

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Souther: District of Texas
FILED

MAY 1 6 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| EXEL BOBBINS AND PLASTIC | § | |
| COMPONENTS, INC., | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. B-01-148 |
| | § | |
| JSW PLASTICS MACHINERY, INC. | § | [Assigned to the Hon. Hilda G. Tagle] |
| Defendant | § | Stipulated to Magistrate Felix Recio] |

# Trial Brief on Plaintiff's Cause of Action for Breach of Contract

TO THE HONORABLE JUDGE OF SAID COURT: Comes now EXEL BOBBINS AND

PLASTICS COMPONENTS, INC., (hereinafter refereed to as "EXEL"), and files this their Trial

Brief on Plaintiff's Cause of Action for Breach of Contract, and in support thereof, would

respectfully show unto the court as follow:

## BACKGROUND

1. EXEL BOBBINS AND PLASTIC COMPONENTS, INC., ("EXEL") is a Texas

Corporation with its principal place of business in Brownsville, Cameron County, Texas.  JSW

PLASTICS MACHINERY, INC., ("JSW") is a Delaware corporation with its principal place of

business in Anaheim, California.  EXEL is in the business of custom injection molding.  JSW is in

the business of selling injection molding machines.

2. In 1999, JSW agreed to sell to EXEL certain JSW plastic molding machines.  EXEL

sought to purchase JSW molding machines in order to provide plastic molding services to its

customers, including, but not limited to, Sunbeam-Oster.

1

3. JSW extended a line of credit to EXEL for the purchase of JSW machines. *See attached exhibit 1 hereinafter refereed to as "Contract 1".* "Contract 1" was signed by Jerry Johnson, Vice President for JSW and was never withdrawn.

4. The terms of Contract 1 provided payment terms of 5% down payment and balance net 180 days, at 0% interest. JSW further guaranteed EXEL a stock inventory of injection molding machines from their Anaheim California facility with delivery within fourteen days or less. Principals of EXEL PLASTICS, INC., an Illinois Corporation decided to open a plant in Brownsville. They already had contracts with Schumacher and maquilladoras located in Matamoros and were doing the work in Chicago. They were also negotiating with Sunbean, Inc. to do a large amount of their work requiring up to 16 machines. Before they moved, to get the Brownsville operation going, they negotiated an agreement with JSW to provide machines and machine financing. Since they were a start up corporation in Brownsville, they needed the line of credit from the machine supplier.

5. Finally, JSW promised their "full support on an ongoing basis" and "to assist EXEL in any way possible to accommodate the needs of Sunbeam." *See exhibit 1*

6. It was projected that EXEL would purchase 14-16 machines (two machines at a time) pursuant to the $1.5 Million line of credit. This was confirmed by the testimony of JSW employees Jerry Johnson and Dennis Potchateck. *See exhibit 3*

7. In reliance on Contract 1, EXEL traveled to Brownsville, Texas, rented a warehouse, signed a lease for five years and purchased auxiliary equipment needed to set up the facility. Further, EXEL entered into an agreement with the Brownsville Economic Development Council in order to earn incentives by employing and continuing to employ individuals at the EXEL facility in Brownsville, Texas.

2

8. Thereafter, EXEL triggered the $1.5 million dollar line of credit and issued purchase orders to JSW for the purchase of two machines:

a.  Purchase order #9 dated November 7, 2000 for model J500

b.  Purchase order #15 dated January 23, 2001 for model J110. *See exhibit 4*

9. On January 30, 2001, JSW confirmed the line of credit and agreed to sell to EXEL the above referenced machines for the total sum of $287, 355.00 using the $1.5 million dollar line of credit. *See exhibit 2, hereinafter referred to as "Contract 2"*     This contract was signed by the Vice President of operations for JSW (Jerry Johnson).

10. Pursuant to "Contract 2", JSW  agreed to accept the 5% down payment in three equal monthly installments of $4,788.59. After the last down payment was made, there were no payments due for a period of six months.  Then, starting on the seventh month, EXEL was to make eleven monthly payments of $5000.00 until the twelfth month, at which time EXEL agreed to make a balloon payment of the balance owed ($217,768.23). These terms were provided with 0% interest. The machines (J110 and J500) were to be shipped after the first installment of $4,788.59 was paid. JSW further assured EXEL, that these machines were ready to be shipped. *See exhibit 2.*

11.This first contract was negotiated with  the more lenient terms than the line of credit contract (180 days net) because of trouble EXEL was having getting outside financing on a separate J385 machine that they had purchased previously to do work for Schumacher.  This J385 purchase was not part of the line of credit but later became the purported reason that both contracts 1 and 2 were breached.  Thus EXEL's inability to get financing on the J385 was not only known to JSW but was no reason for the terms rejected in contract 2.

12.JSW has never denied the existence of these contracts and JSW employees Jerry Johnson

3

and Dennis Pochatek testified in their deposition, that they did extend the $1.5 M line of credit to EXEL and they agreed to sell to EXEL the J500 and J110 pursuant to contract 2. *See exhibit 3.* Further, defendant has not plead any defenses challenging the validity and/ or enforceability of "Contract 1" or "Contract 2". *(Hereinafter collectively refereed to as the "Contracts")*

13. In February of 2001, employees of JSW (Jerry Johnson, Bob Fehrenbach and Dennis Pochatek) had two telephone conferences with employees of Sunbeam, whereby JSW, through their employees, confirmed to Sunbeam that JSW had extended a $1.5 million dollar line of credit to EXEL for the purchase of 14-16 machines. JSW further advised Sunbeam that JSW was going to supply and sell machines to EXEL and further support EXEL in all of their business dealings with Sunbeam. In exchange, Sunbeam told JSW that they would be sending molds to EXEL for production. *See exhibit 4.* This was further confirmed by Robert Fehrenbach, JSW's prior salesman. *See exhibit 5.*

14. On April 30, 2001, EXEL paid to JSW the $4,788.59 which represented the first installment of the 5% down payment. JSW never delivered the J110 and J500 pursuant to the "Contracts".

15. On May 8, 2001, Steve Becker, President of EXEL, again requested, in writing, that the machines (J110 and J500) be delivered to EXEL pursuant to the Contracts.

16. By letter dated May 10, 2001, JSW confirmed they had received the $4,788.59. However, JSW stated they would not ship the machines. Finally, JSW advised EXEL it would apply the $4,788.59 (down payment for J500 & J110) toward the recovery and remarketing of the J385 machine previously purchased by EXEL. JSW's refusal to ship the machines and honored its line of credit caused EXEL to lose profits and suffer consequential damages. *See exhibit 6.*

4

17. JSW never delivered the J500 or J110. Further, JSW did not return the $4,788.59 paid by EXEL as a down payment, despite a request by Steve Becker for the return of such funds.

18. As a result of JSW actions and/or inactions, EXEL incurred damages including, but not limited to lost profits, expenses, costs and other actual and consequential damages.

## ELEMENTS ON BREACH OF CONTRACT

19. In order for the Plaintiff to prove their claim for breach of contract, they must prove the following:

A. that plaintiff and defendant had a valid and enforceable contract

      a. Offer
      b. Acceptance
      c. Mutual assent
      d. Execution and delivery of the contract with the intent that it be mutual and
      binding
      e. Mutuality of obligation.

*Wright v. Christian & Smith 950 SW2d 411 (Tex.App.-Houston [1ˢᵗ Dist.] 1997, no writ); Texas Gas Utility v. Barrett, 460 SW2d 409,412 (Tex.1970)*

B. that plaintiff performed

C. that defendant breached the contract

D. defendants breach caused the plaintiff injury

*Southwell v. University of the Incarnate word, 974 SW2d 351, 354-55 (Tex.App.-San Antonio 1998, pet. denied) Hussong v. Schan's 896 SW2d 320,326 (Tex.App.-Houston [1ˢᵗ Dist.] 1995, no writ)*

Whether the contract is enforceable and whether the defendant breached is a question of law for the Court to determine. *America's Favorite Chicken Co. V. Samaras, 929 SW2d 617, 622 (Tex.App.-San Antonio 1996, writ denied);Bank One v. Stewart, 967 SW2d 419, 432 (Tex.App.-Houston [14ᵗʰ Dist.] 1998, pet. denied)*

## A. Valid and Enforceable Contract

20. Defendant has not alleged or plead any defense regarding the validity and enforceability of "Contract 1 & 2" However, even if defendant attempts to challenge the existence of a valid and enforceable contract, defendant will fail. "Contracts 1 & 2" constitute offers by JSW which were

5

accepted by EXEL. Both contracts have specific terms which were agreed upon by both parties which is evidence by their signature thereon. *See Exhibits 1 & 2*    Finally, the "Contracts" were delivered to the appropriate party and called for mutual obligation of the parties.

21. Pursuant to the "Contracts", JSW extended a $1.5 M line of credit to EXEL, and agreed to sell EXEL 14-16 machines, two machines at a time to accommodate the needs of Sunbeam. EXEL, was obligated to purchase their machines from JSW pursuant to the payment terms outlined in "Contract 2". The testimony of JSW's own employees establish and confirm the existence of valid and enforceable contracts with EXEL. *See exhibit 3*

## B. Performance by EXEL

22. EXEL issued purchase orders for two machines triggering the $1.5 M line of credit. Thereafter, EXEL issued and delivered a check to JSW for the down payment ($4788.92).

## C. Breach by JSW

23. JSW failed to honor the $1.5 M line of credit.

24. JSW failed to deliver any machines to EXEL.

25. JSW failed to assist and accommodate EXEL to fulfill the needs of Sunbeam.

## D. Injury to EXEL

26. Because JSW failed to honor the line of credit and failed to deliver the machines to EXEL, EXEL lost five contracts with Sunbeam-Oster for the production of the following:

    -BL series coffee maker
    -OPP series coffee maker
    -PL series coffee maker
    -TM series pitcher & brew basket
    -PR series coffee maker reservoir

Further, because EXEL lost the work with Sunbeam, EXEL also lost incentive money from the Brownsville Economic Development Council.

## Conclusion

27. Based on the law and evidence Plaintiff request that this Honorable Court find that:

a. There is a valid and enforceable contract between Plaintiff and Defendant;

b. That Plaintiff performed their obligation;

c. That Defendant breached the contract by failing to perform their obligations; and

d. That the Plaintiff was damaged as a result of Defendants breach.

Further, Plaintiff request this Honorable Court find that Plaintiff has met its burden of proof on their cause of action for breach of contract and the burden has shifted to the Defendant to prove one of their affirmative defenses.

Respectfully submitted,

**GRIFFITH, HILL & OCHOA, L.L.P.**
One Park Place, Suite 500
100 Savannah Avenue
McAllen, Texas 78503
(956) 971-9446
(956) 971-9451 - facsimile

By: _____
John R. Griffith
State Bar No. 08480750
Fed. ID No. 12186
Viola G. Garza
State Bar No. 00787518


Moises M. Salas, Jr.
Law Offices of Moises M. Salas, Jr.
847 East Harrison
Brownsville, Texas 78520
(956) 982-0600
(956) 982-0601 (fax)
ATTORNEYS FOR PLAINTIFF
EXEL BOBBINS AND PLASTIC

7

## **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above and foregoing instrument was forwarded to all counsel of record, to wit:

***Attorney-In-Charge for Defendant:***
David G. Garza
**Garza & Garza, L.L.P.**
680 East St. Charles, Suite 300
P.O. Box 2025
Brownsville, Texas  78522-2025
(956) 541-4914
(956) 542-7403 (fax)

James J. Regan
Regan - Braun Law Offices
2522 Artesia Blvd., Suite 200
Redondo Beach, California 90278
(310) 372-1988
(310) 318-5894 (fax)

via PRIORITY MAIL, return receipt requested, on this _____ day of May, 2003.

By: _____
John R. Griffith
Viola G. Garza

8

# EXHIBIT 1

# JSW PLASTICS MACHINERY INC.

HEAD OFFICE: LOS ANGELES
3726 EAST MIRALOMA AVENUE • ANAHEIM, CALIFORNIA 92806-2107 • PHONE (714) 630-5651 • FAX (714) 630-1886

| CHICAGO TECHNICAL CENTER | EAST COAST OFFICE | DETROIT OFFICE | ATLANTA OFFICE |
|---|---|---|---|
| 1300 LANDMEIER ROAD | P.O. BOX 498 | 44712 HELM STREET | 1700 CUMBERLAND POINT DR., STE#17 |
| ELK GROVE VILLAGE, IL 60007 | DAYVILLE, CT 06241-0498 | PLYMOUTH, MICHIGAN 48170 | MARIETTA, GEORGIA 30067 |
| PHONE: (847) 427-1100 | PHONE: (860) 774-2613 | FHONE: (734) 455-9003 | PHONE: (770) 952-0269 |
| FAX: (847) 427-1131 | FAX: (860) 774-3297 | FAX: (734) 455-9058 | FAX: (770) 956-9058 |

February 29, 2000

To Whom It May Concern:

JSW Plastics Machinery Inc., will support the growth and expansion of Exel Bobbins and Plastic Components Inc., by providing any model of JSW PMI Plastic Injection Molding Machine, which they will require for future projects with Sunbeam-Oster. This also includes maintaining a new machine inventory for quick delivery, based on the demands by Exel Customers, as well as providing full support on an on-going bases. We will assist Exel in any way possible to accommodate the needs of Sunbeam-Oster in all of their molding needs.

As of this date, JSW PMI has extended a credit line of $1,500,000.00 to Exel for the purchase of JSW's products and services, and agrees to a payment term of 5% down payment and balance net 180 days, at 0% interest. In addition, JSW PMI guarantees Exel a stock inventory of Injection Molding Machines at our Anaheim, CA. facility with delivery requirements of fourteen (14) days or less.

Once again, it has been and will be a pleasure doing business with Exel Plastics Inc., and sincerely appreciate our relationship of being a team supplier member of Exel Plastics.

Sincerely,

Jerry Johnson
Vice President

**EXHIBIT**

Plts 7

# EXHIBIT 2

*Exhibit D*



**JSW**
**JSW PLASTICS MACHINERY INC.**

January 30, 2001

Mr. Steve Becker
EXEL BOBBINS Inc.
3301 NAFTA Parkway – Unit C
Brownsville, TX 78521

Dear Steve,

As you will remember, JSW Plastics Machinery, Inc., extended a Line of Credit to your company, EXEL BOBBINS Inc., and now that we are getting close to shipping machines into your facility in Brownsville, TX., we must have an agreement as to the re-payment of this Line of Credit. Therefore, please accept the following proposal. We will be shipping the following Machines, per your Purchase Order #'s 15 and 5.

1 – JSW Model J500EII Injection Molding Machine    ~~$206,500.00~~   *202,500.00 per 3/3/2000 Quote + our Conversation today 3/31/01*
1 – JSW Model J110EII Injection Molding Machine    $ 84,835.00
         TOTAL INVOICE AMOUNT    *$4788.92*   ~~$291,335.00~~   *$ 287,335.00*

A 5% Down Payment of the total order amount is normally required prior to shipment, however we will make a special consideration to EXEL BOBBINS of 3 Equal Monthly Payments of $~~4,855.59~~, with the first payment due prior to shipment of machines, and the next Down Payment Installment is due Thirty (30) days after shipment, and the last Down Payment Installment Sixty (60) days after shipment. *$ 217,768.23*

After the last Down Payment Installment is made, there will not be any payments due for a period of Six (6) Months. Then, starting on the Seventh (7) Month, EXEL BOBBINS will make Eleven (11) Monthly payments of $5,000.00 until the Twelfth (12) Month, at which time EXEL BOBBINS agrees to make a balloon payment of the balance owed (~~$ 221,768.23~~) to JSW Plastics Machinery. No interest will be charged during this special financing period, however it is agreed that JSW Plastics Machinery will still remain the owner and have recovery rights of this equipment until final payment has been made by EXEL BOBBINS or it's Financial Partner. JSW Plastics Machinery has the right to cancel or withdraw from this agreement after given written notice to EXEL BOBBINS on a Thirty (30) days notice.

Steve, if you are interested in pursuing this agreement, please sign below and return to my attention, a.s.a.p. as we are ready to ship these machines to you. Should you have any questions about this agreement, or require additional information, please feel free to contact Dennis Pochatek at the Chicago Technical Center.

Sincerely,

Jerry Johnson
Vice President Operations

Accepted By: _____
               Signature
         *President*
                Title
Date: _____2/26/01_____

CORPORATE OFFICE   3772 EAST MIRALOMA AVENUE, ANAHEIM, CA 92806-2107.  PHONE: 714-630-5651   FAX: 714-630-1866
CHICAGO TECHNICAL CENTER  1300 LANDMEIER ROAD, ELK GROVE VILLAGE, IL 60007  PHONE: 847-427-1100  FAX: 847-427-1121
ATLANTA REGIONAL OFFICE  730 CUMBERLAND POINT DR., SUITE 17, MARIETTA, GA 30067  PHONE: 770-952-0269  FAX: 770-866-9058
DETROIT REGIONAL OFFICE  24464 CATHERINE INDUSTRIAL DR., SUITE 310, NOVI, MI 48375  PHONE: 248-449-5422  FAX: 248-449-6818

# EXHIBIT 3

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE SOUTHERN DISTRICT OF TEXAS

3    BROWNSVILLE DIVISION

4

5  EXCEL BOBBINS AND PLASTIC    )

6  COMPONENTS, INC.,    )

7    Plaintiff,  )

8  vs.    ) No. B-01-148

9  JSW PLASTICS MACHINERY, INC.,  )

10    Defendants.    )

11

12

13    The videotaped discovery deposition of

14  DENNIS POCHATEK called for examination pursuant to

15  Notice and the Rules of Civil Procedure for the

16  United States District Courts pertaining to the

17  taking of depositions, taken before Judy Carlson, a

18  notary public within and for the County of McHenry

19  and State of Illinois, at 1300 Landmeier Road,

20  Chicago, Illinois, on the 10th day of October,

21  2002.

22

23  Reported by: Judy Carlson, CSR

24  License No.: 084-003347

1

---

1  APPEARANCES:

2

3    GRIFFITH, HILL & OCHOA, L.L.P., by

4    MR. JOHN R. GRIFFITH &

5    MS. VIOLA GARZA,

6    One Park Place 100

7    Savannah Avenue, Suite 500

8    McAllen, Texas 78503

9    (956) 971-9446

10    Representing the Plaintiff,

11

12    REGAN, BRAUN LAW OFFICES, by

13    MR. JAMES J. REGAN,

14    2522 Artesia Boulevard

15    Redondo Beach, California 90278

16    (310) 372-1988

17    Representing the Defendant.

18

19  ALSO PRESENT:

20    Mr. Steve Becker & Mr. Fumio Hirayama.

21

22

23

24

2

1    Q.  Okay.

2        I'm talking about a financing deal like

3    this one, where JSW Plastics is saying we will

4    provide financing of up to 1.5 million.  In other

5    words, you're going to get special terms or some

6    other arrangement, I'll ask you in a minute what

7    that is, under that arrangement, would you

8    necessarily get your commission up front?

9    A.  I don't believe that this letter states or

10   even the agreement that we were going to finance.

11   We are not a finance company.  So, we were never

12   going to finance Excel Bobbins.

13   Q.  Well, let me ask you that, then, what is

14   your understanding of what is meant by as of this

15   date, JSW, PMI has extended a credit line of 1.5

16   million to Excel for the purchase of the JSW's

17   products and services and agrees to a payment term

18   of five percent down payment and balance net 180

19   days at zero percent interest.  What does that

20   sentence mean to you?

21   MR. REGAN:  I'm going to object as no

22   foundation, inquiries into attorney-client

23   privilege and calls for a legal conclusion.  I'll

24   instruct the witness not to answer.

31

1    BY MR. GRIFFITH:

2    Q.  Okay.

3        Are you going to listen your attorney's

4    objection despite the fact that you just told me

5    you had an understanding of what that meant?

6    A.  I'm going to listen to my attorney.

7    Q.  Okay.  And refuse to answer?

8    A.  Yes.

9    Q.  Let me ask it this way, separate and apart

10   from the February 29, 2000 letter, you told me

11   earlier that from Jerry Johnson and Bob Fehrenbach,

12   you got an understanding of what the 1.5 million

13   for equipment as needed as long as certain criteria

14   met -- was met, what was your understanding back at

15   that time when you first heard about it as to what

16   the 1.5 million financing or the arrangement of the

17   1.5 million financing was for?

18   A.  The way I understood it, the $1.5 million

19   was to be put towards the purchase of equipment.

20   And at the time, it was that there was going to be

21   approximately -- well, the number always changed

22   from 12 to 17 machines for Sunbeam Oster business.

23   Q.  Okay.

24       And was your understanding that those

32

1  machines would be delivered periodically, let's
2  say, two at a time or were they all just going to
3  be 12 machines all at once? What was your
4  understanding of how that was going to come out?
5     A.  It would come over a period of time.
6     Q.  Now, do you have any knowledge why the
7  original commitment discussed five percent down and
8  balance net 180 days whereas a later arrangement
9  had no payments for six months and then 12 months
10  of payments with balance due at the end of that
11  time, do you know -- do you know why that changed?
12     A.  Do I know why this came about?
13     Q.  Right.
14     A.  Yes.
15     Q.  Why was that?
16     A.  Excel Bobbins did not have the wherewithal
17  to pay for the machinery.
18     Q.  In 180 days?
19     A.  We didn't know. We were seeking at this
20  time to get a down payment. And at this time that
21  this letter was written, we were also seeking
22  payment for a 385 that they had in their possession
23  that was due -- past due.
24     Q.  It was past due on January 30, 2001?

33

1     A.  No, not at -- well, January, March. I
2  don't know the exact date of when it became past
3  due.
4     MR. REGAN: Counsel, for purposes of the
5  record, I don't know whether the video camera can
6  pick up the exhibit that was being referred to, but
7  I believe that the witness was referring to Exhibit
8  6, and underneath it is 5. But it was those two
9  exhibits just for purposes of the record.
10  BY MR. GRIFFITH:
11     Q.  Okay.
12        Let me just -- we are working off of 6.
13  But let me ask you --
14     MR. REGAN: Probably this one would be the
15  better.
16     MR. GRIFFITH: Right.
17  BY MR. GRIFFITH:
18     Q.  Let me ask you what is your knowledge as
19  to why -- well, first of all, do you know who made
20  the notations on Exhibit 5?
21     A.  That would be the handwritten notations?
22     Q.  Yes.
23     A.  Steve Becker.
24     Q.  Do those handwritten modifications, are

34

1   Q.  But it was your understanding that the 1.5
2   was in conjunction with 12 to 17 machines to be
3   used for Sunbeam Oster business, is that correct?
4   A.  Yes.
5   Q.  It wasn't like the 1.5 million could be
6   used for, you know, hunting trips in Alaska or
7   whatever else. It was for machines to be purchased
8   for supplying Sunbeam Oster with product?
9   A.  Yes.
10  Q.  And who did you get that understanding
11  from?
12  A.  Again, stated before, it would have been
13  Jerry Johnson and Bob Fehrenback were the two major
14  people that I talked to.
15  Q.  Okay.
16  And I guess I just wanted to know if as to
17  the specifics of 12 to 17 machines to be used for
18  Sunbeam Oster, if that's something you learned from
19  Jerry more particularly than Bob or just both?
20  A.  To tell you the truth, it was never
21  brought up. No one ever told me that, no, they are
22  going to use this to go hunting in Alaska. I just
23  assumed that all of this would be used to buy
24  equipment.

39

1   Q.  Okay.
2   Well, and I guess what I'm curious about
3   is it to buy equipment or to buy equipment to
4   provide Sunbeam Oster with molded product?
5   A.  Sunbeam Oster.
6   Q.  Okay.
7   So, it wasn't to be used to buy equipment
8   for OEM for other companies. It was specifically
9   tied to Sunbeam Oster, that was your understanding?
10  A.  That was my understanding.
11  Q.  Now, let's talk about the 385 that was
12  purchased. I guess, well, let me ask you this, do
13  you remember when discussions about purchasing the
14  385 first occurred?
15  A.  No.
16  Q.  Was that before you got involved with the
17  company?
18  A.  Yes.
19  Q.  Was it ever a -- did you ever discuss with
20  anybody the effect upon your commission or your
21  salary of the sale of these machineries -- this
22  machinery to Excel Bobbins under the 1.5 million
23  line of credit?
24  A.  Please state that again.

40

1    But -- and so I guess my question is on --

2  so, then March 23, 2001, you were getting him

3  another month to make the pavement because you knew

4  he was having trouble making the payment?

5    A.  Yeah.  The best that I can recollect out

6  of this whole thing, he had not -- still had not

7  had any financing, and he needed or he was stating

8  he had another month.  So, I looked up the entire

9  back order for him because I had nothing to do with

10  the sale of the 385 when it was started.

11    So, I looked it up and found out that

12  Steve was correct.

13    Q.  Okay.

14    And so, you got him an extra month to make

15  that payment on March 23?

16    A.  Uh-huh.  Sorry about that.

17    Q.  Let me hand you Plaintiff's Exhibit 13 and

18  ask you if you know who made the handwritten

19  notations on that one?

20    A.  The handwriting on the bottom is mine.  I

21  don't know who wrote the top one.

22    Q.  Okay.

23    Is that the work paper that you would have

24  worked off of to base your --

109

1    A.  The one month.

2    Q.  -- Exhibit 11 one month additional time

3  on?

4    A.  Yes.

5    MR. REGAN:  Counsel, does this paper work,

6  Exhibit 13, clear up the question you had with

7  regard to the original sale to Excel Bobbins -- to

8  Excel Plastics?

9    MR. GRIFFITH:  It's a JSW Plastics document.

10  It's not going to clear up anything in that regard.

11  I'm sure that you will do that for me, though, at

12  some point.

13  BY MR. GRIFFITH:

14    Q.  Now, let me ask you when you first became

15  involved with Excel Bobbins, was that early on in

16  your employment or was that something that you

17  just -- you didn't get involved in until later?

18    A.  The best that I can answer that is Excel

19  Bobbins -- I don't know when Excel Bobbins became

20  Excel Bobbins.  We started talking to Excel

21  Plastics that's who I started talk with.  And

22  somewhere along the way, our representative at the

23  time Bob Fehrenback came in and said they are now

24  going to call themselves Excel Bobbins down in

110

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE SOUTHERN DISTRICT OF TEXAS

3    BROWNSVILLE DIVISION

4

5    EXCEL BOBBINS AND PLASTIC        )

6    COMPONENTS, INC.,                )

7        Plaintiff,        )

8    vs.                    ) No. B-01-148

9    JSW PLASTICS MACHINERY, INC.,    )

10       Defendants.       )

11

12

13       The videotaped discovery deposition of

14   GERALD ARTHUR JOHNSON called for examination

15   pursuant to Notice and the Rules of Civil Procedure

16   for the United States District Courts pertaining to

17   the taking of depositions, taken before Judy

18   Carlson, a notary public within and for the County

19   of McHenry and State of Illinois, at 1300 Landmeier

20   Road, Chicago, Illinois, on the 11th day of

21   October, 2002.

22

23   Reported by: Judy Carlson, CSR

24   License No.: 084-003347

1

---

1    APPEARANCES:

2

3        GRIFFITH, HILL & OCHOA, L.L.P., by

4        MR. JOHN R. GRIFFITH &

5        MS. VIOLA GARZA,

6        One Park Place 100

7        Savannah Avenue, Suite 500

8        McAllen, Texas 78503

9        (956) 971-9446

10           Representing the Plaintiff,

11

12       REGAN, BRAUN LAW OFFICES, by

13       MR. JAMES J. REGAN,

14       2522 Artesia Boulevard

15       Redondo Beach, California 90278

16       (310) 372-1988

17           Representing the Defendant.

18

19   ALSO PRESENT:

20       Mr. Steve Becker & Mr. Fumio Hirayama.

21

22

23

24

2

1  Q. Right.

2  A. And also, if the 110 was actually purchase

3  order No. 9, and you show here that the 720 is

4  purchase order 5. Why didn't he then change the

5  number of the purchase order?

6  Q. Okay.

7  So, to correct that problem, we would have

8  to change this five to a nine in the first

9  paragraph, correct?

10  A. Yes.

11  Q. Now, as far as the numbers that were

12  written into this contract, did you agree to those

13  numbers?

14  A. No.

15  Q. Did Dennis agree to those numbers?

16  A. I don't believe so.

17  Q. Okay.

18  So, you're taking the position that it was

19  not agreed between JSW Plastics and Excel Bobbins

20  that the sales price would be the handwritten in

21  price and that the down payment would be the

22  handwritten in down payment, is that correct?

23  A. That's correct.

24  Q. As long as we are on this contract, why is

79

1  it that -- well, first of all, this is your

2  signature on Exhibit 5, correct?

3  A. Yes.

4  Q. Okay.

5  Did you negotiate the terms of this

6  agreement that's embodied in Exhibit 5?

7  A. With who?

8  Q. Well, I -- Steve Becker. Really, with

9  anybody.

10  Are you -- were the part at JSW Plastics

11  that came -- that gave JSW Plastics' position with

12  regard to this agreement?

13  A. This was the offer of sale that was given

14  to Excel Bobbins.

15  Q. Okay.

16  A. The -- the contents printed in my letter,

17  not the modifications.

18  Q. Right.

19  Now, were those -- was that offer

20  negotiated with Steve Becker before it was typed

21  out in this format in Exhibit 5?

22  A. I would imagine so. Yes.

23  Q. Who did those negotiations?

24  A. Either myself or Dennis.

80

1    Q. And I guess maybe an easier way to ask

2  this is did Dennis type this letter up and just

3  hand it to you for your signature or were you the

4  one that drafted this letter?

5    A. I drafted that letter.

6    Q. Did you draft it based upon what you were

7  told by Dennis or did you draft it based upon what

8  you discussed with Mr. Becker?

9    A. This is a very hard question to answer

10  because prior to Dennis Pochatek coming on board

11  with JSW, I handled the Excel Plastics account with

12  Bob Fehrenbach.

13      Sometime after Dennis came on board, it

14  was his responsibility to negotiate the deals. So,

15  therefore, I can't say who actually negotiated.

16  But I certainly will attest that it was put into

17  this letter by me.

18    Q. Okay.

19      And you said this is an offer of sale.

20  So, this is basically JSW Plastics' offer to Excel

21  Bobbins as to what you would agree to -- what JSW

22  Plastics would agree to, correct?

23    A. For these two specific machines. Yes.

24    Q. Okay.

81

1      Why is it that you offered six months no

2  payment, and then payments over 12 months with a

3  balloon at the end of the total 18 months? Why is

4  it that you offered that to Excel Bobbins?

5    A. Well, it was -- it became very apparent

6  that Excel Bobbins was having difficulty obtaining

7  financing. And even though we are not a finance

8  company, we tend to try to support our customers in

9  any way we can.

10      So, in being able to sell these two

11  machines, we offered a special sales concession, if

12  you will, to Excel Bobbins. That -- when I talk

13  about sales concession, it can be -- that meaning

14  could either be cash discounts or payments over

15  time without any type of interest or several

16  different items.

17      So, what we try to do is support each and

18  every customer in the way that they -- they need at

19  that time of purchase. You made reference to the

20  five percent down payment in 180 days. I'm sorry.

21  Okay. Should I continue or --

22    Q. Let me go ahead and ask a question.

23      The reason I smiled is because yesterday

24  Dennis called it special terms, and you're calling

82

1    Q.  Well, I probably didn't say that right.

2        Was that line of credit set up so that

3    Excel Bobbins could purchase machines to support

4    Sunbeam Oster?

5    A.  I think that was the intent.  Yes.

6    Q.  Okay.

7        I mean, it even says right here, which

8    they will require for future projects with Sunbeam

9    Oster, correct?

10    A.  That's correct.

11    Q.  Well, was it your position that this 1.5

12    million line of credit was just for anything that

13    Steve wanted to do or Excel Bobbins wanted to do or

14    was it specifically tied to the Sunbeam Oster

15    project?

16    A.  The conversations of creating this letter

17    was because Sunbeam was very close to giving Excel

18    Bobbins some business.

19    Q.  Okay.

20        And what was it -- what was your

21    understanding of what Excel Bobbins needed to

22    support that business?

23    A.  I think Sunbeam was a little bit concerned

24    of the status of Excel Bobbins being a start-up

85

1    company and maybe not having the cash available to

2    purchase machines.

3    Q.  Okay.

4        And what kind of machine requirement was

5    it that Sunbeam was looking for?

6    A.  As far as machine ranges?  Or I don't

7    understand.

8    Q.  Either machine ranges or total numbers,

9    whatever you remember?

10    A.  Well, it changed quite a bit from time to

11    time.  And one minute it was 385 and a 720, then a

12    week later, it changed to a 110 to a 500.  And we

13    questioned Mr. Becker about why is he always

14    changing it.  And he responded by saying well, it's

15    not me, it's my customer's requirements that's

16    causing me to change.

17    Q.  Yesterday when we talked to Dennis and

18    then we also talked to Bob Fehrenbach, both of them

19    talked about that this Sunbeam Oster deal was set

20    up with an eye toward anywhere 12 to 16 machines.

21    Is that what you remember also?

22    A.  That is correct.

23    Q.  So, I guess I'm not really talking about

24    which machines.  I'm talking about what was being

86

1  not a legally binding document?

2    A.  No.

3    Q.  So, when you wrote this, you had no

4  intention of it being a legally binding document,

5  is that correct?

6    A.  Say that again.

7    Q.  When you wrote this letter on behalf of

8  JSW Plastics, you had no intention of it being a

9  legally binding document?

10    MR. REGAN:  I'll just object as calling for a

11  legal conclusion. This witness isn't qualified to

12  make that.

13  BY MR. GRIFFITH:

14    Q.  You can still answer.

15    A.  No comment.

16    Q.  Well, I want to know what your intention

17  was. And let me not -- leave out the word legally.

18    When you wrote this letter, you did not

19  consider this to be a binding document on JSW

20  Plastics, correct, is that your testimony?

21    A.  That is correct.

22    Q.  Okay.

23    And it's your position that this letter

24  was not written to support Excel Bobbins and

89

1  Plastic, but rather was written to support Excel

2  Plastics because that's who you had the

3  relationship with, correct?

4    A.  No. I don't think that's correct.

5    Q.  Because you said a moment ago that it was

6  your understanding that Excel Bobbins didn't even

7  exist at this time.

8    A.  Well, at that time they had no -- no

9  history with JSW.

10    Q.  Right. Okay.

11    Reading the first sentence, it says we

12  will support the growth and expansion of Excel

13  Bobbins and Plastics Components, Inc., is that

14  correct, did I read that right?

15    A.  Yes.

16    Q.  Okay.

17    And by that, you're not referring to Excel

18  Plastics, you're referring to Excel Bobbins and

19  Plastic Components, Inc., correct?

20    A.  Yes.

21    Q.  And you understood that was the company

22  that was going to be operating in Brownsville,

23  correct?

24    A.  Yes.

90

BY MR. GRIFFITH:

Q. Thank you. Which was Exhibit 7, correct?

A. Yes. Five percent down, balance 180 days.

Q. And in fact, weren't there two phone calls between yourself and Mr. Becker and individuals at Sunbeam where JSW Plastics through you confirmed that very arrangement, that those machines would be available to Excel Bobbins to support Sunbeam work?

A. Well, I can only recall one telephone call.

Q. Okay.

And I think it was Bob Fehrenbach yesterday that said that there were two that he remembered. Let me ask you about the one that you remember.

Was it, in fact, a conference call between yourself and one or more principals of Sunbeam and Mr. Becker, do you remember that being the parties involved?

A. The call that I remember was Steve Becker was present at the Sunbeam facilities.

Q. Okay.

A. He put me on speaker phone with Hector Lu --

Q. Hector Lucio, I think.

A. Oh, Lucio, yes, of Sunbeam.

Q. Okay.

A. And I was in my office here alone at the Chicago Tech Center.

Q. So, Dennis was not with you nor was Bob at that time?

A. No. They were not.

Q. But -- and what you remember as far as on the other side it was Mr. Becker and Hector Lucio at the Sunbeam plant?

A. That is correct.

Q. And in that conversation, did you confirm to Hector Lucio that you would support Excel Bobbins by providing machinery to Excel Bobbins?

A. Yes, I did.

Q. And did you confirm with Hector Lucio that you, in fact, would provide that machinery along the lines that we just discussed, that you would provide the machines over time or did you just say we will support it?

A. There were no details confirmed in that conversation except for the commitment of supporting Excel Bobbins to becoming a successful

131

132

# EXHIBIT 4

Exel Bobbins & Plastic Components Inc.

# Purchase Order

301 NAFTA Parkway
Unit C
Brownsville, TX 78521

| DATE | P.O. NO. |
|------|----------|
| 11/7/2000 | 9 |

| Vendor | SHIP TO |
|--------|---------|
| JSW Plastics Machinery Inc<br>3726 E. Miralonna Avenue<br>Anaheim, CA 92806<br>Fax: 847-427-1131 | Exel Bobbins & Plastic Components Inc.<br>3301 NAFTA Parkway<br>Unit C<br>Brownsville, TX 78521<br>Ph. 956-832-0807  Fax 832-0811 |

| ITEM | DESCRIPTION | QTY | RATE | AMOUNT |
|------|-------------|-----|------|--------|
| IE2 | 500 Ton Injection Molding Machine; B-Barrel | 1 | 206,500.00 | 206,500.00 |
| | NOTE: Ship to above address; Bill to Exel Plastics | | | |
| | 302 roma Jean Pkwy.<br>Streamwood, IL 60107 | | | |

Payment Terms as per Sales Rep. Robert Feherenbach: 5% down; Net 6 months

| Total | $206,500.00 |
|-------|-------------|

**EXHIBIT**

Exel Bobbins & Plastic Components Inc.

# Purchase Order

3301 NAFTA Parkway
Unit C
Brownsville, TX 78521

| DATE | P.O. NO. |
|------|----------|
| 1/23/2001 | 15 |

| Vendor | SHIP TO |
|--------|---------|
| JSW Plastics Machinery Inc<br>3726 E. Miraloma Avenue<br>Anaheim, CA 92806<br>Fax: 847-427-1131 | Exel Bobbins & Plastic Components Inc.<br>3301 NAFTA Parkway<br>Unit C<br>Brownsville, TX 78521<br>Ph. 956-832-0807  Fax 832-0811 |

| ITEM | DESCRIPTION | QTY | RATE | AMOUNT |
|------|-------------|-----|------|--------|
| J110 FII | J110 II with a 7.2 oz "B" barrel, wired for 460/3/60 voltage | 1 | 84,835.00 | 84,835.00 |

Special Discounted Price   Machine is in stock, subject to prior sale.

| | Total | $84,835.00 |
|--|-------|------------|

EXHIBIT

π( 30

# EXHIBIT 5

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE SOUTHERN DISTRICT OF TEXAS

3    BROWNSVILLE DIVISION

4

5    EXCEL BOBBINS AND PLASTIC        )

6    COMPONENTS, INC.,            )

7        Plaintiff,        )

8    vs.                ) No. B-01-148

9    JSW PLASTICS MACHINERY, INC.,    )

10        Defendants.        )

11

12

13    The videotaped discovery deposition of

14    ROBERT FEHRENBACH called for examination
pursuant

15    to Notice and the Rules of Civil Procedure for the

16    United States District Courts pertaining to the

17    taking of depositions, taken before Judy Carlson, a

18    notary public within and for the County of McHenry

19    and State of Illinois, at 1300 Landmeier Road,

20    Chicago, Illinois, on the 10th day of October,

21    2002.

22

23    Reported by: Judy Carlson, CSR

24    License No.: 084-003347

1

APPEARANCES:

1

2

3    GRIFFITH, HILL & OCHOA, L.L.P., by

4    MR. JOHN R. GRIFFITH &

5    MS. VIOLA GARZA,

6    One Park Place 100

7    Savannah Avenue, Suite 500

8    McAllen, Texas 78503

9    (956) 971-9446

10        Representing the Plaintiff,

11

12    REGAN, BRAUN LAW OFFICES, by

13    MR. JAMES J. REGAN

14    2522 Artesia Boulevard

15    Redondo Beach, California 90278

16    (310) 372-1988

17        Representing the Defendant.

18

19

20    ALSO PRESENT:

21    Mr. Steve Becker & Mr. Fumio Hirayama.

22

23

24

2

1   the time that you were representing one specific

2   company selling injection molders, you don't

3   represent any other company?

4       A.   That is correct.   My contracts are

5   explicit that way.

6       Q.   That is was going to be my next question.

7   Do you have a contract with each of these companies

8   whereby you have an agreement to sell strictly

9   their machines?

10      A.   That's correct.   If I have an exclusive

11  contract, then I am required under my corporation

12  payments in the State of Illinois not to sell

13  competitor products.

14      Q   Okay.

15          And prior to selling Nogata machinery,

16  what type of machines were you selling?

17      A.   JSW.

18      Q.   How long did you sell JSW machines?

19      A.   Almost ten years, I imagine.

20      Q   During the ten years that you were selling

21  JSW machines, did you have a contract to sell

22  exclusively JSW machines?

23      A.   Yes, I did

24      Q   The entire ten years?

9

1       A.   Ten years.   If it's ten years.   It might

2   be nine or eight.   But the best of my recollection,

3   it's nine plus.

4       Q.   Would you have a copy of the contract?

5       A.   I do have a copy of my contract with JSW,

6   but obviously, I wasn't asked to bring any

7   particulars with me.

8       Q.   Right.

9           But if I were to subpoena or ask you for a

10  copy of those contracts, you would have that

11  contract?

12      A.   I should still have those paperwork   Yes

13      Q   Is it only one contract or is it various

14  contracts throughout each year?

15      A.   It was one contract originally, but when

16  Mr. Hirayama appointed Mr. Johnson, he basically

17  was changing contracts quite readily throughout the

18  industry and with me a number of times

19      Q.   Ask you to clarify that a little bit   You

20  said you had one specific contract, but then Jerry

21  Johnson came in and changed it?

22      A.   He changed a few customer base territory,

23  add on, take off, whatever.   So, I have more than

24  one — you know, one contract, but basically it was

10

1    A.  Jerry said the reason was because he had

2    other agencies that were looking for the territory,

3    and he thought he could expand and sell more

4    opinions.

5    Q.  It just happened that it was a coincidence

6    that right after the phone call with Excel is when

7    they terminated you?

8    A.  It was a good opportunity.  I am in the

9    office.  I already did what he asked.  And brought

10   me in here and terminated me.

11   Q   To your knowledge, has JSW hired a supper

12   agency to take over their sales?

13   A.  Yeah  They lasted less than a year and

14   didn't sell too much at all

15   Q   What was the name of that company?

16   A   Priority  They disbanded  Couldn't even

17   keep their sales going.

18   Q.  Do you have any idea who has taken over

19   the JSW sales represent --

20   A.  I heard recently that Essco is their new

21   representative.

22   Q.  Essco is that E-s?

23   A.  I think it's, E-s-s-c-o.  I'm not sure of

24   the spelling.

15

1    Q.  That conversation in April of 2000 when

2    you were terminated to Excel, who did you speak to?

3    A.  I don't understand that question.

4    Q.  You said the day that Jerry Johnson

5    terminated you, you had spoken with somebody from

6    Excel.  I'm trying to figure out who it was.

7    A.  It was an attempt on a conference call

8    with Sunbeam Corporation and Steve Becker and in

9    Brownsville, Texas, I believe.

10   Q.  Do you know who at Sunbeam was present

11   during that conference call?

12   A.  I did at the time.  It was one of their

13   executives.  Actually, was a couple people, I

14   believe.  And I wouldn't recall the name two years

15   later, though.

16   Q   Okay.

17       And on behalf of JSW Jerry Johnson was

18   present and Dennis Pochatek --

19   A.  Pochatek.

20   Q.  -- Pochatek was present?

21   A.  I didn't mean to correct you.

22   Q.  I'm sorry.

23   A.  Helping you out there

24   Q.  Pochatek.

16

1       Anyone else with JSW that was present

2  during that telephone conference?

3       A.  I don't believe so.

4       Q.  And what was the purpose of that telephone

5  conference?

6       A.  Jerry was trying to establish the --

7  No. 1, the commitment from Sunbeam to Excel

8  Corporation, and also for delivery of machines.

9  Jerry was in a hurry to have JSW ship these

10  machines down to Steve Becker's organization.

11      Q.  Do you know why Jerry was in such a hurry

12  to deliver these machines?

13      A.  On a number of occasions, Jerry tried to

14  get me to get Steve to accept the machines and keep

15  them down there, and for whatever -- whatever

16  reasons he has within JSW to have the machines

17  shipped, that, I wouldn't be privy to.  I assumed

18  it was because he was trying to get his sales up

19  and he wanted me to coerce Steve to get the

20  machines ahead of time.  And I told him Steve is

21  not going to accept the machines until he has the

22  business and the molds in his plant because it

23  costs money to maintain machines on the floor.

24      Q.  During this telephone conference, who was

                        17

1  the one that was doing most of the talking, was it

2  yourself or was it Jerry Johnson?

3       A.  It was Jerry Johnson talking to Sunbeam,

4  Steve Becker.  I'm not even sure if that's -- you

5  know, this happened on more than one occasion that

6  we had tried to make contact and talk to people

7  that Steve was going to be doing business with in

8  Texas that ascertain basically the conversation was

9  to make sure that Steve was getting the business

10  and Sunbeam was saying, yes, he was getting the

11  business.  And it takes time to transfer molds and

12  have the business go to Excel.

13      Q.  I just want to be clear, during that

14  telephone conference in April of 2000, you did

15  confirm with Sunbeam that Sunbeam was going to give

16  Excel Bobbins business in Brownsville?

17      A.  Yes.

18      Sunbeam spoke very highly of Steve and

19  said that there was quite a lot of business that

20  was going to be given to Steve through Sunbeam

21  Corporation, and I'm not exactly whether this was

22  more than one man at this meeting.  There was a

23  couple times when we had more than one people from

24  Sunbeam on the other line.  So --

                        18

1    Q.  And I just want to -- right now, I just

2  want to talk about that specific meeting that you

3  remember in April of 2000.  And --

4    A.  Thereabouts, April of 2000.  Okay.

5    Q.  Right.

6      Did anyone with Sunbeam during that

7  specific conference discuss the amount of work that

8  they were going to be giving to Excel Bobbins?

9    A.  Yes.  And I don't recall.  I know it

10  required a number of machines.

11      They were talking at the time Excel a

12  total of 12 machines over a period of a year, year

13  and a half.  At this time, it was five machines to

14  be shipped.  And basically, Steve had given me a

15  verbal on the whole business because the commitment

16  made by JSW to supply the machinery  I do know

17  there was, I believe at that time, a hard copy

18  which I still have of five machines that was --

19  with a PO that was issued and other machines that

20  were to follow.  And I think a verbal PO was placed

21  on that, too.

22    Q.  But you know for sure that in April of

23  2000, Sunbeam was going to require at least five

24  machines -- or Excel was going to require at least

1  five machines in order to do the work for Sunbeam?

2    A.  Yes.

3      There was other customers involved too,

4  but Sunbeam was the biggest customer at that time.

5    Q.  Okay.

6      Did they -- anyone from the Sunbeam

7  corporation talk during that April 2000 telephone

8  conference specifically about which parts were

9  going to be made by Excel Bobbins?

10    A.  We had a couple of discussions about

11  parts, not just in this one phone call, but the

12  coffee maker was one of them.  I remember that.

13      And you know, I sell the machinery, not

14  the parts  But there was parts -- a lot to do with

15  this instant coffee pot and some bigger parts that

16  were involved.  But I think it was all related to

17  that type of industry, consumer goods industry, I'd

18  like to say.

19    Q.  And do you remember during that telephone

20  conference if Jerry Johnson confirmed to Sunbeam

21  that they were going to support Excel Bobbins with

22  the machines?

23    A.  Yes, he did.

24    Q.  Do you remember specifically what he said?

19                                    20

1    A.  Yes.  He said that he had a commitment to

2  Excel Bobbins.  Excel Bobbins had paid their bills

3  up to now, previously.  And they had the machines

4  in stock, and they were ready to ship tomorrow.

5  That it was Jerry's words.  In fact, they wanted to

6  ship right away.

7    Q.  In February -- I'm sorry.  In April of

8  2000, were you aware that JSW had extended a $1.5

9  million line of credit to Excel Bobbins?

10    A.  My involvement with Excel Bobbins, excuse

11  me, on a line of credit which we had discussed with

12  Jerry and I think Dennis wasn't privy to this prior

13  to Dennis, was a line of credit at the time was --

14  it could have been 1 5 million but my recollection

15  was only a million, okay, at the time when I was

16  involved.

17    Now, after my termination, I learned that

18  the line of credit was extended higher for whatever

19  reason.  But I wasn't involved in any extension of

20  any of credit line  The one million was what we

21  had agreed to at the time and with me and Jerry,

22  and private meetings, and that they had two

23  machines outstanding at that time.

24    So, 800,000 more at least in that original

1  line of credit which I was involved with.

2    Q.  Okay.

3    You said you had a private meeting with

4  Jerry Johnson whereby you used the line of credit.

5  Do you remember when you had that meeting?

6    A.  Yeah.  That was long prior to this.  When

7  we started doing business with Excel Bobbins.

8    Q  Is there any way you can give me a --

9    A.  At least six months prior to any of this.

10    We were doing business with Excel in

11  Streamwood, and then, we sell one machine or two

12  machines down to Excel Bobbins down in Texas.  And

13  Steve said for him in order to acquire the

14  additional business, he asked if we'd make the

15  commitment to his company which we did at the time.

16    Q.  Let me show you what has been marked as

17  Plaintiff's Exhibit No  7, and ask if you have ever

18  seen this letter before?

19    A.  Yes.  I was involved with this letter.

20    The terms were initially started with

21  Excel by me before Jerry's employment with JSW.  I

22  had made the arrangements with JSW's management at

23  the time for that five percent down payment which

24  was standard.  At the time, it was 10 percent, but

21

22

1    we, you know, be able to provide numerous machines.

2    And at the time, he was talking

3    over-a-year-and-a-half, two-year period of 12

4    machine deal, and we didn't want to, obviously,

5    take a PO at that time for the whole amount.  What

6    we took a PO for, I believe five or six machines

7    that he placed with us.

8        And he gave a list of machines.  He sent a

9    list up here a couple times.  There was a couple of

10    changes that were made in the list because of the

11    size of the machine wasn't suitable for what he was

12    doing

13    Q    You said he mentioned there was a couple

14    of customers  Was one of the customers that he

15    mentioned Sunbeam?

16    A.   Yes.  Sunbeam was the main customer that

17    he always brought up.

18    Q    And you also said that he said that you

19    already had a line of credit with us.  Are you

20    talking about JSW?

21    A    Meaning us, I -- obviously, I'm not an

22    employee of JSW  Yes.  It was JSW that I was

23    referring to that issued a line of credit.

24    Q    So, by the time that he had that meeting

37

1    down in Brownsville, he had -- Excel Bobbins had

2    already set up a line of credit with JSW?

3    A.   Yes, he did.

4    Q.   Okay.

5        And during that telephone conversation, he

6    told you the number of machines he would need and

7    as soon as he got back, he sent you a list of the

8    size of the machines that he was going to need?

9    A.   That's correct, on a couple of occasions.

10    And he also sent them to Jerry, and Jerry was

11    present here when we were discussing machine sizes

12    in this room here.

13    Q    After that initial telephone conversation

14    with Steve Becker, what did you do?  Did you get

15    off the phone and call Jerry and say, hey, I just

16    talked to Steve, Excel Bobbins is going to be

17    needing 12 machines?

18    A.   Actually, those conversations were held at

19    JSW  Jerry was present when -- on the last go

20    around, in fact, Jerry was a little annoyed because

21    Steve changed the model on one of the machines

22    And he was ready t ship down, I believe it was

23    either a 720 or a 960 ton machine, in that range.

24    And Steve decided to go down with a smaller model,

38

1    Q.  Were you present when this letter,

2    Exhibit 7 was prepared?

3      A.  Yes.  I was with Jerry Johnson when we

4    discussed this and sending a line of credit to

5    Mr. Becker.

6      Q.  Now, when you said you were present, where

7    were you specifically?

8      A.  JSW's office here, Elk Grove, Landmeier

9    Avenue.

10     Q   Do you know how soon you were meeting with

11   Mr Johnson prior to February 29, 2000?

12     A.  No

13     Q.  Okay

14     A.  Could have been discussed 30 days in

15   advance.  Just like Steve didn't get all his

16   correspondence out on time, Jerry didn't get all

17   his out either.

18     Q.  Is it accurate that you negotiated these

19   terms, the five percent down, net 180 days with

20   Mr. Becker at Excel sometime prior to this being

21   discussed with Jerry Johnson?

22     A.  No.  I can't issue a line of credit.  I

23   only do individual orders which was the five

24   percent down, net six months, and that's subject to

83

1    approval from JSW.

2      Q.  I didn't go to the line of credit.  I just

3    talked about the five percent down.

4      A.  The initial negotiation for the first

5    machine sold to Excel which was in Schaumburg was a

6    five percent, six month credit term that we

7    negotiated -- that I was involved in the

8    negotiating with, and that line of credit

9    basically -- that that term, I should state, was

10   used for subsequent business transactions.

11     Q   Now, was the press that we earlier -- you

12   were shown a copy of, I believe it was Exhibit 16,

13   the 385 ton press, were you involved in the sale of

14   that press to Excel Plastics?  Do you see this 385

15   ton machine?

16     A   Yes.  I sold him a 385 ton E2P machine to

17   Excel Plastics.  That is correct.

18     Q   And was that per a purchase order 98-1811?

19     A   That would appear so in this writing.

20     Q   Okay

21       And Exhibit 16, to the best of your

22   knowledge, is a purchase order from Excel Plastics,

23   correct?

24     A.  Correct.

84