IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

SEP 1 9 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| EXEL BOBBINS AND PLASTIC COMPONENTS, INC., | § § § | CIVIL ACTION No. B-01-148 |
| Plaintiff, | § § | [Assigned to the Hon. Hilda G. Tagle Stipulated to Magistrate Felix Recio] |
| vs. | § § | |
| JSW PLASTICS MACHINERY, INC., | § § | |
| Defendant. | § § § § | |

**BRIEF OF DEFENDANT JSW PLASTICS MACHINERY, INC. IN SUPPORT OF FINDING IN FAVOR OF DEFENDANT FOR NON-BREACH OF CONTRACT; MEMORANDUM OF POINTS AND AUTHORITIES**

Defendant JSW Plastics Machinery, Inc. ("JSW-PMI" or "Defendant") asks the court for judgment for Defendant and requests that the court find that on the evidence before this court:

(1) Plaintiff Exel Bobbins and Plastics Components, Inc. ("Exel" or "Plaintiff") has failed to sustain its burden of proof on the issue of liability on its cause of action for breach of contract in that no breach by Defendant has been established as a matter of law; and

(2) Defendant's Affirmative Defenses as set forth below have been established as a matter of law, thereby providing a complete defense to Plaintiff's breach of contract cause of action:

(a)     First (1st) Affirmative Defense that each claim of plaintiff fails to state a claim for

1

which can be granted;

(b)    Third (3rd) Affirmative Defense of estoppel:  Plaintiff failed to provide assurance that it could pay Defendant and perform the contract;

(c)    Fourth (4th)Affirmative Defense of waiver;

(d)    Fifth (5th) Affirmative Defense of unclean hands;

(e)    Eighth (8th)Affirmative Defense of excuse;

(f)    Eleventh (11th) Affirmative Defense for failure to make timely payments on machines ordered and delivered, and thus, a failure of consideration;

(g)    Thirteen (13th) Affirmative Defense of good faith discharge of Defendant's obligations;

(h)    Fifteenth (15th) Affirmative Defense under Chapter 2 of the Texas Business and Commerce Code and more specifically, Section 2.703(1) and (6) and 2.609;

(i)    Sixteenth (16th) Affirmative Defense of privilege under Texas Business and Commercial Code Sections 2.609 and 2.703.

(j)    Seventeenth (17th) Affirmative Defense of reasonable and justifiable exercise of Defendant's right to cancel and withdraw the contract upon written notice as set forth in Exhibit 2 to Plaintiff's Second Amended Complaint. (Attached hereto as Exhibit "1.")

(k)    Eighteenth (18th)  Affirmative Defense of failure of consideration that defeats the effectiveness of the contract.  Exel failed to obtain order commitments from Sunbeam-Oster, to pay for goods ordered by Plaintiff from Defendant, and to provide reasonable assurance of Plaintiff's ability to perform the contract.

(l)    Nineteenth (19th) Affirmative Defense of unjust enrichment in that Plaintiff would

2

be unjustly enriched if allowed to enforce the contract and obtain damages for alleged breach thereof, rendering enforcement of the contract unconscionable under the facts of this case.

(m)     Twenty-First (21st) Affirmative Defense of material breach by Plaintiff of purchase agreement for the J-385 plastic injection molding machine by reason of Plaintiff's failure to make timely payments despite Defendant's requests that it do so, Plaintiff thereby having repudiated the Contract. (Trial Ex. 1, 2, and 14).[1]

(n)     Twenty-Second (22nd) Affirmative Defense of failure to perform conditions precedent to the Contract by Plaintiff having failed to do the following: (i) make timely payments for the J-385 (ii) provide Defendant with written purchase orders or contracts between Sunbeam-Oster and Plaintiff; (iii) provide UCC-1 financing statement executed by John Annoreno, owner of an undivided 50% interest in Exel Bobbins; and (iv) obtain bank financing for the purchase of equipment from Defendant.

(o)     Twenty-Third (23rd) Affirmative Defense of repudiation of the Contract by Plaintiff's failure and refusal to pay the $133,500 balance due for its purchase of the J-385. Based upon all of the foregoing, Defendant was entitled to exercise its remedies under Texas Business and Commercial Code Section 2.610, subsections 1 through 3, which included the right to (1) await Plaintiff's performance of the Contract and (2) resort to any available remedy for breach of contract, including withdrawal of the line of credit and/or refusing to ship additional machines to the

_____

[1] Unless otherwise stated, all trial exhibit references are to Defendant's Exhibit Numbers, each of which was received into evidence by the court.

3

Plaintiff.

# I.  INTRODUCTION

Exel has sued JSW-PMI for breach of contract and conversion.   The court called the case for a bench trial on the merits on September 9, 2003. The liability phase of the trial has been completed, trial on the issues of liability and damages having been bifurcated on stipulation of the parties. Defendant seeks judgment in its favor on the grounds that Plaintiff did not present legally sufficient evidence for Plaintiff to prevail on either of its two causes of action. This brief is directed solely to the breach of contract cause of action.  A separate brief will be filed concurrently regarding the conversion cause of action.

# II.  FACTUAL SUMMARY

JSW-PMI is, and at all times relevant to this action was, engaged in the business of selling plastic injection molding machines to commercial clients engaged in the plastic injection molding business.  JSW-PMI had prior to 2000 sold plastic injection molding machines to Exel Plastics, Inc., a plastic injection molding business owned by John Annoreno and located in Streamwood, Illinois. In 1999, Annoreno and Steve Becker formed Exel Bobbins and Plastic Components, Inc. located in Brownsville, Texas.  This was a start-up company to be jointly owed by Annoreno and Becker which would be run primarily by Becker. Exel sought to utilize JSW-PMI as a supplier of plastic injection molding machines for the new company.  At that time, Exel viewed its primary potential new client as Sunbeam-Oster, the manufacturer of various consumer products, and so informed employees of JSW-PMI.  In an effort to support Exel's start-up venture, JSW-PMI provided Exel with a letter addressed  "To Whom It May Concern" dated February 29, 2000 ("February 2000 Agreement") which stated that JSW-PMI would provide Exel  with any model of machines required by Exel  for future products with Sunbeam-Oster.  The letter further stated that JSW-PMI had

4

extended to Exel Bobbins a line of credit in the amount of $1.5 million for the purchase of JSW-PMI machines on the following terms: 5% down with the net balance due in 180 days at no interest. (Defendant's Trial Exhibit 1).

Thereafter, in August, October and November 2000 and January 2001, Exel Bobbins produced purchase orders to JSW-PMI for four machines (rated in tonnage at, respectively, 110-tons, 385-tons, 500-tons and 720-tons) (hereafter referred to as 'J-110," "J-385," "J-500" and "J-720" respectively) for a total purchase price of almost $740,000. [Purchase Order Nos. 98-1811, 5, 9 and 15, Trial Exhibits 2 (J-385), 4 (J-720), 5 (J-500) and 12 (J-110], respectively.) Each of these purchase orders reflected the terms set forth in the February 2000 Agreement: 5% down, net balance 180 days. However, Exel made the required 5% down payment on just one of these machines, the J-385 costing $140,000, with a down payment of $7,000. (Invoice dated September 5, 2000, Trial Exhibit 3.)

Having received the down payment, JSW-PMI delivered the 385-ton machine to Exel. The balance of $135,000 was due on April 23, 2001, calculated from the start-up date of the machine. [On March 23, 2001, Defendant agreed to a later due date when Dennis Pochatek told Mr. Amaya to set the payment due date for April 20, 2001 (Trial Exhibit 22).]

By January 2001, Exel was experiencing financial difficulties, difficulties which Exel communicated to JSW-PMI. In an effort to help Exel secure financing for its operations, JSW-PMI referred Exel to Wells Fargo Bank and on January 17, 2001, Steve Becker applied to Wells Fargo for financing for acquisition of JSW-PMI machines valued at $290,500. (Trial Exhibit 9)  Wells Fargo informed Dennis Pochatek of JSW-PMI on January 22, 2001, that the package Becker submitted to the bank (a copy of which Wells Fargo provided to Pochatek) consisted only of a cover letter and some newspaper articles, characterized Exel as a "start-up from a financial perspective"

and that Wells Fargo would become involved only if Exel Plastics in Illinois became involved. Wells Fargo wrote to Becker in January 2001, stating that the bank would require a detailed business plan, including financial information, management background, sales and market analysis and equipment acquisition justification, personal financial statements of Becker and Annoreno, and financial statements of Exel Pastics for the past two years. Wells Fargo also stated that the transaction structure with the bank would require personal guarantees of Becker and Annoreno, corporate guarantees of Exel Pastics and a down payment. (Fax dated January 22, 2001, Trial Exhibit 10). Exel Bobbins' Steve Becker testified he did not provide any of the requested documentation to the bank. He further testified that between January and April, 2001, he asked for loans ranging from $290,000 to $1,000,000, which testimony is evidence of Exel Bobbins' continuing need for operating capital.

On January 23, 2001, Exel issued to JSW-PMI its Purchase Order No. 15 for the J-110 at a purchase price of $84,835.00. (Trial Exhibit 12) The J-110 was joined with Exel's Purchase Order No. 9 for the J-500, which had been issued on November 17, 2000. Exel did not make any down payment on these machines. In view of these purchase orders and Exel's financial instability and lack of financing, JSW-PMI wrote Steve Becker on January 30, 2001 regarding the line of credit and Exel's recent orders for the shipment of machines. JSW-PMI accommodated Becker's request for an agreement regarding re-payment of the line of credit. JSW-PMI agreed to ship the J-110 and J-500, which had a combined invoice amount of $291,335.00, on different terms than JSW-PMI normally required. JSW-PMI agreed to allow Exel to acquire the J-110 and J-500 for three monthly combined down payments of $4,788.92, i.e., delivery would be made upon receipt of 1/3 of the normal down payment. Payment terms were further extended so that after receipt of the three initial monthly payments, Exel Bobbins would have no payments for six months. Thereafter Exel Bobbins

6

would be required to make eleven monthly payments of $5,000 each and in the twelfth month a balloon payment of $217,768.23. This agreement was set forth in a letter dated January 30, 2001 from JSW-PMI to Exel ("January 2001 Agreement") (Trial Exhibit 13). JSW-PMI expressly reserved the right to recover the equipment until final payment was made by Exel and JSW-PMI further reserved the right to cancel or withdraw from this agreement after giving 30-days written notice to Exel.

Steve Becker did not sign this agreement, rather, he amended the payment terms on February 26, 2001. In the interim, Exel, on February 8, 2001, issued its Purchase Order No. 20 for the J-720, with a purchase price of $312,000. (Trial Exhibit 4). A month after signing the January 30 Agreement, Becker made handwritten changes to it by which he reduced the price on the J-500 from $206,500 to $202,500, and reduced the 3 monthly down payments from $4,855.59 to $4,788.92. (Trial Exhibit 14).

Continuing to have concern about Exel's financial status, JSW-PMI wrote to Becker on



represented himself in the letter to be a purchasing manager for Sunbeam-Oster, he testified in deposition that he did not become a purchasing manager until about September 1, 2001, almost five (5) months later. Lucio was not an officer of Sunbeam-Oster. In the letter, Lucio expressly stated that it "doesn't represent a formal commitment with JSW or Exel Plastics until we sign a formal contract, but according [sic] the Sunbeam Corp. requirements, Exel comply [sic] with all our expectations in price, storage, deliveries,, q.c. systems, etc.." (Trial Exhibit 25)

In view of its concerns, JSW-PMI, on March 21, 2001, sent Becker UCC-1 Financing Statements for the J-100 and J-500. These were signed by Becker on April 2, 2001. (Trial Exhibits 24 and 23, respectively). However, efforts to have the UCC-1s signed by John Annoreno were unsuccessful. JSW-PMI wrote to Becker on March 23, 2001, indicating that they had attempted to see Annoreno to get his signature on the UCC-1 but Annoreno told them he was "tied up" (Trial Exhibit 21). JSW-PMI's Gerald Johnson went to Exel Plastic's facility to obtain Annoreno's signature but Annoreno would not see him. Johnson thereafter made several phone calls to Annoreno regarding the UCC-1's. Annoreno never signed the UCC-1 financing statements.

On March 22, 2001, JSW-PMI wrote to Exel and confirmed Exel's cancellation of three machines (a J-165, J-245 and J-310) which had been on hold for Exel. (Trial Exhibit 20) Exel made no objection to JSW-PMI's letter confirming cancellation of these machines.

Exel did not make the $133,000 payment due on the J-385 on April 23, 2001. No down payment on the J-110 and J-500 was made by Exel until April 30, 2001, when it sent JSW a check for $4,855.59. (Check No. 3021, Trial Exhibit 29.) This reflected the initial down payment as set forth in the original agreement and not as modified by Becker in March. Although Exel was now delinquent on its payment for the J-385, had no financing in place, had not fully executed the UCC-1s which had been forwarded to him over a month earlier, and had not provided JSW-PMI with a

8

firm commitment from Sunbeam-Oster, Becker phoned JSW-PMI on May 4, 2001, said he was working with a lending institution to arrange financing and requested immediate delivery of the J-110 and J-500. Becker was told such delivery could not occur due to the past due balance on the J-385 and that JSW-PMI required a payment guarantee from Exel's financing sources before delivery could take place. Becker provided no evidence of any financing from, although he claimed to be working with Heller Financial. JSW-PMI learned that Becker's representations to JSW-PMI that Heller Financial had approved a loan to Exel were in fact untrue. (Trial Exhibit 31.)

At trial, the parties testified that on May 7, 2001, a teleconference was held involving personnel from Exel Bobbins and JSW-PMI. The testimony is consistent that Becker said he wanted to go forward with delivery of the J-110 and J-500 and wanted "to make" the transaction work so he could get the machines. Johnson testified that Becker stated in the teleconference that he would have financing for the machines in two or three days and that it was Becker who suggested the May 11, 2001, date by which Plaintiff would make the balance due payment for the J-385. Johnson's testimony was not refuted by Plaintiff.

Without having made any resolution of the $133,000 past due balance on the J-385, Becker wrote to JSW-PMI on May 8, 2001, stating that Exel was "releasing" its purchase order Nos. 9 and 15 for the J-110 and J-500 under the terms of the January 30 Agreement. (Trial Exhibit 32). JSW-PMI's Johnson responded by letter to Becker dated May 10, 2001. (Trial Exhibit 33). JSW-PMI acknowledged receipt of Exel's $4,855.59 partial down payment for the J-110 and J-500, both of which were on hold pending full payment of the balance due on the J-385. As a result of Exel Bobbins' non-payment for the J-385, JSW-PMI withdrew the line of credit. JSW-PMI gave Exel until May 11, 2001 (the date proposed by Becker) to obtain financing for the J-385, but was told by JSW-PMI that should Exel fail to do so by that date that JSW-PMI reserved its right to recover the

9

J-385 and cancel all existing and remaining orders. In that event, JSW-PMI also reserved its right to apply all funds received from Exel to the recovery and remarketing of the J-385.

By late April/early May, 2001, JSW-PMI had ample grounds for insecurity regarding Exel Bobbins' ability to perform the contract:

1.  Exel Bobbins had failed to pay for the J-385 on time and owed JSW-PMI a balance of $133,000;[2]/

2.  Exel Bobbins had failed to obtain financing to pay the balance due on the J-385 despite Becker's admitted, repeated attempts to obtain such financing from several institutions;

3.  JSW-PMI learned that Sunbeam, the entity that Exel Bobbins claimed was going to provide it with substantial business which would require Exel Bobbins to acquire 12 to 17 machines from JSW-PMI, had filed for bankruptcy in or about December 2000;

4.  Despite repeated requests, including by letter dated March 19, 2001 (Trial Exhibit 17), JSW-PMI never received a firm commitment of business from Sunbeam-Oster to Exel Bobbins;

5.  Sunbeam-Oster did not issue any purchase orders to Exel Bobbins in calendar year 2000 and, according to Becker's testimony, Sunbeam-Oster did not issue any purchase orders to Exel Bobbins until late May, 2001, despite the fact that Exel Bobbins had two machines in place that could have produced products for Sunbeam-

---

[2]/ During the course of litigation, defendant's counsel and witnesses variously referred to the amount due as $133,155, or $133,000, or $131,500. Basically, we use $133,000 for reference purposes. For all intent and purpose, it is the same amount. The precise amount was resolved via settlement in the Los Angeles Superior Court action.

Oster prior to that time;

6.    John Annoreno, an owner of one-half of Exel Bobbins, failed or refused to execute a UCC-1 financing statement for two machines despite JSW-PMI's written requests that he do so. (Trial Exhibits 19 and 21.)  Annoreno also had a plastic injection molding business, Exel Plastics,  in Chicago to which the JSW-PMI machines could have been moved in the event of Exel Bobbins' default.   The UCC financing statement provides for protection for creditors against debtors.

7.    Exel Bobbins had requested that JSW-PMI restructure the down payment provisions under the original agreement by breaking the down payment into three equal, monthly installments, a request which JSW-PMI agreed to. (Agreement dated January 30, 2001; Trial Exhibit 14.)

8.    Exel Bobbins issued purchase orders for four machines with a total value in excess of $738,000 for which it would not or could not  make a down payment but which were nonetheless held in JSW-PMI's inventory.  Exel Bobbins eventually agreed to cancel three of these purchase orders. (Letter dated March 20, 2003; Trial Exhibit 20); and,

9.    Exel Plastics, of which John Annoreno was a principal, had failed to pay JSW-PMI a balance due of $90,000 on a machine.  (Letter dated April 20, 2001 from Dennis Pochatek to John Annoreno; Trial Exhibit 26.) JSW-PMI was relying on Annoreno, a half owner of Exel Bobbins, to perform under  the line of credit JSW-PMI had extended to Exel Bobbins.

10.    JSW-PMI's Rick Bell had learned that Becker's representation to JSW-PMI that he had secured financing from Heller Financial was untrue;

11

As late as May 25, 2001, Johnson e-mailed a potential equipment financier in an attempt to assist Becker's search for financing of the JSW-PMI machines, reflecting Johnson's continued efforts to work with Becker and Exel Bobbins. Becker, however, went elsewhere. In the early May teleconference, Becker stated he could go to Lucky Goldstar for machines and in late May, 2001, Exel Bobbins in fact did so, leasing three machines from Lucky Goldstar, which were financed internally by Lucky Goldstar. (Plaintiff Trial Exhibit 31.) Becker testified that these three machines replaced the JSW-PMI J-100 and J-500, the delivery of which had been suspended (but not cancelled) by JSW-PMI. Becker acknowledged that he had these three "LG" machines in use as of June/July 2001. Exel Bobbins could not have afforded to purchase the two JSW-PMI machines and lease the three Lucky Goldstar machines. By acquiring replacement machines, Exel Bobbins repudiated its agreement to purchase the J-100 and J-500 from JSW-PMI.

Exel never obtained third-party financing for the J-110 or J-500, never provided JSW-PMI with a firm commitment from Sunbeam-Oster, and never fully executed the UCC-1 financing statements. In June 2001, Exel leased three machines from Lucky Goldstar, which financed the lease internally, and these machines replaced the two machines for which delivery had been suspended by JSW-PMI.

On June 21, 2001, Becker wrote to counsel for JSW-PMI and stated he was making arrangements to pay the balance due on the J-385 by June 29, 2001, and that therefore that machine was not to be removed from Exel. (Trial Exhibit 36). JSW-PMI's counsel responded by letter to Becker dated June 28, 2001, informing Becker that the balance then due ($134,931.32 with interest) could be wired to a designated bank. (Trial Exhibit 37). By letter dated July 10, 2001, Becker informed JSW-PMI that Exel was having trouble financing the J-385 and wished to offer an additional 5% down payment plus monthly payments of $2,800 until it was able to acquire

12

financing. This was the first offer by Exel Bobbins to arrange payoff terms, Becker having previously stated that Exel Bobbins would pay the entire balance due. Exel never acquired third-party financing for the J-385. By letter agreement dated July 13, 2001, JSW-PMI and Exel agreed to payment terms for the J-385 that would extend through July 20, 2002. (Trial Exhibit 39). Exel failed to make the balloon payment which was due on August 1, 2002. On October 17, 2002, JSW-PMI sued Exel Bobbins in Los Angeles Superior Court for the balance due.

Exel sued JSW-PMI in the instant action on August 30, 2001.

### III. ARGUMENT

#### A.    Plaintiff's Claim for Breach of Contract

In order to sustain its claim for breach of contract, Plaintiff must prove, among other elements, that Defendant breached the terms of the contract. Plaintiff has not introduced legally sufficient evidence to prevail on this issue. There are no controverted issues of fact upon which reasonable persons could differ. In addition, Defendant has pled as various affirmative defenses that Plaintiff's breach of contract claim is barred and that Defendant was justified in terminating the contract under the provisions of Chapter 2 of the Texas Business and Commerce Code ("UCC") § 2.609. [First Amended Answer to Plaintiff's Second Amended Original Complaint, Fifteenth (15th) Affirmative Defense.] The defendant presented evidence which supports waiver, estoppel, failure of consideration, good faith, unclean hands, etc.

#### 1.    Plaintiff Repudiated the Contract within the Meaning of Chapter 2 of the Texas Business & Commercial Code, Thereby Relieving Defendant of its Duty to Perform and Entitling Defendant to Cancel the Contract

A party may suspend performance without being in breach where, as here, one party has reasonable grounds to believe that the other party will not perform a contract, thereby relieving the

13

former of the duty to perform. *Universal Resources Corp. v. Panhandle Eastern Pipe Line Co.*, 5th Cir. 1984 - Tex.) 813 F.2d 77, 79, reh den, en banc (CA5 Tex) 821 F.2d 1097.   Chapter 2 of the Texas Business and Commerce Code recognizes that "the parties bargain for performance, and not merely a promise plus the right to win a lawsuit.  Furthermore it recognizes that a continuing sense of reliance and security that the promised performance will be forthcoming when due is an important feature of the bargain." In this regard, a seller needs protection against, among other things, "having to deliver on credit to a shaky buyer...Once [the seller] has been given reason to believe that the buyer's performance has become uncertain, it is an undue hardship to force [the seller] to continue performance. " (65 Texas Jur 3d, Sales, §168, p. 170; Official UCC Comment 1 to §2.609)

UCC Section 2.609 provides as follows:

"(a) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired.  When reasonable grounds for insecurity arise with respect to the performance of the other party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

(b) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.

(c) Acceptance of any improper delivery or payment does not prejudice the aggrieved party's right to demand adequate assurance of future performance.

(d) After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract."

Upon repudiation of the contract, the aggrieved party may either await performance by the repudiating party for a commercially reasonable time, suspend his own performance, or resort to any remedy for breach. UCC §2.610.  Where a buyer fails to make a payment when due or repudiates a contract in whole or in part, the seller may, among other remedies, withhold delivery of such goods

or cancel the contract. UCC §2.703.

Under the UCC, JSW-PMI was relieved of its duty to perform and did not breach the contract with Exel for the following reasons: (1) JSW-PMI had reasonable grounds for insecurity with respect to Exel's performance of the contract (Refer to the 10 grounds of insecurity previously stated herein), (2) JSW-PMI demanded adequate assurance of due performance from Exel , [the 5/10/01 Johnson to Becker letter and prior communications - refer to Ex. 13: "..."special consideration" in going to extended payment terms, ex. 14: Becker's revisions of 3/2/01, Ex. 17: Concerns about 6 machines in inventory totaling over $1 Million in value per J. Johnson, Sunbeam commitment; Ex. 20 re cancellation of 3 purchase orders for machines; Ex. 21: Re UCC-1 signatures; Ex. 22: extended Exel's payment due date; Ex. 25: Lucio's non-committal letter; Ex. 26: Exel Plastics owes $90,000; Ex. 31: Bell investigation of Exel with Heller Finance; Ex. 32: Becker's letter confirming machine pickup], (3) JSW-PMI, pending receipt of such assurance, reasonably suspended its own further performance of the contract by withholding delivery of additional machines to Exel, (4) Exel failed to provide such assurance within a reasonable time, thereby repudiating the contract (by not responding to the 5/10/01 letter and prior written and verbal communications; and by leasing the 3 LG molding machines), and (5) upon such repudiation, JSW-PMI exercised its right to (a) withhold delivery of additional machines to Exel and (b) cancel the contract.

   a.   **The provisions of the UCC apply to the transactions between JSW-PMI and Exel**

Based on the evidence adduced during plaintiff's case-in-chief, it is evident that the provisions of Chapter 2 of the Business and Commerce Code apply to the transactions between JSW and Exel:

   (a)     Chapter 2 of the UCC applies to "transactions in goods";

    (b)    The plastic injection molding machines are "goods" within the meaning of the UCC ["all things (including specially manufactured goods) which are movable at the time of identification of the contract for sale other than the money in which the price is to be paid..." [UCC §2.105(a)];

    (c)    JSW and Exel are "merchants" within the meaning of the UCC ("a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction..." (UCC §2.104);

    (d)    The transactions in issue were "between merchants" ("any transaction with respect to which both parties are chargeable with the knowledge or skill of merchants") [UCC §2.104(3)]; and

    (e)    The transactions between Exel and JSW-PMI were "sales" ("the passing of title from the seller to the buyer for a price"). [UCC §2.106(1)]

### b.    The UCC is to be liberally construed and applied

In applying the provisions of the UCC to the subject transactions, the UCC should be construed liberally and a formalistic approach has therefore been rejected. *USX Corp. v. Union Pacific Resources Co.*, 753 S.W.2d 845, 853 (Tex.App.-Fort Worth 1988). Questions to be decided by the trier of fact are (a) Whether a demanding party has reasonable grounds for insecurity, (b) whether the demand is adequate to put the other party on notice of the need for adequate assurance, (c) the adequacy of the assurance, and (d) whether the failure to provide assurance justified suspension of the demanding party's performance. *Johnson v. Land O'Lakes,* 181 F.R.D. 388, 394 (USDC ND Iowa 1998) (and cases cited therein); *Ford Motor Credit Co. v. Ellison,* 974 S.W.2d 464, 467 (Ark. 1998); *AMF, Inc. v. McDonald's Corp.*, 536 F.2d 1167, 1170 (7th Cir. 1976). Each of these factors is to be evaluated according to the standard of commercial reasonableness under the

16

particular circumstances of the case. UCC §2.209(a) and (b); Official Comments 1-4 to §2.209.

### c.    JSW-PMI had reasonable grounds for insecurity regarding Exel's performance of the contract

The circumstances that may be considered in determining whether the party demanding adequate assurance of performance has reasonable grounds for insecurity include (1) the nature of the sale contract, (2) repetition by the party upon whom demand is made of conduct that caused the insecurity in other transactions, (3) insecurity existing in other contracts unrelated legally to the contract at issue; (4) expanding use of credit terms by the party upon whom demand is made, and (5) reputation and rumors concerning stability and conduct of the party upon whom demand is made. *Ford Motor Credit Co., v. Ellison, supra,* 974 S.W.2d at 467-68.

### (1)    Exel's financial condition was and remained unstable up to and beyond the time of JSW-PMI's alleged breach

The failure of a party to make timely payments as well as that party's financial difficulties or instability have consistently been found to constitute reasonable grounds for insecurity on the part of the concerned party. *Smyers v. Quartz Works Corp.*, 880 F.Supp. 1425, 1433-34 (D.Kan 1995) (the seller of machinery used to fabricate quartz crystals was held to have had reasonable grounds for insecurity where the buyer had cash flow problems which might effect its ability to pay the seller, the buyer had not complied with contractual payment obligations for other, different types of machines sold to buyer, and buyer failed to respond to seller's inquiries); *Erwin Weller Co. v. Talon, Inc.*, 295 N.W.2d 172, 299 UCC Rep Serv 1302, 1304 (South Dakota Supreme Court, 1980) (growing unpaid credit extended to buyer for delivered goods combined with failure to respond to attempts to resolve the matter held to constitute reasonable grounds for seller's insecurity with respect to future performance, justifying suspension of further deliveries); *Clem Perrin Marine*

17

*Towing, Inc. v. Panama Canal Co.*, 38 UCC Rep Serv 490, 496 (U.S. Ct. of Appeals 5th Circuit, 1984) (where lessee of tugboat with an option to buy learned from a third party that the lessor was not making mortgage payments on the vessel, the court held it was reasonable for the lessee to feel insecure about the lessor's ability to provide clear title to the boat and to demand assurance of performance); *Lubrication and Maintenance, Inc. v. Union Resources, Inc.*, 522 F.Supp. 1078, 1082 (S.D.N.Y. 1981). Even rumors of financial instability have been found to constitute reasonable grounds for insecurity on the part of the concerned party. *In re J.W. Aluminum Co.*, 30 UCC Rep Serv 2d 543, (MD Fla. 1996) (supplier of aluminum products had reasonable grounds for insecurity where buyer was indebted to seller in the amount of $3 million and seller became aware of widespread rumors of buyer's financial difficulties and was about to file for bankruptcy); *Ford Motor Credit Co. v. Ellison, supra* (rumors concerning stability are circumstances which may be considered in determining the reasonableness of the demanding party's insecurity); *Corn Products Refining Co. v. Fasola*, 94 N.J.L. 181 (1920), cited approvingly in Official UCC Comment 4 to UCC §2.609 (a buyer's failure to make a customary 10 day cash discount payment coupled with a rumor that the buyer's financial condition was shaky constituted reasonable grounds for insecurity); *Smith-Shariff Paper Co. v. P.N. Hirsch & Co. Stores, Inc.*, 754 S.W.2d 38, 41 (seller having read a newspaper articles that the buyer was going out of business gave the seller reasonable grounds for insecurity; *Turntables, Inc. v. Gestetner*, 382 N.Y.S.2d 798, 19 UCC Rep Serv 131, 132 (defendant seller's non-delivery of goods held not to be a breach of contract and buyer could not recover damages where seller was entitled to benefit of UCC §2-609 because, among other things, buyer was in arrears in payment for goods already delivered, even though the sale was on credit and even though seller's suspicion that buyer was insolvent may have been inaccurate).

Exel's continuing financial shakiness was not simply a rumor: it was experienced by JSW-

18

PMI via objective, identifiable conduct on the part of Exel which was documented and admitted by Exel, thereby forming a reasonable basis for JSW-PMI to feel insecure about Exel's ability to pay for the undelivered machines, an insecurity which continued to exist up to the time JSW-PMI cancelled Exel's line of credit and suspended the delivery of additional machines.

Exel's April 30, 2001 delayed payment (due for 3 months from 1/30/01) of a $4,855.59 deposit on the delivery of two additional machines with a combined purchase price of $287,335 was inadequate assurance of Exel's future ability to pay for the two additional machines, much less its ability to pay for $1.5 million in equipment under the line of credit. Exel's demand that in the face of such insecurity JSW-PMI nonetheless deliver additional machines was unreasonable. In *Hornell Brewing Co., Inc. v. Spry*, 664 N.Y.S.2d 698, 703 (Sup. 1997), defendant, a start-up beverage distributorship, after paying plaintiff beverage supplier a past due balance of $79,000 on previously ordered goods which thereby created a zero balance due, immediately ordered from plaintiff additional goods at a total purchase price of $390,000 to $450,000. Plaintiff-seller requested assurances from defendant of financial stability before releasing any more product but defendant failed to reply. The court held that plaintiff-seller had reasonable grounds about defendant's ability to perform in the future where the defendant was "substantially in arrears almost from the outset of their relationship with plaintiff, had no financing in place, bounced checks, and had failed to sell even a small fraction of the product defendant...originally projected." Exel was similarly in arrears during its relationship with JSW-PMI, had no financing in place and was unable to qualify for financing, failed to meet any of its sales expectations and had continually failed to provide requested assurance of performance to JSW-PMI. On these facts, JSW-PMI clearly had reasonable grounds for insecurity at the time it cancelled the line of credit and declined Exel's demand that it deliver additional machines.

19

In view of Exel's repeated failure to provide the requested assurances of performance with respect to both the J-385 and the J-110 and J-500 machines, JSW-PMI was justified in exercising its right under UCC §2-703 to cancel the line of credit.

**(2)  Exel's failed to make timely payments for the J-385 machine**

Exel's failure to make timely payments on the J-385, even though it was sold by JSW-PMI to Exel under what Exel contends was a separate contract from that which JSW-PMI is alleged to have breached, constituted reasonable grounds for JSW-PMI to feel insecure about Exel's ability to pay for the J-110 and J-500. The UCC itself recognizes that insecurity may arise under an independent contract between the parties. As stated in Official UCC Comment 3 to §2.609:

> "Under commercial standards and in accord with commercial practice, a ground for insecurity need not arise from or be directly related to the contract in question. The law as to 'dependence' or 'independence' of promises within a single contract does not control the application of the present section.
> ...
>
> Thus a buyer who falls behind in 'his account' with the seller, even though the items involved have to do with separate and legally distinct contracts, impairs the seller's expectation of performance."

This pertains precisely to one of JSW-PMI's grounds for insecurity: Exel's admitted failure to make timely payments for the J-385, a separate machine sold under a separate agreement between the parties. In *Smyers v. Quartz Works Corp., supra*, the buyer argued that although the seller may have had reasonable grounds for insecurity regarding buyer's admitted failure to pay a balance due on delivered welding machines, the goniometers (used to fabricate quartz crystals), which seller refused to ship were under a separate contract under which no grounds for insecurity had yet arisen. The Court of Appeals rejected this argument, citing to Comment 3 to UCC §2.609 and held that the seller, on these facts, reasonably feared he would not be paid and was reasonably reluctant to relinquish control over the goniometers because once shipped, his recourse in the event of

20

nonpayment would be severely limited. 880 F.Supp. at 1433, fn. 7.  And in *Toppert v. Bunge Corp.*,
24 UCC Rep Serv 618, 623, 60 Ill App3d 607, 377 N.E.2d 324, plaintiff farmer who had completed
delivery under the second of several contracts to sell corn to defendant was found by the court to
have had reasonable grounds for insecurity with respect to defendant's performance of the remaining
contracts where defendant refused to pay plaintiff for the delivered goods, the court citing to
Comment 3 to UCC Section 2-609 in holding that the plaintiff-seller was justified in refusing to
perform the additional contracts without payment by defendant-buyer under the second contract.

### d.    JSW-PMI made sufficient, reasonable demands on Exel for adequate assurance of performance

UCC §2.609(a) provides that once a party has reasonable grounds for insecurity, it may make
written demand for adequate assurance of due performance.  This provision has been construed
liberally and courts have not strictly adhered to the necessity of a formal writing in particular
language, so long as the demand for assurance is clear and unequivocal. *Arb, Inc. v. E-Systems, Inc.*,
664 F.2d 189, 196, fn. 10 (D.C. Cir 1980) (particular writing demanding assurance not required
where the pattern of interaction of the parties demonstrates both parties' clear understanding that
suspension of performance was the alternative to the other's satisfactory performance, citing *AMF,
Inc. v. McDonald's Corp., supra*, 536 F.2d at 1170-71; *Hornell Brewing Co., Inc. v. Spry, supra*, 664
N.Y.S.2d at 702; *Ward Transformer Co. v. Distrigas of Massachusetts*, 779 F.Supp. 823, 826
(E.D.N.C. 1991 (letter by insecure seller to buyer stating that delivery would not be made during a
certain week coupled with the seller's statement that it would store the equipment until then and that
buyer must pay an enclosed invoice in full within 30 days could reasonably be found to constitute
a demand for reasonable assurance).  Under certain circumstances, an oral request for assurance may
be sufficient. *Smyers v. Quartz Works Corp., supra*, 880 F.Supp. at 1433; *AMF, Inc. v. McDonald's*

*Corp., supra,* 536 F.2d at 1170-71 (evidence of a party's clear understanding that the insecure party would suspend performance pending receipt of adequate assurance obviates the necessity for a written demand); *Atwood-Kellogg, Inc. v. Nickeson Farms,* 602 N.W.2d 749, 753 (S.D. 1999) (oral demand for adequate assurance sufficient so long as the demand provides an understanding of the insecure party's intent to suspend performance until receipt of adequate assurances from the other party). A demand for payment for delivered goods in the face of non-payment may, without more, operate as a demand for adequate assurance of performance under UCC Section 2-609. *Toppert v. Bunge Corp., supra,* 24 UCC Rep Serv at 623; *Kunian v. Development Corp. of America,* 12 UCC Rep Serv 1125 (Conn. 1973).

The UCC recognizes that repeated delinquencies must be viewed as cumulative and, equally, that repeated claims for assurance render the basis for such claims increasingly obvious. Official UCC Comment 4 to §2.609. Even if a written demand is required, extrinsic evidence of the circumstances surrounding written demands for assurance as well as evidence of any negotiations subsequent to such demands is admissible. *Johnson v. Land O'Lakes, supra,* 181 F.R.D. at 395. Moreover, if a party's conduct is sufficiently egregious so as to substantially impair the value of the contract, a written demand may be dispensed with entirely. *S&S, Inc. v. Meyer,* 478 S.W.2d 857, 17 UCC Rep Serv 137, 144.

There are no "magic words" which constitute a request for assurance. *USX Corp. v. Union Pacific, supra,* 753 S.W.2d at 852 (series of letters by seller to buyer requesting that buyer honor the contract "without further delay" and provide the seller with information within four days of the letter held legally and factually sufficient to constitute demand for assurance of performance); *T&S Brass and Bronze Works v. Pic-Air,* 790 F.2d 1098, 1104-05 (4th Cir. 1986) (not clearly erroneous for magistrate to interpret a letter stating party could not make further payments "until this entire

22

matter is cleared up" as constituting demand for assurance under UCC §2.609).

Both by conduct and express written and verbal communications, JSW-PMI made it abundantly clear to Exel that JSW-PMI was aware of Exel's financial difficulties and that JSW-PMI needed assurance from Exel that Exel would be able to perform its obligation under the contract to make timely payments, both for a previously delivered machine and for those machines that Exel might order in the future under the $1.5 million line of credit. During the entire time relevant to this lawsuit, both parties knew that Exel was a start-up company. Between August 22, 2000 and January 23, 2001, Exel issued purchase orders for machines with a total purchase price of almost $740,000, yet made a down payment on only one, the J-385. JSW-PMI held the remaining machines in inventory because Exel was not forthcoming with the required down payments. Exel expressed to JSW-PMI the difficulty it was having obtaining financing for the machines and JSW-PMI responded by referring Exel to both Wells Fargo Bank and U.S. Bank in January 2001. JSW-PMI's efforts to assist Exel in obtaining financing for the acquisition of machines was clearly an attempt to obtain assurance of Exel's performance, and given both parties' awareness of Exel's financial weakness at that time, Exel ought reasonably to have understood that these referrals were requests for assurance of performance.

In late 2000, JSW-PMI learned that Sunbeam-Oster, the company that Exel viewed as its primary customer in Texas, had filed for Chapter 11 bankruptcy. Thereafter, JSW-PMI reasonably asked Exel to provide it with evidence of a firm commitment that Sunbeam-Oster would issue purchase orders to Exel for products. On March 19, 2001, JSW-PMI's Dennis Pochatek reminded Steve Becker that Sunbeam-Oster had not provided any such commitment and insisted on resolution of this issue. (Trial Exhibit 17). This, too, was an unambiguous request for assurance of performance.

On March 21, 2001, JSW-PMI sent to Steve Becker for his signature two UCC-1 financing statements which would give Exel a security interest in the J-110 and J-500, machines for which Exel had issued purchase orders but on which they had not made the required down payment. JSW-PMI also attempted to get John Annoreno's signature on the UCC-1s at or about the same time without success, an attempt of which Becker was made aware by letter to him from Dennis Pochatek dated March 23, 2001 (Trial Exhibit 21). These attempts to obtain a security interest in the machines also constituted a request for assurance of performance by Exel.

A further request for assurance of performance was made by JSW-PMI's Fumio Hirayama who, in a phone call with Steve Becker on May 4, 2001, told Becker that with respect to the J-110 and J-500, JSW-PMI required protection, including payment of the by-then overdue balance payment on the J-385. JSW-PMI also needed a payment guarantee on new equipment from a financing source such as Wells Fargo Bank, U.S. Bank or Heller Financial. (Trial Exhibit 30). And in his May 10, 2001 letter, JSW-PMI's Jerry Johnson again asked Becker to obtain financing for the overdue balance due on the J-385 before the J-110 and J-500 would be shipped. (Trial Exhibit 33).

Based on the foregoing facts, each of JSW-PMI's requests for assurance was timely, reasonable and was clearly communicated to or was otherwise made known to Exel.

e.    **Exel's failure to provide adequate assurance of performance within a reasonable time constituted a repudiation of the contract**

What constitutes adequate assurance of due performance is subject to factual conditions. (Official UCC Comment 4 to §2.609). For example, "[w]here the financial stability of a party is in question, the furnishing of a credit report by a bank might be adequate assurance." 65 Texas Jur 3d, Sales, §168, p. 171. JSW-PMI requested that Exel provide evidence of bank financing and even referred Exel to several lenders, but, Exel never provided JSW-PMI with evidence of such financing.

24

Each date by which JSW requested that Exel provide it with assurance of performance was reasonable within the meaning of §2.609(d). The "reasonable time for taking any action depends on the nature, purpose and circumstances of such action." (UCC §1.204.) What is a reasonable time is a question of fact to be resolved by the trier of fact. (§1.204(c).) In *USX, supra,* 753 S.W.2d at 852-53, the buyer's failure to provide seller with requested information within four days was found to constitute one reasonable basis for seller's suspension of its own performance.

Exel's demand that JSW-PMI ship the J-110 and J-500 immediately upon having paid 1/3 of the deposit (which was delayed for three months) evidences Exel's failure to provide adequate assurance. In *Ward Transformer Co. v. Distrigas of Massachusetts, supra,* the seller of a transformer asserted that it had reasonable grounds for insecurity of performance by the buyer of the machine. The original contract called for delivery to buyer no later than May 14, 1990. However, the buyer instead began discussing canceling the contract and, contrary to trade custom, declined requests for a delivery date. The buyer eventually indicated it would take delivery the first week in July. The seller, in view of the buyer's past actions, wrote a letter to buyer on May 4 stating they would store the transformer until the first week in July but that buyer must pay an enclosed invoice within 30 days. The seller later reduced this requirement to a 50% payment. The buyer declined to pay either the full or partial payments and on May 29 requested immediate delivery without any payment, which seller refused. On these facts, the court held that the buyer's motion for summary judgment should be denied because a reasonable trier of fact could find that the seller had reasonable grounds for insecurity of buyer's performance, that either the May 4 letter was sufficient to constitute a demand for assurance or that a written demand was not necessary, and that the buyer's offer to pay 15% of the purchase price was insufficient assurance, thereby defeating buyer's claim that seller had repudiated the contract.

25

Exel's continued promises to make payment on the J-385, to acquire outside financing, and to provide a commitment from Sunbeam-Oster, without more, did not constitute adequate assurance to JSW-PMI of Exel's ability to pay for additional machines under the contract. After having been notified on May 10, 2001, that JSW-PMI was withdrawing the line of credit due to non-payment for the J-385 and was suspending delivery of the J-110 and J-500 pending full payment for the J-385, Exel remained unable to make the delinquent payment or obtain third-party financing and did not provide JSW-PMI with a firm commitment from Sunbeam-Oster or obtain Annoreno's signed UCC-1 financing statement. As a result, the reasons for JSW-PMI's insecurity regarding Exel's ability to pay for the J-110 and J-500 were not reasonably satisfied and continued in existence. This state of affairs continued for two months until JSW-PMI entered into an agreement with Exel for extended payments for the J-385. By that time, however, Exel had leased from Lucky Goldstar, another supplier of plastic injection molding machines, three machines which were intended by Exel to replace the two machines the delivery of which remained suspended by JSW-PMI. Exel's new lease obligations to Lucky Goldstar decreased its financial ability to pay JSW-PMI for the J-110 and J-500 and did not provide JSW-PMI with any assurance of Exel's ability or intent to perform the contract. It has been held that one party's acquisition of substitute goods constitutes evidence of repudiation of a contract entitling the other party to recover for breach of contract. *Blair International, Ltd. v. LaBarge, Inc.*, 515 F.Supp. 891, 894. (E.D. Missouri, 1981) (failure to provide agreed upon letter of credit combined with false cancellation of the sales contract after having secured substitute goods held to constitute repudiation of the contract).

**f.      Exel forfeited any contractual right it may have had to order machines upon issuing a purchase order and making a deposit**

Exel contends that because the terms of the original agreement allowed it to acquire

machines up to a cumulative purchase price of $1.5 million under the letter of credit simply by issuing a purchase order and making the required 5% deposit, it had the right to continue to order machines on that basis despite it history of late or non-payment and its failure to provide reasonable assurance with respect to its overall financial stability and ability to pay for the 385 machine. This contention is without merit, as illustrated by the holding in *International Therepeutics, Inc. v. McGraw-Edison Company*, 721 F.2d 488 (N.D. Tex. - 5th Cir. 1983). In this diversity action, International Therapeutics ("Buyer") sued McGraw-Edison ("Seller") for breach of a verbal contract. Seller manufactured a medical device known as a mechanical percussor and Buyer provided a mold for the outer casing of the percussors. Between 1970 and 1975, Buyer issued forecasts regarding its needs and Seller manufactured percussors to these forecasts, Buyer issuing written purchase orders only from time to time. No advance payments or security was required by the Seller, the terms being payment in full within 30 to 90 days of delivery. By late 1975, the Buyer was seriously in arrears. Payments had not been made within the 30- to 90-day period and Buyer had in fact made no payments for over 200 days. On December 12, 1975, Seller gave Buyer notice that it would not ship pending orders until it received Buyer's financial statement. No statement was provided. On January 16, 1976, Seller advised Buyer that in view of its failure to provide the statement, all outstanding purchase orders were cancelled. As stated by the court, this "ended the contractual relation" between the Buyer and Seller. (721 F.2d at 490). In February 1976, the parties resumed their business with one another. However, Seller required that Buyer post a letter of credit and make payment in advance before it would accept and ship new orders. These terms were to continue until the delinquent balance was paid in full. In April, the Seller told Buyer it would continue to sell percussors on the condition that (a) the Buyer bought 5,000 units annually (with a quarterly guarantee of 1,250 units) at an increased unit price payable in 60 days and (b) Buyer

27

purchase insurance protection for the Seller. Buyer declined to accept these terms. The Buyer thereafter sued the Seller for breach of contact, claiming that (1) between 1970 and April. 1976, Seller was obligated by a "course of dealing" to provide it with an indefinite supply of precussors, and (2) termination of the contract without notice caused Buyer to suffer lost profits. The jury found there was a course of dealing and that Buyer had suffered $60,000 in damages.

The Court of Appeals reversed and rendered judgment in Seller's favor. While the court found there was a course of dealing under UCC §1-205(1), which formed the contract, the court held there was no such course of dealing after January 16, 1976, when Seller cancelled all outstanding purchase orders, the Buyer having forfeited that position by having failed to make timely payments and by having repudiated the contract by its failure to furnish the financial data requested by Seller. The court held that the Seller had properly cancelled the contract as an exercise of one of its available remedies under UCC §2-703 for Buyer's failure to make a payment when due or repudiation of the contract.

### g.    Exel did not retract its repudiation

The UCC recognizes that a failure to provide adequate assurance is a breach "only by repudiation," which allows the possibility of a retraction of the repudiation under that section of the UCC dealing with retraction, "unless the aggrieved party has acted on the breach in some manner." Official UCC Comment 5 to §2.609. Under §2.611(1), a party can retract his repudiation unless the other party has "materially changed his position or otherwise indicated that he considers the repudiation final." This section does not require proof that the aggrieved party have been prejudiced before retraction will be barred. *Neptune Research & Development, Inc. v. Teknics Industrial Systems, Inc.*, 10 UCC Rep Serv 2d 107, 117, 235 NJ Super 522, 563 A.2d 465 (1989). Retraction may be by "any method which clearly indicates to the aggrieved party that the repudiating party

28

intends to perform, but must include any assurance justifiably demanded under the provisions of this division." UCC §2.611(2). Exel contended that JSW-PMI's July 19, 2001 (Ex. 39) acceptance of an agreement for Exel to make extended payments for the J-385 was the same offer that JSW-PMI previously rejected. However, there was no proof submitted on this point. Yet, Exel's unsupported claims go to a possible claim of a retraction of Exel's repudiation based on its failure to provide assurance regarding payment for the J-385. Again, this is unsupported by the evidence. Moreover, the July 19, 2001 letter agreement was more than 30 days after the 5/10/01 letter. Also, the terms agreed to were first presented by Becker in his 7/10/01 letter (Ex. 38). (Certainly, not early as argued by Plaintiff's counsel.)

Despite JSW-PMI's withdrawal of the line of credit and suspension of delivery of the J-110 and J-500 on May 10, 2001, Exel failed to provide any assurance of its performance until at least July 13, 2001, when it entered into the agreement with JSW-PMI for extended payments for the J-385. Between May 10 and July 13, Exel repudiated the contract by leasing 3 LG machines of 100, 390 and 500 tons respectively for $7,680 per month. This act precluded the cash for Exel Bobbins to purchase the JSW-PMI machines 110 and 500. Moreover, the July 19, 2001 agreement did not constitute retraction of any repudiation of the contract. *In re Humboldt Fir, Inc.*, 426 F.Supp. 292, 298 (N.D. Cal. 1977) (repudiating party's request for additional extensions of time unaccompanied by assurance of performance held not to constitute a retraction of the repudiation.) By that date, however, Exel still had not provided JSW-PMI with a fully executed UCC-1 financing statement or a firm commitment from Sunbeam-Oster. Moreover, in late May/early June, Exel had leased three substitute plastic injection molding machines from Lucky Goldstar. From the perspective of JSW-PMI, this rendered delivery of the J-110 and J-500 even more problematic since Exel was now under additional financial obligations which lessened its ability to pay JSW-PMI not only for the

29

J-385 but the two additional machines as well. In addition, the leasing of substitute machines implied that Exel no longer sought delivery of the J-110 and J-500. Any retraction of repudiation which may have been evidenced by Exel's July 19 agreement (Ex. 39) to make extended payments for the J-385, was negated by Exel's late May acquisition of replacement machines, which clearly did not indicate to JSW-PMI that Exel, as the repudiating party, intended to perform with regard to the J-110 and J-500. Therefore, even if Exel's July 13 agreement to make payments for the J-385 may be considered an attempt to retract its earlier repudiation of the contract, by that date JSW-PMI's position with respect to the sale of the J-110 and J-500 had materially changed and Exel had not, as required by §2.611(2), retracted its repudiation in a manner clearly indicating that it intended to perform the contract.

A non-aggrieved party's course of conduct may be such that in and of itself it creates such a change of position in the aggrieved party as to prevent the non-aggrieved party's retraction of its repudiation. In *Neptune Research & Development, Inc. v. Teknics Industrial Systems, Inc., supra,* a seller that attempted to retract its own repudiation just one hour after the buyer refused to accept delivery was barred from doing so where the evidence demonstrated what the court characterized as the seller's previous less-than-exemplary conduct, which consisted of repeated delays in the promised delivery to buyer of a specialized machine manufactured by the seller, the delays having occurred over a three month period during which the seller gave the buyer noncommittal or evasive responses as to the reasons for delay. The court, which upheld the buyer's cancellation of the contract, held that the seller had repudiated the contract by its repeated, unexplained delivery delays and failure to provide adequate assurance of delivery and that it was barred from retracting its repudiation even though the buyer had not changed its position for the worse. 10 UCC Rep Serv 2d at 117.

30

Just as plaintiff's filing of a lawsuit has been held to be an objective expression of plaintiff's intent to treat the defendant's repudiation as a final breach of the contract between them, thereby rendering defendant's attempted post-filing retraction ineffective (*Lake Erie Distributors, Inc. v. Martlet Importing Co., Inc.*, 634 N.Y.S.2d 599, 30 UCC Rep Serv 2d 231, 232), so equally should Exel's filing of its lawsuit against JSW-PMI in October 2001 be construed as an objective expression of Exel's refusal to retract its repudiation of the contract.

### 2.    Exel is Estopped From Asserting Any Claim for Breach of Contract

Pursuant to the Third Affirmative Defense of Estoppel, Exel fails to provide any assurance that it could pay JSW-PMI the monies due under either the J-385 contract or the contract for purchase of the J-110 and J-500. As Exel was unable at any point during the April through June 2001 period to demonstrate its ability to provide financing for the J-385, Exel should not be heard now to claim that it was somehow legally excused from performing. Following the May 10, 2001 Johnson to Becker letter (Ex. 33), Becker, according to his testimony, never spoke with JSW-PMI's Pochatek or Johnson.   Estoppel may be based on silence or inaction, rather than on affirmative misrepresentations as one under duty to speak or act has by his silence or inaction mislead the opposing party to its detriment. *Smith v. National Resort Community, Inc.,* 585 S.W. 2d 655,658 (Tex) (1979); *Scott v. Vandor,* 671 S.W. 2d 79, 87 (Tex. App. —Houston [1st Dist.] 1984, writ ref'd n.r.e.).

### 3.    Exel Waived Any Claim Against JSW-PMI for its Failure to Proceed in Good Faith With the Contracts With JSW-PMI

JSW-PMI asserts that Exel's claim for breach of contract is barred by the doctrine of waiver. Essentially, Exel is barred from obtaining any relief by Exel's failure to provide assurance to JSW-PMI that Exel was capable of performing on the contracts by making timely payments when due.

Exel was not capable of procuring financing, nor capable of securing monies in which to pay JSW-PMI the $133,000 when due on April 23, 2001.   Thus, Exel waived its contractual rights and JSW-PMI was exercising its right pursuant to the Texas Business and Commerce Code to suspend performance by shipping the J-110 and J-500 and demanding Exel pay the J-385 overdue payment prior to shipment of these two machines.

**4.      Exel's Claim for Breach of Contract Fails for Lack of Consideration**.

Plaintiff asserts that Exel is barred from its claim for breach of contract for failure of consideration.   Basically, Exel's inability or refusal to pay the $133,000 on the J-385 defeats the effectiveness of the contract between the parties.  If Exel is unable to pay for the first machine when it is due, then, JSW-PMI is excused from performing on the shipment of the two additional machines that Exel seeks delivery of.   Common sense dictates that a business person will not increase the monies due by a debtor, when, the debtor has already established his inability to pay. The UCC codifies this recognition of business person's common sense.  Thus, the fact that Exel breached the contract with JSW-PMI by failure to pay for the J-385 gives rise to a failure of consideration in the contracts between the two parties.

**5.      Exel Bobbins Failed to Comply with Conditions Precedent to Performance of the Contract(s) Between Exel and JSW-PMI**

JSW-PMI required Exel to provide certain conditions in order for JSW-PMI to go forward on the shipment of the J-110 and J-500, to wit:

A.  That the J-385 be paid for;

B.  That Sunbeam provide a firm written commitment to Exel Bobbins that Sunbeam would actually use Exel Bobbins as a custom molder.

C.  That John Annoreno and Steven Becker both execute the UCC-1 financing

32

statement.

        D.   That Exel Bobbins have in place a financial arrangement with a lending institution.

        The obligation to perform a contract may be affected by a condition precedent (*See Dillon*

S.W. 2d 1, 3 (Tex. 1976) a condition precedent may affect an obligation of a contract to perform.) Conditions precedent to an obligation to perform are acts or events that are to occur after the contract is made and that must occur before there is a right to immediate performance and before there can be a breach of contractual duty.  Hohenberg, supra. at 3.The conditions precedent must be fulfilled exactly or there will be no liability on the contractual promises that the conditions qualify

letter of 5/10/01 (Ex. 33) does Johnson state that this is a letter embodying an exclusive summary of all terms. The course of dealing, usage in the trade, and course of performance clearly establishes that JSW-PMI was requesting and Exel was attempting to obtain Sunbeam's commitment. In fact, Becker testifies that he had kept JSW-PMI apprised of the progress of developing business with Sunbeam from February of 2000 through April of 2001, a period spanning almost 14 months. Thus, it is only logical that having waited this significant length of time and held several machines in inventory, that JSW-PMI was anxious to determine if Sunbeam would actually provide a formal commitment to Exel Bobbins. All these facts were well known prior to the 5/10/01 Johnson to Becker letter.

The UCC-1 financing statement had previously been requested from Becker on the J-385. As time passed and JSW-PMI became more concerned about Exel's ability to pay, JSW-PMI required both owners of Exel, Annoreno and Becker, to sign the UCC-1 financing statement. Again, this requirement was known by Exel several weeks before the issuance of the May 10, 2001 Johnson to Becker letter.

Finally, Exel had asked JSW-PMI to provide assistance on the financing with a referral of various lending institution sources. Again, this information had been known by Exel for several months prior to the May 10, 2001 letter. Therefore, whether or not these specific conditions were stated in the May 10, 2001 letter is secondary to the fact that Exel knew that JSW-PMI was requiring Exel to satisfy these conditions. Exel never satisfied these conditions.

## IV. CONCLUSION

Based on the foregoing, Exel has failed to establish as a matter of law that JSW-PMI breached the contract between Exel and JSW-PMI. In addition, on the evidence adduced, JSW-PMI has established as a matter of law its affirmative defenses of 1, 3, 4, 8, 13, 15, 16-19 and 21-23.

34

Moreover, under Chapter 2 of the Texas Business and Commerce Code JSW-PMI had reasonable grounds for insecurity regarding Exel's performance of the contract, JSW-PMI made reasonable requests to Exel for assurance of performance, and Exel failed to provide adequate assurance of performance within a commercially reasonable period of time not exceeding thirty days. Exel thereby repudiated the contract and JSW-PMI thereafter properly exercised its rights and remedies under Chapter 2 of the Texas Business and Commerce Code, including the right to suspend delivery of additional machines and cancel the line of credit.

Submitted herewith are the Defendant's proposed findings of fact and conclusions of law which support judgment in favor of Defendant JSW Plastics Machinery, Inc.

Dated: September 19, 2003.

Respectfully submitted,

By: _____
　　DAVID C. GARZA
　　SBN 07731400
　　Federal Id No. 3778
　　GARZA & GARZA, L.L.P.
　　680 East St. Charles, Suite 300
　　P.O. Box 2025
　　Brownsville, Texas 78522-2025
　　Tel: (956) 541-4914; Fax: (956) 542-7403
　　Attorney-in-Charge for JSW Plastics
　　Machinery, Inc.

　　JAMES J. REGAN
　　CAL. SBN 80576
　　REGAN • BRAUN LAW OFFICES
　　2522 Artesia Boulevard, Suite 200
　　Redondo Beach, California 90278
　　Tel: (310) 372-1988; Fax: (310) 318-5894

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing **BRIEF OF DEFENDANT JSW PLASTICS MACHINERY, INC. IN SUPPORT OF FINDING IN FAVOR OF DEFENDANT FOR NON-BREACH OF CONTRACT; MEMORANDUM OF POINTS AND AUTHORITIES** have been served on attorneys of records to the following addresses on this 19th day of September, 2003.

John R. Griffith                       *Via Certified Mail/RRR*
Viola G. Garza                        *No. 7003 0500 0003 2609 6351*
GRIFFITH, HILL, OCHOA & GARZA, LLP
One Park Place
100 Savannah Avenue, Suite 500
McAllen, Texas 78503

Moises M. Salas, Jr.                   Via Regular Mail
LAW OFFICES OF MOISES M. SALAS JR.
847 East Harrison
Brownsville, Texas 78520

DAVID C. GARZA

36