IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

SEP 1 9 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| EXEL BOBBINS AND PLASTIC COMPONENTS, INC., | § § § | CIVIL ACTION No. B-01-148 |
| Plaintiff, | § § | [Assigned to Hon. Hilda G. Table Stipulated to Magistrate Felix Recio] |
| vs. | § § § | |
| JSW PLASTICS MACHINERY, INC., | § § | |
| Defendant. | § § § | |

**(DEFENDANT'S PROPOSED)
FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF
JUDGMENT FOR DEFENDANT JSW-PMI ON PLAINTIFF'S SECOND AMENDED
ORIGINAL COMPLAINT FOR CAUSES OF ACTION FOR BREACH
OF CONTRACT AND FOR CONVERSION**

## I. FINDINGS OF FACT

1. Plaintiff Exel Bobbins & Plastic Components, Inc. ("Exel Bobbins" - "Plaintiff") is a corporation incorporated under the laws of the State of Texas in 1999 with its principal place of business in Brownsville, Cameron County, Texas and is engaged in the business of manufacturing certain plastic molded components for commercial clients by utilizing plastic injection molding machines.

2. Defendant JSW Plastics Machinery, Inc. ("JSW-PMI" -"Defendant"), is a corporation incorporated under the laws of the State of Delaware with its principal place of business in Corona, California, and is engaged in the business of selling plastic injection molding machines to commercial clients.

3. Plaintiff was a start-up company during the years 1999, 2000 and 2001.

4. Plaintiff and Defendant are 'merchants' within the meaning of Section 2.104 of the Texas

Business and Commerce Clause (hereafter "UCC").

5. Plaintiff and Defendant entered into a contract dated February 29, 2000 (the "February 2000 Agreement") by which the parties agreed as follows:

   a. Defendant would sell plaintiff plastic injection molding machines.

   b. Defendant would extend a line of credit to plaintiff in the amount of $1.5 Million on the following terms (i) five percent (5%) down payment toward each machine purchased; and (ii) the net balance due within one hundred eighty (180) days.

6. Plaintiff and Defendant entered into a contract dated February 26, 2001 which called for the purchase and sale of a J110 and J500 molding press under amended terms requested by Steve Becker ("Becker"), President of Exel Bobbins. Exel Bobbins and JSW-PMI agreed that payment for these two presses would be a five percent (5%) down payment made in three (3) equal monthly installments of $4,855.59, the first payment due prior to shipment. After payment of the last down payment installment, no payments were due for six months. Starting in the seventh month, Plaintiff was to make eleven monthly payments of $5,000 each until the twelfth month, when Plaintiff was to make a balloon payment of the balance in the sum of $221,768.23.

7. The contract involved the sale of "goods", was a "transaction in goods" and the transaction in issue was "between merchants" within the meaning of Chapter 2 of the Texas Business and Commerce Code and UCC Sections 2.104(3) and 2.105(1).

8. Plaintiff submitted purchase orders for injection molding machines to Defendant as follows:

   a. P.O. No. 98-1811 dated September 5, 2000, for JSW Model J385II (hereafter "J-385") at a purchase price of $140,000; (Defendant Trial Ex. 2 and 3).[1]

---

[1] Unless otherwise stated, all exhibits refer to defendant's trial exhibits which were received into evidence at trial.

    b.    P.O. No. 5 dated October 18, 2000 for JSW Model J720 (hereafter "J-720:) at a purchase price of $312,000 (Ex. 5). Plaintiff never paid the down payment on this machine.

    c.    P.O. No. 9 dated November 7, 2000, for JSW Model J500EII (hereafter "J-500") at a purchase price of $202,500; (Ex. 5 and 6)

    d.    P.O. No. 15 dated January 23, 2001, for JSW Model J110EII (hereafter "J-110:) at a purchase price of $84,835 (Ex. 11)

9. The Plaintiff made a down payment of $7,000 on the J-385 on or about September 5, 2000, and the balance of $133,000 was due on March 8, 2001 (Ex. 3). Later, the balance of the payment was agreed to be changed to April 23, 2001 (per Ex. 3, and 22).

10. By January 2001, Plaintiff was experiencing difficulty obtaining third party financing for its purchase of the J-385 machine from Defendant and sought Defendant's assistance in obtaining such financing.

11. In order to assist Plaintiff in obtaining such financing, Defendant referred Plaintiff to Wells Fargo Bank and U.S. Bank.

12. In January 2001, Wells Fargo Bank informed Defendant that Plaintiff's submission package was insufficient, that Plaintiff was a start-up company from a financial perspective and that a transaction with Wells Fargo would require the involvement of Exel Plastics in Illinois. Defendant learned at the same time that Wells Fargo had informed Plaintiff that Wells Fargo would require a detailed business plan, personal financial statements of the owners of Plaintiff's business, two years financial statements from Exel Plastics, the personal guarantees of Plaintiff's owners, the corporate guarantee of Exel Plastics and a down payment.

13. Between January 2001 and the end of April 2001, Defendant learned that Plaintiff had not

provided, or refused or was unable to provide, Wells Fargo with each of the requested items and understood that Plaintiff was no longer working with U.S. Bank. Defendant also confirmed that Plaintiff's representation to Defendant that Heller Financial had approved a loan to Plaintiff was not true.

14. In 2000, Plaintiff had informed Defendant that its proposed primary customer in Texas would be Sunbeam-Oster.

15. In late 2000, Defendant learned that Sunbeam-Oster had filed for Chapter 11 bankruptcy.

16. In early 2001, Defendant requested that Plaintiff provide it with a commitment from Sunbeam-Oster. By letter from Defendant to Plaintiff dated March 19, 2001, Defendant reminded Plaintiff that no firm commitment from Sunbeam-Oster had been provided and sought a resolution of this issue (refer to Ex. 17).

17. On or about April 19, 2001, Defendant was provided with a letter from Sunbeam-Oster signed by Hector Lucio ("Lucio"), who claimed to be a purchasing manager for Sunbeam-Oster. (However, deposition testimony of Lucio revealed he did not become a purchasing manager until September 1, 2001). Lucio, while stating that Sunbeam-Oster would conduct business with Plaintiff and would book machine time, expressly stated that the letter did not represent a formal commitment to Plaintiff or Defendant and was subject to a formal contract between the parties and Plaintiff's compliance with Sunbeam-Oster requirements, including those regarding price, storage, deliveries, and q.c. systems (refer to Ex. 25).

18. By letter from Defendant's Dennis Pochatek ("Pochatek") to Plaintiff's Becker dated March 23, 2001, Defendant requested that Becker and John Annoreno ("Annoreno"), both 50% owners, to execute UCC-1 financing statements for the J-110 and J-500 (refer to Ex. 21). Becker executed the UCCs on or about April 2, 2001 (Ex. 23 and 24). In the March 23 letter, Pochatek informed Becker that he had tried to see Annoreno to sign the UCC

financing statement but was told Annoreno was too busy to do so. Annoreno never signed the UCC financing statements.

19. In the contract offer of 1-30-01 (Ex. 13), Defendant requested that Plaintiff execute and return the agreement as soon as possible as Defendant was ready to deliver the machines. Defendant did not execute the agreement until February 26, 2001 (or until March 21, 2001 per Becker's handwritten notations on Ex. 14). No down payment accompanied the executed agreement.

20. By April 23, 2001, Plaintiff failed to pay the then-due balance of $133,000 on the J-385.

21. By check dated April 30, 2001, Plaintiff made the first down payment installment on the J-100 and J-500 in the amount of $4855.59 (Ex. 28). This was 3 months after JSW-PMI issued its special terms (see Ex. 13).

22. On April 30, 2001, JSW-PMI lawfully obtained possession of the $4,855.59 from Exel (Ex. 28).

23. On May 4, 2001, Becker was told by JSW-PMI's Pochatek and/or Jerry Johnson ("Johnson) that the J-110 and J-500 would not be shipped as JSW-PMI was concerned about Exel's ability to pay and that Exel had not paid the monies due on the J-385.

24. On May 4, 2000, Becker called JSW-PMI President Fumio Hirayama ("Hirayama") and asked if the J-110 and J-500 would be released. Hirayama said no as the J-385 had not been paid for. The parties agreed to a telephone conference on May 7, 2001.

25. On May 7, 2001, there was a telephone conference attended by Exel Bobbins owners, Becker and Annoreno, JSW-PMI's Los Angeles employees Hirayama and Rick Bell and JSW-PMI Chicago Tech Center employees Pochatek and Johnson. The parties discussed:
   a. JSW-PMI' concerns about Exel Bobbins' ability to pay because Exel Bobbins had failed to make the $133,000 payment on the J-385 on the amended payment date of

5

        April 23, 2001, not secured a commitment from Sunbeam and not obtained financing.

   b.   What assurance could Exel Bobbins provide to JSW-PMI that payment would be made. Becker stated he would pay off the J-385 in 2 or 3 days, asked for and received until May 11, 2001 to make payment on the J-385.

   c.   The May 11, 2001 date for Exel Bobbins to pay was selected by Becker.

   d.   At all times during the telephone conference of May 7, 2001, Exel Bobbins owners desired to go forward with the purchase of the J-110 and J-500 presses.

   e.   The testimony as to whether a demand was made for return of the $4855.59 deposit is conflicting. JSW-PMI Johnson testifies that Becker never made demand for the return of this deposit in the May 7, 2001 conversation or any other conversation Johnson and Becker had. Conversely, Becker, at best, claims he said if you do not ship the machines return my deposit.

26.   At this point the testimony of Becker is viewed with suspicion for, at least, the following evidentiary reasons:

   a.   Becker's direct testimony was inconsistent and fragmented

   b.   On cross-examination, Becker testified to attending college and obtaining 75, 40, or 50 hours of credit at Florida International, Santa Fe or Hunter (sp?) Becker never attended the University of Florida.

        Yet in deposition on 4/4/02, Becker testified, at pg. 9, line 6 through pg. 10:1 as follows:

        "**Q. (By Regan):** What is your highest level of education a college?

        A. (By Becker): College

> Q. What college?
>
> A. University of Florida
>
> Q. What year did you graduate?
>
> A. '96
>
> Q. What was your major?
>
> A. Engineering. Civil, structural engineering
>
> Q. It is – was it a double major, or was it civil?
>
> A. Civil. Civil is structural.
>
> Q. And did you accomplish this in four years or five years?
>
> A. Six years.
>
> Q. Have you taken any postgraduate courses?
>
> A. No.
>
> Q. Okay. Did you work while you were in college?
>
> A. No, I didn't.
>
> Q. Okay. Following your graduation from college, did you work?
>
> A. Self-employed."

When questioned further on the issue of graduation at trial, Becker testified that "you" would not know the difference if I (Becker)graduated.

c. Becker testifies in response to Special Interrogatories, in the <u>JSW-PMI v. Exel Bobbins,</u> Los Angeles Superior Court Litigation Case No. BC 283558 at response to Special Interrogatory No. 36. (Ex. 47)

"36. Exel objects...Exel responds as follows: the JSW 385 EIIP became inoperable on or about October 27, 2001, and remained inoperable until January 7, 2002, when the movable platen for the JSW 285 EIIP was repaired and related components were

7

replaced." (See Ex. 47).

The response was verified by Becker on April 28, 2003. Yet, on April 4, 2002, in deposition in the subject case, Becker testified at pg. 197:21 to 198:3:

"**Q. (By Regan):** Okay. Do the JSW machines that you have at your location, do they run full-time, like clockwork?

A. (By Becker): Like clockwork

Q. Okay. So they basically have about 100 percent uptime?

A. Absolutely.

Q. Okay.

A. Excellent machines."

    d.    Becker testified at trial that Sunbeam was very happy with Exel Bobbins' delivery performance and that Exel Bobbins was never late. Yet, in his 4/4/02 deposition, Becker testifies at pg. 199:1-5 as follows:

"**Q. (By Regan):** Have they complained to you about being late on your shipments?

A. (By Becker): Yes.

Q. And by "they" I mean Sunbeam Oster?

A. Yeah. Numerous times."

    e.    Becker concluded his cross-examination by testifying that when he gets tense, it effects his ability to accurately recall events that previously occurred.

27.    On May 8, 2001, Plaintiff informed Defendant that having made the $4,855.59 initial deposit, it was "releasing" purchase orders for the J-110 and J-500 and needed confirmation of their pick up (refer to Ex. 32).

28.    By letter dated May 10, 2001, Defendant informed Plaintiff that the deposit for the J-110 and J-500 had been received and would be applied to their acquisition but that delivery was

being held until full payment was received for the delinquent balance due on the J-385. Defendant also informed Plaintiff that the $1.5 Million line of credit was being withdrawn due to non-payment for the J-385. Confirming a telephone conversation of May 7, 2001, Defendant gave Plaintiff an extension to May 11, 2001 to pay the past-due balance so that Plaintiff could arrange financing. If Plaintiff were unable to obtain such financing, Defendant stated it would cancel existing and remaining orders.

29. Plaintiff did not obtain financing or make the past-due payment on the J-385 by May 11, 2001.

30. Becker testifies at trial that after receiving the May 10, 2001 letter (Ex. 33), Becker did not have further conversations with JSW-PMI Pochatek or Johnson regarding shipment of the J-110 or J-500, or the deposit of $4,855.59.

31. Defendant did not deliver the J-110 or J-500 to Plaintiff.

32. On 5/25/01, JSW-PMI's Johnson issued an email to Mr. Johnson, a financial provider, to try to assist Exel Bobbins (refer to Ex. 34).

33. On 5/31/01, Plaintiff leased three plastic injection molding machines from Lucky Goldstar, which financed the lease internally. The three machines had a capacity of 100, 390 and 500 tons (refer to Plaintiff's Trial Ex. 31).

34. By letter to Plaintiff dated June 13, 2001, Defendant demanded immediate payment of the sum of $134,931.32, which constituted the then outstanding balance and accrued interest due Defendant on the sale of the J-385 (refer to Defendant's Trial Ex. 35).

35. On June 21, 2001, Plaintiff wrote to legal counsel for Defendant stating that Plaintiff was making arrangements to pay the balance due on the J-385. Accordingly, no arrangements will be necessary to remove the J385 from Exel Bobbins facilities. (Refer to Ex. 36).

36. On July 10, 2001, Plaintiff wrote to Defendant stating that Plaintiff was having trouble

financing the J-385 (Ex. 38).

37. On July 13, 2001, Plaintiff and Defendant executed a letter agreement regarding payment terms for the J-385 with the balance to have been paid by July 20, 2002 (Ex. 39).

38. Defendant retained the deposit of $4,855.59 in a suspense account under General Ledger Account No. 2520-000 (Ex. 48).

39. Plaintiff never made a demand on Defendant for the return of the $4,855.59 deposit.

40. Defendant never refused a demand by Plaintiff for the return of the $4,855.59 deposit.

41. On August 31, 2001, Plaintiff filed its original complaint against Defendant in this action. The original complaint did not contain a cause of action for conversion. Plaintiff first alleged a cause of action for conversion against Defendant in its First Amended Original Complaint filed herein on September 11, 2002. A Second Amended Original Complaint was filed herein by Plaintiff in or about February 2003.

42. Plaintiff has not alleged in its First Amended or Second Amended Complaints that it made demand upon Defendant for the return of the $4855.59 deposit or that any such demand was excused as a matter of law.

43. The evidence does not demonstrate beyond a reasonable doubt that Defendant appropriated Plaintiff's $4,855.59 deposit with the intent to deprive Plaintiff of the ownership thereof.

## II. CONCLUSIONS OF LAW

44. Defendant did not breach the contract for the line of credit of February 29, 2000 (Ex. 1).

45. Defendant did not breach the contract for sale of the J-110 and J-500 to plaintiff (Ex. 13 and 14).

46. Exel breached its contracts with JSW-PMI when it is estopped by its own conduct, verbal statements and written documents.

47. Exel breached its contracts with JSW-PMI when it waived its rights to proceed to

perform to the contracts.

48. Exel breached its contracts with JSW-PMI when it failed to retract its repudiation of the contracts.

49. Exel breached its contracts with JSW-PMI for failure of consideration due when Exel did not pay the money due on the contract for purchase of the J-385.

50. Exel failed to perform conditions precedent to the obligations of Defendant when Exel failed to pay off the J-385, obtain a firm commitment from Sunbeam, Annoreno to sign UCC-1 for J-110 and J-500, and to obtain bank financing, thereby excusing Defendant from further performance of the contract.

51. Defendant had reasonable grounds for insecurity regarding Plaintiff's performance of the contract.

52. Defendant made reasonable requests to Plaintiff for assurance of Plaintiff's performance of the Contract.

53. Plaintiff failed to provide Defendant with adequate assurance of performance within a commercially reasonable time not exceeding thirty days.

54. Plaintiff repudiated the contract and thereby breached the contract(s) by its repudiation.

55. Plaintiff did not retract its repudiation or failed to timely retract its repudiation prior to a material change in the Defendant's position.

56. Upon Plaintiff's repudiation, Defendant was entitled to exercise, and did exercise, its remedies under Chapter 2 of the Texas Business and Commerce Code by suspending delivery of additional equipment to Plaintiff and by cancelling the line of credit.

57. JSW-PMI received the deposit of $4,855.59 in a valid and lawful manner.

58. Exel failed to plead and prove that it made a demand on JSW-PMI for return of the $4,855.59 deposit.

59. Under Texas state law, Defendant did not convert Plaintiff's $4855.59 deposit or any funds or other property belonging to Plaintiff.

60. Defendant did not violate the provisions of Texas Civil Practice and Remedies regarding the $4855.59 deposit as more fully provided in Code Section 134.001, et seq. and/or Texas Penal Code Section 31.03.

61. The deposit of $4,855.59 remains in Defendant's suspense account subject to a demand to be received from Plaintiff Exel Bobbins.

62. Defendant JSW-PMI is entitled to an award of costs in this action.

SIGNED on _____, 2003.

U.S. MAGISTRATE JUDGE
FELIX RECIO

Respectfully submitted,

By: _____
DAVID C. GARZA
Texas SBN 07731400
Federal I.D. No. #3778
GARZA & GARZA, L.L.P.
680 East St. Charles, Suite 300
P.O. Box 2025
Brownsville, Texas 78522-2025
Tel: (956) 541-4914; Fax: (956) 542-7403
Attorney-in-Charge for Japan Steel Works
America, Inc.

JAMES J. REGAN
CAL. SBN 80576
REGAN ♦ BRAUN LAW OFFICES
2522 Artesia Boulevard, Suite 200
Redondo Beach, California 90278
Tel: (310) 372-1988; Fax: (310) 318-5894

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing **(DEFENDANT'S PROPOSED) FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF JUDGMENT FOR DEFENDANT JSW-PMI ON PLAINTIFF'S SECOND AMENDED ORIGINAL COMPLAINT FOR CAUSES OF ACTION FOR BREACH OF CONTRACT AND CONVERSION** have been served on attorneys of records to the following addresses on this 19th day of September, 2003.

| | |
|---|---|
| John R. Griffith<br>Viola G. Garza<br>GRIFFITH, HILL, OCHOA & GARZA, LLP<br>One Park Place<br>100 Savannah Avenue, Suite 500<br>McAllen, Texas 78503 | *Via Certified Mail/RRR*<br>*No. 7003 0500 0003 2609 6351* |
| Moises M. Salas, Jr.<br>LAW OFFICES OF MOISES M. SALAS JR.<br>847 East Harrison<br>Brownsville, Texas 78520 | Via Regular Mail |

_____
David C. Garza